# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| ANNETTE NAVARRO MCCALL and NAVARRO PHOTOGRAPHY LLC, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| | : | No. 1:17-CV-406-DRC |
| v. | : | |
| | : | |
| | : | Judge Douglas R. Cole |
| THE PROCTER & GAMBLE COMPANY and WALMART INC. (f/k/a WAL-MART STORES, INC.), | : | |
| | : | |
| | : | Magistrate Judge Karen L. Litkovitz |
| Defendants. | : | |

## DEFENDANTS THE PROCTER & GAMBLE COMPANY AND WALMART INC.'S *DAUBERT* MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF JEFFREY SEDLIK

Karen K. Gaunt (0068418)
Robert M. Zimmerman (0079584)
Jaci L. Overmann (0089306)
Liane H. Rousseau (0093435)
DINSMORE & SHOHL LLP
255 Fifth Street, Suite 1900
Cincinnati, OH 45202
Telephone:  (513) 977-8200
Facsimile:  (513) 977-8141
karen.gaunt@dinsmore.com
robert.zimmerman@dinsmore.com
jaci.overmann@dinsmore.com
liane.rousseau@dinsmore.com

Benjamin C. Mizer (0083089)
Charlotte H. Taylor (admitted *pro hac vice*)
JONES DAY
51 Louisiana Ave. NW
Washington, D.C.  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
bmizer@jonesday.com
ctaylor@jonesday.com

*Attorneys for Defendants The Procter & Gamble Company and Walmart In*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ...................................................................1

FACTUAL BACKGROUND ...........................................................................4

I.      Between 2010-2012, Plaintiffs Invoice LPK 7 Times for a Total of $104,500 for Use of All Photographs at Issue in This Case. ...........................................4

II.     Plaintiffs' Comparable Invoicing With Other Health and Beauty Products. .....................6

III.    Mr. Sedlik's "Opinions." ...........................................................................8

      A.     Mr. Sedlik's Opinions on Actual Damages Reach $4,769,350. ...........................8

            1.    Market Rates ...........................................................................8
            2.    Navarro's Fee Schedules ...........................................................9
            3.    Model Fee Differential Analysis ...................................................9

      B.     Mr. Sedlik's Opinion on Fraud Damages. ...........................................10
      C.     Mr. Sedlik's Other 29 Sections. ...................................................10

ARGUMENT ...........................................................................................11

I.      LEGAL STANDARD. ...........................................................................11

II.     ARGUMENT. ...........................................................................12

      A.     Mr. Sedlik Is Not Qualified to Testify as an Expert on Damages Calculations. ...........................................................................12

      B.     Mr. Sedlik's Actual Damages Analysis Is Speculative and Unreliable. ...............15

            1.    *Mr. Sedlik's Market Rate and Navarro Fee Analysis Are Fatally Based on Table F, Which Is Unreliable, Speculative, and Not Sufficiently Tied to the Facts of the Case* ...................................17
            2.    *Mr. Sedlik's Market Rate and Navarro Fee Analysis' Methodologies Are Unreliable, Speculative, and Not Sufficiently Tied to the Facts of the Case* ...................................20
            3.    *Mr. Sedlik's Additional Unauthorized Usages Are Unreliable and Entirely Speculative* ...................................22
            4.    *Mr. Sedlik's Model Fee Differential Analysis Is Speculative and Unreliable* ...................................23

      C.     Mr. Sedlik's Fraud Damages Opinion is Speculative and Unreliable. ...............25
      D.     Mr. Sedlik's Damages Conclusions Fail the "Common Sense" Test, Let Alone the Daubert Standard. ...................................26
      E.     Mr. Sedlik's Improper Legal Conclusions Are Inadmissible. ...................27
      F.     The Remaining "Opinions" Held By Mr. Sedlik Are All Either Not Based in any Expertise or Irrelevant. ...................................28
      G.     Mr. Sedlik's Testimony Should Also Be Excluded Under Rule 403. ...................30

## TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION .................................................................................................................30

CERTIFICATE OF SERVICE ........................................................................................31

## TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Alvarado v. Oakland Cnty.*,
    809 F. Supp. 2d 680 (E.D. Mich. 2011) ...........................................................27

*Ancho v. Pentek Corp.*,
    57 F.3d 512 (7th Cir. 1998) ............................................................................13

*Atl. Richfield Co. v. Farm Credit Bank of Wachita*,
    226 F.3d 1138 (10th Cir. 2000) .....................................................................16

*Baker v. Urban Outfitters, Inc.*,
    254 F. Supp. 2d 346 (S.D.N.Y. 2003) ......................................................16, 26

*Bridger v. Union R. Co.*,
    355 F.2d 382 (6th Cir. 1966) .........................................................................13

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) .......................................................................................12

*Bruce v. Weekly World News, Inc.*
    310 F.3d 25 (1st Cir. 2002) .......................................................................21, 22

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) .......................................................................22

*Country Rd. Music, Inc. v. MP3.com*,
    279 F. Supp. 2d 325 (S.D.N.Y. 2003) ...........................................................25

*Crow Tribe of Indians v. Racicot*,
    87 F.3d 1039 (9th Cir. 1996) .........................................................................28

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .............................................3, 4, 12, 15, 17, 26, 30

*Davis v. Gap, Inc.*,
    246 F.3d 152, 167 (2d Cir. 2001) ..................................................................15

*Design Basics LLC v. Deshano Cos., Inc.*,
    Case No. 10-14419, 2012 WL 4340784 (E.D. Mich. Sept. 21, 2012) ..........13, 14, 28

*Design Basics LLC v. Forrester Wehrle Homes, Inc.*,
    No. 3:15CV00666, 2017 WL 5467152 (N.D. Ohio Nov. 14, 2017) ...............27

*Eiben v. Gorilla Ladder Co.*,
    No. 11-CV-10298, 2013 WL 1721677 (E.D. Mich. Apr. 22, 2013) ...............13

i

**TABLE OF AUTHORITIES**
(continued)

Page

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .......................................................................................12

*Graham v. Wyeth Lab*,
    906 F.2d 1399 (10th Cir. 1990) ...............................................................12, 13

*Johnson Elec. N. Am., Inc. v. Mabuchi N. Am. Corp.*,
    103 F. Supp. 2d 268 (S.D.N.Y. 2000) ..............................................12, 17, 26

*Johnson v. Manitowoc Boom Trucks, Inc.*,
    484 F.3d 426 (6th Cir. 2007) ......................................................................15

*JRL Enters., Inc. v. Procorp Assoc.*,
    No. 01-2893, 2003 WL 21284020 (E.D. La. June 3, 2003) ............................17

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .......................................................................................12

*Martinez v. McGraw*,
    No. 3-08-0738, 2013 WL 495502 (M.D. Tenn. Feb. 7, 2013) ..................15, 29

*McLean v. 988011 Ontario, Ltd.*,
    224 F.3d 797 (6th Cir. 2000) ......................................................................12

*Nelson v. Tenn. Gas Pipeline Co.*,
    243 F.3d 244 (6th Cir. 2001) .................................................................11, 12

*Nieves-Villanueva v. Soto-Rivera*,
    133 F.3d 92 (1st Cir. 1997) ..........................................................................27

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014) ......................................................................16

*Paulus v. Citicorp N. Am., Inc.*,
    No. 2:12-cv-856, 2014 WL 4557603 (S.D. Ohio Sep. 12, 2014) ....................11

*Pride v. BIC Corp.*,
    218 F.3d 566 (6th Cir. 2000) ......................................................................11

*Recursion Software, Inc. v. Double-Take Software, Inc.*,
    No. 4:10-CV-403, 2012 WL 1576252 (E.D. Tex. May 4, 2012) ....................16

*Rivera v. Mendez & Compañia*,
    988 F. Supp. 2d 174 (D.P.R. 2013) ...............................................................16

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Scrap Metal Antitrust Litig.*,
 527 F.3d 517 (6th Cir. 2008) ............................................................11

*Stross v. Hearst Comm'cns, Inc.*,
 No. 5-18-CV-01039-JKP-RBF (W.D. Tex. June 8, 2020) ..................20, 21, 22

*Thoroughbred Software Int'l, Inc. v. Dice Corp.*,
 488 F.3d 352 (6th Cir. 2007) ............................................................15

*Turpin v. Merrell Dow Pharms., Inc.*,
 959 F.2d 1349 (6th Cir. 1992) ...........................................................11

*United States v. Duncan*,
 42 F.3d 97 (2d Cir. 1994) ................................................................27

*United States v. Gordon*,
 493 F. App'x 617 (6th Cir. 2012) ......................................................27

*United States v. Hawkins*,
 969 F.2d 169 (6th Cir. 1992) ............................................................30

*United States v. Smithers*,
 212 F.3d 306 (6th Cir. 2000) ............................................................30


Statutes

17 U.S.C. § 504 ............................................................................15


Rules

Federal Rule of Evidence 702 ..............................................3, 4, 11, 12, 14
Federal Rule of Evidence 403 ..................................................................30

Defendants The Procter & Gamble Company ("P&G") and Walmart Inc. (collectively "Defendants") hereby move to exclude the expert testimony and report of Jeffrey Sedlik, a purported expert proffered by Plaintiffs ("Plaintiffs" or "Navarro").

