# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### Western Division - Cincinnati

|  |  |
|---|---|
| **ANNETTE NAVARRO MCCALL**, *et al.*, | |
| **Plaintiffs**, | Case No. 1:17-cv-00406-DRC |
| **v.** | Judge Douglas R. Cole |
| **THE PROCTER & GAMBLE COMPANY**, *et al.*, | Magistrate Judge Karen L. Litkovitz |
| **Defendants**. | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF PROFESSOR JEFFREY SEDLIK

4848-4168-9289

## **TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................................1

II.    PROFESSOR SEDLIK'S QUALIFICATIONS .....................................................4

     A.    Professor Sedlik is eminently qualified to testify on copyright damages in photography licensing cases and has so testified on numerous occasions...............4

III.   ARGUMENT AND AUTHORITIES.....................................................................8

     A.    Overview of Professor Sedlik's three methods used to calculate actual damages ..8

          1.    The Market Rate Methodology....................................................9

          2.    Navarro's Fee Schedule Methodology.....................................11

          3.    The Model Fee Differential Approach......................................12

     B.    Professor Sedlik's Table of Usages and License Tables provides a reliable foundation for his Market Rate approach and Navarro Fee Schedule approach in calculating actual damages for Defendants' usage violations ..............................14

     C.    Navarro's license fees she charged P&G did not limit the amount of her actual damages claim and there is no legal requirement that she calculate her damages based upon her licensing history with P&G. .........................................................24

     D.    The cases cited by Defendants in which courts have excluded expert testimony in licensing cases as being too speculative are readily distinguishable and Defendants ignore the fact that Professor Sedlik's methodology has been repeatedly accepted by numerous courts .........................................................29

     E.    Professor Sedlik is qualified to calculate fraud damages and his methodology is sound. .......................................................................................................30

     F.    Defendants' hodgepodge of additional criticisms of Professor Sedlik's opinions are either irrelevant or, at best, go to the weight and not admissibility of his testimony.......................................................................................................32

          1.    Defendants' criticisms that Professor Sedlik self-corrected several errors is not a *Daubert* issue and ignores that their own experts' reports had numerous errors which they failed to catch. ..............................32

          2.    Professor Sedlik makes clear that he is not offering any legal opinions in this case and only cited to legal authorities in rebuttal to Defendants' expert..............................................................................................33

          3.    Contrary to Defendants' motion, Professor Sedlik does not purport to offer an expert opinion on the "Additional Unauthorized Usages"...................35

          4.    Defendants' differing views on the relevant facts in this case are not a *Daubert* issue .........................................................................................35

i

5.      Professor Sedlik properly considered the amount a willing buyer would
        have been reasonably required to pay a willing seller at the time they
        entered into a license, whereas Defendants' two "experts" improperly
        relied upon a retroactive analysis based upon information that would have
        been unknown and unknowable to the parties at the time the license was
        entered into................................................................................................36

IV.     CONCLUSION.................................................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*,
  226 F.3d 1138 (10th Cir. 2000) ...............................................................29, 30

*Baker v. Urban Outfitters, Inc.*,
  254 F. Supp. 2d 346 (S.D.N.Y. 2003)..............................................................30

*Bandag, Inc. v. Al Bolser Tire Stores, Inc.*,
  1985 WL 5702 (W.D. Wash. Oct. 21, 1985) ....................................................23

*Chi-Boy Music v. Charlie Club, Inc.*,
  930 F.2d 1224 (7th Cir. 1991) .........................................................................27

*Dash v. Mayweather*,
  731 F.3d 303 (4th Cir. 2013) ...........................................................................33

*Ed Schmidt Pontiac-GMC Truck, Inc. v. DaimlerChrysler Motors Co.*,
  2008 WL 668242 (N.D. Ohio Mar. 4, 2008) ....................................................34

*Fletcher v. Vandyne*,
  2009 WL 3789925 (S.D. Ohio Feb. 24, 2009)..................................................21

*Gaylord v. United States*,
  678 F.3d 1339 (Fed. Cir. 2012).........................................................................27

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983).................................................................36, 39

*Jacobellis v. Ohio*,
  378 U.S. 184 (1964) (Stewart, J., concurring) ...................................................3

*Karol Western Corp. v. Smith News Co.*,
  2013 U.S. Dist. LEXIS 191840 (C.D. Cal. Aug. 23, 2013) (attached as Ex. 3
  to this response) ................................................................................................6

*Leonard v. Stemtech Health Scis., Inc.*,
  2013 WL 5311295 (D. Del. Sept. 23, 2013)....................................................6, 7

*Leonard v. Stemtech Int'l, Inc.*,
  834 F.3d 376 (3d Cir. 2016)...................................................................... passim

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
  472 F. App'x 19 (2d Cir. 2012) ........................................................................23

*Oracle Corp. v. SAP AG*,
  765 F.3d 1081 (9th Cir. 2014) ........................................................................29

*Polar Bear Prods., Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) ..........................................................................21

*Rivera v. Mendez & Compañia*,
  988 F. Supp. 2d 174 (D.P.R. 2013)..................................................................29

*Semerdjian v. McDougal Littell*,
  641 F.Supp. 2d 233 (S.D.N.Y. 2009)...............................................................37

*Sensonics, Inc. v. Aerosonic Corp.*,
  81 F.3d 1566 (Fed. Cir. 1996).........................................................................23

*Stross v. Hearst Comm'ncs, Inc,.*
  No. 5-18-CV-01039-JKP-RBF (W.D. Tex. June 8, 2020) ...................................27

**STATUTES**

Copyright Act...................................................................................................26

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ..............................................................................................21

## I.    INTRODUCTION

Professor Jeffrey Sedlik is a renowned expert in the field of photography licensing who prepared an expert opinion in this case regarding the amount of Plaintiff Annette Navarro's actual damages. Professor Sedlik has been qualified as a damages expert in numerous other copyright-infringement cases involving photographs. He has used the same tried-and-true damages methodology in this case as in his many other expert engagements, all with substantially similar fact patterns. Professor Sedlik's rigorous damages approach has always survived the inevitable *Daubert* challenge in the many other copyright cases in which he has opined on actual damages, yet Defendants here make the same, familiar attacks that other courts have uniformly rejected. This Court should do the same. Professor Sedlik is eminently qualified to render an opinion on actual damages in this case, and his methodology is rigorous, reliable, and tested.

Defendants make two primary arguments in moving to exclude Professor Sedlik's testimony. First, Defendants argue that Professor Sedlik allegedly is not qualified to render an opinion on actual damages. This argument is truly frivolous. Professor Sedlik is the pre-eminent expert in the country in calculating actual damages in copyright-infringement cases brought by photographers.

Second, Defendants urge that Professor Sedlik's actual damages methodology is speculative and unreliable. But the two primary damages methodologies—the market rate approach and Navarro's licensing fee approach—that Professor Sedlik used in calculating hypothetical license fees in this case are the two standard accepted methodologies that courts have repeatedly approved. Defendants take issue with the assumptions that underlie Professor Sedlik's methodologies, but these assumptions are based upon a rigorous, documented, and

1

scientific methodology that Professor Sedlik has used in numerous prior engagements and which has survived many other *Daubert* challenges unscathed.

In attacking Professor Sedlik's methodology, Defendants focus particular attention on two issues: (1) the number of hypothetical licenses that Professor Sedlik utilized in his damages calculations as documented in his "License Tables,"[1] and (2) the amount of actual damages that Professor Sedlik calculated in comparison to the amount of license fees that P&G paid Navarro in past transactions. Neither of Defendants' wholly unqualified "experts" made any attempt to understand, let alone address, the assumptions or methodology that went into the License Tables. Rather, they simply "opined" that there are too many hypothetical licenses and the damages are too high in comparison to the license fees that Navarro actually charged. These observations by Defendants' supposed experts do not remotely qualify as "expert" opinions, so Defendants' motion is based on nothing more than lawyer argument.

Regarding the first point, Professor Sedlik's report contains a "Table of Usages"[2] that meticulously documents 683 discrete instances of infringement committed by Defendants that result in Professor Sedlik's damages calculations based upon 674 hypothetical licenses itemized in the License Tables. These tables are an accounting of the accumulation of Defendants' numerous temporal, geographic, and media violations. For example, for the Daily Facials product, Navarro licensed the use of her Image for three years from July 1, 2012 through June 30, 2015, in North America only, and for use on packaging, in-box brochures, the internet, and press releases. *See* SOUF ¶¶77-79 (Doc. 204-1, #9439). But P&G violated the temporal, geographic, and media restrictions by using Navarro's Image for the Daily Facials product in

---

[1] Preliminary Expert Report of Prof Jeffrey Sedlik (Corrected), February 5, 2020, "Preliminary Report," Exhibit R: "Market Rates: Agencies - Licenses and Actual Damages, by License Number" and Exhibit W: "Navarro Fees: Licenses and Actual Damages, by License Number."

[2] Preliminary Report, Exhibit F, "Table of Usages."

2

unauthorized countries and regions (Europe and Latin America), beyond the June 30, 2015 license expiration (as late as May 2018), and in unauthorized ways (brandSAVERS, coupons, and in-store displays). *See* SOUF ¶¶65(e), 77-79 (Doc. 204-1, ##9435, 9439). Professor Sedlik's Table of Usages accounts for each of these multifarious violations that drive the number of hypothetical licenses Professor Sedlik calculated in the License Tables.

