IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Western Division - Cincinnati

| | |
|---|---|
| ANNETTE NAVARRO MCCALL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE PROCTER & GAMBLE COMPANY; *et al.*, <br><br> Defendants. | Case No. 1:17-cv-00406-DRC <br><br> Judge Douglas R. Cole <br><br> Magistrate Judge Karen L. Litkovitz |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION TO EXCLUDE EXPERT REPORT OF STEVEN HAZEL AND PARTIALLY**
**EXCLUDE EXPERT REPORT OF DOUG BANIA**

Defendants' Response does not change the fact that their experts Steven Hazel and Doug Bania are unqualified, and that Hazel failed to do the work to reach a reliable conclusion and lacks any factual or legal basis for his opinions. Navarro's Motion should be granted.

**I. HAZEL IS UNQUALIFIED**

   **A. Hazel Is Unqualified to Opine About a Hypothetical Copyright License**

Hazel is unqualified to give an opinion about a hypothetical copyright license between the parties or to rebut the opinions of Professor Sedlik, an actual copyright licensing expert.[1] Navarro does not dispute that Hazel has accounting experience. But he is not qualified to opine about the details of a hypothetical copyright license, because he has no such licensing

---

[1] Hazel's exclusion in other cases is relevant to the Court's consideration of the present motion, because Hazel's previous faulty opinions call into question his qualifications and his ability to render a reliable opinion in this case. *Center City Periodontists, P.C. v. Densply Int'l, Inc.*, 321 F.R.D. 193 (E.D. Pa. 2017), is particularly relevant, where the court excluded Hazel's opinion because he "fail[ed] to account for" a necessary factor in the damages analysis, "render[ing] his model unreliable and ill-fitting." *Id.* at 204. Hazel committed a similar error in this case by failing to take other factors into account in his "sales trend" analysis, discussed in more detail below. *See also Lord Corp. v. S&B Tech. Prods.*, 2012 U.S. Dist. LEXIS 39002, at *3 (E.D.N.C. Mar. 22, 2012) (Doc. No. 221-3 at PageID 12479-50) (overruling objections to Magistrate Judge's finding that Hazel had "not provided an evidentiary basis for the quantitative assumptions that informed his opinion," just like Hazel did not explain how or what evidence he relied on to take other factors into account in his present analysis).

1

experience.[2] The cases on which Defendants rely all involve an accountant merely computing figures, not opining about the details of a hypothetical license. *See, e.g.*, *Thomas v. Deloitte Consulting*, 2004 U.S. Dist. LEXIS 30736, at *12 (N.D. Tex. Nov. 30, 2004) (Doc. No. 221-3 at PageID12770, 12773)[3] (finding accountant qualified to testify whether the plaintiff had received post-termination compensation, even though he did not have employment law experience, because the question on which the expert opined "involve[d] accounting and tax issues," the subject of the accountant's expertise); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (finding accountant qualified to testify on the topic of "analyz[ing] thousands of records concerning Hunt Health's accounts receivable, a job for which an accountant is properly qualified").[4]

The court in *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461 (D. Mass. 2017), allowed an accountant to opine about intellectual property damages, even though the expert "ha[d] not negotiated licenses or sales of intellectual property." *Id.* at 467. The court allowed the expert to do so, however, only because "his opinion [was] not based on those approaches," *i.e.*, the hypothetical negotiation approach. *Id.* Instead, "[h]is [unwitting investment] approach focuse[d] on forensic accounting, valuations of companies and investor contributions more broadly, and the calculation of profits"; in other words, the "subjects where he ha[d] the specialized skill sufficient to serve as an expert witness." *Id.*

---

[2] Navarro disagrees that Hazel has "substantial prior experience . . . related to photographs." *See* Defs. Resp. at 3 (Doc. 221 at PageID 12458). At his deposition, Hazel claimed to have been hired in such cases in the past, but he could not provide any details about those engagements, and could not even remember if he ever wrote a report (much less testified) in those cases. *See* Hazel Dep. 196:3-197:7 (Doc. 217-1 at PageID 11700). In any event, that kind of litigation experience still would not give him the type of licensing experience necessary to support his opinion.

