IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| ANNETTE NAVARRO MCCALL and NAVARRO PHOTOGRAPHY LLC, | : | |
| | : | No. 1:17-CV-406-DRC |
| Plaintiffs, | : | |
| v. | : | Judge Douglas R. Cole |
| | : | |
| THE PROCTER & GAMBLE COMPANY and WALMART INC. (f/k/a WAL-MART STORES, INC.), | : | Magistrate Judge Karen L. Litkovitz |
| | : | |
| Defendants. | : | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR *DAUBERT* MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF JEFFREY SEDLIK**

Defendants The Procter & Gamble Company ("P&G") and Walmart Inc. (collectively "Defendants") hereby submit this reply brief in support of their motion to exclude the expert testimony and report of Jeffrey Sedlik ("Motion"), a purported expert proffered by Plaintiffs ("Plaintiffs" or "Navarro").

**I.  INTRODUCTION**

Plaintiffs' principal argument as to why this Court should allow Mr. Sedlik to testify in this case is because his "tried and true damages methodology" was allowed by the *Leonard* court. This simplistic plea highlights Plaintiffs' lack of response to almost every one of Defendants' challenges on the merits, which, in total, demonstrate that Mr. Sedlik's testimony is so unreliable it would confuse the jury and prejudice Defendants. Plaintiffs' Opposition either ignores or addresses only superficially the following arguments:

1

- Mr. Sedlik makes the unsupported leap from Navarro's historical invoicing precedent[1] of bundled rights worth $104,500 to his $3 to $4.7 million actual damages' opinion based on an assertion that 674[2] separate and discrete licenses are required (Mot., Doc. # 214, PageID 10545–47);

- Mr. Sedlik provides no explanation for why Navarro invoiced "Internet" as a bundled right, which he admits would have included commercial blogs, yet his hypothetical licensing fee requires nearly 50 individual, discrete licenses valued at more than $300,000 for commercial blogs here (*Id.*, PageID 10544);

- Mr. Sedlik provides no explanation for why Navarro invoiced "FSCI" as a bundled right for three years for $10,500 (inclusive of other usages) in one instance, yet his hypothetical licensing fee requires more than 230 individual licenses for separate and discrete FSCI's valued at more than $700,000 in total for Daily Facials alone (*Id.*, PageID 10544–45);

- Mr. Sedlik provides no support for the leap between identifying a model differential by product yet applying an average and highest model fee differential across the board to reach a third actual damages opinion in excess of $4 million (*Id.*, PageID 10549); and

- Mr. Sedlik provides no support for an across-the-board $624,375 price tag for an alleged "assignment" of copyrights across 12 unequally created and differently utilized images when Navarro's assignment rates are allegedly based upon a five-year worldwide buyout and she previously invoiced these types of rights for $21,000 (*Id.*, PageID 10550).

Plaintiffs do not address these arguments. Under *Daubert*, this Court must act as a gatekeeper to the admission of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "An indispens[a]ble component of a reasonable license fee is, quite obviously, that it be reasonable." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 358 (S.D.N.Y. 2003). "In assessing the reliability of an expert opinion, a resort to common sense is not inappropriate." *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 286 (S.D.N.Y. 2000) (excluding expert testimony when, despite its "dazzling sheen of erudition," it reached "a result which any average person could readily recognize as preposterous").

---

[1] Defendants maintain that the invoices on which Plaintiffs rely were not copyright licenses at all (*see* Defs.' MSJ, Doc. # 185-1; Defs.' Opp., Doc. # 207; Defs.' Reply, Doc. # 212), but assuming for the sake of argument that Mr. Sedlik's analysis is properly premised on licenses, it is fatally flawed for all the reasons herein.

[2] In the opening brief, Defendants referred to 672 licenses as Mr. Sedlik testified to in his deposition. (Mot., Doc. #214, PageID 10527.) It appears that the number of licenses upon which he opines, however, appears to be 674.

Mr. Sedlik's multi-million dollar hypothetical license fee for the uses at issue—uses identical to those Navarro invoiced for just tens of thousands of dollars on numerous occasions—is anything but "reasonable." Instead, it violates all notions of common sense and is a transparent attempt to engineer a windfall figure for Plaintiffs. It would not assist any trier of fact at arriving at a reasonable outcome, and would be confusing and highly prejudicial to the Defendants. This Court should grant Defendants' Motion to Exclude the Report and Testimony of Professor Jeffrey Sedlik.

