## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**ANNETTE NAVARRO, et al.,**

        **Plaintiffs,**

            **v.**

**PROCTER & GAMBLE COMPANY, et al.,**

        **Defendants.**

        **Case No. 1:17-cv-406**
        **JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

This matter comes before the Court on two of Defendants' Motions in Limine to exclude Navarro's experts on profit-based damages (Docs. 215 and 216). One of the two motions addresses Professor Larry Chiagouris. Chiagouris is a marketing professor who opines essentially that (1) images are an important aspect of consumer goods packaging; and (2) Navarro's images had a positive impact on sales. The second motion is directed at John Burshek. Burshek also examines the connection between Navarro's photos and Defendants' profits, but focuses his analysis specifically on the asserted relationship between Navarro's photos and P&G's sales of its Daily Facials product. Defendants argue that neither of these experts passes muster under Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), or Fed. R. Evid. 403. For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion in Limine to Exclude Larry Chiagouris (Doc. 216) and **DENIES** Defendants' Motion in Limine to Exclude John Burshek. (Doc. 215).

## BACKGROUND

This is an action for copyright infringement. (*See* Fifth Am. Compl., Doc. 133, #4054–4109[1]). Navarro claims that Defendants willfully infringed on her copyrights in certain photos that she provided to P&G for use pursuant to licensing arrangements between the parties. (*See id.* at ¶¶ 186–87, #4090–91). According to Navarro, P&G continued to use the photographs after the licenses expired, and also used them on products and in geographic areas outside those covered by the parties' agreements. (*Id.* at ¶ 246, #4104). Such use, she says, constituted willful infringement of her copyrights. (*Id.* at ¶ 1, #4055). She sued P&G and Walmart (who distributes the P&G products that bear the allegedly infringing photographs) in this Court. (*Id.* at ¶¶ 4–5, #4055–56). The matter was originally pending before another Judge on this Court, but in December 2019, it was transferred to the undersigned Judge.

One element of a copyright infringement case that a plaintiff must prove at trial is damages (at least if the plaintiff is seeking damages other than statutory damages). Apart from statutory damages, a plaintiff in a copyright infringement action may seek two different types of damages: actual damages and profit-based damages. 17 U.S.C. § 504(b). The first of those, actual damages, reflects the straightforward concept that an infringer should pay the copyright owner compensation for amounts that the copyright owner lost due to the infringement. *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 358 (6th Cir. 2007) (conceptualizing actual damages as "the amount [the copyright owner] would have

---

[1] Refers to Page ID Number.

received but for [the infringer's] unlawful copying) (quoting *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 439 F. Supp. 2d 758, 772 (E.D. Mich. 2006)). Often this is the value that the infringer would have paid to use the copyrighted material legally—an amount sometimes calculated as a "reasonable license fee" based on a hypothetical "willing-seller/willing-buyer" informed by norms and customs in the relevant industry.[2] *Id.* at 359 ("[A]ctual damages may include in appropriate cases the reasonable license fee[.]") (quoting *Davis v. Gap, Inc.,* 246 F.3d 152, 167 (2d Cir. 2001)).

But infringement does not happen in a vacuum. Infringement does not merely *harm* the copyright owner, but also may *benefit* the infringer in the infringer's own business to an even greater extent. Profit-based damages, the second form of compensatory damages under the statute, force the infringer to disgorge the profits it realized from the infringement to the extent that such profits exceed the copyright owner's actual damages. *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 865-66 (W.D. Mich. 2008) (explaining that a plaintiff can only recover profit-based damages in excess of actual damages). In that way, the infringer is not allowed to profit from its infringement, thereby reducing the incentives to infringe in cases where the infringer's profits might exceed a reasonable licensing fee. This in turn

---

[2] Other times, actual damages are equal to the amount of profits that the copyright owner lost as a result of the infringement. For example, a copyright owner might recover actual damages in the amount of lost business or lost market value as a result of consumers purchasing the infringer's product. *See, e.g.*, *Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 280-81 (6th Cir. 1988) (explaining that the measure of actual damages is the profits the copyright owner would have made on houses it would have sold but for its competitor's infringement).

pushes infringers to actually negotiate licenses up front, rather than infringe first and worry about a "reasonable license fee" later and only if sued. *Id.* at 866 ("profit damages eliminate a major incentive to steal the copyright instead of fairly negotiating for its use with the owner") (quoting *McRoberts Software, Inc. v. Media 100, Inc*, 329 F.3d 557, 568 (7th Cir. 2003)).

The calculation of profit-based damages is a two-step process. First, the copyright owner must identify the part of an infringer's gross revenues that bears a "reasonable relationship" to the alleged infringement. *Balsley v. LFP, Inc.*, 691 F.3d 747, 767-68 (6th Cir. 2012). Say, for example, the defendant company sells prints of photographs A and B, only the latter of which is an infringing image. The revenues at issue, then, would be those associated with sales of photograph B, not photograph A. Then, once the copyright owner has identified the appropriate revenues, the burden shifts to the infringer to demonstrate what part, if any, of those revenues are not profits attributable to the infringement. *Id.* at 769. The infringer can do so in two ways—first by pointing to the expenses it incurred in generating the revenues, and then second, by allocating any remaining amount (the profit) among infringing and non-infringing activity. *Id.* at 767 (quoting 17 U.S.C. § 504(b)).

An example helps. Imagine a company that sells a t-shirt for $20 that has a collage of fifteen images on it, only one of which is copyrighted, and that the company has sold 10,000 such t-shirts. Its gross revenues reasonably related to the infringement are $200,000. But, assume further that the company bought the plain t-shirts at wholesale for $12 each, and that the silk-screening cost $3 per t-shirt.

Thus, the "profit" on each t-shirt is only five dollars ($20-$12-$3), which amounts to a total profit of $50,000. The company may then argue that, of that $50,000, only a portion is attributable to the infringing image, as the other images, for example, may also have contributed to the sale. As noted, the defendant bears the burden on this reduction issue—both in terms of identifying the appropriate expenses, and as to allocating the remaining profit.

Navarro's briefing suggests that both of the experts at issue here are intended to offer opinions principally as to the first step of this bipartite framework. That is, their opinions are intended to assist in identifying the P&G revenues that bear a "reasonable relationship" to the infringing activity. (*See* Pls.' Resp. to Defs.' Mot. to Exclude Test. of Larry Chiagouris, ("Pls.' Chiagouris Resp."), Doc. 224, at #13063; Pls.' Resp. to Defs.' Mot. to Exclude the Test. of John Burshek, ("Pls.' Burshek Resp."), Doc. 222, at #12857-59). That is not to suggest that the opinion testimony, to the extent admissible, may not also come into play with regard to the second step (in terms of rebutting the Defendants' efforts at allocation), but Navarro directs the arguments in her oppositions to the motions in limine principally to the first step.