## INTRODUCTION AND SUMMARY

This case is about the extent to which Annette Navarro provided P&G (through its agent Libby Perszyk Kathman ("LPK")) the rights to use a series of her photographs ("Photographs at Issue") for P&G's Olay product packaging designs.  Plaintiff designated Jeffrey Sedlik, a photographer, as a copyright liability and damages' expert in this litigation.  (*See* Sedlik Rpt., Doc. # 182-2, PageID 7897.)  Mr. Sedlik acknowledges, as he must, that Navarro authorized P&G to use the Photographs at Issue for a total of **$104,500** (*id.*, PageID 7926-28; Sedlik Dep., Doc. # 210, PageID 10249).  There can be no greater indication of the actual damages at issue in this case than that one figure.  But in order to justify this protracted intellectual property litigation and Plaintiffs' wildly exorbitant demands, Mr. Sedlik produced a report with an amount many magnitudes greater.  Thus, after applying a series of "expert" calculations, Mr. Sedlik opines that Navarro's actual damages for P&G's use of the Photographs at Issue could be as high as **$4,769,350**.  And even beyond that, he opines that her fraud damages would be **$7,388,000**.  So in a case involving usage rights with an established arms-length, market value in the very low six figures, Mr. Sedlik's "expert" opinion is that the photographer is due millions.

To support these excessive numbers, Mr. Sedlik's report[1] includes no less than 60 pages of report with 32 headers outlining his "opinions," with approximately 900 pages in exhibits.[2]  His

---

[1] Mr. Sedlik submitted his opening report on January 14, 2020.  Mr. Sedlik then submitted a "Corrected" opening report, Doc # 182-2, accompanied by a summary of changes.  (*See* Corrections Worksheet, attached as Exh. 1.) Relevant excerpts of the January 14, 2020 Report can be found at Exh. 2, attached herein.

[2] Unless otherwise noted, any citation to Mr. Sedlik's Report will be a reference to his February 5, 2020 Corrected Report at Doc. # 182-2.  The Exhibits to this Corrected Report are contained at Exh. 3, attached herein. References to

first two alternative ways to calculate actual damages—his alleged market rate analysis ("Market Rate Analysis") and Navarro's own fee schedule ("Navarro's Fee Schedule Analysis")—are speculative and unreliable. Both are based upon a "Table of Usages"[3] (collectively Exhibit F and Exhibit I to his report) that Navarro compiled and gave him in the middle of litigation, and that he "assume[s]" is accurate (even though it is not), admits is premised on a number of assumptions, and merely "spot checked" to see if it seemed reasonable. (Sedlik Dep., Doc. # 210, PageID 10241.) Mr. Sedlik then uses these speculative (at best) figures to support an opinion that, P&G, as a willing buyer, would have paid $3 to $4.7 million across 672 license negotiations to use Navarro's photographs—essentially the same uses for which P&G previously paid just over $100,000.

Mr. Sedlik's third way of calculating actual damages—based upon supplemental payments P&G made to the models involved in the Photographs at Issue ("Model Fee Differential Analysis")—is equally unreliable. This approach contradicts Mr. Sedlik's Navarro Fee Schedule Analysis methodology and differs from any commonly known method for negotiating licenses in the industry. But even if the method were reliable, it does not justify Mr. Sedlik's next step, which is an unfounded calculation of applying an average across the projects (completely negating any rationale for using this methodology to begin with) or the unjustifiable highest differential across all projects in order to achieve the unreliable opinion of **$4,040,670**.

Mr. Sedlik ignores the actual evidence of Navarro's prior licensing practices; offers error-ridden calculations; and employs unsound and speculative methodologies throughout his opinion. Although Mr. Sedlik wants the Court to trust his "35 years of experience," one cannot reasonably

---

the Exhibits to this Corrected Report are first identified by specific sections within the particular Exhibit, and then by page number within the overall collection of Exhibits.

[3] Defendants understand that Navarro's Table of Usages was split into Exhibit F and I in Mr. Sedlik's report. Doc. # 210, PageID 10241.

opine on a hypothetical negotiation by ignoring the historical precedents on both sides of it. The hundreds of pages of exhibits he attaches to his report cannot disguise the wildly speculative nature of his damages estimate.

Mr. Sedlik further opines that Navarro is entitled to **$7,388,000** in fraud damages. Setting aside that Mr. Sedlik is not a "legal" expert, and therefore has no basis to draw any of the legal conclusions riddled throughout his report, his fraud methodology is fundamentally unreliable on its face. Here, again, he starts and ends with Navarro's "accounting of the fee" she would have required for a copyright assignment—**$624,375**—and multiplies that by each of the 12 Photographs at Issue in this lawsuit (several of which his itemization of the invoices in Exhibit U indicate she charged $0 or less than $250/year of usage) to get over $7 million in damages—a preposterous number in light of the *actual* market cost of photographs used for this purpose.

These opinions defy both common sense and Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

But Mr. Sedlik's problems do not stop there. Plaintiffs would have this Court *entirely supplant* the trier of fact and the trier of law with Mr. Sedlik's other testimony related to copyright infringement, having him serve in the role of both judge and jury. Mr. Sedlik's expert testimony is teeming with legal arguments and ultimate "conclusions" on various legal questions. Similarly, Mr. Sedlik's report is rife with Plaintiffs' self-serving recitation of their version of the facts, asking the Court or even more dangerously, a jury, to adopt these as truth simply because they are provided under the guise of an expert. These statements are nothing more than thinly-veiled arguments of counsel, which Mr. Sedlik seeks to burnish with the imprimatur of "expert" testimony.

For the reasons explained in greater detail below, Mr. Sedlik's testimony should be excluded pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, as embodied in Federal Rule of Evidence 702.  Mr. Sedlik should be precluded from offering any testimony in this case.

## FACTUAL BACKGROUND

P&G manufactures a broad range of products across multiple categories, including beauty, grooming, personal care, and fabric care.  From 2010-2012, P&G worked with the design agency LPK to create the packages for various Olay beauty and skincare products, including the ProX Spinning Brush ("ProX"); Smooth Finish Facial Hair Removal—Fine to Medium Hair ("Teal Box'); Smooth Finish Facial Hair Removal—Medium to Coarse Hair ("Purple Box"); and Daily Facials.  For these four projects, LPK asked Annette Navarro to take photographs of four models.[4]

**I.  Between 2010-2012, Plaintiffs Invoice LPK 7 Times for a Total of $104,500 for Use of All Photographs at Issue in This Case.**

Over the course of the ProX, Teal Box, Purple Box, and Daily Facials projects, Navarro took the Photographs at Issue, a total of 12 photographs that ultimately appeared in finished Olay packaging designs.  In connection with these projects, Navarro sent LPK seven invoices.  (*See* Fifth Am. Compl. Exhs., Doc. # 133-1, PageID 4142, 4144, 4149, 4151, 4156, 4158; Teal Box Add'l Usage, Doc. # 183-5, PageID 8166.)  Regardless of any intellectual property rights or licenses conveyed (or not) by these invoices (*see* Def. MSJ, PageID 8336-8352; Def. Opp., Doc. # 207, PageID 9478-9501; Def. Reply, Doc. # 212, PageID 10418-10447), Mr. Sedlik opines that the invoices "clearly restated approved limited rights" and that "Navarro's invoices speak for themselves."  (Sedlik Rpt., Doc. # 182-2, PageID 7925-7926.)  Nevertheless, Mr. Sedlik also creates a "more detailed itemization" of the invoices with fees broken out by media type and/or by

---

[4] For more background on the facts of the case, *see* Def. MSJ, Doc. # 185-1, PageID 8330-8335.

year.  (*See* Exhibit U (Exh. 3 pp. 814-16).)  *Compare* Doc. # 133-1, PageID 4149 with Exh. 3, p. 815, excerpts shown *infra*.