The large number of hypothetical licenses identified in the Table of Usages is directly correlated to the vast scope of the temporal, geographic, and media violations that P&G committed. Had P&G's infringement not been so rampant and pervasive, the number of hypothetical licenses would be substantially smaller. By focusing its motion on the large number of entries in the Table of Usages, P&G perversely seeks to *benefit* from the fact that its infringing activities were so widespread in their scope. Under P&G's "reasoning," if it was a minor infringer such that Professor Sedlik was only able to identify a handful of infringements, then P&G would not have this particular complaint. But given that P&G has been a gross infringer and Professor Sedlik identified 683 separate infringements, then P&G (so the theory goes) should somehow be absolved of all damages because there are just too many infringements at issue. Of course, that argument is exactly backwards in holding small infringers to account while granting gross infringers like P&G a hall pass.

Regarding the second point as to the amount of actual damages, Defendants in essence argue that there is some *per se* limitation that has apparently been exceeded in this case regarding the license fees actually charged by Navarro as compared to the amount of claimed damages. Defendants never disclose what the magic number is, but much like Justice Stewart's famous expression in a landmark obscenity case—"I know it when I see it"[3]—Defendants "know it when they see it" when it comes to an actual damages claim that supposedly deviates too far from the

---

[3] *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

underlying license fee. But the "I know it when I see it" standard is no more workable when applied to copyright damages than it was when applied to obscenity cases. In fact, there is no such litmus test as Defendants would have this Court create, as evidenced by various court decisions, including the *Leonard* decision in which Professor Sedlik was the testifying expert. There, the Third Circuit affirmed a jury award of actual damages in a copyright-infringement case of $1.6 million, notwithstanding that the license fee at issue was only $950, a differential that dwarfs any corresponding differential in this case. *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376 (3d Cir. 2016).

As noted, nearly all challenges to Professor Sedlik's assumptions and opinions are mere lawyer argument, as Defendants' two wholly unqualified rebuttal experts make only a half-hearted effort to respond to Professor Sedlik. At best, Defendants' attorneys disagree with the assumptions upon which Professor Sedlik bases his actual damages calculations, and disagree with the amount of his actual damages. But it would be the vanishingly rare case where one side's lawyers did not disagree with the other side's experts. If that were the standard, then no expert would ever survive a *Daubert* challenge. Defendants' lawyers' criticisms clearly go to the weight and not the admissibility of Professor Sedlik's testimony. As courts routinely hold in similar circumstances, cross-examination—not exclusion—is Defendants' recourse. For all the reasons discussed herein, Defendants' *Daubert* challenge to Professor Sedlik's expert opinions in this case should be denied in its entirety.

## II.   PROFESSOR SEDLIK'S QUALIFICATIONS

### A.   Professor Sedlik is eminently qualified to testify on copyright damages in photography licensing cases and has so testified on numerous occasions

Defendants' challenge to Professor Sedlik's qualifications is, to put it bluntly, a joke. Professor Sedlik is likely *the* single most qualified person in the country to testify on the matter

at hand: actual damages in a case involving infringement of a photographer's copyrighted photographs. Navarro challenges Defendants in their reply to identify a single person in the United States with superior credentials and experience to Professor Sedlik. Indeed, Professor Sedlik's world-class qualifications stand in stark contrast to Defendants' two rebuttal experts, Steven Hazel and Doug Bania, neither of who has any experience in cases involving photography licensing, and no experience (Hazel) or virtually no experience (Bania) in copyright cases. *See* Navarro's *Daubert* Mot. at 7-11 (Doc. 217, ##11633-37).

Defendants dismiss Profess Sedlik's "'35 years' of experience," arguing that he provided "no evidence of any related experience." Mot. at 14. But Defendants are guilty of willful blindness in ignoring Professor Sedlik's 35 years of directly related experience in photography licensing, including serving as the long-time President of the PLUS Coalition, the global standards body for the licensing of photographs; teaching courses on copyright photography licensing to law students and lawyers; training employees at the U.S. Copyright Office; serving as a frequent guest speaker and writer on copyright issues and photography licensing; testifying on numerous occasions on copyright and photography licensing issues in federal court; and repeatedly testifying before both the House of Representatives and the Senate as an invited expert on copyright and other intellectual property issues. Professor Sedlik's formidable qualifications are well-documented in the curriculum vitae attached to his original report and were further discussed in detail during his deposition.[4] *See* Sedlik curriculum vitae (Doc. 214-3, ##10596-10604); Sedlik Dep. at 10:8-51:4 (Doc. 210, ##10176-86).

---

[4] Professor Sedlik has submitted the following reports in this case: (1) a preliminary corrected report dated 2/5/20 (Doc. 182-2) including the 891 pages of exhibits attached to this report that were separately filed with the Court (Doc. 214-3); (2) a 3/31/20 rebuttal report to the expert reports of Ellen Boughn and Steve Hazel (Doc. 214-13); (3) a 7/1/20 limited rebuttal report to Doug Bania (attached as Ex. 1 to this response); and (4) a 7/20/20 supplemental rebuttal report to Doug Bania following the Court's order excluding certain of Bania's opinions (attached as Ex. 2 to this response).

5

On the several occasions in which other defendants have unwisely challenged Professor Sedlik's qualifications, the courts have roundly rejected those challenges. *See e.g. Karol Western Corp. v. Smith News Co.*, 2013 U.S. Dist. LEXIS 191840, at *9-10 (C.D. Cal. Aug. 23, 2013) (attached as Ex. 3 to this response); *Leonard v. Stemtech Health Scis., Inc.*, 2013 WL 5311295, at *5 (D. Del. Sept. 23, 2013).

In rejecting a *Daubert* challenge to Professor Sedlik's qualifications, the district court in *Leonard* noted the following:

> Professor Sedlik's *curriculum vitae* makes clear that he has extensive experience in the area of photography licensing. For instance, Professor Sedlik is the current President and CEO of the PLUS Coalition, which is the international photography industry licensing metadata standards body. He operates a company dedicated to licensing his own photographic images for various usages, and has served on advisory boards in which he was consulted on issues including stock photography licensing. Professor Sedlik has written articles on licensing that have been published in various photography publications and has taught classes on the subject. In light of these qualifications, the Court finds that Professor Sedlik has sufficient knowledge, skill and experience in the stock photography industry to qualify him to provide an opinion regarding Plaintiff's actual damages.

*Leonard*, 2013 WL 5311295, at *5 (citations and footnote omitted).

Here, Defendants dismiss Professor Sedlik as a commercial photographer who "has no professional background in statistics, mathematics, accounting, finance, forensics [sic] law or economics." Mot. at 13.[5] Defendants fail to explain why college degrees in any of these disciplines are required in order to calculate actual damages for violating usage rights to a limited photography license.[6] In fact, the defendant made, and the court rejected, this same

---

[5] Moreover, Defendants mischaracterize Professor Sedlik's testimony in that the question posed was "do you have a degree in" any of the referenced fields. While Professor Sedlik acknowledged that he had no degree in any of these fields, he testified that he had taken a number of advanced courses in many of those fields and/or had substantial practical experience in them. Sedlik Dep. at 24:15-27:8 (Doc. 210, ##10179-80).

[6] This is an odd argument for Defendants to make since one of their two damages experts, Doug Bania, has no experience in any of these six fields, and the other, Steve Hazel, has experience in only one (accounting) of the six. To the extent Defendants suggest that having experience in these six fields is a prerequisite for serving as an expert witness in this case, then their own experts flunk the test.

argument in *Leonard*:

> Defendant argues that while Professor Sedlik has experience in the photography industry, he is not qualified to calculate Plaintiff's actual damages because he is not an accountant or other financial expert. However, Defendant points to no legal authority in support of the proposition that in order to calculate actual damages in a copyright infringement case, an expert must be an accountant or financial professional. Indeed, to the contrary, courts have permitted experts in the relevant field of licensing to testify about actual damages in such cases. *See, e.g.*, *Brown*[ *v. Columbia Recording Corp.*], 2006 WL 3616966, at *4[ (S.D.N.Y. Dec. 12, 2006)] (finding that expert with three years of experience negotiating and drafting music industry licenses was qualified to testify regarding plaintiff's actual damages); *Barrera v. Brooklyn Music, Ltd.*, 346 F. Supp. 2d 400, 409 (S.D.N.Y. 2004) (finding that expert with extensive work experience in the stock photography industry was qualified to provide an opinion regarding plaintiff's actual damages).

*Leonard*, 2013 WL 5311295, at *5.

In stark contrast to Professor Sedlik's unique qualifications to render an opinion on actual damages regarding photography licenses, Defendants' two experts, Hazel and Bania, have no experience at all in calculating actual damages for photography licenses. *See* Doc. 271, ##11633-66. Apparently, Defendants recognize their two experts' complete lack of qualifications to render expert opinions in this matter and, under the theory that "the best defense is a good offense," have chosen to challenge Professor Sedlik's qualifications in the hope that the Court will gloss over the vastly superior qualifications that Professor Sedlik brings to this assignment compared to Hazel and Bania and simply deem each of the three experts qualified to testify.[7] Navarro welcomes a searching inquiry by this Court as to the qualifications of all three experts and is confident that the Court will conclude that Professor Sedlik's qualifications to render an opinion on actual damages in this case is vastly superior to the Defendants' experts' supposed qualifications.

---

[7] Unlike Hazel or Bania, one of Defendants' original experts, Ellen Boughn, was undoubtedly qualified to testify on the subject of damages involving photography licensing, as she had a wealth of experience in this area. However, she withdrew for medical reasons and was replaced by Bania, an individual wholly lacking in experience in the photography licensing world.