[3] So that the parties' briefs all cite to the same version of an opinion, with consistent page numbering, this brief uses Lexis citations (and corresponding document numbers) for authorities that Defendants cited using Lexis citations. Otherwise, this brief uses WestLaw citations, where such a citation is available.

[4] Notably, Defendants do not respond to Navarro's citation of *United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998), where the court precluded an "accountant with no banking experience" from opining about how a particular form of financing was used in the banking industry.

4850-7065-3641

*Leon v. Kelly*, 2009 U.S. Dist. LEXIS 39010 (D.N.M. Jan. 1, 2009) (Doc. No. 221-3 at PageID 12796), is similar. The court emphasized that the accountant's opinion did "not involve an intensive analysis of the construction industry or of contracting," but rather was a simple "calculation of profits or business valuation." *Id.* at *46 (PageID 12810). In fact, the court described the expert's work as "performing basic financial calculations." *Id.* at *47. The court held that the expert was qualified to give such an opinion.[5]

Here, by contrast, Hazel purports to conduct a "hypothetical licensing negotiations" analysis, the very topic in which he has no experience. *See* Hazel 2/20/20 Rpt. at 3 (Doc. 145-2 at PageID 4535) ("FTI engaged in an analysis of three alternative hypothetical licensing negotiations . . . ."). For example, he makes choices about the term of the hypothetical license (daily), opines about the number of licenses that allegedly would have been necessary and the parties would have entered, and claims that the hypothetical licenses could have been based on Defendants' revenue. All these opinions require licensing expertise, but Hazel has none and is thus unqualified to offer them.

Navarro's point is not that an accounting expert must *always* have specific experience in the underlying field. If an accounting expert is just using math to perform calculations (as Hock, Defendants' other accounting expert, did), the underlying field is likely not relevant to the accounting expert's task (as in the case of Hock). But if the expert opines about something field-

---

[5] Defendants have retained another accounting expert in this case, Keith Hock, whose expert opinions are properly limited to the area of his accounting expertise. *See* Hock Expert Report at Doc 192-1. Hock performs calculations regarding revenues and expenses that are the type of calculations for which an accountant is well-suited. Hock appropriately limits his opinions to areas within his accounting expertise and, as such, Navarro has not filed a *Daubert* challenge to his opinions. Hazel is qualified to have done the calculations and rendered the opinions that Hock did. However, rather than limiting his opinions to the areas of his expertise, Hazel has strayed far afield by purporting to be Defendants' omnibus expert who purports to offer rebuttal opinions in the fields of photography licensing (rebutting Professor Sedlik) and marketing (rebutting Larry Chiagouris). Hazel also purports to second the opinions of Defendants' survey expert (Professor Zeithammer). But in all three instances, Hazel is unqualified to render expert opinions in the disciplines of photography licensing, marketing, or surveys. Rather, he is simply serving the role of an advocate masquerading as an expert.

specific—such as the form a hypothetical photography license would take, as Hazel does here—the expert must have field-specific expertise, or rely on another expert who does.[6] Hazel flunks that standard, so his unqualified opinion should be excluded.

### B. Hazel Cannot Opine on Zeithammer's Surveys

Hazel also is unqualified to render an opinion blessing Zeithammer's surveys. If the Court grants Navarro's Motion to Exclude Zeithammer (it should), it also should exclude Hazel's "me too" testimony about the surveys. Defendants do not argue that Hazel's testimony about the surveys can survive without Zeithammer, implicitly admitting that the two rise and fall together. *See* Defs. Resp. at 9 n.4 (Doc. 221 at PageID 12462 n.4).

Even if the Court does not exclude Zeithammer's testimony, however, it should exclude Hazel's testimony about the surveys. First, Defendants and Hazel himself admit that he is not a survey expert. In fact, when asked if he did not "have an opinion because [he does not] have a basis to have an opinion whether Professor Zeithammer's survey is correct or incorrect," Hazel said that was "fair," and that he was "not a survey expert." Hazel Dep. at 156:21-157:3 (Doc. 217-1 at PageID 11690). Yet, Defendants persist in arguing that Hazel may "draw his own independent conclusions . . . based on the survey results." Doc. 221 at PageID 12461. Because Hazel admittedly is not a survey expert and denied having an opinion on whether the survey was correct or incorrect (because he was not qualified to do so), the Court should not allow him to present "independent conclusions" based on Zeithammer survey results. In other words, Hazel cannot give the survey results his "independent" blessing, as he lacks the expertise to do so.