**II.  ARGUMENT**

Despite numerous examples of actual amounts paid by P&G for usage of Navarro's photographs, several of which are for the exact photos at issue in this litigation (Mot., Doc. # 214, PageID 10529–32)—and none of which reach six figures—Mr. Sedlik applies his "tried and true damages methodology" to opine that Navarro is entitled to millions of dollars in actual damages. The only consideration Mr. Sedlik gives to Navarro's prior invoicing history with P&G (or other similarly situated clients) is in the Navarro Fee Schedule. Conveniently for Plaintiffs, this Fee Schedule is entirely based on what Navarro herself claims she *would have* charged for the alleged overuse, and includes figures that are magnitudes greater than what she *actually did charge* in the past. Without knowing from what figures Navarro could have possibly started, it is clear that Mr. Sedlik's request to revise her figures down to be "proportionately consistent" with the fees she historically charged was merely paying lip service to the process. (*See* Opp., Doc. # 223, PageID 12881.) Such an exercise cannot salvage his complete "results-driven" testimony as the result remains untethered from the facts. *See In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, No. MDL No. 2:14-mn-02502-RMG, 2016 WL 827067, at *4 (D.S.C. Feb. 29, 2016).

3

To help justify Mr. Sedlik's wildly unreasonable approach and conclusions, Plaintiffs argue that P&G's "rampant and pervasive" infringement is the reason for the purported requirement of 674 hypothetical licenses. (Opp., Doc. # 223, PageID 12873.) But this is grossly misleading. In fact, it is Mr. Sedlik's opinion—and Mr. Sedlik's opinion alone—that a single, discrete license is required for every single instance of P&G's use of the photographs at issue, despite the fact that this approach runs contrary to the norms established by Navarro herself. To be clear, Mr. Sedlik argues that separate and unique licenses were required for: (1) sales of packaged product by different retailers during the same time period; (2) every single coupon sold or imagined to have been sold; and (3) every single blog post, etc. But common sense and Navarro's own prior invoicing practices invalidate this approach. The truth is, Navarro commonly invoiced her services by *bundling* usages, rather than requiring separate, unique invoices every single time a photograph was used. To require otherwise would be to create an unwieldy and unreasonable process for both the photographer and the purchaser. Mr. Sedlik clearly advocates this approach not because of its anchor in reality and common practice, but because it supports a wildly unreasonable windfall for Plaintiffs. This is "the epitome of results-driven, litigation-driven expert testimony" that should be excluded. *In re: Lipitor*, 2016 WL 827067 at *4.

Mr. Sedlik's Model Differential methodology is no more relevant or reliable. (Mot., Doc. # 214, PageID 10548–50.) Plaintiffs offer no explanation as to why it is at all reliable to apply the average model differential across the different projects. Indeed, such a step completely negates any rationale for using the novel model differential methodology to begin with. As Mr. Sedlik also applied the maximum model differential across all projects, this is yet another instance of a "results-driven" decision that should be excluded. *See In re Liptor*, 2016 WL 827067 at *4.

The entirety of Mr. Sedlik's damages opinions are "results-driven," "not reasonable," and defy "common sense" such that they should be excluded under Fed. R. Evid. 702 or 403. What remains is either an opinion on the ultimate issues of fact or law and, as such, should be excluded as well.

### A. Mr. Sedlik's Opinions Based on His Market Rate and Navarro Fee Schedule Methodologies Are Not Relevant Nor Reliable.

Plaintiffs try to summarize Defendants arguments as follows: (1) there are "just too many infringements at issue" and (2) "there is some *per se* limitation that has apparently been exceeded in this case regarding the license fees actually charged by Navarro as compared to the amount of claimed damages." (Opp., Doc. # 223, PageID 12873.) But Plaintiffs entirely misrepresent Defendants' position. While it is true that Defendants believe Navarro's tabulations of infringement contained within the Table of Usages is inaccurate, Mr. Sedlik's report is unreliable *because it does not fit the facts of the cas*e—most specifically that the parties have an established prior invoicing history. Mr. Sedlik's complete disconnect from this fact pushes this expert testimony over the line separating testimony to be afforded little weight to testimony that should be excluded as more prejudicial than probative. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed. R. Evid. 403.")