As Navarro bears the initial burden on damages, Defendants' efforts to exclude these experts have implications for their pending summary judgment motion. Specifically, in that motion, they seek summary judgment on Navarro's claim for profit-based damages, arguing that Navarro cannot establish a "reasonable relationship" between the alleged infringement and Defendants' profits. (Defs.' Mot. for Summ. J., Doc. 185, #8365-71). And part of the evidence on which Navarro relies

in response is these two expert opinions. Thus, before the Court can assess the merits of the summary judgment argument on this topic, it must first determine whether Navarro's profit-based damages experts, Chiagouris and Burshek, offer testimony that is relevant and reliable enough to warrant the Court's consideration. Defendants' two motions in limine directed at these experts are fully briefed and are now ripe for review.

## LAW AND ANALYSIS

Federal Rule of Evidence 702 allows certain witnesses with specialized knowledge to testify as experts at trial. Fed. R. Evid. 702. But admitting expert testimony is not a decision a court should make lightly, as juries tend to place extra weight on expert opinions. *Daubert*, 509 U.S. at 589 (noting that expert opinions can be "powerful"). Accordingly, courts serve an important "gatekeeper" role when it comes to expert witnesses, ensuring that the jury does not encounter misleading "junk science." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (acknowledging that district courts have a "gatekeeping" obligation as to all types of expert testimony); *Best v. Lowe's Home Ctr., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009) (stating that district courts have an obligation to exclude "junk science").

This gatekeeper role involves two basic inquiries. First, the Court must assess whether the expert's testimony is relevant. *Daubert*, 509 U.S. at 589. Relevancy under the Federal Rules of Evidence is a lenient standard. *Id.* at 587. Evidence is relevant so long as it relates to a fact at issue and helps the jury determine that fact at issue. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590-91. Testimony is not relevant if

it simply presents information or conclusions that the jury can reach on its own. *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013); *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (noting that courts sometimes exclude expert testimony on eyewitness identification because "the jury can decide the credibility issues itself").

Next, the Court must inquire whether the expert's testimony is reliable. *Daubert*, 509 U.S. at 589-90. The concept of "reliability" implies that an expert's opinion must be based on something "more than subjective belief or unsupported speculation." *Id.* at 590. Rather, a reliable opinion requires that the expert use (1) a reliable methodology, and (2) base his or her opinion on reliable facts or data. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).

Defendants contend that Chiagouris and Burshek fail to meet both *Daubert*'s minimum relevancy and reliability thresholds. (Defs.' Mot. to Exclude Larry Chiagouris, ("Defs.' Chiagouris Mot."), Doc. 216); (Defs.' Mot to Exclude John Burshek, (Defs.' Burshek Mot."), Doc. 215). In the alternative, Defendants ask the Court to exclude both experts under Fed R. Evid. 403 on the grounds that the potential for prejudice far outweighs whatever minimal probative value the expert opinions may have. (Defs.' Chiagouris Mot. at #11620); (Defs.' Burshek Mot. at #11604). The Court first addresses Defendants' Motion to Exclude Larry Chiagouris, then turns to Defendants' Motion to Exclude John Burshek.

**A.** **The Court Grants Defendants' Motion to Exclude Larry Chiagouris's Opinion as to the Relationship between Navarro's Photos and Product Sales But Will Permit Chiagouris to Testify to the General Importance of Images on Product Packaging.**

Chiagouris's report essentially offers two related insights. In the first portion of his expert report, Chiagouris opines on marketing strategy in a general sense, including the role that photographs play in product marketing. He begins by explaining that "packaging is an important contributing factor to marketing in sales." (Expert Report of Dr. Larry Chiagouris, ("Chiagouris Rep."), Doc. 182-1, #7810). Chiagouris then gets a little more specific, explaining that images on packaging, and especially photographs of models, are likely to have a "significant impact on the marketing and sales of [] personal care products." (*Id.* at #7813). In the latter half of his opinion, Chiagouris opines on the specific relationship between Navarro's photos and the sale of P&G's products. He claims that "Navarro's photographic works … reflected … a very high quality work product" that "more likely than not, had a positive impact on the sales of [P&G's] products[.]" (*Id.* at #7819, 7825).

Though somewhat separate, Navarro contends that the two portions of Chiagouris's report are relevant to the same issue, namely, whether there is a "reasonable relationship" between Navarro's photographs and Defendants' gross revenues. Thus, the Court analyzes the relevancy of both halves of Chiagouris's opinion at the same time. The reliability analysis, on the other hand, requires separate discussion because each of the two portions of Chaigouris's report rely on a different set of facts, data, and methodology. The first portion of Chiagouris's opinion, which discusses marketing strategy generally, relies on Chiagouris's experience in

the field and his reference to various pieces of literature. (*Id.* at #7810-7819). In contrast, the portion of Chiagouris's opinion that explores the specific relationship between Navarro's photos and Defendants' sales relies on facts specific to this case. (*Id.* at #7819-43). The Court accordingly severs its analysis of the reliability of Chiagouris's opinion into two parts.

### 1. Chiagouris's Opinions are Relevant as They Would Help a Jury Determine Whether Navarro's Photographs Bear a "Reasonable Relationship" to Defendants' Sales.

Navarro offers Chiagouris's opinion as evidence that Navarro's photos are "reasonably related" to Defendants' gross revenues, which is her burden under the first step of *Balsley's* profit-based damages framework. (Pls.' Chiagouris Resp. at #13065). Defendants object to Chiagouris's testimony on the grounds that it is irrelevant to the "reasonable relation" issue. A jury, Defendants reason, does not need an expert to explain the "general premise that attractive packaging helps to sell products." (Defs.' Chiagouris Mot. at #11619).

Consumer goods packaging strategy, however, is not a common-sense subject. *Schwab v. Philip Morris USA, Inc.* No. CV 04–1945(JBW), 2005 WL 2401647, *4-5 (E.D.N.Y. Sept. 29, 2005) ("Advertising methodologies are esoteric; the average juror could be helped by an explanation of how they work and were used by defendants"). Rather, in practice, an effective packaging design is the culmination of dozens of nuanced and strategic business decisions. Companies tailor their packaging designs to the needs of their industry, their brand image, and their consumer base. A court

cannot expect the average juror to inherently understand the relationship between a marketing decision and its intended effect on an individual consumer.