**Navarro's Actual Teal Box Invoice:**



**Mr. Sedlik's Characterization of Navarro's Teal Box Invoice in Exhibit U:**

| Invoice Date | Invoice Number | Bates Number | Usage Media | Usage Region | Usage Period (Years) | Image Quantity | Invoice Total | Usage Fee Total | Usage Fee by Media | Usage Fee % by Media | Usage Fee Per Year | Usage Fee Per Image |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Product: Facial Hair Removal Teal 1** | | | | | | | | | | | | |
| 10/20/10 | 8345 | P&GNavarro-000086 | Packaging | North America, Puerto Rico | 3 | 1 | $35,507.55 | $24,000 | $18,000 | 75% | $6,000 | $6,000 |
| 10/20/10 | 8345 | P&GNavarro-000086 | Internet | | 3 | 1 | $35,507.55 | $24,000 | $3,600 | 15% | $1,200 | $1,200 |
| 10/20/10 | 8345 | P&GNavarro-000086 | Brochure | | 3 | 4 | $35,507.55 | $24,000 | $2,400 | 10% | $800 | $200 |
| **Total** | | | | | | | | | $24,000 | 100% | | |

Mr. Sedlik opines that, even though Navarro was licensing her photographs to be on different media like "Internet" and "brochure," *see* invoice above, when it comes to her license for "Packaging," she was licensing the use of the "Packaging" in different mediums and not licensing her photographs to be used on "Packaging."  (Sedlik Dep., Doc. # 210, PageID 10226.)  But Mr. Sedlik's position defies not only logic, but also Navarro's *own* position on licensing for packaging advertising.  (*See* Dep. Ex. 11, Doc. # 174-5, PageID 7055 ("Everyone is usually agreeable to the box appearing as an unfettered shot in advertising, but the image must be on pack."); Navarro Dep., Doc. # 174, PageID 6906-07 ("I still stand by what I wrote. Everyone is usually agreeable

to the box appearing on an unfettered shot in advertising, but image must be on pack.").) In fact, Ms. Navarro has *never* licensed use of an image on packaging and prohibited any use of an image of the packaging to advertise the product. (Navarro Dep., Doc. # 174, PageID 6907.)

In total, Navarro was paid **$104,500** for the usage for all of her work on these projects. Indeed, in the case of Daily Facials, Ms. Navarro was paid **$9,000** for three years of usage on that project. (*See* Exhibit U (Exh. 3 p. 816).) The range of "Usage Media" identified on any of the invoices of the Photographs at Issue included, among others, "Packaging," "Internet," and "Brochure." (*Id.*) With the exception of a particular invoice related to a magazine in Canada, the time period associated with the usage is always in years. (*Id.*)

## II. Plaintiffs' Comparable Invoicing With Other Health and Beauty Products.

In addition to the photoshoots for the Photographs at Issue, Navarro has an extensive history providing photographs to P&G, including over fourteen years of experience working with P&G "on Olay product packaging featuring women's beauty (and the marketing, publicity, and branding of those products) all over the world." (Doc. # 182-2, PageID 7912, 7921.) Indeed, Mr. Sedlik himself provides an exemplary group of "Navarro's Photographs Licensed to P&G" in his report and describes a number of these projects. (*Id.*, PageID 7923, 7940-7942.) Among the terms between Navarro and P&G for projects identified by Mr. Sedlik beyond the Photographs at Issue in this litigation, include:

(1) Olay Cleansing: **$10,500** for three years of "in-store promotion, FSCI[5] and internet" for the "well-known model Shakara" project. (Doc. # 182-2, PageID 7941; Depo. Ex. 154 (attached as Exh. 4).)

---

[5] FSCI stands for Free Standing Coupon Insert, which includes the BrandSavers at issue in this litigation. (Couch Dep., Doc. # 147, PageID 4761.)

(2) <u>Crest Whitestrips</u>[6]: 2006 invoice included "One Year for Unlimited Print Media Library: Advertising, FSCI, POP, DTC, Internet, Packaging, Billboard for (3) Models" for **$67,500** total. (*Id.*; NAV00005288 (attached as Exh. 5).) For a "6 months usage extension for unlimited library North America, includ[ing] all print media and internet" for this agreement, Navarro was paid **$30,000** total. (NAV00005266 (attached as Exh. 6).) For another "12 months usage extension for unlimited library North America, includ[ing] all print media and internet" beyond the initial extension, Navarro was paid **$60,000** total. (NAV000005267 (attached as Exh. 7).)

(3) <u>Scope</u>: Navarro was paid **$18,000** for "instore and internet" for one year. (Doc. # 182-2, PageID 7940; Depo Ex. 181 (attached as Exh. 8).)

In addition, Mr. Sedlik is aware that Navarro also has an extensive history providing photographs for beauty manufacturers beyond P&G, on brands such as Jergens, John Frieda, Biore, and Cover Girl. (Doc. # 182-2, PageID 7912.) Among the terms Navarro agreed upon for projects beyond P&G, include:

(1) <u>Jergens</u>: invoice for "3 years Global digital media use and internet" for **$3,000**. (NAV00003205 (attached as Exh. 9).)

(2) <u>John Frieda</u>: invoice for "3 models US in-store+online+collateral materials for 2 years" for **$22,500** total. (NAV00002816, (attached as Exh. 10), shown *infra*; *see also* NAV00002769 (attached as Exh. 11) ("5 years Global Packaging for 4 models 9 shots" for **$27,000**).)

(3) <u>Biore</u>: "3 models for 3 years Global Packaging, pop, and web" for **$24,000**. (NAV00002775 (attached as Exh. 12).)

At his deposition, Mr. Sedlik testified that he is not "aware of circumstances where Ms. Navarro has been paid a million dollars or more for a grouping of 10 licenses that she's executed with the same party." (Sedlik Dep., Doc. # 210, PageID 10249.) Indeed, Navarro has never received more than $500,000 for any photograph she has ever taken, let alone twelve of them. (Navarro Responses to Defs.' RFAs, pp. 3-5 (attached as Exh. 14).)

---

[6] It appears that Ms. Navarro characterized this relationship to Mr. Sedlik as "Crest Whitestrips (2003-2010 All Packaging Variants, <u>All Media</u>)". (Doc 182-2, PageID 7922 (emphasis added).)

### III.    Mr. Sedlik's "Opinions."

Mr. Sedlik has submitted five reports in this litigation, with hundreds of pages of exhibits in total.[7]  His Corrected Preliminary Report ("Report") is broken down into 32 headings under which he may have "thousands" of opinions (*see* generally *id.*, PageID 10206), and is accompanied by 880+ pages in his exhibits.  (*See* generally Exh. 3.)

### A.    Mr. Sedlik's Opinions on Actual Damages Reach $4,769,350.

Mr. Sedlik sets forth three alternative calculations of actual damages: "Market Rates," "Navarro's Fee Schedule," and "Model Fee Differential."  His first two methods of calculating damages, "Market Rates" and "Navarro's Fee Schedule" rely on a "Table of Usages," which represents Navarro's own accounting of the 680 unauthorized usages she has found of the Photographs at Issue to date.  Mr. Sedlik "[a]ssume[s] that the information provided . . . in the 'Table of Usages' Exhibit F is correct."  (Doc. # 182-2, PageID 7906.)

#### 1.  *Market Rates*

Under his first methodology, Mr. Sedlik computes license fees by "obtaining reference fee quotes reasonably matching the alleged unauthorized usages to the greatest extent possible."  (Doc. # 182-2, PageID 7943.)  He draws the "alleged unauthorized usages" from his Table of Usages.  (*Id.*, PageID 7942-43.)  The rates he applies are "based on some or all of these factors: the media in which each of the Photographs was reproduced, circulation, size, placement, versions, territory, and period of use."  (*Id.*, PageID 7942.)  On the basis of this calculation, Mr. Sedlik opines that

---

[7] Mr. Sedlik's five reports include:
  1. Preliminary Expert Report of Professor Jeffrey Sedlik dated January 14, 2020;
  2. Preliminary Expert Report of Prof Jeffrey Sedlik (Corrected) dated February 5, 2020;
  3. Rebuttal Expert Report of Professor Jeffrey Sedlik dated March 31, 2020;
  4. Rebuttal Expert Report of Professor Jeffrey Sedlik to Limited Expert Rebuttal Report of Doug Bania dated July 1, 2020; and
  5. Supplemental Rebuttal Expert of Professor Jeffrey Sedlik to Limited Expert Rebuttal Report of Doug Bania dated July 20, 2020.