### III.    ARGUMENT AND AUTHORITIES

### A.    Overview of Professor Sedlik's three methods used to calculate actual damages

In Professor Sedlik's Preliminary Report, he provided a thorough, detailed description of the methodologies he employed in determining actual damages using three different approaches. Professor Sedlik further provided comprehensive substantiation of his calculations in 27 damages exhibits attached to his report, and provided a detailed explanation of each exhibit in "Damages Table Details" (Exhibit AC).[8] Professor Sedlik further explained his damages-related approaches and exhibits in his Rebuttal Report, Section O, "Actual Damages Approaches in My Preliminary Report." *See* Doc. 214-13.

Professor Sedlik reviewed the information listed by Navarro and Navarro's counsel in the "Table of Photographs" (Exhibit E), a list of the twelve photographs at issue. For illustrative purposes and ease of reference, Professor Sedlik created the "Visual Index of Photographs" (Exhibit C), including a depiction of each of the twelve photographs, labeled with the "Image Number" he assigned to each photograph in the "Table of Photographs."

Professor Sedlik reviewed the information provided in the "Table of Usages" (Exhibit F), listing the details of each alleged unauthorized usage of a Navarro photograph, as discovered by Navarro and documented by Navarro and Navarro's counsel. In reviewing the "Table of Usages," he considered the explanations and citations provided by Navarro in the "Notes to Table of Usages" (Exhibit I), substantiating the basis for each assumption made necessary by Defendants' failure to produce detailed documentation of their usages of Navarro's photographs.

Professor Sedlik supplemented the information presented in the "Table of Usages" by

---

[8] *See* Doc 214-3, containing all exhibits to Professor Sedlik's 2/5/20 Preliminary Report. Exhibit AC provides a helpful narrative description that essentially serves as a glossary of the various exhibits attached to Professor Sedlik's preliminary report. (*See* Doc. 214-3, ##11473-77).

providing the "Table of Usage Start Dates and End Dates" (Exhibit H) that contained an itemized listing of the start and end dates for each usage listed in the "Table of Usages." For transparency and ease of reference, Professor Sedlik also provided the "Table of Usages by Image Number" (Exhibit G), reorganizing the Table of Usages by the "Image Number" assigned to each Navarro photograph.

For illustrative purposes, Professor Sedlik created the "Visual Index of Usages" (Exhibit D), including a depiction of each alleged unauthorized usage discovered by Navarro and listed in the "Table of Usages," labeled with the "Usage Number" he assigned to each usage, as listed in the Table of Usages. Where P&G admitted a usage without providing Navarro with a copy of that usage, Professor Sedlik inserted a placeholder indicating "Image Not Available" in the "Visual Index of Usages."

### 1. The Market Rate Methodology

In the Market Rate approach, Professor Sedlik conducted a survey of multiple vendors, and applied average market pricing to each hypothetical license corresponding to each of the known infringing usages in this matter. Professor Sedlik explained his Market Rate methodology in detail and provided voluminous documentation substantiating his survey and calculations. Professor Sedlik has applied this very same methodology in numerous other expert engagements, and without exception, his methodology has passed muster at both the district and circuit court levels.

Specifically, Professor Sedlik used the methodology described in the Preliminary Report, Section S, "Actual Damages - Market Rates," with additional detailed explanation in "Damages Table Detail" (Exhibit AC), to arrive at the total actual damages of $3,091,434.58. In summary, Professor Sedlik sought out and obtained the license fee required by three different image licensing agencies for hypothetical licenses that, if granted, would permit each of the alleged

9

infringing usages listed in the "Table of Usages."

For transparency and ease of reference, Professor Sedlik provided seven exhibits with comprehensive documentation of the license fees obtained from the three agencies. He also provided a detailed explanation of each exhibit in "Damages Table Details" (Exhibit AC). These seven exhibits were the following: Market Rates: Agencies - Fee Samples - Screenshots (Exhibit J); Market Rates: Agencies - Fee Samples – Territory Screenshots (Exhibit K); Market Rates: Agencies - Fee Samples - Territory Baseline Percentages (Exhibit N); Market Rates: Agencies - Fee Samples - USA Baselines (Exhibit M); Market Rates: Agencies - Calculated Fee per Territory (Exhibit L); Market Rates: Agencies - 2020 to 2016 License Fee Adjustment (Exhibit O); and Market Rates: Agencies - Samples for 2020-2016 Adjustments (Exhibit P).

To arrive at the fair market value for each hypothetical license, Professor Sedlik calculated the average of the licensee fees required by each image licensing agency for each applicable license type, as represented in the table "Market Rates: Agencies - Average Market Rates, Per License Type" (Exhibit Q). He then applied the license fees from the "Average Market Rates, Per License Type" (Exhibit Q) to the itemized list of hypothetical licenses in the table "Market Rates: Agencies - Licenses and Actual Damages, by License Number" (Exhibit R), to determine the license fee specific to each hypothetical license. Professor Sedlik then calculated the total of all licenses listed in "Market Rates: Agencies - Licenses and Actual Damages, by License Number" (Exhibit R), to arrive at the $3,091,434.58 total of the license fees applicable to hypothetical licenses sufficient to permit the usages listed in the "Table of Usages."

Also for transparency and ease of reference, Professor Sedlik provided "Market Rates: Agencies - Licenses and Actual Damages, by Image Number" (Exhibit S), reorganizing "Market

10

Rates: Agencies - Licenses and Actual Damages, by License Number" (Exhibit R) by the "Image Number" assigned to each Navarro photograph.

### 2. Navarro's Fee Schedule Methodology

In Professor Sedlik's "Navarro's Fee Schedule" approach to Actual Damages, he applied the methodology described in the Preliminary Report, Section T, "Actual Damages - Determined by Navarro's Fees Schedule," with additional detailed explanation in "Damages Table Detail" (Exhibit AC), to arrive at the total actual damages of $4,769,350.

Professor Sedlik requested that Navarro provide a schedule of fees listing Navarro's fee that would be applicable to the use of Navarro's photographs in various media, for various durations, in various geographic territories. Professor Sedlik then discussed Navarro's fee schedule with Navarro, and requested that she adjust the fee schedule to ensure that the fees in the schedule were consistent with fees she historically charged. Where Navarro had no licensing history corresponding to an instance of Defendants' alleged unauthorized use, Professor Sedlik requested that Navarro's fee schedule for similar use must be proportionately consistent with the fees Navarro historically charged for other uses, as determined by the market differential between fees charged for various usages. Based upon Professor Sedlik's input, Navarro then revised her fee schedule, and provided Professor Sedlik with the "Navarro Fee Schedule - Media and Territories" (Exhibit T). Professor Sedlik reviewed Navarro's Fee Schedule to ensure that the fees were reasonably consistent with Navarro's historical pricing and/or proportionately consistent with market rates.

Applying the fees listed in "Navarro Fee Schedule - Media and Territories" (Exhibit T), Professor Sedlik created "Navarro Fees: Fees per License Type" (Exhibit V), an itemized list of fees for license types for hypothetical licenses that, if granted, would permit each of the alleged infringing usages listed in the "Table of Usages." Professor Sedlik then applied the fees listed in

11

"Navarro Fees: Fees per License Type" (Exhibit V) to hypothetical licenses derived from the usages listed in the Table of Usages (Exhibit F), to create "Navarro Fees: Licenses and Actual Damages, by License Number" (Exhibit W). Professor Sedlik then calculated the total of all licenses listed in "Navarro Fees: Licenses and Actual Damages, by License Number" (Exhibit W) to arrive at the $4,769,350 total of the license fees applicable to hypothetical licenses sufficient to permit the usages listed in the "Table of Usages." Once again for transparency and ease of reference, Professor Sedlik also provided "Navarro Fees: Licenses and Actual Damages, by Image Number" (Exhibit X), reorganizing "Navarro Fees: Licenses and Actual Damages, by License Number" (Exhibit W) by the "Image Number" assigned to each Navarro photograph.

In order to more fully understand how the above process worked, illustrative examples involving three hypothetical licenses for Regenerist—described in more detail below at pages 16 through 18—is provided. In those examples, Professor Sedlik applied annual license fees in the range of $797.99 to $2,121.90, based on the scope of each infringing usage. In comparison, Navarro's historical license fee, paid by P&G to Navarro for use of one photograph on the Pro-X package in North America only, was $6,000 per year, which is up to 7.5 times greater than the fee Professor Sedlik assessed in the relevant hypothetical licenses. In short, Professor Sedlik methodically and conservatively applied actual damages to hypothetical licenses in reliance on his market rate survey, on the parties' historical transactions, and on his personal observations during 30 years of photography licensing experience.

### 3. The Model Fee Differential Approach

In addition to Professor Sedlik's primary damages methodologies based on market rates and Navarro's own pricing, he prepared an alternative approach based on the "Model Fee Differential," which he described as "the usage fee amount P&G originally paid to the models appearing in Navarro's photographs, as compared to the amount P&G then paid to the models for

usage exceeding the rights granted by those models." Sedlik 2/5/20 Rpt. at 48-49 (Doc. 182-2, ##7944-45).

In proffering the Model Fee Differential approach, Professor Sedlik did not suggest that the specific fee amounts received by the models were applicable as damages in this matter, nor did he apply any model's fees to any hypothetical license for any alleged unauthorized use of any Navarro photograph. Rather, Professor Sedlik expressly acknowledged his understanding that compensation for publicity rights and compensation for exploitation of copyrights arise from "two different bodies of law," and that his Model Fee Differential approach was presented for "consideration" purposes: "It follows then that consideration of the differential between the models' original fees and the supplementary fees paid retroactively by P&G to the models is justified, despite the fact that such rights arise from two different bodies of law." Sedlik 2/5/20 Rpt. at 48 (Doc. 182-2, #7944).