Second, allowing Hazel to repeat Zeithammer's findings would permit him to unfairly

---

[6] Even the Litigation Services Handbook that Defendants cite for another point recognizes that "[p]arties may use industry experts *who have negotiated licenses or royalties for comparable works in the past* to establish" the value of a hypothetical license. *See* Litigation Services Handbook ¶ 22.2(a)(ii) (Doc. 221-2 at PageID 12715) (emphasis added).

parrot those results, giving them the illusion of consensus. *See Iconics*, 266 F. Supp. 3d at 469 (explaining that an expert may not "'parrot' the conclusions of other witnesses"); *Thorndike v. DaimlerChrysler Corp.*, 266 F. Supp. 2d 172, 185 (D. Me. 2003) (excluding the portion of an expert's opinion that merely "parroted" other experts' conclusions).

Defendants deny that Hazel is merely parroting or wholesale adopting Zeithammer's conclusions, arguing that Hazel "asked questions" about and "examine[d]" Zeithammer's findings. But those actions do not reflect the application of any independent expertise or show that Hazel conducted any of his own analysis of the survey results. Rather, his report merely describes what Zeithammer did. *See* Hazel 2/20/20 Rpt. at 9, 11 (Doc. 145-2 at PageID 4541, 4543). It does not offer any new analysis. Because Hazel's opinion adds nothing to Zeithammer's survey results—both because Hazel is unqualified and because he did not do the work to reach any independent opinion—Hazel should not be allowed to put his "stamp of approval" on the surveys.

## II. BANIA IS UNQUALIFIED

Like Hazel, Bania also is unqualified to offer an opinion[7] about a hypothetical copyright license between the parties in this case. Bania's expertise does not encompass copyright licensing practices. Bania offers opinions purportedly "[b]ased on [his] licensing expertise," Doc. 217-1 at PageID 11787, even though he purportedly has served as an expert in a copyright photography case only one time, but remembers nothing about that engagement. *See* Bania Dep. 21:24-22:6 (Doc. No. 211 at PageID 10297-98). Bania's generic "intellectual property" licensing

---

[7] Hazel also purports to rebut the expert opinion of Chiagouris, Navarro's marketing expert, albeit Hazel's "rebuttal" consists of two wholly conclusory paragraphs in which Hazel summarily concludes that Chiagouris's findings are "of no value in this case." *See* Hazel 2/20/20 Rpt. at 12 (Doc. 145-2 at PageID 4544). This passing comment does not even qualify as an expert opinion; however, to the extent that it does then Hazel has no marketing expertise that would entitle him to render an expert opinion in rebuttal to Chiagouris. *See* Hazel Dep. at 47:10-15, 48:16-21 (Doc. 217-1 at PageID 11663) (Hazel does not consider himself to be a marketing expert, has never offered an opinion as a marketing expert, and is not planning on offering any marketing expert opinions in this case.)

experience is not an adequate substitute for *photography copyright* licensing in this case. Because Bania purports to opine about issues specific to photography licensing—such as whether a license typically allows use of the copyrighted Image in advertisements for the product on which the Image appears, *see, e.g.*, Bania Rpt. at 13 (Doc 217-2 at PageID 11788)—copyright-specific experience is necessary. But as he said at his deposition, he "do[es] not negotiate photography licensing rights." Bania Dep. at 33:20-25 (Doc. 211 at PageID 10300). He therefore is unqualified to opine about the meaning or scope of typical copyright licenses or the form a hypothetical license would take here.