### 1. Mr. Sedlik's Actual Damages Opinions Do Not Fit the Facts of the Case.

The exact photographs at issue in the litigation were invoiced by Navarro multiple times. Shockingly, Mr. Sedlik ignores this. As explained in the Motion, this dictates that his testimony be excluded on his Market Rate and Navarro Fee Schedule opinions. *See Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) ("The hypothetical-negotiation determination must be tied

5

to the particular work at issue and its marketplace value . . . .); *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 331 (S.D.N.Y. 2003) (excluding as "unreliable" opinion of expert who was "not concerned about the actual history of the Defendant's actual use of the Plaintiffs'" works).

Incredibly, Plaintiffs' counsel's recitation of the steps Mr. Sedlik allegedly took to perform his analysis does not include his review or consideration of the contemporaneous invoices related to the products at issue in this case. (*See* Opp., Doc. # 223, PageID 12878–84.) Nor does it include a review of Navarro's invoices related to similar products not at issue in this case but that were negotiated with other consumer products companies contemporaneously. (*Id.*) Not once.[3]

Neither Mr. Sedlik nor Navarro provide any explanation why any rational consumer products company would pay millions of dollars to use Navarro's photographs. In fact, P&G paid only $2,000 for <u>all worldwide print and web for two years</u> when replacing Navarro's photographs on the Daily Facials packaging. (Mot., Doc. # 214, PageID 10551.) Navarro has never received $500,000 for any groupings of photographs, let alone a single one. (*Id.*, PageID 10532.)

Completely ignoring this analytical gap in the testimony, Plaintiffs instead defend Mr. Sedlik's testimony by stating that it is "the same courtroom-tested methodology he has used in the many other copyright cases where he has testified" (Opp., Doc. # 223, PageID 12894), specifically *Leonard v. Stemtech Health Scis., Inc.*, No. CV 08-067-LPS-CJB, 2013 WL 5311295 (D. Del. Sept. 23, 2013). Plaintiffs state that "the factual similarities between this case an*d Leonard . . .* merits extended discussion." (Opp., Doc. # 223, PageID 12894.) But it is unclear what, if any, of the facts relevant to determining *whether an actual damages methodology is reliable* are similar.

---

[3] At most, Mr. Sedlik discussed "Navarro's fee schedule" with her and "requested that she adjust the fee schedule to ensure that the fees in the schedule were consistent with fees she historically charged." (Opp., Doc. # 223, PageID 12881.)

In fact, the parties in *Leonard* did not appear to have any prior history *at all*, let alone for the exact same photos at issue in the litigation. 2013 WL 5311295 at *4. While Plaintiffs argue that Leonard's prior licensing history through a stock photo agency ranged in amounts and media and time period, the court noted that "many, if not all, of [these prior invoices] were for editorial or educational uses" and that "[l]icense fees for such uses are considerably less than fees for commercial use [at issue in the litigation.]" *Id.* at *6 n.10. While application of a rights-managed benchmark licensing exercise might have been reasonable in light of the facts in *Leonard*, the facts actually relevant to determining a reliable methodology for the usages at issue in this case are wholly different here.

An a la carte rights-managed methodology is inapt when an extensive prior invoicing history exists between the parties and involving these same photographs. The cases Defendants cite for this specific, relevant inquiry are unmentioned by Plaintiffs in the Opposition, with the exception that Plaintiffs cursorily state that *Stross* is "entirely different" than this case. (Opp., Doc. # 223, PageID 12897.) But *Stross* is on point because it addresses the inadmissibility of an expert opinion that ignores prior practices in lieu of a rights-managed license benchmark. In *Stross*, the photographer gave certain publications permission to publish the photos at issue, although he alleges that numerous uses by the defendants were unauthorized uses. (*Stross* Or., Doc. # 145-6, PageID 4652.) The parties did not dispute that the photos in question generated no more than $20,000 or at most $40,000 in revenue. (*Id.*, PageID 4655.) Plaintiff's expert provided a $556,577 hypothetical license fee for the use of the photographs in question based on a three step process: (1) a hypothetical fee that a licensee might pay a stock photo agency for a single appearance of a single photograph; (b) multiplying that fee by the 6,620 unauthorized appearances of the photographs; and (c) applying a volume discount. (*Id.*, PageID 4654–56.)