The decision in *Schwab* illustrates the point. There, a cigarette user sued Philip Morris alleging that it had fraudulently advertised certain of its products as "light" or "low tar" cigarettes. *Id.* at *4–5. In order to demonstrate that Philip Morris intended to defraud its consumers, the plaintiff presented an expert to testify how the "low tar" package labeling is designed to encourage "health conscious" customers to switch to that brand. *Id.* The Court held that this testimony cleared Fed. R. Evid. 702's low relevancy hurdle. *Id.* at *5. What underlies *Schwab*'s holding is a recognition that juries do not naturally understand how packaging design is tied to consumer behavior. Like the expert in *Schwab*, Chiagouris's expert testimony is relevant here to help illuminate the connection between an element of package design and its effect, if any, on consumers.

Further, this case concerns the effect of a very particular packaging element, namely photographic images, on product sales. This presents another area of nuanced inquiry for the jury. After all, not all images or packaging designs are going to appeal equally to consumers. What if P&G used pictures of an automobile instead of a model on its Daily Facials packaging? That seems unlikely to work. Or, in a less absurd example, why would a company use a photo of a model as opposed to a photo of the product itself on the packaging? What makes certain images effective in generating sales? Are some images an especially effective marketing technique for certain products, but not for other products? To address such questions, a jury will need to

understand the role, if any, that images play in moving products, from which it can then determine whether Navarro's photos bear a reasonable relationship to Defendants' sales of various products. Appropriate expert testimony could be helpful to illuminate the complex relationship between packaging design and product sales. *See, e.g.*, *Larin Corp. v. Alltrade, Inc.*, No. EDCV 06–1394 ODW, 2008 WL 11340047 *2 (C.D. Cal. Mar. 19, 2008) (allowing an expert to testify as to "how packaging is an important element in the marketing and selling of a product").

Chiagouris's opinions are designed to assist the jury in answering this complex question. Images in packaging design, Chiagouris explains, can serve several purposes depending on the company's marketing needs. First, images on packaging help to "engage" the busy consumer who may otherwise walk right past a product. (Chiagouris Rep. at #7811). Chiagouris often terms this concept as the "first moment of truth" or "FMOT." (*Id.* at #7819). His opinion goes on to explore the importance of this consumer engagement. Specifically, Chiagouris opines that the FMOT matters more in some industries than others and is especially important in the increasingly competitive personal care products industry. (*Id.* at #7810-11).

In another section of his opinion, Chiagouris explains that companies select packaging design elements in such a way that "communicate[s] their brand to the consumer." (Chiagouris Rep. at #7812). This latter insight is particularly relevant here, because the average juror is not likely to know how or why a company like P&G adapts its packaging and advertising strategies (including its use of images) to fit the market. An analogous case helps to illustrate the helpfulness of expert testimony in

such situations. In *Merisant Co. v. McNeil Nutritionals, LLC*, Merisant tendered a branding expert to testify that McNeil, the manufacturer of Splenda, used marketing taglines, product packaging, print, radio and television advertising to brand itself in the sugar market rather than the sugar-substitute market. 515 F. Supp. 2d 509, 539 (E.D. Penn. 2007). McNeil responded with a motion in limine, alleging that the expert's testimony was not relevant because the jury, as consumers, could judge the effect of McNeil's advertising techniques for themselves. *Id.* at 540. The court disagreed, explaining that:

> The Court declines to accept McNeil's argument that its brand positioning strategies, including its multi-million dollar advertising and marketing campaigns, would be so ordinary, obvious and self-evident to a layperson that [the expert's] opinions would be so useless and redundant that they would not aid the jury in this case.

*Id.* Defendants here press essentially the same argument: that juries can judge for themselves whether Navarro's photos affect consumer behavior. Like the *McNeil* Court, however, this Court recognizes that jurors are typically consumers, not marketing professionals. A court cannot expect a juror to fully appreciate the effect of certain packaging elements on the market. The challenge in this case is that jurors are charged with making exactly that determination as part of their inquiry into whether Navarro can establish the "reasonable relationship" required to sustain her claim for profit-based damages. Chiagouris's testimony is relevant because it helps the jury bridge this knowledge gap, both as to the importance of images in general, and as to the importance of these specific images, to P&G's sales of consumer products. Thus, the testimony satisfies *Daubert's* relevance prong.

### 2. *Chiagouris's Opinion about the General Importance of Images on Consumer Packaging is Sufficiently Reliable under Fed. R. Evid. 702.*

Relevance, however, is not the only inquiry. Rather, Fed R. of Evid. 702 and *Daubert* require expert testimony to be both relevant and reliable. Generally speaking, this requires an analysis of (1) whether the testimony is based upon sufficient facts or data, and (2) whether the testimony is the product of reliable principles and methods which the expert has applied reliably to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). Defendants attack Chiagouris's opinion on both fronts.

*Daubert* provides a non-exhaustive list of factors that the Court may consider in assessing the reliability of an expert's opinion. *Kumho Tire Co.*, 526 U.S. at 150-51. Specifically, *Daubert* advises that a court may consider whether the expert's sources and methods were subject to "testing, peer review, [or] publication" or enjoy "general acceptance in the relevant scientific community." 509 U.S. at 593-94. These factors, though, are merely part of a flexible inquiry "with an overarching goal of assessing the 'scientific validity and thus the evidentiary relevance and reliability' of the principles and methodology underlying the proposed expert testimony." *Langan*, 263 F.3d at 621 (quoting *Daubert*, 509 U.S. at 594-95).

The portion of Chiagouris's opinion directed at overall marketing strategies appears to rest on a foundation of scholarly literature that is both published and generally accepted in the field. In this section of his report, (*see* Chiagouris Rep. at #7810-19), Chiagouris provides "context" for the jury's inquiry into the relationship between Navarro's photos and Defendants' sales. This "context" essentially consists

13

of four observations: (1) personal care is a competitive industry; (2) packaging helps companies stand out; (3) images are a particularly helpful element of packaging; and (4) companies spend a lot of time developing packaging because it is important. (*Id.*). Chiagouris supports each of these opinions with references to an assortment of industry reports, books, and scholarly articles.