**$3,091,434.58** is the fair market value of licenses of the Photographs at Issue for alleged unauthorized usages by P&G utilizing this market rate analysis. (*Id.*, PageID 7943.) (Not surprisingly, Mr. Sedlik offers no opinion on why this number would be so wildly higher than any figure P&G—or any other manufacturer, since Mr. Sedlik couldn't recall having worked with any—had previously ever paid pursuant to a valid, arms-length commercial negotiation. *See* Doc # 210, PageID 10189, 10249)

### 2. *Navarro's Fee Schedules*

Under Mr. Sedlik's second methodology, he relies on the Table of Usages and Navarro's own statements of what she would charge for certain media and territory for the Photographs at Issue. (*Id.*) Mr. Sedlik realized the fees she communicated to him "were not proportionally consistent with the fees [she] actually charged" so she "then reduced certain fees and percentages" and he incorporated that version of the fees into the fee schedule he used for this analysis. (*Id.*, PageID 7943-44; *see* Exhibit T (Exh. 3 pp. 811-13).) Mr. Sedlik then multiplied the fees Navarro told him she would charge (Exhibit T) times the "hypothetical licenses for the unlicensed usages" Navarro told him were unauthorized (Exhibit F) to determine that **$4,769,350** is the fair market value of P&G's unauthorized usage. (Doc. # 182-2, PageID 7944; *see* Exhibit W, detailing this accounting (Exh. 3 pp. 820-43).)

### 3. *Model Fee Differential Analysis*

Mr. Sedlik explains his third methodology as follows: because "the usage rights granted by the models to LPK for the use of their likenesses were substantially similar to the usage rights granted by Navarro for the use of her copyrights . . . when P&G's use of the Photographs exceed the scope of rights granted by Navarro to LPK, P&G's use of the models' likeness also exceed the scope of rights granted by the models, in the same measure." (Doc. # 182-2, PageID 7944.) Based

on the above logic, Mr. Sedlik asserts "[i]t follows then that consideration of the differential between the models' original fees and the supplementary fees paid retroactively by P&G to the models is justified." (*Id.*) On that basis, Mr. Sedlik then takes the average model fee differential of 755.38% and the maximum model fee differential of 3866.67% and multiplies that times Navarro's original fees to determine that the range of actual damages based on this methodology would be between **$789,372 and $4,040,670**. (*Id.*, PageID 7945.)

### B. Mr. Sedlik's Opinion on Fraud Damages.

Mr. Sedlik also offers an opinion on the damages caused by P&G's alleged fraud. For this calculation, Mr. Sedlik took explicit instruction from Plaintiffs' counsel to "determine the price at which Navarro, if informed in advance by P&G of P&G's intent to acquire the copyrights in the Photographs prior to creation, would have agreed to assign her copyrights to P&G." (*Id.*, PageID 7950.) To determine this amount, he "requested that Navarro provide an accounting of the fee that Navarro would have required for a prospective copyright assignment of each of the Photographs, if asked." (*Id.*) The amount she said was **$624,375** per photograph (*see* Exhibit AB (Exh. 3, pp. 877-79)), and because he found her methodology "sound," he applied that amount to all 12 Photographs at Issue, accounted for the $104,500 in usage fees already paid to Navarro, and determined that **$7,388,000** is the appropriate amount of fraud damages. (Doc. # 182-2, PageID 7951.)

### C. Mr. Sedlik's Other 29 Sections.

Mr. Sedlik's Report purportedly contains an additional 29 headings of additional "opinions" not yet discussed. These range from background sections on commercial photographers (Section A) to his putative opinions on the 2007 Supplier Agreement (Section P) to

P&G's Continued Willful Infringement of the Photographs (Section AA). (*See generally* Doc # 182-2.)

**ARGUMENT**

## I.     LEGAL STANDARD.

Trial judges are the gatekeepers to the admission of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "[E]xpert evidence can be both powerful and quite misleading." *Id.* at 595 (citation omitted). Thus, as the Sixth Circuit has repeatedly admonished, determining the admissibility of expert testimony requires "close judicial analysis." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) (quoting *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992)). The admissibility of expert opinion testimony is governed by the Federal Rules of Evidence. *Daubert*, 509 U.S. at 587. Rule 702 admits expert opinions from qualified witnesses who provide reliable knowledge relevant to the issues in the case that would assist the trier of fact. Fed. R. Evid. 702. In this Circuit, enforcement of this rule proceeds in three steps. *Paulus v. Citicorp N. Am., Inc.*, No. 2:12-cv-856, 2014 WL 4557603, *5 (S.D. Ohio Sep. 12, 2014).

First, the witness must be qualified according to his or her "knowledge, skill, experience, training, or education." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). Second, the expert's testimony must be relevant, in that it will help "the trier of fact to understand the evidence or to determine a fact in issue." *Id.* This prong—also known as the "fit" requirement—"has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592). "Expert testimony which

11

does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. Third, the testimony must be reliable. *In re Scrap Metal*, 527 F.3d at 529. Expert witnesses must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Importantly, "the expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nelson*, 243 F.3d at 254 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Unless all three prerequisites are met, expert testimony must be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. at 142. The proponent of opinion testimony bears the burden of establishing its admissibility by a preponderance of proof. *See, e.g.*, *Nelson*, 243 F.3d at 251. If an expert opinion is not supported by sufficient facts or is contradicted by indisputable facts in the record, the Court should exclude the opinion. *See id.*; *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Johnson Elec. N. Am., Inc. v. Mabuchi N. Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) ("[E]ven where an expert's methodology is reliable, if the analysis is not based upon relevant and reliable data, the expert's opinion will be inadmissible.").

## II.   ARGUMENT.

### A.   Mr. Sedlik Is Not Qualified to Testify as an Expert on Damages Calculations.

To testify as an expert, the witness must *be* an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This means that "the subject matter [of the expert

12

testimony] must be closely related to a particular profession, business or science . . . ." *Graham v. Wyeth Lab*, 906 F.2d 1399, 1407-08 (10th Cir. 1990) (quoting *Bridger v. Union R. Co.*, 355 F.2d 382, 387 (6th Cir. 1966)); *see also Eiben v. Gorilla Ladder Co.*, No. 11-CV-10298, 2013 WL 1721677, *12 (E.D. Mich. Apr. 22, 2013) (citing *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998) ("An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert.")).

Mr. Sedlik lacks this basic requirement of expertise in the field in which he is testifying. To be sure, he is a commercial photographer and has a B.F.A. from the Art Center College of Design in Pasadena. (Sedlik Dep., Doc. # 210, PageID 10176.) But "instead of confining his opinions" to his commercial photography knowledge, he has "wandered afield from his area of expertise" into providing an unqualified opinion on damages. *Design Basics LLC v. Deshano Cos., Inc.*, Case No. 10-14419, 2012 WL 4340784, *2 (E.D. Mich. Sept. 21, 2012). Mr. Sedlik has no professional background in statistics, mathematics, accounting, finance, forensics law or economics. (Sedlik Dep., Doc. # 210, PageID 10176, 10179.) Mr. Sedlik further has no intellectual property valuation expertise. Mr. Sedlik's experience as a professional photographer in and of itself does not give him any discernible expertise to qualify him to offer expert opinions regarding plaintiffs' damages.

Indeed, his lack of accounting expertise is blatantly demonstrated by the number of errors evidenced from even a cursory glance in his report. For example, Mr. Sedlik had to make significant corrections to his Model Fee Differential calculations weeks after submitting his first report. (*See* Corrections Worksheet, Exh. 1.) His initial report stated that the "Average Model Fee

13

Differential" was 2340%, for a total $2,445,300; and that the "Maximum Model Fee Differential to Original Navarro Fees" was 3870%, for a total of $4,044,150.  Yet, failing to perform even basic math correctly, Sedlik had to entirely recalculate his numbers:

> (1) he states in his January 14, 2020 Report that the average model feel differential was 2340%, yet his February 5, 2020 Corrected Report (based on correct math) shows it as 755%, and his only explanation was that it was "the result of incorrect formula" (*Compare* January 14, 2020 Exhibit AE (Exh. 2, p. 34) *with* February 5, 2020 Exhibit AE (Exh. 3, p. 891); Sedlik Dep., Doc. # 210, PageID 10245-46); and

> (2) his column titled "Supplementary Navarro Fees" in his January 14, 2020 Report applies the *wrong* average of 2340% model differential to the Navarro fees by project, yet his February 5, 2020 Corrected Report (performing proper math) applies the by-project model differential to the Navarro fees to accurately capture the data he thought he was representing. (*Compare* January 14, 2020 Exhibit AE (Exh. 2, p. 34) *with* February 5, 2020 Exhibit AE (Exh. 3, p. 891).