In reviewing the documents and testimony produced in this matter, Professor Sedlik relied on his extensive, real-world experience as a practitioner in the trade, personally negotiating photography license agreements and license agreements with models and their agency representatives. He further relied on his extensive experience as a commercial photography trade association leader, in developing standards and guidelines for commercial photography licensing agreements and practices, and in developing standards and guidelines for licensing agreements and practices for the exploitation of models' likenesses.

Professor Sedlik's extensive knowledge, expertise, and experience allowed him to recognize a relatively unique fact pattern in this matter, in which the scope of media rights initially licensed by the models to P&G was substantially similar to the scope of media rights initially licensed by Navarro to P&G, *and* in which the scope of media rights subsequently

13

licensed by the models retroactively to P&G for P&G's use of the model's likenesses exceeding the model licenses was substantially similar to the scope of P&G's use of Navarro's photographs exceeding Navarro's photography licenses.

Professor Sedlik opined that under these unique circumstances, consideration of the differential between the original model fees and the supplemental model fees was justified. Sedlik 2/5/20 Rpt. at 48 (Doc. 182-2, #7944). He further opined that consideration of the model fee differential had no punitive aspect, and served to shed light on the differential between the fee that P&G agreed was reasonable compensation for the licensed use versus the fee for the unlicensed use. *Id.* at 4849 (Doc. 182-2, ##7944-45). Professor Sedlik then applied that differential to Navarro's original fees paid by P&G to calculate the amount that P&G would be reasonably required to pay Navarro for the unlicensed use if P&G paid Navarro an amount proportionate to the differential between the original and supplementary model fees paid by P&G to the models. Based upon the average of the model fee differential, the actual damages would be $789,732.10 and the actual damages based upon the maximum model fee differential would be $4,040,670.15.[9]

**B. Professor Sedlik's Table of Usages and License Tables provides a reliable foundation for his Market Rate approach and Navarro Fee Schedule approach in calculating actual damages for Defendants' usage violations**

In his Table of Usages at Exhibit F[10] of his report, Professor Sedlik meticulously documents the 683 temporal, geographic, and media violations by P&G and translates these

---

[9] Defendants' lawyers (not their experts) take issue with Professor Sedlik's "manipulat[ion] of the data," arguing, for example, that an "average" is not appropriate and that he should have included a "low end" calculation to correspond to his "maximum" model fee calculation. Mot. at 23-25. All these lawyer arguments go to the weight, rather than admissibility, of Professor Sedlik's Model Fee Differential approach to damages.

[10] Exhibits G, H, and I contain additional columns of information relating back to the Table of Usages in Exhibit F. Professor Sedlik broke the Table of Usages information into these separate exhibits in order to avoid having a very wide fold-out exhibit, which would have been the case if all the information in these separate exhibits had been combined into a single exhibit. Sedlik Dep. at 242:12-245:5 (Doc. 210, #10234)

14

violations into 674 separate hypothetical licenses itemized in the License Tables. *See* Sedlik 2/5/20 Rpt. at 38-40 (Doc. 182-2, ##7934-36) and Exhibit F (Doc. 214-3, ##10959-96). Professor Sedlik relies upon his Table of Usages as an input in calculating damages under the Market Rate approach and Navarro Fee Schedule approach. A primary focus of Defendants' motion is to attack the Table of Usages and the License Tables as being speculative and unreliable and, in particular, Defendants complain regarding the sheer number of usages and hypothetical licenses documented in those tables. *See* Mot. at 17-20. But Defendants' criticisms regarding the Table of Usages and License Tables are misplaced and mischaracterize both the process used in compiling the table as well as the content of the table, which process is explained below.

The quantity of "Usages" listed in Sedlik's Table of Usages is a direct function of the extensive scope of P&G's infringements of Navarro's 12 photographs at issue. The vast majority of the line items in the Table of Usages memorialize P&G's own disclosures of its unauthorized use of Navarro's photographs, as admitted by P&G in its interrogatory answers, witnesses' deposition testimony, company documents, and other evidence.

Based upon the painstaking work of Navarro and her counsel, 683 discrete instances of infringement were discovered and presented in the Table of Usages and then organized by Professor Sedlik into 674 hypothetical licenses, itemized in the License Tables. Had the scope of P&G's infringement of Navarro's photographs been limited to a single instance in which P&G exceeded the temporal limitations of a Navarro license for packaging use, Sedlik's Table of Usages would consist of a single line item, and his Table of Licenses would consist of a single license. But that didn't happen.

Faced with an enormous quantity of P&G's infringing usages, Navarro and her counsel carefully documented each usage in the Table of Usages under Professor Sedlik's supervision. Professor Sedlik required that Navarro provide citations and explanatory notes supporting each entry in the Table of Usages, which Professor Sedlik produced as Exhibit I (Doc. 214-3) to his Preliminary Report. After careful review of the Table of Usages, Professor Sedlik developed hypothetical licenses to determine actual damages for the various unauthorized usages exceeding the temporal scope of the license, the geographic limitations of the license, and the media permissions of the license. In developing his hypothetical licenses, Professor Sedlik looked to P&G's historical business transactions with Navarro (as represented in the examples provided below), and also to standard practices in the photography licensing industry, based on his extensive personal experience as a commercial photographer and commercial photography trade association executive, and further corroborated by his survey of commercial photographers of Navarro's caliber. *See* Sedlik 3/31/20 Rpt. at 35-37 (Doc. 214-13, ##11542-44).

The development and application of the usages and licenses—and the reason why the number of hypothetical licenses contained in the Table of Usages is so large—is easily understood by consideration of an example arising from one of the transactions at issue.

In 2010, Navarro did a photo shoot for P&G to create photographs for use on P&G's ProX packaging. In the initial license, P&G requested and purchased the limited right to use one of Navarro's photographs on the ProX box for a period of 3 years only and in North America only. P&G later approached Navarro to request and purchase an additional license, affording P&G the limited right to use Navarro's photograph of the ProX packaging in "in-store" advertising for one year only and in North America only. That is the full extent of the license Navarro granted to P&G. Thus, P&G neither requested nor received a license authorizing it to

16

make use of the photograph outside of North America, nor for a period of greater than 3 years, nor for any usage other than on the packaging itself (with the exception of the one-year license for "in-store" advertising), nor on packaging for any product other than the ProX.

Without requesting a license and without Navarro's knowledge or permission, P&G not only continued to reproduce and distribute Navarro's photograph on ProX boxes for an additional two years in North America after the 3-year license expired, but distributed the ProX product in China for more than five years and in Latin America for nearly three years without a license, and also used Navarro's photograph on packaging for a different product, P&G's Regenerist Brush product, in North America, Asia, and Europe. *See* SOUF ¶¶69-71 (Doc. 204-1, #9434).

Three examples of Defendants' usages and corresponding hypothetical licenses arising from P&G's wholly unauthorized use of Navarro's photograph on packaging for P&G's Regenerist product are explained below. Professor Sedlik developed these hypothetical licenses based on the usages described in the Table of Usages, as follows:

License L075. This is for unlicensed use of Navarro's photograph on P&G's Regenerist packaging in North America. Usage U10 in the Table of Usages describes P&G's unlicensed use of Navarro's photograph on P&G's Regenerist packaging between 12/1/15 and 12/21/17, during which, according to P&G, 24,854 units were sold in North America. In the corresponding License L075, Professor Sedlik's hypothetical license applies actual damages to Usage U10. In the Market Rate Approach, he applied a license fee of $1,140 per year, the average market rate for similar use, as determined by a survey of multiple vendors. Sedlik 2/5/20 Rpt. Ex. R (Doc. 214-3, #11355). In the Navarro Fee Schedule approach, he applied a license fee of $6,000 per

year, determined by Navarro's Fee schedule for packaging use in North America. Sedlik 2/5/20 Rpt. Ex. W (Doc. 214-3, #11414).

License L070. This is for unlicensed use of Navarro's photograph on P&G's Regenerist packaging in Asia. Usage U11 in the Table of Usages describes P&G's unlicensed use of the ProX photograph on Regenerist packaging between 7/1/13 and 6/30/15, during which, according to P&G, 107,202 units were sold in the Asia Pacific region. In the corresponding license L070, Professor Sedlik's hypothetical license applies actual damages to Usage U11. In the Market Rate Approach, Professor Sedlik applied a license fee of $1,766.51 per year, the average market rate for similar use, as determined by a survey of multiple vendors. Sedlik 2/5/20 Rpt. Ex. R (Doc. 214-3, #11355). In the Navarro Fee Schedule approach, he applied a license fee of $5,400 per year, determined by Navarro's Fee schedule for packaging use in the Asia Pacific region. Sedlik 2/5/20 Rpt. Ex. W (Doc. 214-3, #11414).

License L072. This is for unlicensed use of Navarro's photograph on P&G's Regenerist packaging in Europe. Usage U12 in the Table of Usages describes P&G's unlicensed use of the ProX photograph on Regenerist packaging between 3/1/13 and 12/31/15, during which, according to P&G, 802,834 units were sold in Europe. In the corresponding license L072, Professor Sedlik's hypothetical license applies actual damages to Usage U12. In the Market Rate Approach, he applied a license fee of $2,121.90 per year, the average market rate for similar use, as determined by a survey of multiple vendors. Sedlik 2/5/20 Rpt. Ex. R (Doc. 214-3, #11355). In the Navarro Fee Schedule approach, he applied a license fee of $5,400 per year, determined by Navarro's Fee schedule for packaging use in Europe. Sedlik 2/5/20 Rpt. Ex. W (Doc. 214-3, #11414).

Professor Sedlik went through this same meticulous process in creating hypothetical licenses for all 674 licenses that correspond to the hundreds of discrete infringements of the temporal, geographic, and usage restrictions contained in Navarro's licenses for the four licensed products at issue (ProX, the two facial hair removal products, and Daily Facials), as well as the wholly unlicensed product (Regenerist). While P&G complains that the number of hypothetical licenses derived from the Table of Usages is excessive, P&G has no one to blame but itself for the massive extent of its infringing activities.