Bania also is unqualified to opine on liability. By his own admission at his deposition, his expertise in this case is "not based on any liability issues"; it is "strictly limited to damages." Bania Dep. at 27:9-13 (Doc. 211 at PageID 10299). Yet he purports to offer opinions that some of the allegedly infringing uses were actually within the scope of the parties' licenses, so therefore Navarro is not entitled to damages with respect to those uses. *See* Mot. at 11 (Doc. 217 at PageID 11637) (providing examples). Defendants admit that those opinions are "related to the scope and detail of the alleged licenses regarding Navarro's photographs." Defs. Resp. at 12 (Doc. 221 at PageID 12465). That is exactly the kind of liability opinion that Bania is not qualified to offer and denied that he would offer. The Court should preclude him from presenting a liability opinion to the jury, even if Defendants attempt to disguise the liability opinion as a "no damages" opinion.

### III. HAZEL'S OPINION IS UNRELIABLE

Putting aside Hazel's lack of qualifications, his opinions are inadmissible for the additional, independent reason that they are unreliable.

#### A. Hazel's Trend Analysis Is Worthless

Hazel's "trend analysis" borders on the comical in that he (more to the point, an unknown

person within FTI) drew a line connecting a point A to a point B on a chart—a task that Hazel admits "a ten year old with a crayon" could have done—and dresses this up as an "expert opinion." Hazel Dep. at 75:24-76:25, 97-20-98:4 (Doc. 217-1 at PageID 11670, 11675-76).[8] Defendants fail to address the substance of Navarro's arguments regarding Hazel's opinions, but instead quibble over terminology, arguing that Hazel conducted a "sales trend" analysis instead of a "trend-line" analysis. Whether called a "sales trend" analysis or a "trend line" analysis, the substance of Hazel's analysis is unreliable, and therefore inadmissible.

First, the "analysis" is nothing of the sort. Defendants now practically admit that the dotted line on Hazel's charts is unhelpful. *See* Doc. 221 at PageID 12467 ("[T]he analysis depicted in the chart is the solid blue and orange lines."). As described in Navarro's Motion, Hazel does not know who drew the line, or why that person drew it as he or she did. Testimony that an unknown person drew a line on a chart for an unknown reason, (presumably) based on some undefined methodology, is neither helpful nor reliable.

Second, putting aside the lack of any discernible methodology, Hazel's trend opinion is unreliable for the additional reason that he completely failed to control for other factors that could have affected P&G's sales represented in the charts. The problem is not that Hazel did not eliminate *all* possible alternative factors, but that he did not show how he considered (much less eliminated) *any* other possible factor. Expert analysis that "fail[s] to correct for salient factors" is "worthless." *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998); *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (holding that the "expert's failure to make any adjustment for" other variables "indicate[d] a failure to exercise the degree of care that a statistician would use in his scientific work, outside

---

[8] In fairness to Hazel, his actual testimony was that "my ten year old could do it, but maybe yours couldn't." Hazel Dep. at 75:24-76:25 (Doc. 217-1 at PageID 11670).

the context of litigation," and therefore the opinion was inadmissible); *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) (holding that "failure to control for differences" made the expert's analysis "essentially worthless"); *Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 54-55 (D. Conn. 2004) (excluding study because expert did not control for any potential confounding factors).[9]

*In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014), is instructive. In that case, the defendant's expert analyzed the effect of an alleged antitrust conspiracy on e-book prices. The court excluded that analysis, however, because the expert "fail[ed] to control for systematic factors affecting prices." *Id.* at *10. "Some of [the expert's] 'analyses' simply chart[ed] the price at which titles were sold over time." *Id.* Thus, the court held that the expert's opinion was "unreliable and likely to mislead and confuse a jury." *Id.* Similarly here, Hazel simply purported to chart the volume of P&G's product sales over time, and failed to control for any other factors in reaching his conclusion. He did not, for example, take into account any change in P&G's advertising expenditures, the state of the economy, or any other factors on a long list of variables that could have impacted P&G sales. *See* 3/31/20 Chiagouris Rpt. 16-18 (Doc. No. 217-3 at PageID 11832-34).