7

But the court excluded the expert's testimony entirely, noting several concerns. First, the "method, to start, assumes without adequate justification that a fair-market-value figure in these circumstances would not take into consideration <u>the actual licensing history</u> of these photographs." (*Id.*, PageID 4654 (emphasis added).) Second, the court noted that the "ultimate hypothetical fee" did not "line up with other circumstances of the case," namely that "Plaintiff doesn't seriously dispute—that use of the photos in question generated no more than $20,000 or at most $40,000 in revenue" so the Plaintiff's expert's fair market value assessment of "over $550,000" while "not necessarily determinative" is "certainly a red flag." (*Id.*, PageID 4655) And third, the court noted that the expert applied *only* a 10% bulk discount, and could point to no license fee in a similar set of circumstances comparable to the $550,000. Lastly, the court noted that without an expert, plaintiff is "free to prove up valuation by other competent, reliable evidence" which the court expects to be "evidence of the range of <u>actual prior transactions</u> involving these photographs" as that would assist the factfinder. (*Id.*, PageID 4656 (emphasis added).) Ultimately, according to the *Stross* court, all of these issues "reflect an expert valuation suffering from a reliability problem fed by unexplained gaps in reasoning" and indicate that the opinions "are likely to confuse, rather than inform, the factfinder." (*Id.*)

The same fatal flaws exist here. First, Mr. Sedlik's also method "assumes without justification" that a fair market opinion "would not take into consideration the actual licensing history of these photographs." Second, Mr. Sedlik does not dispute that the photographs in question "generated no more than $20,000" in broad usage fees for a multi-year period—yet he opines that 674 separate and discrete licenses valued in excess of $3 million would have been required. Third, Mr. Sedlik applied *no* bulk discount fee and he completely ignored the fact that Navarro bundled usage rights in her invoices for one relatively nominal fee. And fourth, Mr.

8

Sedlik can point to no instances in which the plaintiff—or anyone—has ever received millions of dollars for use of any photograph in a similar set of circumstances. (Sedlik Dep., Doc. # 210, PageID 10248–49.)

Similarly, Plaintiffs do not address *Bruce v. Weekly World News* where the court noted that the photographer "would not have been able to negotiate with [Defendants] for anything other than a single, lump-sum, up-front licensing fee, as distinguished from a per-use fee such that the plaintiff could receive only $17,000 in actual damages," i.e., what he would have received from a broad up-front license, rather than the $359,000 in purported lost license fees. 310 F.3d 25, 30 (1st Cir. 2002).

Because Mr. Sedlik's entire Market Rate and Navarro Fee Schedule opinions suffer from these same fatal flaws, they should be excluded. *See Country Rd. Music, Inc.*, 279 F. Supp. 2d at 330 ("Where an expert's opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, or assumptions that represent <u>a complete break with the evidence in the record</u>, it should be excluded.") (emphasis added) (internal citations and quotations omitted).

### 2. Navarro's Table of Usages Are an Unreliable Foundation for Any Methodology.

Mr. Sedlik's opinions should also be excluded because they rely on an unreliable foundation: Navarro's self-created Table of Usages. Plaintiffs argue that "Professor Sedlik meticulously documents the 683 temporal, geographic, and media violations by P&G." (Opp., Doc. # 223, PageID 12884.) Yet Mr. Sedlik did no such thing. As he candidly admits, the work that forms the entire basis of Mr. Sedlik's Market Rate and Navarro Fee Schedule analysis was done by "Navarro and her counsel." (*See id.*, PageID 12885 ("Based upon the painstaking work of *Navarro and her counsel...*") (emphasis added); *see also id.*, PageID 12886 ("*Navarro and her*

9

*counsel* carefully documented each usage..." (emphasis added).) While Plaintiffs characterize Mr. Sedlik's "supervision" and "careful review" of the Table of Usages, Mr. Sedlik himself says "Navarro constructed this table and gave me the instruction to assume that it was accurate." (Sedlik Dep., Doc. # 210, PageID 10241.)[4]

Plaintiffs identify "[t]hree examples of Defendants' usages and corresponding hypothetical licenses" arising from P&G's alleged unauthorized use of Navarro's photograph on the Regenerist packaging to demonstrate the legitimacy of Mr. Sedlik's analysis. (Opp., Doc. # 223, PageID 12887.) Yet these examples, presumably the most straightforward examples Plaintiffs could find to use, actually reinforce several of Defendants' arguments for why Mr. Sedlik's testimony should be inadmissible.