For example, when discussing the competitive nature of the personal care industry, Chiagouris references three industry reports about increasing competition, and a Harvard Business School report about the cost of getting consumer attention. (*Id.* at #7810-11). During his discussion about the different ways that packaging helps drives sales, Chiagouris draws on several different books about successful product branding. (*Id.* at #7811-12). Chiagouris then turns to the particular importance of images on packaging. In that section of his report, he summarizes a set of scholarly articles on the topic. (*Id.* at #7813-14). Finally, Chiagouris references his personal consulting experience and two books on branding to draw the jury a picture of the branding and packaging design process. (*Id.* at #7815-18).

These various published pieces of academic literature fit *Daubert*'s vision of reliable "facts and data." Chiagouris's explanation of general packaging practices contained in his expert reports, as well as the academic sources contained in the articles, book, and reports he cites, satisfies the Court that his testimony as to general marketing practices will be the product of reliable principles that are accepted within his field, accompanied by appropriate facts and data.

### 3. Chiagouris's Opinion about the Specific Relationship Between Navarro's Images and Defendants' Sales is Not Reliable.

The balance of Chiagouris's opinion addresses the specific relationship between Navarro's photographs and Defendants' sales. (*Id.* at #7819-43). The overarching theme of this section is that Navarro's photos were a "very high quality work product" that had a "positive impact" on Defendants' sales. (*Id.*). This opinion sounds fine on the surface, but *Daubert* instructs the Court to dig a little deeper. On closer inspection, it becomes apparent that the foundation for Chiagouris's opinion is nothing more than a recitation of P&G's own statements and conduct, coupled with arguments about the inferences that should arise from such conduct. Navarro's photographs had a positive effect on Defendants' sales, Chiagouris reasons, because (1) P&G's statements indicate the positive impact of Navarro's photos, (*id.* at #7819-34); (2) P&G's marketing practices demonstrate the value of Navarro's photos, (*id.* at #7834-41); and (3) P&G is a sophisticated market-research-driven company that knows how to pick good photos (*id.* at #7842-43).

For example, Chiagouris opines that "P&G placed value on having a photograph of a model on the packages" based on P&G's use of Navarro's photos for a long period of time. (*Id.* at #7823, 7826-27). He then goes on to discuss an instance in which P&G revamped its marketing campaign after experiencing a decline in sales following the removal of photographs from its Daily Facials packaging. (*Id.* at #7827-30). Chiagouris concludes that "obviously" P&G's decision to put models back on the package was "based on experience with the marketing tactics needed to build a brand." (*Id.* at #7831). As further evidence of the value of Navarro's photos,

Chiagouris collects a series of statements from P&G and its affiliates praising Navarro: from LPK employee Paige Robinson's opinion that Navarro is "an amazing photographer" (*id.* at #7824), to former LPK employee Kassey Wooten's opinion that "people knew [Navarro] and really liked her work." (*Id.* at #7825). Chiagouris concludes that these statements and events, when taken together, demonstrate that "Navarro's photographs were an important part of P&G's marketing of the products at issue in this case." (*Id.* at #7843).

In short, Chiagouris wants to tell the jury that Navarro's photographs mattered because P&G thought they did. He will then further assure the jury that P&G's behavior is a good indicator of the quality of Navarro's photographs because "P&G is widely recognized as a market research driven organization" and, as such, their packaging decisions "cannot be viewed as uninformed." (*Id.* at #7842).

Thus understood, Chiagouris's opinion falls short of *Daubert's* requirements. To be sure, experts can, and often should, rely on record facts to support their opinions. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (permitting veterinarian to testify to cause of race-horse's death because his opinion had a factual basis in the record). But the expert must then use his or her expertise to build upon this factual foundation. Sometimes, for example, an expert conducts a survey or test to demonstrate a connection between the facts in the record and a particular principle. *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 777-78 (W.D. Mich. 2006) *aff'd*, 502 F.3d 504 (6th Cir. 2007) (explaining that in the Sixth Circuit consumer surveys are an accepted practice for trademark

experts). Other times, the expert may testify as to scientific principles to help the jury itself draw conclusions from the facts. *In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.*, No. 1:08 GD 50000, 2010 WL 1796334, *4-7 (N.D. Ohio May 4, 2010) (allowing experts to use a "combination of their areas of expertise, experience, personal research and review of published case reports and research data" to opine that a chemical element causes a certain medical condition). But what an expert may not do, is merely offer "assumptions" based on the record. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001).

An expert whose conclusions are just "assumptions" has not used a weak methodology; he has used no methodology at all. For example, in *Nelson*, the plaintiffs offered an expert to testify that PCB from Defendant's natural gas pipeline caused the plaintiffs' impairments. *Id.* at 252. There were a number of potential causes for these impairments, including alcohol and cigarette use. *Id.* But instead of trying to discern which among these potential causes was an actual cause of the impairments, the expert simply assumed that if PCB was present, and enough people demonstrated symptoms, then PCB must have been the causal factor. *Id.* at 252-53. The Sixth Circuit found that this testimony failed under *Daubert* because there was "simply too great an analytical gap between the data and the opinion proffered." *Id.* at 254 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Like the expert in *Nelson*, Chiagouris makes an unsubstantiated leap between facts in the record and his ultimate opinion. Chiagouris repeatedly notes P&G's perception of Navarro's work, and then summarily concludes that, because P&G

17

seemingly approved of Navarro's photographs, those photographs must have had a reasonable relationship to Defendants' revenues. Without any testing or other application of specialized knowledge, there is nothing to ensure that the Chiagouris's subjective opinions are a sound—or expertised—interpretation of the facts. This is a problem, as the Sixth Circuit has repeatedly instructed that "[r]ed flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best*, 563 F.3d at 177).

Navarro argues that the absence of testing is not fatal to an expert's opinion. (Pls.' Chiagouris Resp. at #13070). She explains that *Newell Rubbermaid*, the Sixth Circuit case which said a lack of testing is a "red flag," is a products-liability action, and its holding should be limited to those types of cases. (*Id.*). Not so. Although *Newell* was a products liability action, the Court takes from it the more general proposition that an expert must have a sound basis for connecting the facts in the case to their conclusions. The question at issue in *Newell* was whether a forklift was "defective" for purposes of establishing a products liability claim. 676 F.3d at 529. The plaintiff produced an expert who compared the number of accidents from defendant's forklift with the number of accidents from other forklifts. *Id.* at 528-29. Based on this difference alone, the expert concluded that the forklift was defective, and then outlined two "safer" alternative designs, but failed to test either design. *Id.* The Court refused to admit the expert's testimony because there was no testing, or really any

18

methodology, that supported either conclusion. *Id.* at 529. To put it another way, both the accident rate and potential alternative designs are facts in the record, but the expert needed to provide some explanation—beyond his own speculative and unsubstantiated opinion—as to *why* that means that the defendant's forklift was defective. The lesson of *Newell* is that an expert cannot rely on his or her own subjective speculation to interpret facts in the record.