Additionally, Mr. Sedlik:

- Misused "mean" and corrected it to "median" (Corrections Worksheet, Exh. 1);

- "Fifteen usage images were omitted and five usage images were unintentionally provided that do not correspond to a usage listed in the Table of Usages" (March 31, 2020 Rebuttal, p. 48 (attached as Exh. 13)); and

- "Five territories were unintentionally omitted from Exhibit N to my Preliminary Report, and that five territories listed in the exhibit were not used in my calculations." (*Id.*, p. 49.)

Even setting aside these errors, it is unclear whether Mr. Sedlik has any expertise whatsoever on damages, as his analysis essentially starts and ends with information he received from the Plaintiff.  This pretense is exactly the type of "junk science" that Rule 702 was intended to keep out.  *See Design Basics LLC*, 2012 WL 4340784 at *2 (citation omitted).  He is an industry expert posing as a damages expert, and even though he repeatedly cites his "35 years" of experience as the basis of his opinions, he provides no evidence of any related experience and in fact has not had any experience at all with consumer packaged products in beauty.  (Sedlik Dep., Doc. # 210, PageID 10188.)

To the extent Plaintiffs intend to rely on Mr. Sedlik's previous experience to attempt to show that he is qualified to testify in this matter,[8] "[t]he Sixth Circuit Court of Appeals has long recognized that expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." *Martinez v. McGraw*, No. 3-08-0738, 2013 WL 495502, *1 (M.D. Tenn. Feb. 7, 2013) (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)). "One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purpose of testifying." *Id.* (citing *Johnson*, 484 F.3d at 434).

Because Mr. Sedlik has no discernible expertise to opine on the damages purportedly suffered by Navarro, and *Daubert* and its progeny mandate his exclusion.

### B. Mr. Sedlik's Actual Damages Analysis Is Speculative and Unreliable.

Even if Mr. Sedlik possessed adequate general qualifications to testify as an expert on copyright damages—which he does not—the specific opinions he offers in this case must be excluded because they are methodologically unsound and wholly speculative.

The Copyright Act entitles plaintiffs to recover both actual damages and any profits of the infringers that are "attributable to" the infringement. 17 U.S.C. § 504. Plaintiffs offer Mr. Sedlik's opinions to address the first of these categories. When evaluating actual damages, it is common to consider a "reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 359 (6th Cir. 2007) (quoting *Davis v. Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001));

---

[8] Mr. Sedlik has never been deemed an "expert" on fraud damages. (Sedlik Dep., Doc. # 210, PageID 10250.)

*Recursion Software, Inc. v. Double-Take Software, Inc.*, No. 4:10-CV-403, 2012 WL 1576252, *6 (E.D. Tex. May 4, 2012) ("The license fee is determined by reference to fair market value.  This is an objective analysis rather than a subjective analysis based on what the copyright owner would have charged.")

In the copyright context, courts consistently exclude expert opinions concerning a hypothetical licensing fee when they are unduly speculative and not "grounded in objective evidence of what a buyer would reasonably have been charged for the particular use at issue." *Rivera v. Mendez & Compañia*, 988 F. Supp. 2d 174, 179 (D.P.R. 2013) (citation omitted); *see Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1089 (9th Cir. 2014) (affirming judgment as a matter of law on the ground that Oracle failed to provide enough evidence to permit the jury to establish an objective, non-speculative hypothetical license price as it failed to introduce objective evidence of benchmark transactions, such as licenses previously negotiated for comparable use of the infringed work, and benchmark licenses for comparable uses of comparable works); *Atl. Richfield Co. v. Farm Credit Bank of Wachita*, 226 F.3d 1138, 1166-67 (10th Cir. 2000) (excluding expert testimony because expert failed to account for the actual amount of the royalties received by similar companies in calculating the fair market value).  This is particularly true where, as here, the actual objective market value is readily apparent based on scores of historical arms-length transactions between the parties for the precise services at issue.

In particular, courts have been cognizant of the risk of abuse inherent in awarding hypothetical licensing fees, and have cautioned against their use as "windfall[s]" for plaintiffs, emphasizing that an "indispensable component" of a hypothetical licensing fee be that it be "reasonable." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 358 (S.D.N.Y. 2003).  While Mr. Sedlik's nearly 1000 pages of materials might be mistaken for a careful analysis of this matter,

a closer review tells an entirely different story—that quantity seeks to mask the lack of quality. Mr. Sedlik's testimony cannot pass the *Daubert* standard.

> 1.   *Mr. Sedlik's Market Rate and Navarro Fee Analysis Are Fatally Based on Table F, Which Is Unreliable, Speculative, and Not Sufficiently Tied to the Facts of the Case*

As an initial matter, Mr. Sedlik's Table of Usages—which underpins two of his three "methodologies"—is not based on any expert knowledge at all, let alone a reliable methodology. Mr. Sedlik admits that Navarro manually created the Table of Usages.  (Sedlik Dep., Doc. # 210, PageID 10241.)  He also admits that whether any line item was in or out of license was also conducted by Annette Navarro.  (*Id.*)  Indeed, Mr. Sedlik admits that he entirely "relied on an assumption that the information in [the Table of Usages] were correct in order for [him] to create [the exhibits upon which his Market Analysis and Navarro Fee Analysis] and to perform our calculations."  (*Id.*, PageID 10242.)  Mr. Sedlik did not verify these uses, either by his own "experience" or by reference to common industry practice.  (*Id.*, PageID 10238-39.) Mr. Sedlik did not supervise the compilation of these uses.  (*Id.*)  Indeed, at best, Mr. Sedlik "spot checked" this table for reasonableness.  (*Id.*)  This speculative, unverifiable exercise makes Mr. Sedlik's conclusions unreliable.  *See Johnson Elec. N. Am.*, 103 F. Supp. 2d at 283-84 (excluding expert testimony because expert based his damage calculation on estimates of the number of plaintiff's products instead of reliable empirical data); *JRL Enters., Inc. v. Procorp Assoc.*, No. 01-2893, 2003 WL 21284020, *7-8 (E.D. La. June 3, 2003) (excluding testimony as nothing more than "an exercise in arithmetic on unreliable values," where expert's numbers had no basis in reality).

Even a spot check should have identified unreasonable and unsupportable conclusions in Navarro's chart of unauthorized uses.  For example, Mr. Sedlik did not try to verify the layers of Navarro's assumptions baked into an unauthorized in-store usage of 5,000 in-store displays for a 2-month period, namely the completely arbitrary 50% assumption of the 37,000 stores that

allegedly had Ms. Navarro's photograph in it.[9]  (Exhibit I, Line #U04/Img #I01, p. 1 (Exh. 3 p. 425); Sedlik Dep., Doc. # 210, PageID 10241.)  Despite not verifying the data, Mr. Sedlik uses this particular usage as the speculative basis for his Market Rate Analysis for a point of sale advertisement in North America for up to one year for $3401.50.  (Exhibit R, License #237, p.9 (Exh. 3 p.769).)

To take another example, in one line item for "Advertising" in a "magazine and newspaper" for the Facial Hair Removal Purple Box, Mr. Sedlik opines that P&G would have paid $73,769.99 for a 7-year license. (Exhibit R, License #239, p. 9 (Exh. 3 p. 769).) But this estimate is based solely on the unverified fact—assumed by Ms. Navarro—that P&G used her photograph in magazines with a circulation of 84,000,000. (Exhibit I, p. 4 (Exh. 3 p. 428) ("[t]he circulation totals for major women's magazines was 12,000,000, which over a seven year time period, resulted in an estimated quantity of 84,000,000").)  Such unverified "assumptions," over the course of hundreds of entries, quickly compound one another, making Mr. Sedlik's total estimate a number that Plaintiffs' might as well have picked—not a reliable data point that could assist a trier of fact.[10]

Even setting aside these many erroneous assumptions, Mr. Sedlik also failed to notice or address instances in which Plaintiffs' Table of Usages posits multiple different unauthorized usages for usage that would ordinarily have been covered in a single license.  For example, the

---

[9] Even if one looks at Ex. 63 P&G Answer 8 for the Period and Territory, and LPK-000097 and P&GNavarro-000058, the alleged citations in Exhibit I upon which Ms. Navarro based her assumptions, these assumptions are unreasonable. Interrogatory 8 specifically asked for "each of the Alleged Infringing Products, the date of the first and last sale or usage, each country where the Alleged Infringing Products were sold or used, and each specific usage made of the Images (e.g. whether the Images were used in packaging, brochures, inserts, in-store displays, advertisements, catalogs, the Internet, etc.)."  No aspect of this question suggests that an answer as to a usage like "in-store" means that it was used in every time period and/or every geography identified in the prior clauses.  Such a reading is unreasonable.  (*See* P&G Supplemental Answers to Interrogatories, Doc. # 63, Page ID 8236-40.)  In fact, had Mr. Sedlik tried to verify an actual unauthorized usage, he would have seen that Plaintiffs have zero actual evidence it can point to that P&G used Navarro's Photograph I01 in store out of any license period or geography.