Moreover, Professor Sedlik's approach, which assumes that the parties would have entered into license extensions for specific and limited uses in specific geographic territories and for specific time periods, is fully consistent with the parties' actual course of dealing. In the present case, the parties entered into three very specific license extensions. P&G paid Navarro $5,000 for a license to use her photograph for in-store brochures for one year only and in North America only for ProX. *See* SOUF ¶48 (Doc. 204-1, #9426). P&G paid Navarro $18,000 for a license to use her photograph for the facial hair removal Teal Box for three years in North America on packaging, the Internet, and brochures as well as global usage for press releases. *See* SOUF ¶56 (Doc. 204-1, #9429). P&G also paid Navarro $500 for a license to use her photograph in one monthly edition of several Canadian magazines for the facial hair removal Teal Box. *See* SOUF ¶57 (Doc. 204-1, ##9429-30).

With the above context for Professor Sedlik's Table of Usages and the resulting 674 hypothetical licenses that he calculated in the License Tables, Navarro addresses Defendants' specific criticisms regarding the Table of Usages and hypothetical licenses.

*First*, Defendants complain that it is unreasonable to assume 674 hypothetical license negotiations and 900 pages of exhibits. Mot. at 2. As explained above, the number of

hypothetical licenses is due to the scope of Defendants' infringements, so they have no legitimate basis to complain. Defendants question why there should be 14 separate licenses for a particular set of usage violations or why individual licenses would have been required for each brandSAVER coupon. Mot. at 19-20. But this is just lawyer advocacy that is not rebutted by any testimony from Defendants' "experts," and it will be up to the jury to decide whether the number of licenses contained within the License Tables is reasonable. Moreover, Defendants' complaint that Professor Sedlik's report contains nearly 900 pages of supporting exhibits is a self-defeating attack on the thoroughness of Professor Sedlik's work and the incredible level of detail in which he documented his underlying methodology and assumptions.[11]

_Second_, Defendants complain that Professor Sedlik relied upon Navarro to populate the usage violations and he merely spot-checked the accuracy of the information. Mot. at 2, 17. First, that characterization is incorrect. Professor Sedlik explained at his deposition that while Navarro compiled the table initially, he went through the entire table "from the top to the bottom" and made "sure that the information . . . was sufficient to support a determination that that [sic] the assumptions were reasonable." Sedlik Dep. at 271:4-22 (Doc. 210, #10241).[12] Second, there is nothing improper about Professor Sedlik relying upon Navarro and her counsel in identifying in the first instance the usages that exceeded the temporal, geographic, and usage limitations in the licenses between P&G and Navarro. "Common sense dictates that an expert may confer with the

---

[11] Moreover, as explained in footnote 10, Professor Sedlik broke the Table of Usages information in Exhibit F into three additional exhibits to his report in order to be helpful to opposing counsel and avoid having one exhibit that contained scores of columns and would have resulted in one extremely long "fold out" exhibit. This effort by Professor Sedlik to be helpful added several hundred pages to the nearly 900 pages of exhibits for which Professor Sedlik is now being criticized. There are a number of other exhibits where Professor Sedlik sorts and displays the same information in different ways in a further attempt to be helpful and transparent. Had Professor Sedlik not undertaken these efforts, the number of pages of exhibits to his report would have been dramatically smaller. This shows that Defendants' criticism that Professor Sedlik's report contains approximately 900 pages of exhibits is one of form and not substance.

[12] Moreover, Professor Sedlik compiled the License Tables without Navarro's assistance. _See_ Sedlik Dep. at 272:17-24 (Doc. 210, #10241).

copyright holder and that the background data may be factored into calculations of actual damages." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004); *see also, e.g.*, *Fletcher v. Vandyne*, 2009 WL 3789925, at *2 (S.D. Ohio Feb. 24, 2009) ("[A]n expert may rely on assumed facts if there is support in the record for those facts."); Fed. R. Evid. 702 advisory comm. notes (2000) ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.").

Navarro has first-hand knowledge regarding the terms of the licenses that she negotiated and entered into and is fully competent to identify the usages that she believes exceeded the rights that she granted. Indeed, Navarro is more familiar than anyone, including Professor Sedlik, regarding the usages she authorized and those that she did not. Whether one of Navarro's Images was used beyond the terms of the license is a fact question not the subject of an expert opinion. Thus, Defendants wholly fail to identify why Professor Sedlik, as opposed to Navarro, should be required to be the person to populate the Table of Usages. Moreover, the relevant jury question will be not *who* input the information into the Table of Usages, but rather whether the information is accurate (addressed below).

*Third*, Defendants suggest that the Table of Usages is not accurate (*see* Mot. at 3), but fail to identify a single entry of the 683 entries that is objectively inaccurate. Where there is evidence of an actual usage, the Table of Usages is populated with an image and a description of the usage violation. Notably absent from Defendants' motion is a single citation that any of the actual usages identified in the Table of Usages is inaccurate.

*Fourth*, Defendants take issue with certain assumptions that Navarro and Professor Sedlik were forced to make regarding certain unlicensed usages, but the scope of the usage violation was indeterminate because P&G did not maintain adequate records. For example, P&G had a

license for "in-store display" for only one of the five products at issue (ProX) and only for a one-year period, from February 1, 2011 through January 31, 2012. (Doc. 204-1, #9425) (SOUF ¶44). Yet, P&G admitted in its interrogatory answers that it used Navarro's Images for all five products on in-store displays, which was a clear usage violation. (Doc. 204-1, ##9433-34) (SOUF ¶64). P&G did not, however, disclose the number of stores, the number of displays, the regions, duration, or design of the displays, or any other information that should have been part of P&G's record keeping, but was not. Had this usage information been available to Professor Sedlik, he would have used it in calculating actual damages.

Because P&G did not produce specific documentation relating to these types of usage violations, certain assumptions regarding P&G's in-store displays were necessary, and those exact assumptions are identified in Professor Sedlik's exhibits. Professor Sedlik documented each assumption in his Table of Usages,[13] and Defendants' lawyers take issue with several of those assumptions as supposedly being unreasonable *See* Mot. at 17-20 (complaining about assumptions relating to in-store usage violations and circulation numbers for women's magazines). Defendants' criticisms are misplaced for number of reasons.

First, while Defendants' *lawyers* challenge the assumptions, Defendants' *experts* fail to provide any of their own assumptions in rebuttal. Second, Defendants' counsel is on full notice regarding the exact assumptions Professor Sedlik has made and counsel has every opportunity to cross-examine Professor Sedlik at trial and try to persuade the jury that the assumptions on

---

[13] Defendants' suggestion that Professor Sedlik tried to "disguise" the supposed speculative nature of his damages calculations (*see* Mot. at 3) is contrary to the facts. Rather than putting forth assumptions that were unknown and could not be subject to cross-examination, Professor Sedlik was careful to identify each assumption contained in his Table of Usages so that Defendants and their experts would have every opportunity to test the reasonableness of those assumptions.

which he relies are unreasonable.[14] As such, Defendants' criticisms clearly go to the weight and not admissibility of Professor Sedlik's testimony.

Third, it is standard and accepted practice for a damages expert to make assumptions when the defendant's records are incomplete. *See, e.g.*, *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996) ("When the calculation of damages is impeded by incomplete records of the infringer, adverse inferences are appropriately drawn."); *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 472 F. App'x 19, 22 (2d Cir. 2012) (affirming district court's damages award and noting the district court's conclusion "that the incomplete sales records produced by the defendants invited an inference of a 'massive counterfeiting enterprise'"); *Bandag, Inc. v. Al Bolser Tire Stores, Inc.*, 1985 WL 5702, at *2 (W.D. Wash. Oct. 21, 1985) (awarding damages for 11,500 instances of infringement, even though defendant's records showed only 8954 instances, because defendant's records were incomplete). According to P&G's novel theory, P&G can use Navarro's photographs in an unauthorized fashion without legal consequence so long as P&G's records do not detail the full extent of the scope of that unauthorized usage. As noted above, that is not the law, and Defendants cite no legal authority embracing this perverse result.

Lastly, Defendants make a legal argument that certain uses contained within the Table of Usages were within the scope of the license; for example, suggesting that certain digital media categories or blogs are encompassed under the term "Internet." Mot. at 19. Whether certain usages are covered by the licenses is, in the first instance, a legal question for the Court. In fact, Navarro moved for summary judgment that certain usages were outside the scope of the license as a matter of law. (Doc. ##9364-70). To the extent that these usage issues are not resolved as a

---

[14] As described at his deposition, Professor Sedlik was provided with the assumptions. He reviewed the citations supporting those assumptions and provided notes describing them. Sedlik Dep. at 260:2-22 (Doc. 210, #10238).

matter of law, then it will be for the jury (not the experts) to determine whether certain usages are or are not within the terms of the license.

### C. Navarro's license fees she charged P&G did not limit the amount of her actual damages claim and there is no legal requirement that she calculate her damages based upon her licensing history with P&G.

Defendants urge that the amount of license fees that P&G paid Navarro for the use of her images serves as a de facto limitation on the amount she can recover in actual damages. *See* Mot. at 1 ("There can be no greater indication of the actual damages at issue in this case than that one figure" of $104,500 in Navarro's license fees.). But this assertion is not backed up by citation to any legal authorities. The case law makes clear that (1) a copyright plaintiff need not base her damages methodology on the past license fees she charged the infringer, and (2) the amount of her actual damages is not limited by the amount of the license fees she charged.