Defendants assert that Hazel took other factors into consideration in reaching his conclusion, but Hazel's unsupported say-so in his deposition is not enough. Hazel did not identify any such factors or describe how he considered them in his report. When confronted at his deposition and asked what factors he analyzed in the sales trend, he first responded, "I don't think we did anything specifically." Hazel Dep. 159:16-19 (Doc. 217-1 at PageID 11691). He

---

[9] Navarro's Motion cited numerous other cases for the same proposition. *See* Doc. 217 at PageID11642-43 (citing *Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, 2015 WL 12001264 (W.D. Tenn. June 30, 2015); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010)). Defendants did not even attempt to distinguish those cases in their Response.

4850-7065-3641

then claimed to have considered "economic factors, accounting factors, finance factors, any other factor, . . . inventory-management factors, any other factors that we could come up with that will affect" the sales trends. *Id.* at 159:23-160:4 (Doc. 217-1 at PageID 11691). But he then admitted that he did not do a quantitative analysis of those factors, and that he did not discuss anywhere in his expert report how he considered any other variables, quantitatively or otherwise. *Id.* at 160:5-177:10 (Doc. 217-1 at PageID 11691-95).

Defendants contend that "Plaintiffs fail[ed] to show that any of these variables would have impacted the conclusions Mr. Hazel drew from his analysis." Doc. 221 at PageID 12468. Putting aside that Defendants are incorrect—Gannon's analyses indicate that a statistically rigorous analysis shows that P&G sales were lower than anticipated after Navarro's Images were removed from the packaging, Gannon 3/31/20 Rpt. at 29 (Doc. No. 200-7 at PageID 9148)—it is not Navarro's burden to show that Hazel's conclusions are unreliable. Rather, it is Defendants' burden to show that Hazel's conclusions are reliable. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) ("It is the proponent of the testimony that must establish its admissibility by a preponderance of proof."). Because Hazel failed to consider alternative explanatory factors to make his analysis reliable, Defendants cannot carry that burden.

Hazel's failure to consider other factors also distinguishes this case from the ones on which Defendants rely. For example, in *Brighton Collectivble, LLC v. Believe Productions, Inc.*, 2017 U.S. Dist. LEXIS 15086 (C.D. Cal. Jan. 30, 2017) (Doc. No. 221-3 at PageID 12818), the court recognized and cited several cases for the proposition that a sales trend analysis may be inadmissible if the expert completely fails to control for other factors. *Id.* at *14-15 (PageID 12823). "Under the circumstances of th[at] case," however, the court held that the expert's sales trend analysis was admissible because the expert "controlled for certain variables which he

9

viewed as important," even though he did not control for other variables. *Id.* at *16. Here, by contrast, Hazel did not control for *any* variables.

In *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384 (D.N.J. 2009), the court recognized that "where 'many potential intervening factors can affect the plaintiff's sales, and the presence of such factors bears on the sufficiency of the plaintiff's proof,' a sales trend approach *will be insufficient*." *Id.* at 487 (emphasis added) (quoting Restatement (Third) of Unfair Competition § 36 comment i).

Defendants cite *Omega Engineering, Inc. v. Eastman Kodak Co.*, 30 F. Supp. 2d 226 (D. Conn. 1998), with the parenthetical description "describing sales trend analysis for lost profits calculations in intellectual property and business dispute." But *Omega Engineering* actually supports Navarro. There, the court described an expert's sales trend analysis and then rejected it as "highly suspect and fundamentally unsound," especially because the expert could not "meaningfully isolate" (*i.e.*, control for) the cause of any difference in sales. *Id.* at 263.

Even the Litigation Services Handbook that Defendants cite recognizes that "[o]ther factors could affect the profitability of the with-and-without [infringement] versions: the condition of the overall economy, the amount of advertising used, demand for the work's market segment, the work's age, and competing products." Litigation Services Handbook ¶ 22.2(b) (Doc. 221-2 at PageID 12718).[10] Hazel failed to take any of those factors into consideration.

Because Hazel's trend "analysis" is no analysis at all and could have been done by a ten-year old (albeit Hazel's ten year old), and fails to take into account widely recognized factors other than Navarro's Images that could have impacted P&G's sales trends, Hazel's opinion is unreliable, and the Court should exclude it.

---

[10] Navarro agrees with Defendants that the Litigation Services Handbook says that "mathematical techniques (such as regression)" are "helpful." The Handbook does not support the proposition, however, that such techniques are unnecessary. *Contra* Defs. Resp. at 13 (Doc. 221 at PageID 12466).