Mr. Sedlik's Licenses L075, L070, and L072 are each unique, alleged licenses for Regenerist packaging in North America, Asia, and Europe respectively. (*Id.*, PageID 12887–88.) Looking at L075, L070, and L072 collectively, and using the Market Rate approach, Mr. Sedlik concludes that the "unlicensed use of Navarro's photograph on P&G's Regenerist packaging" has a total accrual of $17,562.[5] The assumption Mr. Sedlik utilized to arrive at this hypothetical license fee is based upon the photograph appearing on up to ¼ of the cover of product packaging. (Sedlik Rpt. Ex. R., Doc. # 214-3, PageID 11355.) This is no surprise considering this information came from the Table of Usages put together by Navarro and her counsel, which describes the alleged

---

[4] In its overview of methodology in calculating actual damages, Plaintiffs' Opposition describes the steps that Mr. Sedlik allegedly took—none of which are supported by any record citations. And in fact, much of the "comprehensive substantiation" is contradicted by Mr. Sedlik's actual testimony. While Plaintiffs characterize Mr. Sedlik as having "considered the explanations and citations provided by Navarro" and "substantiat[ed] the basis for each assumption" (Opp., Doc. # 223, PageID 12878), Mr. Sedlik repeatedly distanced himself from the work Navarro did in compiling the Table of Usages in his deposition. (*See,e.g.*, Sedlik Dep., Doc. # 210, PageID 10241 ("[T]hat was all done by Navarro and then spot checked by me.").)

[5] *See* Sedlik Rpt. Ex. R, Doc. # 214-3, PageID 11355 (showing the calculations of ($1,766 x 2) + ($2,122 x 5) + ($1,140 x 3)).

10


unauthorized usage associated with the licenses as having a placement on the "Cover" and the size "Up to 1/4." (*Id.*, PageID 10960.) Yet a hypothetical license fee based on the image being up to 1/4 of the cover is not reasonably connected to the facts of this case, as the image is very clearly less than 1/16, and *on the back of the packaging*.

Even taking the alleged unauthorized use at face value,[6] Plaintiffs describe these three licenses as if they are inclusive of all the licenses Mr. Sedlik opined are required to compensate Navarro for P&G's alleged unauthorized use of her photograph on P&G's Regenerist packaging. (Opp., Doc. #223, PageID 12887–88.) Yet Mr. Sedlik also includes *two more licenses* he alleges would have been required for specific sales at both Target and Walmart that Plaintiffs do not identify in their opposition. (*See* Sedlik Rpt. Ex. R, Doc. # 214-3, PageID 11355 (lines L074 and 080 based upon alleged usage U390 and U423) and Ex. I, PageID 11084, 11089.) In Mr. Sedlik's actual damages universe, therefore, P&G would have been the willing buyer of at least five separate licenses, with no bundled pricing, for packaging alone, during the same time period. (*See also* Mot., Doc. # 214, PageID 10543–44.) This again, is wholly unbound from the actual facts of the case.

---

[6] In addition to the reasons identified in Defendants' Motion for Summary Judgment that no unauthorized use occurred at all, *see* Def.s' MSJ, Doc. # 185-1, Defendants further contest Plaintiffs' allegations that any use beyond the "ProX box" was unauthorized use (*see* Opp., Doc. # 223, PageID 12886) for at least the fact that the actual invoice does not even identify "ProX" nor does it include "box." (Fifth Am. Compl. Ex. C1, Doc. # 133-1, PageID 4142.)

Plaintiffs defend Mr. Sedlik's 674 hypothetical licenses based on the "parties' actual course of dealing" on "three very specific license extensions," namely an alleged $5,000 license for in-store brochures for one year only in North America for ProX; $18,000 license for Facial Hair Removal – Teal Box for three years in Western Europe on packaging, Internet, and brochures as well as a global usage for press releases;[7] and $500 license to use a photograph of the model off the packaging in the Canadian Elle magazine for $500. (Opp., Doc. # 223, PageID 12889.)

But this is absurd in light of the fact that the referenced "facial hair removal Teal" invoice in fact *was not specific at all* and contained four different types of media for three years bundled into a single invoice. (Fifth Am. Compl. Ex., Doc. # 133-1, PageID 4151.)[8] This precedence by itself would suggest that Mr. Sedlik could have saved "Navarro and her counsel" their work product and assigned each product a retroactive hypothetical license across multiple media and time periods at once. In fact, this is what Defendants' expert did. (*See* Hazel Rpt., Doc. # 145-2, PageID 4535.) And this is what Navarro herself did upon learning of any alleged overuse. (*See* Fifth Am. Compl. Ex., Doc. # 133-1, PageID 4146.)