Chiagouris engages in exactly the kind of improper extrapolation that *Newell* prohibits. The expert in *Newell* recounted accident rates and leapt to the conclusion that the defendant's forklift was defective. *Id.* Chiagouris recounts P&G's experience with Navarro, and then leaps to the conclusion that Navarro's photographs had a positive impact on sales. In both circumstances, the expert makes unfounded (or at least unsubstantiated) assumptions about the consequences of facts in the record. For this reason, Chiagouris's opinion on the relationship between Navarro's photographs and Defendants' revenues is unreliable, and thus inadmissible, under *Daubert*.

In reaching this conclusion, the Court notes that, as P&G points out, this is not the first time that a district court has excluded opinion testimony from Chiagouris on *Daubert* grounds. The Court mentions that only because the problem in the previous instance, much like here, was the apparent lack of any testing or other objective basis to substantiate the opinions he intended to offer. The other matter, *Plasti Dip*, was a trademark case in which Chiagouris opined that two similar brand names would confuse consumers. *Plasti Dip Int'l, Inc. v. Rust-Oleum Brands Co.*, No. 14-cv-1831, 2017 WL 914643, *5 (D. Minn. Feb. 13, 2017), *R&R adopted*, No. 14-cv-1831, 2017

WL 913590 (D. Minn. Mar. 7, 2017). But Chiagouris declined to perform any testing or conduct any survey to substantiate his opinion. *Id.* The *Plasti Dip* court refused to allow Chiagouris to offer his bald assertions of confusion to a jury. *Id.* Likewise here, Chiagouris attempts to draw a conclusion from facts in the record without providing any expertised analytical support for the connection between the two.

Navarro contends that *Plasti Dip* is irrelevant, and even if it is relevant, she suggests that the Court should focus on another portion of the *Plasti Dip* opinion which admitted a different aspect of Chiagouris's testimony. (Pls.' Chiagouris Resp. at #13073). In that portion of the *Plasti Dip* opinion, the court allowed Chiagouris to testify that the defendants' blog posts created the potential for consumer confusion, even though he failed to offer a study or other empirical evidence to that effect. *Plasti Dip Int'l, Inc.*, 2017 WL 914643 at *4-5. The reason for this, the Court said, was that, unlike Chiagouris's first opinion, which concerned *actual* consumer confusion, his opinion about the blog posts only went to *potential* consumer confusion. *Id.* at *5. Essentially, the *Plasti Dip* court held that Chiagouris would need some type of consumer study to verify conclusions about an actual effect on the market, but not to verify his theoretical predictions about potential effects on the market.

Building on that portion of the *Plasti Dip* opinion, Navarro argues that testing is not required here, because Chiagouris offers testimony only to establish the *potential* effect of Navarro's photographs on the Defendants' sales. (Pls.' Chiagouris Resp. at #13073-74). But the Court finds *Plasti Dip*'s distinction between *potential* effects and *actual* effects unpersuasive. Both types of opinions are equally subject to

20

*Daubert*, and the Court sees no reason why an expert should be able to draw unfounded conclusions just because the expert is testifying to a *potential* or theoretical occurrence as opposed to an *actual* occurrence.

The bottom line is that, in the portion of his opinion in which he seeks to opine about the impact of Navarro's photographs, Chiagouris basically seeks to parrot back P&G's own statements, coupled with an argument that "P&G is good at marketing, so if it likes the pictures, the pictures must add value." That is an argument, not an expert opinion. Because this portion of Chiagouris's opinion is entirely divorced from any cognizable methodology that connects his conclusions about Navarro's photographs to the facts in this case, it is not reliable as that term is used in *Daubert*.

As a result, the Court **GRANTS IN PART** Defendants' Motion to Exclude Larry Chiagouris (Doc. 216). In particular, the Court strikes his opinion testimony about the specific effect, if any, of Navarro's photographs on Defendants' sales of its various products. In other words, Chiagouris will be permitted to opine generally about the importance of packaging to sales of consumer products and especially beauty and personal care products, as well as the role that photographs can play in connection with that. But the Court will not permit him to opine that Navarro's photographs were high-quality photographs, or that they were useful in driving sales of P&G's products. He has failed to provide a reliable basis substantiating any such opinions.

**B.      John Burshek's Opinion Meets Daubert's Relevancy and Reliability Standards.**

Navarro also offers John Burshek's testimony to establish that her photographs are reasonably related to Defendants' revenues. (Pls.' Burshek Resp. at #12859). In order to establish this connection, Burshek conducted an online consumer survey of women between the ages of eighteen and seventy-five who had purchased the Daily Facials product during the last five years. (Expert Rep. of John Burshek, ("Burshek Rep."), Doc. 178-1, #7254-55). The substantive part of this survey asked respondents to:

> 1.      State whether they would "look closer" at one of two Daily Facials packages: one with Navarro's photos and one without any photo at all (but with all other design elements).
>
> 2.      State which product they were "more likely to purchase."

(*Id.* at #7256). Defendants argue that this survey fails to meet *Daubert*'s minimum relevancy and reliability standards. (*See generally* Defs.' Burshek Mot.). For the following reasons, the Court finds that Burshek's survey is both relevant and reliable under *Daubert*.

**1.      Burshek's Study is Relevant to the Question of Whether Navarro's Photographs are Reasonably Related to Defendants' Revenues.**

Navarro offers Burshek's study to establish that her photographs on the Daily Facials product are reasonably related to Defendants' gross revenues, which is her burden under the first step of the *Balsley* profit-based damages inquiry. (Pls.' Burshek Resp. at #12859); *Balsley*, 691 F.3d at 767-68. Burshek's survey helps establish this connection, Navarro explains, because it "shows that the [Daily Facials]

22

package WITH the Navarro image is preferred to a statistically significant degree over the [Daily Facials] package WITHOUT the Navarro image." (*Id.*). Defendants disagree. They argue that Burshek's survey is not relevant to the profit-based damages issue because the survey, at best, shows that "some purchasers would be somewhat 'more likely' to purchase the Daily Facials product with Navarro's Image 11 on the front than the same Daily Facials product without Navarro's photo." (Defs.' Burshek Mot. at #11590). Defendants claim this evidence is not relevant to the issue of profit-based damages because it does not help a jury understand what percentage of consumers would have actually changed their purchasing decisions based on the presence or absence of Navarro's photographs. (*Id.*).