[10] This lack of verification is consistent across the Navarro Fee Analysis as well.  (*See, e.g.*, Exhibit W (Exh. 3 pp. 820-43).)

Table of Usages lists several individual unauthorized uses of the same photo, I07, and Mr. Sedlik maintains these individual unauthorized uses and generates individual licenses with the "Retail, product and packaging; Product packaging, covers and tags; USA, Canada, Puerto Rico (North America); Up to 1 year." (Exhibit X, Licenses 101-114, pp. 7-8 (Exh. 3 pp. 851-52).) By looking at even a sampling of Navarro's explanations for these alleged unauthorized usages, however, one can see that the usages cover (a) alleged sales for various retailers (Ahold, Walmart, and Supervalu to name a few) for the same or at least overlapping time periods (*see* Exhibit I, U#393, p. 69; U#398, p. 70; U#420, p. 72 (Exh. 3 pp. 493-94, 496)); and (b) *several of the exact same explanations*: "P&G produced a Nielsen file of Units sold by some of the top retailers of the products at issue. The data provided only captures 2014 through 2017." (*See* Exhibit I, Usage # U587, U590, U593, U597, U600, pp. 104-05 (Exh. 3 pp. 528-29).) Mr. Sedlik provides no basis or reasonable explanation as to why 14 licenses would be required for the same photo, license type, and territory, within overlapping time periods. This unique licensing scheme contradicts Navarro's invoicing methodology—where she licensed packaging annually *one time* for a few thousand dollars, not by retailer for hundreds of thousands of dollars. (*See, e.g.*, Doc. # 133-1, PageID 4142, 4144, 4149, 4151, 4156, 4158.)

Similarly, Mr. Sedlik racks up hundreds of thousands of dollars in actual damages for "Commercial Blog" (*see* Ex. W, pp. 22-23 (Exh. 3 pp. 842-43)), yet that is one of *many* digital media categories that he says would fit under the term "Internet" (Sedlik Dep., Doc. # 210, PageID 10237)—for which Navarro's prior licensing transactions for the Photographs at Issue only cost a few thousand dollars for years. (*See* Ex. U (Exh. 3, pp. 814-16).)

And last, Mr. Sedlik concludes that P&G's use of Navarro's photographs on the product packaging in its Brandsaver flyers (or FSCIs) would have required hundreds upon hundreds of

unique licenses.  But this is divorced from the reality of this case.  For example, Mr. Sedlik opines that individual Licenses 310 – 546 for Daily Facials would have been required for each individual Brandsaver, several hundred of which Mr. Sedlik doesn't even have *any* evidence ever existed, (Exhibit W, pp. 10-19 (Exh. 3 pp. 830-39); Exhibit I, pp. 18-58 (Exh. 3 pp. 442-82)), nor support to show why they would be licensed individually rather than at least on an annual basis per Navarro's prior licensing history.  *See supra* pp. 6-7.

Because Mr. Sedlik's reliance on the unverifiable, speculative information provided to him by the Plaintiff through the Table of Usages, all of his opinions based on these tables should be excluded.

2.     *Mr. Sedlik's Market Rate and Navarro Fee Analysis' Methodologies Are Unreliable, Speculative, and Not Sufficiently Tied to the Facts of the Case*

In addition to being based on the faulty Table of Usages, Mr. Sedlik's Market Rate and Navarro Fee Schedule methodologies are unreliable because they are contrary to Navarro's actual licensing practices, as demonstrated by her prior transactions with P&G and other companies. Specifically, both methodologies assume that P&G would negotiate separate licenses for every coupon and social media post individually, and multiple overlapping packaging licenses.  *See supra* pp. 17-20.  In reality, however, even assuming that unauthorized usages exist (*but see* Def. MSJ, Doc. # 185-1, PageID 8336-8352; Def. Opp., Doc. # 207, PageID 9478-9501; Def. Reply, Doc. # 212, PageID 10418-10447), P&G and Navarro would have negotiated a bundled license across media and time that would cover these alleged unauthorized usages at rates comparable to the invoices outlined in pages 4-6.  That is how the parties proceeded in the past.  (*Id.*)

In his Market Rate and Navarro Fee Schedule analyses, however, Mr. Sedlik ignores all information that would lower his damages calculations, including "[this] full range of relevant prior transactions," which "provide some of the best valuation evidence." *Stross v. Hearst*

*Comm'cns, Inc.*, No. 5-18-CV-01039-JKP-RBF, *4 (W.D. Tex. June 8, 2020), Doc # 145-6.  For

example, Mr. Sedlik spent time "review[ing] examples of Navarro's photography," and compiled

numerous examples of Navarro's photography for different commercial and editorial clients (*see*

Doc. # 182-2, PageID 7913-7915)—apparently because he thought they were relevant to the facts

at issue in this case—*but he never analyzed any of the invoices* associated with this photography.

Had he done so, he would have had to account for (1) evidence that Navarro placed a value between

approximately $3-25,000 *in total* for extremely broad marketing rights in prior licensing

transactions; and (2) evidence that the parties negotiated a bundled set of rights rather than an

individual license for each Brandsaver, Internet, and retailer use.[11]  What is more, any sound

estimate of fees would have to posit that P&G was a willing buyer, and no support exists for the

notion that P&G would have paid millions of dollars for 672 licenses to use Ms. Navarro's

photographs.[12]

Instead, Mr. Sedlik chooses to just assume that for each coupon in which Navarro's

photograph on product packaging appears, and hundreds in which it does not, P&G would

separately pay the top market rate for each of these individually.  This hypothetical is unmoored

from reality.

Courts routinely hold that computations of actual damages in copyright cases must consider

the parties' prior licensing transactions.  For example, in *Bruce v. Weekly World News, Inc.*, the

plaintiff claimed that the defendant infringed his photograph by publishing it in a newspaper and

on the Internet and sought $359,000 in purported lost license fees.  310 F.3d 25, 29-30 (1st Cir.

---

[11] Mr. Sedlik admitted that his actual damages calculations includes a licensing scheme by which "single posts" on social media are licensed individually for $2500 each time, yet, when asked whether he was aware of *any* instances in which Navarro charged her clients that way, he responded, "I'm not aware of any.  I asked her for her pricing for those usages." (Sedlik. Dep., Doc. # 210, PageID 10238.)

[12] When asked whether he had seen "any examples where Ms. Navarro has executed 600 licenses or 400 licenses or 300 licenses with any of her clients," Mr. Sedlik said, "I have not . . . ." (*Id.*, PageID 10243.)

2002).  The defendant presented evidence that it did not have a practice of paying licenses fees for each individual use, however, and the First Circuit held that the plaintiff could receive only $17,000 in actual damages, *i.e.*, what he would have received from a broad up-front license.  *See Stross v. Hearst Comm'ncs*, 5-18-CV-01039-JKP-RBF, *4 (excluding expert opinion of actual damages of over $550,000 because hypothetical license fee was based on a "fair market value for 6,620 unauthorized appearances of the photographs but the use of the photos in question generated no more than $20,000 or at most $40,000 in revenue"); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (expert opinion that "did not incorporate all aspects of the economic reality of the [relevant] market" was inadmissible).