The Third Circuit's decision in *Leonard v. Stemtech* in which Professor Sedlik was the damages expert is directly on point and is particularly instructive because that decision rejects many of the same core arguments that Defendants make here.[15] In *Leonard*, Professor Sedlik testified to the photographer's actual damages for copyright infringement using the same Market Rate approach he used in this case—the same courtroom-tested methodology he has used in the many other copyright cases where he has testified on actual damages. Given the factual similarities between this case and *Leonard*, as well as the Third Circuit's extensive analysis of Professor Sedlik's testimony, *Leonard* merits extended discussion.

In *Leonard*, the photographer specialized in stem cell photography. He used a stock photography agency (Photo Researchers) to license his photographs for fees ranging from less

---

[15] It is important to note that Professor Sedlik has been qualified as an expert numerous times and he has used the same market rate methodology here as in the many other cases that have passed muster with numerous courts including the *Leonard* case.

than $100 to several thousand dollars. 834 F.3d at 382-83. Leonard also directly licensed his photographs in amounts that included $1,325 for use of his image in a brochure with a print run of 5,000, $1,500 for use on a magazine cover, $4,000 for a one-year license for use at trade shows, and $6,500 to a university for a four-year license for use on its website. *Id*. Leonard granted Stemtech a one-year license to use a single image (Image 4) in Stemtech's magazine. *Id*. at 383. Leonard also offered Stemtech a one-year license to use Image 4 on Stemtech's website for $300, but Stemtech declined because "the price was too high." *Id*.[16] Stemtech paid only $500 of the $950 invoice, but continued to use Image 4 without a license and in other promotional materials. *Id*.

Despite being on notice of Leonard's claims that Stemtech and its distributors were using his images without permission, Stemtech failed to notify its distributors of his assertions.[17] *Id*. at 384. In fact, in conducting some Internet searches, Leonard discovered additional usage violations by Stemtech and its distributors, including unauthorized usages for various websites, DVDs, videos, and PowerPoint presentations. *Id*.

Professor Sedlik was the actual damages expert in *Leonard*, and the court explained the Market Rate approach he used in that case, the same methodology he used here.

> Sedlik estimated the fair market value of a license to use the images. To this end, he contacted two of the largest stock photo agencies and two agencies that specialize in scientific images to ascertain the fair market value of microscopic photography images when licensed for various forms of media comparable to those Stemtech used in its marketing materials. From the quotes provided by these

---

[16] This is eerily similar to the present facts regarding the ProX product. Navarro granted P&G a three-year license to use her image on the ProX packaging only. P&G then requested an additional estimate for three years usage on the Internet, advertising, and free-standing coupon inserts (FSIC). Navarro provided an estimate for these additional usages, but P&G declined to purchase these additional usage rights and instead stated that P&G "will just the leverage the usage rights for on pack." *See* Doc. 163-1, ##5854-55 discussed at SOUF ¶46 (Doc. 204-1, #9246)).

[17] Likewise, P&G was on notice of Navarro's claims of copyright-infringement for several years prior to Navarro filing suit, but P&G never notified its distributors, such as Walmart, of Navarro's copyright-infringement allegations, either before Navarro filed suit in June 2017 or afterwards.

agencies, *he generated a benchmark licensing fee of between $1,277.10 and $2,569.46. He then applied the average of these fees to the 92 infringing uses identified at trial, which yielded a fee of $215,767.66.*

*Id.* at 385. Professor Sedlik then applied a multiplier (the present case does not involve a multiplier) based on "scarcity" and "exclusivity" of the stem cell photographs and opined that the range of actual damages was $1.4 million to nearly $3 million. *Id.* The jury returned a verdict of $1.6 million. *Id.*

On appeal, Stemtech challenged Professor Sedlik's damages methodology and the trial court's denial of its *Daubert* motion,[18] and further objected to the $1.6 million actual damages award as excessive. The Third Circuit rejected all challenges and affirmed the $1.6 million award. The court began by discussing the case law on actual damages. Because the Copyright Act "should be broadly construed to favor victims of infringement," the court explained, "uncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that damages are attributable to the infringement." *Id.* at 390 (citations omitted). The court then discussed the two common methods used to calculate actual damages in copyright cases: the "market value" approach and the other based on the plaintiff's own past licensing fees. *Id.* at 390.

The Defendants' criticisms in this case are carbon copies of the criticisms made by Stemtech and roundly rejected by the Third Circuit.

First, Stemtech complained that Professor Sedlik should have used Leonard's past licensing history, instead of the Market Rate approach, to calculate damages. The Third Circuit

---

[18] The Third Circuit upheld the district court's denial of the *Daubert* motion in which the district court had determined that "Sedlik's method for calculating Leonard's actual damages using fair market value, as opposed to Leonard's past licensing history, was reliable, as there is no requirement that actual damages be calculated based on a plaintiff's own history of licensing fees. It also concluded that Sedlik had a factual basis for his calculation based upon the quotes he received for other photographs. Finally, the District Court concluded that there was a fit between the facts of the case and Sedlik's damages calculation, and that challenges to the fit and reliability of the market value method could be pursued via cross-examination." 834 F.3d at 391.

rejected this argument and stated that there was "no authority requiring the use of [the past licensing fee] method as opposed to the fair market value approach, and case law on this subject supports using the fair market value." *Id.* (citations omitted). The present Defendants and their "experts" likewise complain loudly that Professor Sedlik did not base his actual damages on Navarro's past licenses with P&G.[19] However, as *Leonard* makes clear, there is no requirement that Navarro do so. *See id.*; *see also Gaylord v. United States*, 678 F.3d 1339, 1345 (Fed. Cir. 2012) (holding that the lower court erred by capping damages at the defendant's highest past license payment, and explaining that on remand, "the court may find that a hypothetical negotiation between the parties would result in a higher ongoing royalty than the rate earned by Mr. Gaylord or the Postal Service under past agreements"); *cf. Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991) (affirming award of statutory damages that were "approximately three times the amount due under past license agreements"). Professor Sedlik used the identical Market Rate approach in *Leonard* as he used here. For the same reasons that the Third Circuit approved Professor Sedlik's market rate approach, so too should this Court.[20]

Second, Stemtech complained about Professor Sedlik's usage table that resulted in 92 hypothetical licenses for the infringement of a single photograph. *Id.* at 391. Stemtech further argued that Professor Sedlik "relied on unverified information from Leonard's counsel and did not make an independent determination of usages or calculate separate fees for the 92 alleged infringements. " *Id.* The court described Professor Sedlik's methodology thusly: "To enable him to estimate the fair market value, he collected quotes from Getty Images and other photo

---

[19] Defendants are incorrect. Professor Sedlik took the past licenses into account. *See, e.g.*, Sedlik Dep. 283:22-284:19 (Doc. 210, #10244).

[20] Defendants reliance on *Stross v. Hearst Comm'ncs, Inc,*. No. 5-18-CV-01039-JKP-RBF (W.D. Tex. June 8, 2020) (filed in this matter at Doc. 145-6) is most curious since the expert that was excluded in that case was none other than Defendants' original expert, Ellen Boughn, a fact not mentioned by Defendants in their discussion of this case. *See* Mot. at 21-22. Moreover, the fact that Boughn was excluded in that case is of no relevance since her methodology was entirely different than the methodology used by Professor Sedlik in this case.

licensing agencies and obtained a range of licensing fees for various uses similar to those involved in the case, averaged them, and then applied the average to the 92 alleged instances of infringement. Stemtech's disagreement with the calculation methodology and the underlying assumptions Sedlik made about which images and uses were similar in this case goes to the weight given to his testimony, rather than admissibility." *Id.*

As discussed above, P&G makes an identical complaint regarding Professor Sedlik's usage table in this case that resulted in 674 hypothetical licenses based on Defendants' infringement of 12 separate photographs. P&G likewise argues that Professor Sedlik relied on "unverified information" in his usage table, and P&G takes exception to the sheer number of infringements identified in Professor Sedlik's Table of Usages and the number of licenses in his License Tables. Defendants' arguments should suffer the same fate as the substantively identical arguments made by the defendant in *Leonard*.

Finally, Stemtech also attacked the jury's award of $1.6 million in damages as grossly excessive in a case in which the parties' actual license fee was only $950. Thus, the damages award was a multiple of 1684 times (or more than 168,000 percent) higher than the underlying license fee. The Third Circuit noted that while the award "was quite high, and perhaps surprising, we cannot say it lacked an evidentiary basis such that it 'shock[s] the judicial conscience." *Id.* at 394. Here, P&G paid Navarro $104,500 for the licenses at issue. Bania compares that number to Professor Sedlik's market opinion of $3,091,434 and his past licensing opinion of $4,769,350, and calculates the former results in a damages multiple of more than 29 times (2958%) Navarro's license fee and the latter a damages multiple of more than 45 times (4564%) Navarro's license fee. Bania Rpt. at 12 (Doc. 217-2, #11787). P&G and its experts dismiss these multiples as per se unreasonable, but these damages multiples pale in comparison to the *Leonard*

multiples that were blessed by the Third Circuit.

**D.    The cases cited by Defendants in which courts have excluded expert testimony in licensing cases as being too speculative are readily distinguishable and Defendants ignore the fact that Professor Sedlik's methodology has been repeatedly accepted by numerous courts**

As discussed above, Defendants' challenge to Professor Sedlik's methodology in this case runs smack into the enormous headwind that the same damages methodology he has used in this case has been repeatedly and uniformly approved by numerous other courts in which he has testified to actual damages in copyright cases. Ignoring this elephant in the room, Defendants cite a handful of inapposite cases where courts found the particular damages methodology of the experts in those cases to be speculative.