### B. Hazel's Actual Damages Methodologies Are Unreliable Because They Lack a Sufficient Factual or Legal Basis

Hazel purports to rebut Sedlik's actual damages opinions by presenting three alternative actual damages methodologies. Putting to the side Hazel's complete lack of qualifications, *see supra*, his methodologies are unreliable, because they are inconsistent with both the facts and the law.

First, Hazel's invoice-methodology opinion is unreliable because he does not have any evidentiary basis for his conclusions. For example, he calculates an "after-the-fact" daily license rate, even though Navarro and P&G always agreed to licenses measured in years, a practice that is consistent with industry standards. *See* Sedlik 3/31/20 Rpt. at 2-3 (Doc. 214-13 at PageID 11509-10). Using a daily license rate is not only incorrect as a matter of fact, but also as a matter of law. The hypothetical license must "be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical negotiations would have considered at the time of the negotiations." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983); *see also Semerdjian v. McDougal Littell*, 641 F. Supp. 2d 233, 239 (S.D.N.Y. 2009) ("Actual damages are to be determined from an ex ante, or pre-infringement perspective."). Because the parties would not have known in advance the number of days during which Defendants' infringement would continue, using a daily rate is inappropriate. Hazel's daily rate calculation lacks any evidentiary basis, so it should be excluded.

Second, Hazel's revenue-based methodology also is inconsistent with the facts and the law. Using this methodology, Hazel opines that Navarro would have received a portion of the revenues earned from P&G products using her Images. Hazel admitted, however, that Navarro and P&G had never negotiated license fees using this "revenue-based" methodology, so it is has no basis in the parties' previous dealings. *See* Mot. at 22 (Doc. 217 at PageID 11648). There is

11

zero evidence that P&G would ever have agreed to pay Navarro or that she would have agreed to accept a license fee based upon the revenues P&G generated from product sales that used Navarro's Images. Hazel created this revenue-based methodology out of whole cloth. Hazel also was unaware of any case that had approved this methodology or any experts who had relied upon it. *Id.* And like the invoice-methodology approach, it relies on facts that were not known—and could not have been known—to the parties at the time of the hypothetical negotiation. That is improper. *See Hanson*, 718 F.2d at 1081; *Semerdjian*, 641 F. Supp. 2d at 239.

Finally, Hazel's rights-managed methodology also is unreliable. Navarro's objection is not to a properly implemented rights-managed methodology (like Sedlik's), but rather to the way in which Hazel implemented that methodology. For example, Hazel relied on license fees for a single, stock photograph, even though the hypothetical licenses here primarily involve multiple photographs specially created for a client. Sedlik 3/31/20 Rpt. at 6-8 (Doc. 214-13 at PageID 115013-14). He also ignored whether the scope and circumstances of the licenses on which he relied were similar to the hypothetical license here, and instead assumed they were coextensive. *Id.* Additionally, he did not average license fees across multiple vendors, as Sedlik did, but instead relied on a single stock photo vendor. *Id.* At bottom, Hazel's third approach is unreliable because he failed to ensure that the underlying licenses were actually comparable to the hypothetical license. There is no factual or legal precedent for the way in which Hazel implemented his rights-managed methodology, so it is unreliable and should be excluded.

### IV.   CONCLUSION

For these reasons, the Court should preclude Hazel from presenting his unreliable opinions, which he is unqualified to offer. The Court should also strike the improper portions of Bania's report and prevent Bania from offering those opinions in front of the jury.

Dated: September 4, 2020

Respectfully submitted,

*/s/ Gary Cruciani*
Gary Cruciani

John C. Greiner (0005551)
**GRAYDON HEAD & RITCHEY LLP**
312 Walnut St., Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
Email: jgreiner@graydon.law

**MCKOOL SMITH, PC**
Gary Cruciani
Chelsea A. Priest
Carson D. Young
300 Crescent Court, Suite 1500
Dallas, Texas 75201

*Counsel for Annette Navarro McCall and Navarro Photography LLC*

13

4850-7065-3641