Moreover, the parties' prior invoicing history also includes Navarro invoicing for the following usages (each of which, based on Mr. Sedlik's report, would have required many dozens or hundreds of individual hypothetical licenses in his imagined construct):

(1) "unlimited library North America, includes all print media and internet" for six months usage extension (Dep. Ex. 159, Doc. # 214-6, PageID 11491);

(2) "unlimited library North America, includes all print media and internet" for 12 months usage extension" (Dep. Ex. 158, Doc. # 214-7, PageID 11493);

---

[7] Plaintiffs state this was for North America, but Defendants believe this is just an error.

[8] And the specific charge for the Canadian Elle magazine was for a one-off magazine advertisement with the model off the packaging and not usage in which P&G would contemplate using again, the way it would for packaging, coupons, and blog posts. (*See* Fifth Am. Compl. Ex., Doc. # 133-1, PageID 4153–54.)

12

(3) "Two years usage worldwide, web and all print of model on pack" for the replacement of the Daily Facials model (Dep. Ex. 128, Doc. # 214-15, PageID 11587).

Moreover, Plaintiffs offer *zero* explanation as to the "analytical leap" that enabled Mr. Sedlik to opine that 230 individual hypothetical licenses valued at more than $700,000 were required for P&G's use of an image of the Daily Facials' <u>packaging</u> on coupons. (*See* Mot., Doc. # 214, PageID 10544–45). In fact, Plaintiffs' Opposition completely ignores that Mr. Sedlik included an exemplary group of "Navarro's Photographs Licensed to P&G" in his report and described a number of the historical invoicing transactions between Navarro and P&G or similar consumer products companies—yet did not factor into his opinion the low value of Navarro's photographs in these arms-length transactions. (*See Id.*, PageID 10531.) Such historical transactions clearly show that a hypothetical licensing arrangement for Navarro's photography only contemplates a single usage fee for bundled media usage. (*Id.*, PageID 10531–32.) Moreover, Mr. Sedlik's rights-managed database screenshots themselves demonstrate the absurdity of Mr. Sedlik's number of hypothetical licenses, as Masterfile's rights-managed price calculator on which he relies states *<u>that a license for packaging includes</u> "[a]ny secondary usage of the package in advertising, promotion, web or time media...for the duration of the license."* (*See, e.g.*, Doc. # 214-3, PageID 11235) (emphasis added.)

Lastly, Plaintiffs offer *zero* explanation as to the "analytical leap" that would be required for Mr. Sedlik to opine that nearly 50 individual licenses valued at more than $300,000 would be negotiated for Commercial Blog posts for Daily Facials alone. In fact, Navarro's own invoices include "Internet" and Mr. Sedlik stated that Internet would have included all digital media. (*See* Mot., Doc. # 214, PageID 10544; Sedlik Dep., Doc. # 210, PageID 10237.)

Unsurprisingly, Plaintiffs want all of Mr. Sedlik's testimony to go to the jury to decide "whether the number of licenses contained within the Licenses Tables is reasonable." (Opp., Doc.

# 223, PageID 12890.) But it is the Plaintiffs' burden to prove that their expert is qualified and has opinions that fit the facts of the case and that are reliable. A cross-examination of the witness on nearly every single line-item of the thousands of pages of his reports would undoubtedly confuse the jury. And allowing the jury to consider the possibility, as fantastical as it may be, that P&G would have actually paid *millions* of dollars across 674 hypothetical licensing negotiations would be highly prejudicial to the Defendants. The entirety of Mr. Sedlik's opinions based upon his Market Rate and Navarro Fee Schedule methodology should be excluded.