The problem with Defendants' argument is that it misconstrues Navarro's burden under *Balsley*'s two step inquiry. Under *Balsley*, Navarro bears the initial burden of establishing that her photographs bear a "reasonable relationship" to Defendants' gross revenues. *Balsley*, 691 F.3d at 768. If Navarro can make this showing, then she has the right to sue for the entirety of those gross revenues. *See, e.g., ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 625, 634 (6th Cir. 2020) (allowing ECIMOS, a systems software manufacturer, to sue for 1.25 billion dollars, the entirety of Carrier's revenue from one if its manufacturing plants that used ECIMOS' copyrighted database-script source code). But that is just the starting point. The pendulum then swings to the Defendants, who are tasked with sorting out which of these "reasonably related" gross revenues are actually profits (i.e., netting out expenses), and of those profits, which are actually attributable to the infringement. *Balsley*, 691 F.3d at 768. In other words, Navarro provides the jury a pool of gross revenues reasonably related to Defendants'

infringement, and then Defendants have an opportunity to reduce that figure to better reflect the actual profits that bear a causal relationship to the infringement.

Defendants complain that Burshek's study shows only that Navarro's photographs made "some consumers" "more likely" to purchase Daily Facials instead of showing that the photographs *actually* caused those consumers to purchase Daily Facials. (Defs.' Burshek Mot. at #11590). In essence, Defendants take issue with the fact that Burshek's study does not show causation. But showing causation (or, rather, a lack thereof) is Defendants' burden under *Balsley*, not Navarro's. Instead, Navarro must demonstrate only that her photographs had a reasonable relationship to the revenues she uses as a basis for recovery. Burshek's survey may not demonstrate causation, but it does attempt to demonstrate a consumer preference for packaging with Navarro's photographs. Even Defendants admit that Burshek's study might show that Navarro's photographs made it "more likely" that consumers would purchase the Daily Facials product. (*Id.*). Accordingly, Burshek's study is relevant in that it purports to show a connection, even if a somewhat loose connection, between Navarro's photographs and Defendants' gross revenues on the Daily Facials product.

### 2. *Burshek's Survey is Reliable*

Burshek's contribution to this case takes the form of the online consumer survey referenced above. As noted, it was directed at women between the ages of eighteen and seventy-five who had purchased the Daily Facials product in the last five years, and asked them whether product packaging with Navarro's photograph made them more likely to purchase the product than packaging without a photograph. (*Id.* at #7256).

24

An expert's survey meets *Daubert*'s reliability standards if the expert: (1) properly defines the "universe" of respondents; (2) selects a representative sample of that universe; (3) frames the questions in a clear, precise and non-leading manner; (4) uses competent interviewers who follow sound interview procedures and have no knowledge of the litigation or the purpose of the survey; (5) accurately reports the data; (6) analyzes the data in accordance with accepted statistical principles; and (7) assures the objectivity of the process. *Safe Auto Ins. Co. v. State Auto. Mut. Ins. Co.*, No. 2:07-CV-1121, 2009 WL 3150328, at *2 (S.D. Ohio Sept. 30, 2009) (quoting *Leelanau Wine Cellars*, 452 F. Supp. 2d at 778).

Defendants suggest that Burshek's survey fails to meet a number of these reliability standards. First, Defendants argue that Burshek failed to draw from a properly defined universe of respondents (prong 1). Second, Defendants assert that Burshek's survey is unreliable because he failed to replicate marketplace conditions (an aspect of prong 7). Finally, Defendants suggest that Burshek used leading questions that infected the survey with bias (prongs 3, 4, and 7). Below, the Court addresses, and rejects, each of those objections in turn. Relatedly, Defendants suggest that "even if any of these errors were not an independent basis for excluding [the survey], the cumulative errors render the survey inadmissible" under Fed. R. Evid. 403. (Defs.' Burshek Mot. at #11604). But, as the Court finds that Burshek's survey does not suffer from any of these errors, at least not to any significant degree, the Court also declines to exclude the survey under Fed. R. Evid. 403.

### a.  Burshek's "Universe" of Survey Respondents is Not So Underinclusive So As To Be Unreliable.

The selection of a proper universe is one of the most important factors in ensuring a survey is reliable. *Leelanau Wine Cellars*, 452 F. Supp. 2d at 781 (citing *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264 (5th Cir. 1980)). Selection of a proper universe is critical because "even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003) (quoting 5 McCarthy, § 32:159 at 32–250.3). A proper universe of respondents includes the people whose opinions are relevant to the question at hand. *Leelanau Wine Cellars*, 452 F. Supp. 2d at 781-82. The goal is to survey a group of people that is representative of this population. *See Rocky Brands, Inc. v. Red Wing Shoe Co., Inc.*, No. 2:06–cv–00275, 2009 WL 5125475 *4-5 (S.D. Ohio Dec. 28, 2009) (asking whether surveyed patrons adequately represented likely purchasers of the product at issue).

But, in practice, it is difficult to select a perfect sample. Sometimes, surveys are overinclusive in that the sample includes people whose opinions are irrelevant to the issue in the litigation. *See, e.g.*, *Leelanau Wine Cellars*, 452 F. Supp. 2d at 783 (universe was overinclusive when survey sample included all Michigan residents who may purchase $5-$14 wine when the product at issue would likely be purchased from a tasting room); *Whirlpool Prop., Inc. v. LG Elec. USA, Inc.*, No. 1:03 cv 414, 2006 WL 62846 *4 (W.D. Mich. Jan. 10, 2006). On the other end of the spectrum sit underinclusive surveys, which are flawed because they fail to capture a portion of the

relevant respondents. *See, e.g.*, *Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1182 (D. Kan. 2007) (survey was underinclusive when it sampled only a narrow selection of customers who attended a trade show instead of the entire pool of customers). If a survey is over- or underinclusive, then it might not paint an accurate picture of the relevant population. And, if the survey if over- or underinclusive to a significant degree, the survey would be unreliable, and thus inadmissible, under *Daubert*. *See id.*

That said, a survey does not have to be perfect to be admissible. *Honestech, Inc. v. Sonic Sol.*, 430 F. App'x 359, 362 (5th Cir. 2011). Rather, the survey need only reflect a "fair sampling" of the relevant population. *Id.* (quoting *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 487-88 (5th Cir. 1986)). Thus, a survey is not automatically unreliable just because it samples an over- or underinclusive universe. Often, these flaws will go to the weight of the survey instead of its admissibility. *See, e.g.*, *Leelanau Wine Cellars*, 452 F. Supp. 2d at 785-86 (concluding that a survey is admissible despite serious questions regarding the survey universe and methodology); *Rocky Brands*, 2009 WL 5125475 *4-5 (admitting an underinclusive survey because that issue "goes to the weight of the evidence, not its admissibility"). An over- or underinclusive universe will make a survey inadmissible only when the universe is so unrepresentative that the survey loses its probative value entirely. *See Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272-76 (S.D.N.Y. 1990) ("The flaws in the universe, design and interpretation of defendants' study undermine its probative value, and it deserves no weight[.]").