### 3. *Mr. Sedlik's Additional Unauthorized Usages Are Unreliable and Entirely Speculative*

Separately but relatedly, Mr. Sedlik also computes a "rough estimate" of additional actual damages of "approximately **$10,759,320**" ("Additional Unauthorized Usage Damages").  Doc # 182-2, PageID 7953.  The basis of this opinion is, again, Navarro's compilation of additional instances of copyright infringement.  (Doc # 182-2, PageID 7953.)  But here, Mr. Sedlik *has performed no methodology*.  (*Id.*)  He basis his opinion of a $10+ million damages award entirely on (1) "Navarro continu[ing] to discover additional usages not disclosed by P&G," and (2) "intend[ing]" to perform some kind of similar ill-founded exercise as described above at some unidentified point in time.  (*Id.*)  Instead, he just "assum[es]" that 20% of the usages identified are duplicates or invalid (without a basis), that each usage occurred on a website (without a basis) up to ¼ page (without a basis) in the U.S. target market (without a basis) for 5 years (without a basis).  This opinion is complete "junk science" and should be inadmissible for the same reasons that Mr. Sedlik's Market Rate Analysis and Navarro Fee Schedule Analysis should be excluded.  *See* pp. 15-22 *supra*.)

        4.      *Mr. Sedlik's Model Fee Differential Analysis Is Speculative and Unreliable*

Mr. Sedlik's third methodology for determining actual damages, the "Model Fee Differential," is also speculative and unreliable. He posits that "the usage rights granted by the models to LPK for the use of their likenesses were substantially similar to the usage rights granted by Navarro for the use of her copyrights" such that "[i]t follows then that consideration of the differential between the models' original fees and the supplementary fees paid retroactively by P&G to the models is justified." (Doc. # 182-2, PageID 7944; *see also* Sedlik Dep., Doc. #210, PageID 10247.) This is not a methodology that he has employed in copyright licensing. (Sedlik Dep., Doc. # 210, PageID 10248.) It is not one advocates within his role in the PLUS Coalition. (*Id.*) Nor could he identify a single other example where this has been an accepted methodology to determine actual damages. (*Id.*)

Yet, even after making these admissions, rather than following his own avowed basis supporting this methodology, Mr. Sedlik manipulates the data to inflate the amounts he calculates as actual damages. Specifically, Mr. Sedlik asserts that the models and photographs tracked the same rights, which would mean that his analysis would use any model fee differential on a project-by-project basis—that is, applying the percentage basis for the ProX model fee differential to calculate the corresponding fee to Navarro for the ProX photograph—and stopping there. Yet, Mr. Sedlik does not stop there. He actually bases his opinion on a range between the average of all four project differentials and also *the singular highest differential* applied across all four projects.

Model Fees - Model Fee Differential Applied to Navarro Fees - Actual Damages

| P&G Olay Product | Original Model Fees | Supplementary Model Fees | Model Fee Differential | Original Navarro Fees | Supplementary Navarro Fees |
|---|---|---|---|---|---|
| ProX | $ 24,000.00 | $ 340,800.00 | 1420.00% | $ 23,000.00 | $ 326,600.00 |
| Facial Hair Removal Teal | $ 54,000.00 | $ 108,000.00 | 200.00% | $ 42,500.00 | $ 85,000.00 |
| Facial Hair Removal Purple | $ 30,000.00 | $ 87,000.00 | 290.00% | $ 30,000.00 | $ 87,000.00 |
| Daily Facials | $ 9,000.00 | $ 348,000.00 | 3866.67% | $ 9,000.00 | $ 348,000.00 |
| Totals | $ 117,000.00 | $ 883,800.00 | NA | $ 104,500.00 | $ 846,600.00 |

| | | | | |
|---|---|---|---|---|
| Apply Average Model Fee Differential to Original Navarro Fees | 755.38% | $ 104,500.00 | $ 789,372.10 |
| Apply Maximum Model Fee Differential to Original Navarro Fees | 3866.67% | $ 104,500.00 | $ 4,040,670.15 |

(Exhibit AE (Exh. 3 pp. 890-91).)

Mr. Sedlik's own calculations, however, demonstrate the model fee differentials were quite different (1420% for ProX, 200% for Facial Hair Removal Teal, 290% for Facial Hair Removal Purple, and 3867% for Daily Facials). Given that the use of every photograph was different, and both the "original" and "supplementary" model fees were for different usage rights, it is not methodologically sound to apply the ratio of "original" to "supplementary" fees from one project to another. Mr. Sedlik does not even try to explain why an average would be appropriate; nor does he offer any explanation for applying the 3867% Maximum Model Fee Differential to the other three projects. (Sedlik Dep., Doc. # 210, PageID 10246.) But his reasons for choosing this methodology, and ignoring the more logical methodology he initially set forth, are obvious: the Daily Facials model differential of 3867% yields the highest damages estimates. If Mr. Sedlik had done a project-by-project analysis (as he said he would), he would have come up with far lower estimates. (*See id.* ("[W]e did not include, or I did not include the low end because Navarro's available damages should not be based on an assumption that she could only have required what the least talented negotiator was able to achieve in that circumstance.").) But the exercise of evaluating a "hypothetical license fee" requires an objective inquiry into "the fair market value, the result of negotiation between a willing buyer and a willing seller, for a license for the use the

infringer made, *not* the highest use for which plaintiff might license." *Country Rd. Music, Inc. v. MP3.com*, 279 F. Supp. 2d 325, 331 (S.D.N.Y. 2003) (citations and quotations omitted).  Because Mr. Sedlik's model fee differential opinion ultimately has no reliable methodology, it should be excluded.

### C.    Mr. Sedlik's Fraud Damages Opinion is Speculative and Unreliable.

Mr. Sedlik's estimate of the damages caused by P&G's alleged fraud is similarly flawed. Specifically, in reaching this opinion, he relies upon the Plaintiffs' own opinion of the market value of her work.  The estimate contains too much of an analytical gap for it to be admissible.

Mr. Sedlik has no experience in determining fraud damages.  (Sedlik Dep., Doc # 210, PageID 10250.)  In formulating his estimate on this point, Mr. Sedlik simply took instruction from Plaintiffs' counsel on the standard, asked Navarro what she would charge for a prospective copyright assignment, and multiplied that $624,375 times the number of Photographs at Issue in the case. (Doc. # 182-2, PageID 7950-51.) This yielded a total estimate of **$7,388,000**.  (*See id.*, PageID 7951.)  This methodology, however, is untethered from the facts as Navarro has *never* received anything approaching $624,375 for any of her photos.  (*See* Navarro Responses to Defs.' RFAs, pp. 3-5 (attached as Exh. 14).)  Mr. Sedlik assumes that the appropriate fees used to calculate the fraud damages were the ones developed specifically by Navarro for use in this litigation (Exhibit AB (Exh. 3 pp. 877-79)) as opposed to the fees agreed upon through any arm's-length negotiations described in pages 4-7.  Not surprisingly, the fees prepared by Navarro are significantly higher that the fees she actually charged during her regular course of business. Moreover, Navarro's photographs are not always priced, used, or valued equally, so a straight multiplier across all of the Photographs at Issue is not supported by the facts of the case.  In fact, Mr. Sedlik itemizes eight of Navarro's 12 Photographs at Issue at $250 or less per year.  (*See*

Exhibit U (Exh. 3, p. 815).)  For these reasons, Mr. Sedlik's testimony on fraud damages should be inadmissible.

### D.    Mr. Sedlik's Damages Conclusions Fail the "Common Sense" Test, Let Alone the *Daubert* Standard.

Taking a step back, all of Mr. Sedlik's damages opinions should be excluded for the additional reason that they defy common sense.  "In assessing the reliability of an expert opinion, a resort to common sense is not inappropriate." *Johnson Elec. N. Am. Inc.*, 103 F. Supp. 2d at 286 (despite its "dazzling sheen of erudition," expert's report reached "a result which any average person could readily recognize as preposterous").  Courts routinely reject copyright holders' claims for actual damages that are excessive on their face.  *See, e.g.*, *Baker*, 431 F. Supp. 2d at 365 (ordering the plaintiff to pay $424,185.04 in fees and sanctions because he pursued a meritless claim for $260,000 in actual damages, when only $3,896 was ultimately awarded).