In *Rivera v. Mendez & Compañia*, 988 F. Supp. 2d 174 (D.P.R. 2013), "the main flaw" with the expert's opinion was that it was premised on "a valuation of Rivera's original artworks, not a valuation of a hypothetical license fee to use, reproduce, and display those works." *Id.* at 179. No such flaw exists in this case.

In *Oracle Corp. v. SAP AG*, 765 F.3d 1081 (9th Cir. 2014), the court held that a damages award of $1.3 billion was speculative, because it was based primarily on "Assumptions," most of which were discredited by other evidence, listed in presentation slides. *See id.* at 1090. Additionally, the court faulted the plaintiff for "not present[ing] evidence of 'benchmark' licenses in the industry approximating the hypothetical license in question." *Id.* at 1093. Here, by contrast, Professor Sedlik surveyed image licensing agencies to identify an appropriate royalty in his Market Rate approach, insisted that Navarro's fee schedule was consistent with rates she historically charged for his Fee Schedule approach, and relied on Navarro's and the models' actual licenses and supplemental licenses in his Model Fee Differential approach.

*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138 (10th Cir. 2000),

did not involve copyright infringement at all.[21] Instead, it involved valuation of $CO_2$, which is a far different market than that for copyright licenses. And even there, the court of appeals held only that the district court's decision to exclude was not "manifestly unreasonable" on the facts of that case, noting that its decision "very well" could have been different if reviewed de novo. *Id.* at 1167-68.

Finally, in *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346 (S.D.N.Y. 2003), the court excluded the expert's opinion because she began with the incorrect "base fee" (for a commissioned photograph rather than a stock photograph), and then made adjustments without any factual basis to support them (such as doubling the base fee). *Id.* at 354-55. Here, Professor Sedlik relied on surveys of licensing agencies, Navarro's fee schedule, and Navarro's and the models' contracts with P&G.

### E. Professor Sedlik is qualified to calculate fraud damages and his methodology is sound.

Defendants attack Professor Sedlik's fraud damages opinion as being speculative and unreliable. Mot. at 25-26. It is not. In addition to calculating copyright damages, Professor Sedlik also calculated fraud damages in the amount of $7,388,000. *See* Sedlik 2/5/20 Rpt. at 53-55 (Doc. 182-2, #7949-51); Sedlik Dep. at 126:13-148:2; 305:18-314:1 (Doc. 210, #10205-10, 10249-52).

Based upon the facts of this case, Professor Sedlik explained the close correlation between the approach he used in calculating copyright damages and fraud damages. *See* Sedlik Dep. at 307:19-314:1 (Doc. 210, ##10249-52). At a high-level, in calculating copyright damages, he began with the license fee that P&G actually paid Navarro for the usage it purchased and

---

[21] The district court also relied on the fact that the expert had not previously used the approach at issue, 226 F.3d at 1166, which is unlike this case, where Professor Sedlik has repeatedly used the same approach, and courts have repeatedly approved of its use.

compared that fee to the amount that Navarro would have charged based upon Defendants' actual usage. The delta between the two numbers represents the actual damages for copyright infringement. *Id*.

The methodology that Professor Sedlik used in calculating fraud damages is essentially the same, but needs to account for the "but for" world in which Navarro assigned or sold the rights to her photographs to P&G instead of merely licensing these rights. Because Navarro had never sold or assigned the rights to her photographs—she granted only limited licenses— Professor Sedlik was required to estimate what she would have charged to assign her rights given there was no historical precedent. The process he used was, in the first instance, to ask Navarro to calculate what she believed she would have charged to assign her rights. Navarro provided Professor Sedlik with her estimate and he then used his professional judgment as a cross-check against certain historical license fees that Navarro had charged and made downward adjustments to Navarro's estimates. *See* Sedlik 2/5/20 Rpt. at 53-55 (Doc. 182-2, #7949-51); Sedlik Dep. at 126:13-148:2; 305:18-314:1 (Doc. 210, #10205-10, 10249-52).

As with their attack of Professor Sedlik's copyright damages, Defendants attack Professor Sedlik's fraud damages as being too high. But Defendants' experts do not perform an alternative fraud damages calculation, and neither Defendants' experts nor their attorneys ever offer an explanation on what the maximum amount of Navarro's fraud damages that would pass muster in their eyes. Rather, in their motion, Defendants improperly conflate the wholly separate concepts of Navarro granting a *license* to use her images versus an *assignment* of outright ownership to her images. *See, e.g.*, Mot. at 7 ("Navarro has never received more than $500,000 for any photograph she has ever taken, let alone twelve of them."). To make this statement complete, Defendants would need to add "Navarro has never assigned any of her copyright

ownership in any of her photographs to P&G and, therefore, there are no transactions in which the parties have agreed what Navarro would charge or P&G would pay for an assignment of her copyright."

### F. Defendants' hodgepodge of additional criticisms of Professor Sedlik's opinions are either irrelevant or, at best, go to the weight and not admissibility of his testimony

#### 1. Defendants' criticisms that Professor Sedlik self-corrected several errors is not a *Daubert* issue and ignores that their own experts' reports had numerous errors which they failed to catch.

Defendants complain that Professor Sedlik self-reported several errors (most caused by a computer crash) in his subsequent reports. However, Professor Sedlik's calculations are quite extensive, and it is hardly the unpardonable sin for his calculations to have had several errors which he then recognized without prompting, and fixed. Defendants cite no case for the proposition that an expert's testimony should be excluded because his original report contained an error that, upon later review, the expert self-identified and corrected.

Professor Sedlik filed a corrected report that fixed the several errors that he had identified in his prior report.[22] Thus, it is hard to imagine what relevance these continue to have, as the corrected report is the operative report. Moreover, none of P&G's experts has identified a single error in Professor Sedlik's corrected report or any of his three rebuttal reports.

By contrast, Defendants' expert reports contained fundamental errors that they did not

---

[22] Defendants identify several corrections that Professor Sedlik made, each of which he made on his own initiative without Defendants' experts pointing out the mistake. *See* Mot. at 14. The only error that resulted in a substantive change in any of his calculations relate to his calculations for the Model Fee Differential methodology that Professor Sedlik explained in his deposition was merely the result of a computer crash that occurred as the exhibits were being uploaded in preparation for serving on opposing counsel, which caused the wrong exhibit to be incorporated into his calculations. Sedlik Dep. at 288:2-290:1 (Doc. 210, ##10245-46). Professor Sedlik's corrected calculations for his Model Fee Differential methodology stand on their own, and the fact that they were corrected from his original report is neither here nor there. Regarding the three bullet point corrections identified at page 14 of Defendants' motion, the first was a simple typo in which "mean" was corrected to "median" (and the actual calculation correctly employed the median as Professor Sedlik intended), and the second and third bullet points identified corrections that had zero impact on any of Professor Sedlik's calculations. (*See* Doc 214-2, #10558).

even know existed until they were pointed out by Navarro's rebuttal experts or Navarro's counsel. For example, Professor Zeithammer's surveys contained several major errors that included (i) having men erroneously included in his two surveys of daily facial hair removal products notwithstanding his intention to limit survey participants to women, and (ii) having 60 percent of one of his surveys include people who took the survey on their mobile phones notwithstanding that mobile phone users were expressly intended to be excluded. (Doc. 218, ##11867-71)[23] Professor Zeithammer did not catch either of these fundamental mistakes prior to or after his report was issued; rather, it was Navarro's experts who identified these issues.

Likewise, one of Doug Bania's key inputs to his expert report was his Schedule F, which purported to include license terms for 16 other projects between Navarro and P&G. However, only 9 of the 16 projects, in fact, were "other projects" between P&G and Navarro, a fact of which Bania was unaware until pointed out in Professor Sedlik's rebuttal report. Bania Dep. at 94:22-96:4 (Doc. 211, #10316).

### 2. Professor Sedlik makes clear that he is not offering any legal opinions in this case and only cited to legal authorities in rebuttal to Defendants' expert.

Defendants' assertions that Professor Sedlik's reports are "teeming with legal arguments and ultimate 'conclusions' on various legal questions" is incorrect. *See* Mot. at 3, 27-28. First, Professor Sedlik's original report does not contain a single legal citation to any case or other legal authority. *See* Doc. 182-2. However, the report of Ellen Boughn, Defendants' original rebuttal expert, contained a legal discussion regarding the supposed legal standard for calculating the fair market value of a hypothetical license, including a discussion of *Dash v. Mayweather*,

---

[23] The actual numbers for this particular conjoint survey involving the facial hair removal products was that of the 449 final survey participants, 269 took the survey on a smart phone, leaving only 180 qualified participants who took the survey on a proper device. The 180 final survey participants is not even a statistically meaningful sample size and, therefore, renders the entire survey worthless. (Doc. 218, ##11869-71)

731 F.3d 303 (4th Cir. 2013) (Doc. 145-1, ##4530-31). It was only in rebuttal to Boughn's discussion of copyright case law that Professor Sedlik addressed any legal authorities in his original rebuttal report. Sedlik 3/31/20 Rpt. at 20-24 (Doc. 214-13, ##11527-31). And even there Professor Sedlik was careful to note that "[w]hile I am admittedly a layperson and not a lawyer, I am familiar with the court's holding in *Dash v. Mayweather*, as I refer to this opinion as a teaching point in my copyright licensing class." *Id*. at #11528.