### B. Mr. Sedlik's Model Fee Differential Methodology Is "Results-Driven" Testimony that Should Be Excluded.

Navarro argues that "Mr. Sedlik's extensive knowledge, expertise, and experience allowed him to recognize a relatively unique fact pattern in this matter" such that "consideration of the differential between the original model fees and the supplemental model fees was justified." (Opp., Doc. # 223, PageID 12883–84.) Yet, even accepting the methodology as valid (which Defendants do not, *see* Mot., Doc. # 214, PageID 10548–50), Plaintiffs provide no response to the crux of Defendants' criticism here—that Mr. Sedlik's application of the average and maximum model fee differential upends Mr. Sedlik's own stated purpose of the methodology. While Plaintiffs argue that this is "lawyer argument[]" that goes to the weight rather than admissibility of Mr. Sedlik's damages opinion, without any explanation or support whatsoever as to why *this step* of his methodology is "justified," the entire methodology is clearly "results-driven, litigation-driven expert testimony" that should be excluded. *In re: Lipitor*, 2016 WL 827067 at *4.

### C. Mr. Sedlik's Fraud Calculations Are Not Reliable and Should Be Excluded.

Mr. Sedlik's opinion that Navarro is entitled to $7,388,000 in fraud damages is yet another "result-driven" opinion that should be excluded. Essentially, Plaintiffs claim that "[b]ecause Navarro had never sold or assigned the rights to her photographs" before (Opp., Doc. # 223,

14

PageID 12901), she gets to pick her number for what she would have liked to have sold her rights to these photographs for—$624,375 apiece. But "[i]n assessing the reliability of an expert opinion, a resort to common sense is not inappropriate." *Johnson Elec. N. Am. Inc.*, 103 F. Supp. 2d at 286. Mr. Sedlik's fraud damages opinion defies common sense and the facts in the case and should be excluded.

The only point Plaintiffs make in opposition to Defendants' argument that Navarro's hand-picked figure of $624,375 for each photograph assignment is divorced from the prior invoicing history in this case is that "Defendants improperly conflate the wholly separate concepts of Navarro granting a *license* to use her images versus an *assignment* of outright ownership to her images." (Opp., Doc. # 223, PageID 12901) (emphasis in original.) Yet Navarro states that her "Assignment of Copyright" estimates were literally "determined by the license fees applicable to a 5-year worldwide license." (Sedlik Rpt. Ex. AB, Doc. # 214-3, PageID 11470.) Plaintiffs' only counter-argument therefore has no merit.

Mr. Sedlik's $624,375 assignment opinion again, then, cannot be squared with the facts of the case. Navarro has given global buyout rights and for no more than $25,000. (NAV000002751, attached as Exh. 1; NAV00000664, attached as Exh. 2.) There is no dispute that Navarro has never been paid a million dollars or more for a grouping of 10 licenses that she has executed with the same party. (Sedlik Dep., Doc. # 210, PageID 10249.) And Navarro has never received more than $500,000 for any photograph she has ever taken, let alone twelve of them. (Navarro Resp. to Defs.' RFAs, Doc. # 214-14, PageID 11567–70.) Indeed, Mr. Sedlik's own itemization of several of these photographs indicates she charged $0 or less than $250/year of usage. (Sedlik Rpt. Ex. U, Doc. # 214-3, PageID 11407–08.)

### D. Mr. Sedlik's Opinions on Ultimate Issues of Fact and Law Should Be Excluded.

It is well-settled law that an expert cannot testify as to his opinion on the ultimate issue of fact, to provide legal opinions, or to dictate the conclusion of a case. *See, e.g.*, *Alvarado v. Oakland County,* 809 F.Supp.2d 680, 688–89 (E.D. Mich. 2011). Defendants moved to exclude all remaining portions of Mr. Sedlik's testimony as either improper opinions on either the ultimate issues of law or fact. (Mot., Doc. # 214, PageID 10552–54.)

First, Plaintiffs provide no response to Defendants' arguments on Mr. Sedlik's improper testimony on the facts at all (*id.*, PageID 10553–54), thus, tacitly conceding that Mr. Sedlik cannot opine on entire sections of his report where he is just acting as the mouthpiece of Plaintiffs. These sections include Navarro's photography history, original expression in the photographs, relationship with LPK and P&G, reliance on P&G's representations, and the like. (*See id.*)

In response to Defendants' argument that Mr. Sedlik should not be permitted to testify on ultimate issues of law, Plaintiffs only state that "certain statements contained in Professor Sedlik's reports that Defendants characterize as 'legal opinions' are not necessarily so." (Opp., Doc. # 223, PageID 12904.) Plaintiffs support this statement by stating that Mr. Sedlik is not offering an opinion on the ultimate issue of assignment because his report "does not contain a single legal citation to any case or legal authority" but that he holds his opinion "based on [his] knowledge and experience." (*Id.*, PageID 12903–04.) But including or not including legal citations is not the standard by which an expert can have an opinion as to the ultimate issues of law in litigation.