The parties in this case dispute the scope of the relevant universe of respondents. Burshek limited his survey to women between the ages of eighteen and seventy-five who had purchased the Daily Facials product in the last five years. (Burshek Rep. at #7254-55). Navarro explains that the survey properly sampled "actual purchasers" because, under *Balsley*, she must demonstrate Defendants' revenues, and only existing customers contributed to that revenue. (Pls.' Burshek Resp. at #12861-62). Defendants disagree. Defendants argue that if Burshek is trying to capture the effect of Navarro's photographs on the market, he should have surveyed facial wipes customers generally, not just existing customers. (Defs.' Burshek Mot. at #11599). In essence, Defendants contend that Burshek's "universe" is underinclusive.

The Court agrees that Burshek might have captured a more complete picture of the relationship between Navarro's photographs and Defendants' sales if he had included potential customers. The Court does not conclude, however, that this defect makes Burshek's survey unreliable. Burshek's survey, although perhaps not perfect, captured a reasonably broad swath of Defendants' customers (those who bought Daily Facials in the last 5 years). This sample is not a wholly inaccurate or unrepresentative measure of the effect of Navarro's photographs.

A survey like Burshek's does not have to perfectly reflect the relevant population in order to be admissible. It just must give the jury some reliable insight. For example, in *Leelanau Wine Cellars*, a trademark action between two wineries on Michigan's Leelanau Peninsula, an expert offered a survey on consumer confusion.

452 F. Supp. 2d at 782. The expert surveyed Michigan customers over twenty-one years of age who had either purchased, or intended to purchase, a bottle of wine in the $5 to $14 price range within a three-month period of the interview. *Id.* This universe was "significantly overbroad" because "a survey participant who purchases wine only at grocery or discount retail store such as a Meijer or Sam's Club and who does not intend to visit and/or is unaware of Defendants' tasting rooms, or even of wineries in the Leelanau Peninsula, would not be a potential purchaser of Defendants' wine." *Id.* Yet, the court held that, while it was "a close call," this survey was admissible because the survey still provided some, if weak, insight into the relevant population. *Id.* at 785-86.

This case is nowhere near as close a call as *Leelanau*. The point of Burshek's survey is to show that Navarro's photographs had some connection (i.e., were "reasonably related") to the sales of the Daily Facials product. It is hard to know exactly who comprises the relevant pool of customers, but a survey that captures the opinions of a broad swath of existing customers is still helpful, even if fails to account for all potential customers. *See Microsoft Corp. v. Motorola Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) (admitting a survey about how customers value certain features of an Xbox even though the survey only included current Xbox owners and not potential Xbox customers); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *10 (N.D. Cal. June 30, 2012) (admitting a survey to determine what price premium, if any, Samsung consumers are willing to pay for the

features associated with the patents at issue, even though the survey included only recent Samsung customers instead of all customers).

This is not the rare case where the surveyed population is so off target that the survey becomes unreliable. Compare Burshek's survey, for example, to the one found inadmissible in *Hodgdon Power*, a trademark action between two gunpowder suppliers. 512 F. Supp. 2d at 1180. There, the survey on consumer confusion sampled only a narrow selection of the plaintiff's current customers, namely, those that attended one particular gun show and went specifically to the plaintiff's promotional booth. *Id.* The survey was severely underinclusive, and thus inadmissible, as a result of this restrictive sample. *Id.* at 1181-82.

The *Hodgdon* equivalent here would be if Burshek went to one store for one day and surveyed only those customers who were purchasing the Daily Facials product at the register. That universe might be so underinclusive as to render the survey inadmissible. But that is far from the reality here. Burshek opened his survey to just about all adult women who had purchased Daily Facials in the past five years. This sample, although not perfect, still includes a substantial number of Defendants' customers. As such, even if Burshek's survey is underinclusive, it does not present the same problems as a severely unrepresentative survey like the one at issue in *Hodgdon*.

One could perhaps argue that Burshek should have made his sample more expansive (although that has its disadvantages too, as he may also capture those "potential consumers" who would never buy Daily Facials anyway). But Burshek's

sample of the Daily Facials market is not so skewed that it makes the survey so inherently unreliable as to be inadmissible.

> **b. *Burshek's Survey Did Not Stray So Far From Replicating Real Marketplace Conditions As To Be Unreliable On That Ground.***

Just as using an unrepresentative sample can compromise the reliability of survey results, so too can the failure to simulate marketplace conditions. "To have substantial probative value, a survey ... must ... be designed to examine the impression presented to the consumer by the accused product." *Wells Fargo*, 293 F. Supp. 2d at 766 (quoting *Conopco, Inc. v. Cosmair, Inc.,* 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999)).

Defendants argue that Burshek's survey is unreliable because he failed to simulate a real-world shopping situation. Specifically, Defendants take issue with the fact that Burshek's survey asked participants to compare a Daily Facials box with the Navarro photograph and a Daily Facials box without any photograph, instead of a more realistic counterfactual. (Defs.' Burshek Mot. at #11599-60). In the real world, Defendants explain, consumers would pick between Daily Facials and other facial wipes products, not just between two types of Daily Facials packages. (*Id.*). Even then, Defendants continue, Burshek should have used a Daily Facials package with a different photograph as his counterfactual, not an unrealistic no-photo counterfactual. (*Id.* at #11601-02). Navarro counters that Burshek's survey did simulate actual market conditions. She explains that, after 2017, P&G stopped using photographs of models on their Daily Facials package. (Pls.' Burshek Resp. at

#12863). Therefore, Burshek's decision to use a no-photo hypothetical did in fact model real marketplace conditions, at least to some extent.