There can be no clearer example of an excessive damages claim than this case.  Navarro is a commercial photographer with whom P&G had maintained a long-term relationship.  That relationship was littered with examples of actual amounts paid for Navarro's photographs used in advertising.  Those examples provide all the clarity this Court requires regarding the real damages at issue in this case.  They support what common sense (and Mr. Hazel's expert report) would suggest—*i.e.*, a claim for millions of dollars of damages is wholly unsupported by any reasonable view of the facts.  (*See* Hazel Rpt., Doc. #145-2, PageID 4535.)  Navarro herself offered a retroactive license of $14,000 for the alleged unauthorized usages.  (*See* Retroactive License, Doc. # 133-1, PageID 4146.)  In fact, P&G paid $2,000 (for all worldwide web and print of the model on the pack) to replace Navarro's photograph on the Daily Facials packaging.  (Gruen Dep., Doc # 148, PageID 4891-4892; Dep. Ex. 128, attached as Exh. 15.) Seeking to inflate Plaintiffs' damages claims, however, Mr. Sedlik constructs a damages model that lacks a connection to

reality. Accordingly, Mr. Sedlik's conclusions fail the "common sense" test and should be excluded.

### E. Mr. Sedlik's Improper Legal Conclusions Are Inadmissible.

A court's "gatekeeping" duty includes "maintaining 'vigilant' guard against expert testimony that 'embrace[s] . . . actual legal conclusion[s].'" *Design Basics LLC v. Forrester Wehrle Homes, Inc.*, No. 3:15CV00666, 2017 WL 5467152,*8 (N.D. Ohio Nov. 14, 2017) (citing *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 691-92 (E.D. Mich. 2011). Expert opinions on the law and more dangerously conclusions of law are consistently excluded because "the trial judge does not need the judgment of witnesses' to determine what the law is." *Id.* (citing *United States v. Gordon*, 493 F. App'x 617, 626 (6th Cir. 2012)); *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) ("[I]t is for the judge, not the lawyers or the witnesses, to inform the jury of the law applicable in the case and to decide any purely legal issue."); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994 (expert testimony that "undertakes to tell the jury what result to reach . . . does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's").

Mr. Sedlik's report repeatedly violates this fundamental rule. He should not be permitted to testify as to his opinion on the ultimate issue of fact, to provide legal opinions, or to dictate the conclusion of this case. *Forrester Wehrle Homes*, 2017 WL 5467152 at *4 (holding that an expert an architect cannot opine on these issues). To do so would essentially allow Mr. Sedlik to resolve the case on his own. For example, he renders multiple opinions on threshold legal issues that are clearly meant to be decided by a judge as a matter of law or a jury, including:

> (1) Assignment: Mr. Sedlik boldly opines that "the 2007 Supplier Agreement has no bearing on the copyright ownership in any photographs created by Navarro for use by P&G." (Doc. # 182-2, Page ID 7839.)

27

(2) Infringement: "P&G and its customers made significant, unlicensed, and unauthorized use of the Photographs.... A listing of currently known instances of P&G usages of the Photographs is attached as Exhibit F." (*Id.*, PageID 7934.)

Mr. Sedlik is not an attorney and has no legal training. (Sedlik Dep., Doc # 210, PageID 10179.) But even if he were qualified as an expert in the law (which he is not), it still would be inappropriate for him to have an opinion in any of the following areas (in addition to Assignment and Infringement):

- Section V that "P&G should be liable for damages for contributory infringement" (*id.*, PageID 7946);

- Section W that "P&G evinced willful blindness and/or acted with reckless disregard for Navarro's copyrights, knowingly and willfully infringing on Navarro's copyrights (*id.*);

- Section Y that "P&G Demonstrated Reckless Disregard for Navarro's Copyrights" (*id.*, PageID 7947);

- Section Z on "P&G's Continued Willful Infringement of the Photographs (*id.*, PageID 7948); and

- Section AA that "Navarro was the sole copyright owner in the Photographs . . . ." (*id.*).

*See Design Basics LLC*, 2012 WL 4340784 at *2-5 (excluding an architect's "opinion" on copyright law); *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) (finding that expert testimony regarding contract interpretation was an impermissible conclusion of law). Accordingly, the Court should bar Mr. Sedlik from offering any testimony regarding defendant's alleged liability for copyright infringement and any other legal conclusions.

### F. The Remaining "Opinions" Held By Mr. Sedlik Are All Either Not Based in any Expertise or Irrelevant.

The remaining portions of Mr. Sedlik's testimony are also inadmissible. An expert must be "more competent to draw the inference than the lay jurors and judge." John W. Strong, McCormick on Evidence, § 13 (5th ed. and Supp. 2003). Yet in entire sections of his report, Mr. Sedlik is simply the mouthpiece for the Plaintiff. Indeed, in multiple sections, Mr. Sedlik provides

no independent support for his statements other than "Navarro interviews." (*See* Doc. # 182-2, PageID 7912 (Navarro's photography history); *id.*, PageID 7917 (Navarro's original expression in the photographs, including that "P&G provided minimal creative input to Navarro"); *id.*, PageID 7921 (Section F on Navarro, LPK, and P&G); *id.*, PageID 7929 (Section I on Navarro's reliance on P&G's representations).) In these sections, Mr. Sedlik simply recites facts he received from Plaintiff and buries conclusory statements, such as "P&G knew that they could depend on Navarro to consistently produce photographs of the highest quality," with no support. His report does not explain why his expertise would help a trier of fact in understanding what did or did not happen as a factual matter. (*See id.*, PageID 7921-23.) An extensive factual record exists in this case, and the fact witnesses and documents in the record are the appropriate means by which this evidence should come in, rather than allowing Plaintiffs to add undue weight to the evidence by presenting it through an expert witness.

*Martinez* is instructive. 2013 WL 495502. There, the court excluded an expert's testimony that defendants had access to plaintiff's copyrighted composition as the expert did not have any personal knowledge on this point and his "opinion" would be speculative at best, but more importantly, it is a "factual issue and not a proper subject of expert testimony." *Id.* at *2. The court noted that the plaintiff "has not shown that [the expert] is any more capable of listening to the evidence, determining the credibility of the fact witnesses, and making the decision as to whether" defendants did X or Y factually "than the factfinder is. The factfinder is capable of understanding and deciding these facts without the help of an expert." *Id.* Moreover, the witnesses themselves can also speak to what happened in this actual case such that Mr. Sedlik's general background on licensing is irrelevant. All remaining portions of Mr. Sedlik's testimony invade the jury's factfinding mission and should be excluded.

**G.      Mr. Sedlik's Testimony Should Also Be Excluded Under Rule 403.**

The methodological and analytical gaps between reality and Mr. Sedlik's actual damages' conclusions, as well as his invasion into the role of the judge and the jury, are sufficient to require the exclusion of his report and testimony under Federal Rule of Evidence 403 as well.  Rule 403 permits a court to exclude relevant evidence when its probative value is substantially outweighed by a danger of confusing the issues or misleading the jury, among other things.  "A district court has 'very broad' discretion in making this determination." *United States v. Smithers*, 212 F.3d 306, 322 (6th Cir. 2000) (quoting *United States v. Hawkins*, 969 F.2d 169, 174 (6th Cir. 1992)).  Even if any particular gap in Mr. Sedlik's actual damages' analysis considered alone might be thought as going to weight rather than admissibility, any probative value is minimal and substantially outweighed by the risk of unfairly prejudicing Defendants and confusing and misleading the jury.

## CONCLUSION

Mr. Sedlik's calculation of actual damages for the alleged infringement of twelve commercial photographs is analytically unsound, unreliable, contrary to the evidentiary record, based upon speculation, and fails the "common sense" test.  Further, Mr. Sedlik is not qualified as a damages expert, and his opinions on copyright infringement are improper as they merely represent legal argument or impermissibly intrude on the finder of fact's role.  For these reasons, the Court should grant this *Daubert* motion in full.

Dated: August 10, 2020 Respectfully submitted,

*/s/ Karen Kreider Gaunt*
Karen K. Gaunt (0068418)
Robert M. Zimmerman (0079584)
Jaci L. Overmann (0089306)
Liane H. Rousseau (0093435)
DINSMORE & SHOHL LLP
255 Fifth Street, Suite 1900
Cincinnati, OH 45202
Telephone:  (513) 977-8200
Facsimile:  (513) 977-8141
karen.gaunt@dinsmore.com
robert.zimmerman@dinsmore.com
jaci.overmann@dinsmore.com
liane.rousseau@dinsmore.com

*Attorneys for Defendants The Procter &
Gamble Company and Walmart Inc.*

Benjamin C. Mizer (0083089)
Charlotte H. Taylor (admitted *pro hac vice*)
JONES DAY
51 Louisiana Ave. NW
Washington, D.C.  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
bmizer@jonesday.com
ctaylor@jonesday.com

*Attorneys for Defendant The Procter &
Gamble Company*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all

counsel of record via the Court's ECF system.

*/s/ Liane H. Rousseau*
Liane H. Rousseau