Thus, Defendants' concern regarding any alleged legal opinions from Professor Sedlik is moot, as he does not intend to offer any. That being said, certain statements contained in Professor Sedlik's reports that Defendants characterize as "legal opinions" are not necessarily so. For example, Defendants partially quote a sentence from Professor Sedlik's original report that "the 2007 Supplier Agreement has no bearing on the copyright ownership in any photographs taken by Navarro for use by P&G." Mot. at 27. But the full sentence from Professor Sedlik's report reads, "Given the behavior of LPK, P&G, and Navarro in repeatedly offering, accepting, and completing limited usage licenses; and based on my knowledge and experience in the negotiation, application, and use of service agreements, purchase orders, estimates, and invoices in the photography and advertising industries, the 2007 Supplier Agreement has no bearing on the copyright ownership in any photographs created by Navarro for use by P&G." Sedlik 2/5/20 Rpt. at 43 (Doc. 182-2, #7939).

In their summary judgment motions, both parties have sought summary judgment on the 2007 Supplier Agreement and argued that it is unambiguous. However, if the Court were to find the 2007 Supplier Agreement to be ambiguous, then the Court will consider extrinsic evidence, which could include Professor Sedlik's expertise on industry licensing agreements and/or industry custom and usage. *See, e.g.*, *Ed Schmidt Pontiac-GMC Truck, Inc. v. DaimlerChrysler*

34

*Motors Co.*, 2008 WL 668242, at *3 n.2 (N.D. Ohio Mar. 4, 2008) (collecting cases). In any event, Defendants' objection to Professor Sedlik's supposed legal opinions is, at a minimum, premature until the Court rules on the pending summary judgment motions that will clarify what issues remain for the jury.

### 3. Contrary to Defendants' motion, Professor Sedlik does not purport to offer an expert opinion on the "Additional Unauthorized Usages"

Shortly before Professor Sedlik's original report was due, Navarro's trial team produced an infringement report documenting nearly 4,000 additional instances of potential infringements based upon additional infringing uses located on the Internet. In his original report, Professor Sedlik noted that he was comparing these usages in the Infringement Report to the usages in his Table of Usages to identify potential duplicates or uses that are otherwise invalid. Professor Sedlik gave a hypothetical example regarding how additional uses identified in the Infringement Report might impact his actual damages calculation. Sedlik 2/5/20 Rpt. at 57 (Doc. 182-2, #7953). At no point in time did Professor Sedlik purport to offer an opinion on actual damages based upon the Additional Unauthorized Uses. As Professor Sedlik made clear in his rebuttal report, "Section GG of my Preliminary Report [discussing Additional Unauthorized Usages] was a clearly stated 'rough estimate' that was expressly not intended to be an opinion of actual damages." Sedlik 3/31/20 Rpt. at 47 (Doc. 214-13, #11554). Thus, Defendants' motion directed to these Additional Unauthorized Uses is moot as Defendants seek to preclude an alleged opinion that Professor Sedlik has not offered and has no intention of offering.

### 4. Defendants' differing views on the relevant facts in this case are not a *Daubert* issue

In the "Factual Background" section of their Motion, Defendants argue that Professor Sedlik's position on licensing for packaging advertising contradicts Navarro's own position. Mot. at 5. Defendants' argument is based on one sentence of one email that Defendants wholly

misconstrue, and Professor Sedlik explained in detail in his deposition his disagreement with Defendants' interpretation of this one email as well as Defendants' interpretation of Navarro's deposition testimony regarding it. Sedlik Dep. at 218:5-241:20 (Doc. 210, ##1228-33). Again, this is a cross-examination issue for the jury to give whatever weight, if any, to this particular email and to Ms. Navarro's or Professor Sedlik's testimony regarding it.

> **5. Professor Sedlik properly considered the amount a willing buyer would have been reasonably required to pay a willing seller at the time they entered into a license, whereas Defendants' two "experts" improperly relied upon a retroactive analysis based upon information that would have been unknown and unknowable to the parties at the time the license was entered into.**

Defendants apparently complain that Professor Sedlik assumed a series of one-year licenses as part of his hypothetical licenses. Navarro agrees with Defendants' statement that with the exception of a license to use one of her Images in a monthly magazine, "the time period associated with the usage [of her Images] is always in years." Mot. at 6. It is odd that Defendants make this point because Professor Sedlik's damages calculations are faithful to Navarro's practice of licensing her images in yearly increments whereas both of Defendants' experts' damages calculations ignored this standard practice. The proper way to calculate damages is (1) to calculate damages based upon a hypothetical and contemporaneous licensing transaction, and (2) to assume an annual term for each license. That is what Professor Sedlik did but what Hazel and Bania failed to do.

What Hazel and Bania did was to use an improper after-the-fact analysis in which they considered the actual number of days that a particular image had been used beyond the terms of the license and then applied a prorated damages calculation to this excessive use for the number of days of excess usage. But this is flawed in two respects. First, it improperly relies on an after-the-fact methodology. *See, e.g.*, *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081

36

(Fed. Cir. 1983) (explaining that damages should "be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical negotiations would have considered at the time of the negotiations"); *Semerdjian v. McDougal Littell*, 641 F.Supp. 2d 233, 239 (S.D.N.Y. 2009) ("Actual damages are to be determined from an *ex ante*, or pre-infringement perspective.").

Upon expiration of the original term of a license between Navarro and P&G, there would be no way to predict the number of days that P&G would ultimately use an image in excess of the original term of the license. Second, it is wrong because the calculation does not assume the annual licenses based upon a full calendar year that Navarro and P&G always entered into, but rather calculates a *daily* license fee as opposed to an *annual* license fee. Such a practice is also consistent with industry standards. *See* Sedlik 3/31/20 Rpt. at 2-3 (Doc. 214-13, #11509-10).

In fact, in his deposition, one of Defendant's experts unwittingly validated Professor Sedlik's damages approach while invalidating his own approach. *See e.g.* Bania Dep. at 112:19-146:19 (Doc. 211, ##10320-29). Bania testified that he calculated Navarro's annual usage fee to be $6,500 per year. Bania thus testified that his damages calculation would be to multiply the $6,500 per year by the actual number of days of usage. If the excess usage was for 2 and ½ years, then Bania's damages calculation would be $6,500 multiplied by 2.5 for a damages amount of $16,250 for a single license of 2 and ½ years. Bania Dep. at 117:4-118:9 (Doc. 211, ##10321-22). However, Bania was forced to admit that (1) this was an after-the-fact calculation based upon information (the exact number of days of excess usage) that would have been unknown to the parties at the time they entered into the extended license, and (2) was not based upon Navarro's and P&G's historical practice of entering into annual licenses. Bania Dep. at 126:14-128:25 (Doc. 211, #10324).

Thus, counsel walked Bania through the actual licensing approach the parties would have undertaken in the hypothetical world in which, at the end of the three-year license term, P&G would have approached Navarro and sought extended usage. First, Bania agreed that since P&G would not necessarily have known how many years of extra usage that it would need for the Image, it would make sense to assume an annual license for one year at $6,500. At the end of year one, if P&G wanted to extend the license, then it would do so for an additional year. Likewise, if at the end of year two, P&G wanted to extend the license, then it would do so for one more year. The net effect of this approach that Bania agreed was the reasonable approach consistent with the parties' actual course of dealing would be that the parties would have entered into three additional annual licenses at $6,500 per year for a total of $19,500 which is *exactly* the methodology that Professor Sedlik used in creating his License Tabless. *See* Sedlik 3/31/20 Rpt. at 47-48 (Doc. 214-13, #11554-55); Bania Dep. at 117:25-118:9; 129:9-134:3 (Doc. 211, ##10321-22, 10324-25). By contrast, the approach used by Bania and Hazel would be to calculate a single license for the 2 and ½ years of actual excess usage for a total of $16,250. Bania Dep. at 117:25-118:9 (Doc. 211, ##10321-22); *see* Hazel Dep. at 203:3-25; 206:16-20; 241:6-242:22; 253:18-23; 254:24-257:22 (Doc. 217-1, ##11702-03, 11711-12, 11714-15) (calculates a retroactive license based upon the number of days of excess usage and the total actual revenues that P&G received from the sale of the products at issue, neither of which numbers would have been known to Navarro or P&G at the time they agreed to a license).

Professor Sedlik's approach is faithful to the way that Navarro and P&G actually operated, faithful to standard practice in the image licensing industry, and faithful to the legal requirement that the damages be calculated based upon a hypothetical transaction that the parties would have entered *at the time* of the negotiation, and not based upon a retrospective transaction

based upon information that was unknown and unknowable to the parties at that time. *Hanson*, 718 F.2d at 1081.

By contrast, the approach advocated by Defendants' two inexperienced and unqualified "experts" relies entirely and improperly on 20/20 hindsight regarding the extent of the usage violation and fails to consider the license extension terms that the parties would have entered into at the expiration of the original license term. Effectively, both of Defendants' experts advocate a fundamentally flawed approach that requires the contracting parties to be mind readers in projecting future usage violations, whereas Professor Sedlik uses the accepted methodology, consistent with standard practice in the image licensing industry, and with careful consideration of what a willing buyer would have been reasonably required to pay a willing seller at the time the license or license extension was entered into, without the benefit of hindsight. *See* Bania Dep. at 121:11-122:25; 134:21-147:21 (Doc. 211, ##10322-23, 10326-29).

## IV.   CONCLUSION

For all the reasons addressed herein, Defendants' *Daubert* motion directed to Professor Sedlik should be denied.

4848-4168-9289

Dated: August 24, 2020

Respectfully submitted,

*/s/  Gary Cruciani*
Gary Cruciani

John C. Greiner (0005551)
**GRAYDON HEAD & RITCHEY LLP**
312 Walnut St., Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
Email: jgreiner@graydon.law

**MCKOOL SMITH, PC**
Gary Cruciani
Carson D. Young
300 Crescent Court, Suite 1500
Dallas, Texas 75201

*Counsel for Annette Navarro McCall and*
*Navarro Photography LLC*

40