Expert testimony that "undertakes to tell the jury what result to reach . . . does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (emphasis in original). Mr. Sedlik's attempt to tell the jury that "the 2007 Supplier Agreement has no bearing on the copyright

16

ownership in any photographs created by Navarro for use by P&G" is Mr. Sedlik's (and Plaintiffs') impermissible attempt to tell the jury what conclusion to reach. Just because Mr. Sedlik is opining based on his "knowledge and experience" does not make it permissible, and it should be excluded. *See Alvarado,* 809 F.Supp.2d at 688–89.

Moreover, beyond the assignment example, Plaintiffs offer no reason why Mr. Sedlik's opinions on infringement (Section M), contributory infringement (Section V), willful infringement (Section W), reckless disregard (Section Y), continued willful infringement (Section Z), and copyright ownership (Section AA) are not legal opinions that should be excluded. (*See* Mot., Doc. # 214, PageID 10552–53.) As such, whatever remains of Mr. Sedlik's report should be excluded.

### E. Mr. Sedlik's Experience as a Photographer Does Not Qualify Him to Testify As a Damages Expert.

In addition to—or perhaps highlighted by—all of Mr. Sedlik's problems with his fit to the facts of the case, Mr. Sedlik remains unqualified to testify, as to testify as an expert one must *be* an expert. Fed. R. Evid. 702. To support his qualifications, Plaintiffs (a) recite Sedlik's curriculum vitae (Opp., Doc. # 223, PageID 12875); and (b) cite two cases in which defendants have "unwisely challenged Professor Sedlik's qualifications" (*id.*, PageID 12876).

Defendants do not dispute that Mr. Sedlik is an expert in photography licensing as demonstrated by his curriculum vitae. Indeed, Mr. Sedlik's experience in licensing photography may very well have given him a reason to develop a "template" for damages for a plaintiff starting from a clean slate. But working from a "tried and true methodology" is essentially an admission that he assumes it fits the facts of a case. Yet, any *damages expert* would know that one size never fits all to any particular field or matter. Experience in valuing intellectual property gives one the tools of the trade that makes them an expert in valuing damages that fit the <u>different</u> facts of <u>different</u> cases. Here, where significant prior invoicing history exists between parties, Mr. Sedlik's

"template" does not work. Mr. Sedlik should not be qualified to give any damages—actual or fraud—opinions in *this* case, regardless of whether other courts have allowed him to give his testimony in other cases. *See Martinez v. McGraw*, No. 3-08-0738, 2013 WL 495502, at *1 (M.D. Tenn. Feb. 7, 2013) ("One very significant fact to be considered is whether the experts...have developed their opinions expressly for the purpose of testifying.") (citation omitted).

## III. CONCLUSION

This Court should exclude Mr. Sedlik's opinions in this case in their entirety as they are untethered from the legal standard for damages and unreliable in ignoring the most salient facts in the record—the parties' actual invoicing history.

Dated: September 4, 2020

Respectfully submitted,

*/s/ Karen Kreider Gaunt*
Brian S. Sullivan (0040219)
Karen K. Gaunt (0068418)
Robert M. Zimmerman (0079584)
Jaci L. Overmann (0089306)
Liane H. Rousseau (0093435)
DINSMORE & SHOHL LLP
255 Fifth Street, Suite 1900
Cincinnati, OH 45202
Telephone: (513) 977-8200
Facsimile: (513) 977-8141
brian.sullivan@dinsmore.com
karen.gaunt@dinsmore.com
robert.zimmerman@dinsmore.com
jaci.overmann@dinsmore.com
liane.rousseau@dinsmore.com

*Attorneys for Defendants The Procter & Gamble Company and Walmart Inc.*

Benjamin C. Mizer (0083089)
Charlotte H. Taylor (admitted *pro hac vice*)
JONES DAY
51 Louisiana Ave. NW
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
bmizer@jonesday.com
ctaylor@jonesday.com

*Attorneys for Defendant The Procter & Gamble Company*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Defendants' Reply in Support of Their *Daubert* Motion to Exclude Testimony of Jeffrey Sedlik was served upon all counsel of record via the Court's ECF system on September 4, 2020.

*/s/ Liane H. Rousseau*
Liane H. Rousseau