In any event, a survey need not perfectly reflect real marketplace conditions. Rather, the general rule is that "the closer the survey methods mirror marketplace conditions, the greater the evidentiary weight of the survey results." *Whirlpool Prop.*, 2006 WL 62846 at *7. A survey is inadmissible only when its assessment of the market is significantly divorced from reality such that it no longer carries probative value. Take for example the flawed survey in *Vista Food Exchange, Inc. v. Vistar Corp.*, a trademark infringement action between two wholesale food distributors with similar names. No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *4 (E.D.N.Y. Sept. 27, 2005). In that case, the plaintiff's expert presented a survey on consumer confusion. *Id.* As part of this survey, the expert showed participants a brochure with Vista Foods' logo on it. *Id.* The surveyor then asked participants who made this brochure, and presented them with several printed names: Vistar, several unrelated companies (with very different names), or none of them. A majority of respondents chose Vistar, but the "Vistar" option did not include the company's signature logos or font design. *Id.* Therefore, the respondents saw the trademarks in a completely different way than they would have in a real market-place environment. *Id.* at *5. Instead of simulating the market, the survey only measured word association between the names Vista and Vistar. *Id.* Accordingly, the Court said the survey was unreliable for failure to replicate actual market-place conditions. *Id.* In another, even more egregious case, the Eastern District of Michigan excluded a survey on consumer

confusion because the surveyor failed to show the respondents the allegedly infringing material, and so could not properly gauge their reactions to it. *Wells Fargo*, 293 F. Supp. 2d at 766.

Burshek's survey does not suffer from these kinds of fatal flaws. Unlike *Wells Fargo* and *Vista Foods*, Burshek presented respondents with actual photographs of the product, complete with the packaging designs and logos used in Defendants' advertising. Burshek may not have presented respondents with a different-photo counterfactual, or the option to pick facial wipes products from other manufacturers, but he did not have an obligation to account for all potential marketplace conditions. Rather, to pass *Daubert*'s minimum reliability threshold, Burshek must ensure only that his survey bears some reliable relationship to the actual market. Considering Burshek's reliance on actual Daily Facials packaging, the Court cannot say that Burshek utterly failed in this regard. To the extent that Burshek's study deviates from an actual in-store shopping experience, the Defendants are free to point out those weaknesses on cross-examination to the jury.

### c.     Burshek Did Not Use Leading Questions.

Another flaw that can sink a survey is the use of leading questions. Leading questions taint a survey because they tend to *create* the participants' opinions, rather than *elicit* them. *See Wells Fargo*, 293 F. Supp. 2d at 767-68. ("A survey is not reliable if it suggests to the respondents an answer that would not otherwise have occurred to them.").

Defendants suggest that Burshek asked these kinds of impermissible leading questions. Burshek's survey consisted of two substantive questions. First, he asked respondents to state whether they would "look closer" at one of two Daily Facials packages: one with Navarro's photograph and one without any photograph at all (but with all other design elements). (Burshek Rep. at #7256). Next, he asked respondents to state which product they were "more likely to purchase." (*Id.*). Defendants assert that this first question inappropriately focused respondents on Navarro's photograph. (Defs.' Burshek Mot. at #11602-03). This "focalism bias," as Defendants term it, is especially severe because one package had Navarro's photo and one package had no photo at all. (*Id.*). In this way, Defendants say that Burshek practically asked respondents to pick between a blank piece of paper and a picture. (*Id.*). This is "leading," Defendants explain, because people will obviously be drawn to the package with a photograph. (*Id.*). Defendants then argue that this "focalism" bias carries into the next question, because respondents are likely to just repeat their answer from the first question. (*Id.*).

The relevant inquiry here is whether Burshek's questions impermissibly suggested that there is a "right answer." Sometimes, for example, survey questions suggest the right answer when they tip off the respondent as to what the survey is measuring. Take the survey in *Innovation Ventures, LLC v. N2G Distributing, Inc.*, No. 08-CV-01983, 2011 WL 6010206, at *4 (E.D. Mich. Nov. 30, 2011). There, an expert showed survey participants several TV commercials for energy drinks (including one for the plaintiff's product), then showed participants a bottle of the

defendant's allegedly infringing product and asked (1) was this product in the commercials; (2) do you think this product is made by the producers of the products in the commercials; (3) was the [infringing product] sponsored/licensed by producers of the products in the commercials? *Id*. The court held that this line of questioning suggested to the participants that they should look for infringement. *Id.*

Another way a question may be impermissibly leading is if it includes the preferred answer in the question itself. For example, in *Wells Fargo*, the plaintiffs offered a survey to gauge whether customers believed that certain online ads emanated from the Wells Fargo website. 293 F. Supp. 2d at 753, 767-68. The problem with that survey was that the expert "improperly told respondents that pop up ads appear 'on' a website, thus suggesting the association he was trying to establish." *Id.* at 753. This leading question tainted the survey's results. *Id.* at 768. The same problem plagued the survey in *Saxon Glass Tech., Inc. v. Apple, Inc.*, where the expert asked respondents "[d]o you believe that Brand X [IONEX] and Brand Y [ION-X] are likely to produce confusion in the marketplace for chemically strengthened glass and/or glass treatment services?" and "[d]o Brand X and Brand Y give you the impression that the products sold under these brands come from the same commercial source?" 393 F. Supp. 3d 270, 288 (W.D.N.Y. 2019). These are the types of improperly suggestive questions that render a survey unreliable, and thus inadmissible under *Daubert*.

In contrast, Burshek's questions did not suggest to respondents that the subject of the survey was to measure consumer reaction to Navarro's photographs. In

fact, at no point did Burshek even ask about the photographs. If Burshek had asked "does this picture make you want to buy the product" that may have been inappropriately leading. But he did not do so. Defendants suggest that, although Burshek did not explicitly lead respondents, the contrast between a package with a photograph and without a photograph implicitly led respondents to focus on the photograph. Not so. Burshek did not, as Defendants say, ask respondents to pick between "a blank piece of paper and a photo." (Defs.' Burshek Mot. at #11603). Rather, he asked them to pick between two packages that, other than the presence or absence of Navarro's photograph, shared various design elements, including text in various fonts and sizes located in different parts all around the packaging, a mix of colors in various curved shapes, the Olay logo, and background highlighting for certain areas of text. (*See* Burshek Rep. at #7271). Burshek did not ask respondents to pick between one picture with visual intrigue and one without. He simply asked respondents to select which degree of visual dimension they found more appealing. This is not so highly suggestive as to be a "leading question."

In sum, Burshek's survey is both sufficiently relevant and sufficiently reliable that the Court cannot exclude it on *Daubert* grounds.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Exclude the Expert Testimony of Larry Chiagouris (Doc. 216) and **DENIES** Defendants' Motion to Exclude the Expert Testimony of John Burshek (Doc. 215).

**SO ORDERED.**

November 20, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**