## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**ANNETTE NAVARRO,**
**et al.,**

            **Plaintiffs,**               **Case No. 1:17-cv-406**
                                         **JUDGE DOUGLAS R. COLE**

        **v.**

**PROCTER & GAMBLE**
**COMPANY, et al.,**

            **Defendants.**

### <u>OPINION AND ORDER</u>

This cause is before the Court on Defendants Procter & Gamble Company's and Walmart Inc.'s Motion for Summary Judgment (Doc. 185), and Plaintiffs Annette Navarro McCall's and Navarro Photography, LLC's (collectively, "Navarro") Motion for Partial Summary Judgment (Doc. 188). The Court heard in-person oral argument on these motions on September 15, 2020.

For the reasons that follow, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. 185) on the issue of whether Navarro unambiguously assigned all her rights to Libby Perszyk Kathman Holdings, Inc. ("LPK") (*id.* at #8337–42), and on the issue of whether Navarro and LPK were joint authors (*id.* at #8342–52). The Court similarly **DENIES** Walmart's motion for summary judgment on the direct infringement claims that Navarro has asserted against it. (*Id.* at #8355). As to P&G, the Court **DENIES** summary judgment on Navarro's contributory infringement claim (*id.* at #8358–60), **GRANTS** summary judgment on Navarro's

vicarious liability claim (*id.* at #8356–58), and **DENIES** summary judgment on Navarro's fraud claim (*id.* at #8352–55).

As to the damages issues in Defendants' motion (Doc. 185), the Court **GRANTS** Defendants partial summary judgment on their argument that Navarro's damages are limited to a three-year look-back period (*id.* at #8360–63), **DENIES** Defendants summary judgment on their broader argument that Navarro's request for profit-based damages fails as a matter of law in its entirety (*id.* at #8363–71), and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment as to particular categories of Navarro's profit-based damages (*id.* at #8371–78).

The Court then turns to Navarro's Motion for Partial Summary Judgment. (Doc. 188). Like Defendants, Navarro also moves for summary judgment on her direct copyright infringement claims. But, unlike Defendants, who ask for summary judgment on *all* of Navarro's claims, Navarro asks for summary judgment only for certain claims where she alleges that there is no issue of material fact as to whether Defendants exceeded their limited usage rights. (Pls.' Mem. at #9361–70). Because the Court finds that there is an issue of material fact as to whether Navarro assigned her rights to LPK through the Supplier Agreement, the Court also **DENIES** Navarro summary judgment on these limited infringement claims.

Navarro also moves for summary judgment on 28 of P&G's asserted affirmative defenses, 19 of which overlap with Walmart's asserted affirmative defenses. (*Id.* at #9377–9404). P&G and Walmart only meaningfully dispute summary judgment as to

six of these defenses, namely (1) Assignment; (2) Extraterritoriality; (3) Failure to Mitigate; (4) Joint Authorship; (5) Implied License; and (6) Statute of Limitations. (*See* Defs.' Resp. to Pls.' Mem., ("Defs.' Resp."), Doc. 207, #9478–9501 (joint authorship and assignment), 9506–12 (statute of limitations, failure to mitigate, extraterritoriality, and implied license)). Starting with the first of those, as stated above, the Court **DENIES** summary judgment as to the issue of whether Navarro assigned her licenses to LPK.

As to five remaining defenses, the Court **DENIES** Navarro's Motion as to Defendants' extraterritoriality defense, finding that there are disputed issues of fact as to whether Navarro can collect damages based on Defendants' international sales (*id.* at #8520), **DENIES** Navarro's Motion as to Defendants' failure to mitigate defense (*id.* at #8517–18), **GRANTS-IN-PART** (as to the images) and **DENIES-IN-PART** (as to the packaging design) Navarro's Motion as to Defendants' joint authorship defense (*id.* at #9395–9402), **GRANTS** Navarro's Motion as to Defendants' implied license defense (*id.* at #9390–92), and **GRANTS** Navarro's Motion as to Defendants' statute of limitations defense, (*id.* at #9386–87).

As to those affirmative defenses on which Defendants have not opposed summary judgment, the Court holds that Defendants have waived those defenses. Accordingly, the Court **GRANTS** Navarro summary judgment on 21 of P&G's Defenses and 13 of Walmart's defenses.[1] The Court, however, finds that one of the

---

[1] Specifically, the Court grants Navarro summary judgment on failure to state a claim (Defendants' First AD); equitable estoppel and acquiescence (Defendants' Second AD); laches (Defendants' Fourth AD); unclean hands (Defendants' Fifth AD); waiver (Defendants' Sixth AD); Navarro's copyrights are invalid and unenforceable (Defendants' Seventh AD);

"affirmative defenses"—Defendants' claim for attorneys' fees—is not in fact an affirmative defense, but rather a mislabeled counterclaim. As to that claim, the Court finds that Navarro has failed to meet her burden at summary judgment, and accordingly **DENIES** summary judgment on that issue.[2]

Finally, the Court **GRANTS** Navarro's Motion for Partial Summary Judgment on Defendants' breach of contract counterclaim, finding that, as a matter of law, Defendants cannot prove damages, which are an essential element of their claim (Doc. 188, #8496–8502).

The sole remaining issue, then, is Navarro's request for Rule 37 Sanctions, which the Court **DENIES**.

## BACKGROUND

A picture, the old saying goes, is worth a thousand words. In this action, Navarro seeks a determination as to the value of her photographs instead in dollars. In June of 2017, Plaintiff Annette Navarro McCall filed this copyright action on behalf of herself and her company, Navarro Photography, LLC, claiming copyright infringement in twelve photographs that she took. (*See* Compl., Doc. 1, #1–33). She

---

forfeiture or abandonment of copyrights (Defendants' Tenth AD); misuse of copyright (Defendants' Eleventh AD); no volitional act (Defendants' Thirteenth AD); Navarro's rights not infringed upon (Defendants' Fourteenth AD); no remaining commercial value (Defendants' Eighteenth AD); failure to name an indispensable party (Defendants' Nineteenth AD); Navarro received all due compensation (Defendants' Twentieth AD); fraud on the Copyright Office (P&G's Twenty-Fourth AD); P&G's "affirmative defenses" to Navarro's fraud claim (P&G's Twenty-Fifth through Twenty-Eighth, and Thirtieth ADs); fraud damages too remote or speculative (P&G's Twenty-Ninth AD); fraudulent misstatements protected by Ohio doctrine of litigation privilege (P&G's Thirty-First AD).

[2] Defendants listed their request for attorney's fees as their seventeenth affirmative defense. (Walmart's Answer, Doc. 135, #4326; P&G's Answer, Doc. 136, #4425).

named a host of companies as defendants, some of which are no longer part of this action. But two remain part of this case and are relevant for purposes of this opinion. The first is Defendant Procter & Gamble Company, commonly known as P&G. The second is Defendant Walmart, Inc., or just Walmart. A third company, Libby Perszyk Kathman Holdings, Inc., or LPK, which once was a third-party defendant but is no longer, also plays an important role. The summary judgment motions currently before the Court are primarily based on the activities of three of these four parties—Navarro, LPK, and P&G.

**A.      Procter & Gamble And LPK Enter Into The 2007 Master Services Agreement; Navarro Signs The 2007 Supplier Agreement With LPK.**

Procter & Gamble is one of Cincinnati's largest companies and is responsible for some of the world's most recognizable consumer-goods brands. P&G's brands include Crest, Charmin, Bounty, Pampers, Dawn, Febreze, Tide, and Swiffer, just to name a few. This litigation relates to one of P&G's brands, Olay, and the company's efforts to revitalize the image of that product line. That is where another Cincinnati company, LPK, comes in. LPK is a design firm specializing in, among other services, product package design. LPK and P&G have a long history dating back to at least the 1950's. (Geiger Dep., Doc. 155, #5180). At one point, P&G was LPK's largest client, accounting for twenty to thirty percent of LPK's annual revenue. (*Id.*).[3]

In 2007, P&G and LPK executed an agreement to define the terms of their relationship. This took the form of an overarching contract, the 2007 Master Services

---

[3] In 2014, P&G switched the Olay account from LPK to another design firm, Landor. (*See* Geiger Dep., Doc. 155, #5187).

Agreement, which LPK executed on June 27, 2007, and P&G countersigned on June 29, 2007. (Ott Dep. Ex. 68 (the "2007 MSA"), Doc. 183-13, #8285). The 2007 MSA was initially for a term of about three years—June 1, 2007, through June 30, 2010—but the parties later extended it through June 30, 2012. (Pls.' Responses to Defs.' Proposed Statement of Undisputed Facts and Proposed Disputed Issues of Material Facts ("Defs.' SOUF"), at ¶¶ 23–24, Doc. 209-1, #10129).

Consistent with its title, this contract served as a master agreement that governed every engagement between P&G and LPK. The 2007 MSA contains several provisions that are relevant here. The first describes the type of design services that LPK would provide to P&G:

> 2.1 **SPECIFICATIONS**. SELLER [LPK] shall perform and BUYER [P&G] shall purchase Design Services to include, but are not limited to: graphic and brand identity design, packaging design, brand and strategy consultancy, product and packaging innovation design, in-store and environmental design in support of specific project, brand, and//or category engagements in accordance with the terms and conditions set forth in this AGREEMENT and/or Designs produced by SELLER or resulting from such Design Services ("SERVICES") in strict compliance with the specifications as set forth in BUYER's Design Brief or other similar description of scope of work ... .

(2007 MSA at #8276). In the agreement, the parties also specifically addressed intellectual property rights, with LPK warranting that P&G's "use … of such SERVICES and any parts thereof, do not infringe on any copyrights":

> 8.3 **INTELLECTUAL PROPERTY RIGHTS**[.] Notwithstanding anything to the contrary in this AGREEMENT, SELLER (1) represents and warrants to the best of SELLER's knowledge that: (A) as of the performance of the SERVICES, and (B) continuously thereafter, the SERVICES and any parts thereof and BUYER's purchase, use, sale, offer to sell and/or importing of such SERVICES and any parts thereof, do not infringe on any copyrights, design rights (e.g., design patents, design registrations), utility patents, utility models, trademarks, trade

6

secrets or similar intellectual property rights (collectively IP RIGHTS")
of any third party ... .

(*Id.* at #8279). In terms of specifically assigning or transferring intellectual property

from LPK to P&G, the agreement provides that:

> **10.19.1** BUYER shall solely own all IP RIGHTS, including but not
> limited to ideas, discoveries, inventions, works of authorship,
> documents, designs, drawings, electronic media, calculations and
> descriptions which SELLER, prior to or after the EFFECTIVE DATE,
> develops, invents or creates or causes to be developed, invented, or
> created specifically relating to the SERVICES or parts thereof, its
> intended use or relating to SELLER'[s] performance in accordance with
> this AGREEMENT ... .
>
> ...
>
> **10.19.2** ... [A]ny work of SELLER'[s] authorship relating to the
> SERVICES or parts thereof hereunder is "work made for hire".
> SELLER, upon BUYER'[s] request, shall execute any documents, which
> BUYER deems necessary to document BUYER'[s] respective copyright
> ownership. In the event that the work is not considered "work made for
> hire" SELLER irrevocably grants to BUYER a perpetual, non-exclusive,
> worldwide, royalty free and freely assignable license with the right to
> sub license all copyrights, to the extent permissible by LAW including,
> without limitation, the right to reproduce disseminate, publicize,
> translate and use.

(*Id.* at #8285). There is no dispute about the validity of this agreement.

Around this same time period, LPK began its relationship with Navarro. LPK

originally retained Navarro for a non-P&G-related project in September 2007. This

project was smaller in scope—it merely required Navarro to photograph LPK's

employees for LPK's internal use. (Defs.' SOUF at ¶ 8, #10121; Defs.' Responses to

Pls.' Statement of Undisputed Facts, ("Pls.' SOUF"), Doc. 207-1 at ¶ 5, #9520).

Navarro accepted that smaller job hoping it would provide her more exposure in

Cincinnati and thus help grow her business. (Defs.' SOUF at ¶¶ 5–6, #10121).

As a new contractor with LPK, Navarro signed a document—the Supplier Agreement[4]—on September 13, 2007. (Navarro Dep. Ex. 2 ("Supplier Agreement"), Doc. 174-1, #6947–48). That contract identified "Annette Navarro McCall" as the "Supplier," LPK itself, and LPK's "Client or Clients," although the latter only as a group and not by name. (*Id.* at #6947). It also contained a provision related to intellectual property rights. That term specified that the Supplier was assigning to LPK "in perpetuity throughout the world all intellectual property rights … that Supplier … may ever have in the Creations," where "Creation" is a defined term meaning "creative ideas, designs, illustrations, developments, inventions originated or developed by Supplier … for LPK":

> 5.      Ownership and Assignment of Creative Works. All creative ideas, designs, illustrations, developments, inventions originated or developed by Supplier, its employees and agents for LPK ("Creations") are and shall be the property of LPK. LPK is authorized to transfer and assign the Creations and its rights in the Creations to Client. Supplier, its employees and agents do transfer and assign to LPK in perpetuity throughout the world all intellectual property rights and all other rights that Supplier, its employees and agents may ever have in the Creations. LPK is authorized to transfer and assign these rights to Client. Supplier, its employees and agents do agree to sign documents required to evidence this assignment and agree that this assignment is made without further compensation other than fees paid to Supplier. Supplier will cooperate in securing any proprietary rights on behalf of LPK or Client. Should LPK or Client determine that the Creations merit patent, trademark, design registration or copyright protection, Supplier will sign additional documents which Client or LPK determine necessary to protect the proprietary rights and cooperate fully in the prosecution and

---

[4] The parties dispute what this agreement should be called. P&G and Walmart refer to it as the Assignment Agreement, which supports their theory of the case. (Defs.' SOUF at ¶ 9, #10121–22). Navarro disagrees with that characterization. The parties do not dispute that Navarro signed it, though. (*See, e.g.*, *id.*). The title of the document is just "Agreement" next to LPK's logo. (Supplier Agreement at #6974).

> defense of such rights. LPK will pay any expenses associated with the
> preparation and handling of such documents.

(*Id.* at #6947–48). As is clear from the text, this provision also allowed LPK "to transfer and assign these rights to Client," and required Supplier to sign any necessary documents to effectuate that assignment "without further compensation." There is no dispute about the validity of this agreement either.

## B. Navarro, LPK, And P&G Begin Work On Rebranding For Olay.

Against the backdrop of the 2007 MSA and the 2007 Supplier Agreement, the Court turns to the events that led the parties to this juncture. About two years after those agreements were executed, in the late-2009 to early-2010 timeframe, P&G commissioned LPK to update the product packaging for several products in P&G's Olay line. (Defs.' SOUF at ¶ 31, #10131; Pls.' SOUF at ¶ 27, #9537). These products included the ProX Spinning Brush (the ProX or Super Sonic), Daily Hair Fine to Medium Hair Removal (the Teal Box), Daily Hair Medium to Coarse Hair Removal (the Purple Box), and Olay 4-in-1 Daily Facial Cloths (Daily Facials). (Defs.' SOUF at ¶¶ 31, 48, 67, 86, #10131, 10139, 10148, 10155; Pls.' SOUF at ¶ 27, #9537). The projects were assigned corresponding codenames—Rebirth (ultimately Ninja, as to the ProX), Sophia (the Teal Box), Lauren (the Purple Box), and Rebirth (ultimately Woodhouse, as to the Daily Facials). (Hempelmann Dep., Doc. 157, #5423; Schrimpf Dep., Doc. 169, #6468, 6471–72).

At the time P&G began working on this brand update with LPK, P&G decided that those products would be some of the first in the Olay line to depict a model on the packaging. (Schrimpf Dep., Doc 169, #6475). This meant that LPK would be

responsible for not only the package design itself, but also for taking photographs of models for the packaging. Because LPK did not have a photographer on staff, this required LPK to find one. LPK determined Navarro was the right candidate for the job. (Wooten Dep., Doc. 171, #6704).

The first project that LPK and Navarro undertook for Procter & Gamble was the Olay ProX Spinning Brush, the photo shoot for which occurred on January 20, 2010. (Defs.' SOUF at ¶ 31, #10131; Pls.' SOUF at ¶ 27, #9537–38). P&G tasked LPK with redesigning the packaging for that product, which meant that LPK had to combine Navarro's photograph or photographs into LPK's overall package design for the ProX. (Defs.' SOUF at ¶¶ 31–32, #10131). After receiving input from P&G about what it wanted, LPK and Navarro negotiated the logistics and requirements for the photo shoot. (*See* Martin Dep. Ex. 134, Doc. 163-1, #5853–58). Ultimately Navarro and LPK selected one photograph, Image 1[5], which LPK incorporated into the final package design for the ProX, and then provided that package design to P&G. (*See* Defs.' SOUF at ¶ 42, #10136–37).

Apparently satisfied with the results, P&G also enlisted LPK to help redesign the Teal Box packaging. LPK again turned to Navarro for the requisite photographs. Navarro and LPK discussed this photoshoot and priced out several photographic licensing options that LPK relayed to P&G. (*See* Ott Dep. Ex. 57, Doc. 201-1, #9174–92). The parties held a photo shoot on July 1, 2010, and LPK took the Navarro photographs and incorporated them into the new Teal Box packaging design. (Defs.'

---

[5] There is also a fifth product, Regenerist, for which Navarro alleges P&G recycled the image for the ProX (Image 1). (*See* Pls.' SOUF at ¶ 27, #9537–38).

SOUF at ¶¶ 48–49, #10139; Pls.' SOUF at ¶ 27, #9537–38; Navarro Dep., Doc. 174, #6824). LPK similarly transferred the final package design to P&G, but this design incorporated five photographs, Images 2 through 6, one on the front of the box and four on an insert. (*See* Defs.' SOUF at ¶¶ 59–90, #10144–45).

The Purple Box redesign project largely followed the same process as the Teal Box project, and similarly produced four final photographs. In March 2011, LPK and Navarro discussed the terms and content needed for the project. (*See* Ott Dep. Ex. 60, Doc. 201-2, #8091–8116). Later the next month, on April 20, 2011, a photo shoot occurred, and Navarro and LPK selected four images to appear on the packaging, Images 7 through 10. (*See* Defs.' SOUF at ¶ 67, #10148; Pls.' SOUF at ¶ 27, #9537–38). Again, one of the images appears on the exterior of the box and three on an insert included in the packaging. (*See* Defs.' SOUF at ¶¶ 78–79, #10152–53).

The last project for which LPK enlisted Navarro's services was the Daily Facials photo shoot, which took place on March 23, 2012. (*See* Defs.' SOUF at ¶ 86, #10155; Pls.' SOUF at ¶ 27, #9537–38; Ott Dep. Ex. 61, Doc. 183-7, #8168–8207). After negotiating particulars and holding the shoot, LPK incorporated two of Navarro's photographs, Images 11 and 12, onto the new Daily Facials packaging, and also provided that final design to P&G. (Defs.' SOUF at ¶¶ 94–96, #10159–60).

The four photo shoots resulted in four (or five, says Navarro) packaging redesigns that utilized twelve Navarro photographs: ProX (Image 1), Teal Box (Images 2–6), Purple Box (Images 7–10), and Daily Facials (Images 11–12). (*See* Pls.' SOUF at ¶ 27, #9537–38). And, taking Navarro's version of the facts, P&G also

utilized Image 1 on another product, Regenerist. (*See id.*). After P&G completed final payment for each project, LPK distributed payment to Navarro and the models and transferred the package designs to P&G, which then began using the designs for packaging, advertising, coupons, and online promotion.

## C. Usage Rights Issues Began To Bubble Up Almost Immediately.

This recitation seems to suggest that this business arrangement went off without a hitch. But that is not the case. Instead, issues quickly arose regarding the usage rights associated with the photographs that Navarro shot, that LPK incorporated into packaging, and that P&G ultimately utilized in various places over differing periods of time. What, if any, relevancy the events and communications following each of the photo shoots plays in this litigation is a hotly contested issue.

*ProX.* On October 7, 2010, an LPK employee reached out to Navarro to discuss "a request for the Olay Pro-X Model for in-store use." (Ott Dep. Ex. 56, Doc. 183-2, #8091). There seems to be general agreement that "in-store use" is a term of art that refers to using the indicated photograph (Image 1) on promotional materials for in-store displays. LPK had the "understanding that [Navarro's] contract only cover[ed] packaging" and that there would be "additional costs ... for in-store use." (*Id.*). Navarro responded the same day, indicating what the price would be: "5000 and 20 percent agency fee for a total of 6000 for 1 year north america [sic] and the photographer usage would be 5000 for 1 year north america [sic] and that is for in-store." (*Id.*). Navarro also quoted a price for global usage: "15,000 and 20 percent agency fee ... and global usage for photographer would be 15,000, and that's for one

year." (*Id.*). LPK responded that its "client [P&G] has decided to purchase the usage rights for 1 year in North America only." (*Id.*). Someone, likely LPK, worked up a Standard Estimate Template to reflect that purchase. (*See id.* at #8105). Two invoices were generated, one for Navarro ($5000) and one for the model ($5000 + $1000 agency fee). (*See id.* at #8114, 8116). LPK then prepared an invoice and billing preview, totaling $11,250 (the parties do not indicate the source of the additional $250 charge). (*Id.* at #8113). The invoice indicated that LPK was submitting it to P&G. (*See id.* at #8110–13). This occurred at the end of December 2010.

*Teal Box.* Roughly ten months later, in October 2011, LPK again contacted Navarro and inquired about "extend[ing] the usage rights for the model used on the [Facial Hair Removal] Sophia [Teal Box] packaging and in-package brochure" to include distribution in Canada. (Ott Dep. Ex. 59, Doc. 183-5, #8142–43). Navarro responded asking for more specifics, which LPK provided. (*See id.*). Navarro again quoted a price, and LPK again worked up a Standard Estimate Template (*id.* at #8146–63) based on Navarro's invoice (*id.* at #8146–63, 8166). What is missing however, is any document reflecting payment by P&G to LPK, and similarly payment from LPK to Navarro.

Then, just a few weeks later, on November 5, 2010, another issue arose relating to international usage rights for the Teal Box. (Ott Dep. Ex. 58, Doc. 183-4, #8119). Navarro learned that P&G was under the impression that it had the rights to use the Teal Box photographs for global packaging. (*Id.*). She reached out to LPK regarding international usage rights, noting that she believed that the Teal Box rights were

13

limited to North America, with P&G having an *option* to purchase additional rights for Western Europe and other countries. (*See id.* at #8119–20). LPK confirmed that its "client [P&G] was going to pay for the additional countries rights" and that LPK was going to "check back with [its] client to ensure that we are still covered here" and that this was "a great reminder that we need to make sure everything is covered." (*Id.* at #8119). Just a few days later, LPK emailed Navarro and confirmed that "[w]e are going to have to go ahead and purchase those [usage rights for Western European countries] quickly." (*Id.* at #8119).

LPK requested that Navarro "pull this [usage information for Western Europe] into a formal estimate" and notified her that LPK would need to "work back with [its] client [P&G]" to reconcile billing. (*Id.* at #8123). Navarro soon provided LPK the requested estimate, which reflected a line item for "Photographer Usage" at a cost of $18,000 and a "Model Usage Fee Anita Alam Directions USA" with a cost of $24,000. (*Id.* at #8124). LPK again worked up a Standard Estimate Template. (*Id.* at #8125–27). LPK then billed P&G a total of $31,500. (*See id.* at #8128–37). LPK's invoices reflect it was to distribute $18,000 to Navarro and $24,000 to the modeling agency. (*Id.* at #8138–40). This left a $10,500 balance on LPK's books that P&G still owed on top of the $31,500 that LPK billed to it.

**D. Navarro Discovered Alleged Copyright Infringement In June 2015, Reached Out To Both LPK And P&G, And Filed Copyrights In The Images.**

In June of 2015, Navarro contacted P&G regarding its use of the photographs and product packaging. (Defs.' SOUF at ¶ 101, #10162–63). Despite disagreeing

about the content and context of these conversations, there is no doubt they occurred. It also unclear from the record what resolution the parties reached, if any, as a result of Navarro's inquiry.

Navarro first became aware of possible copyright infringement concerning the photograph she took for the ProX product when the model who appeared in that photograph contacted Navarro via email. (*See* Navarro Dep. Ex. 25, Doc. 174-11, #7066–67). Navarro emailed P&G and indicated that the model reported she saw that product packaging on the shelves continued to include her photograph well-beyond the time Navarro (and apparently the model, too) thought the rights had expired. (*See id.* Ex. 28, Doc. 174-13, #7072). When Navarro contacted P&G, she also shared her concern that "[t]his has happened before, where P&G did not buy the usage and I was told the usage was released, but then somehow it keep [sic] getting used." (*Id.*). She further stated that "P&G has always paid the invoicing, when this has happened, because it is copyright infringement." (*Id.*). P&G acknowledged the email and said it would "forward [her] note to the appropriate design manager, as [the recipient could not] help [Navarro] with [the issue]." (*Id.*).

About one week later, on July 1, 2015, P&G responded to Navarro and requested that she send the invoices "for your and the models fees so we can get this taken care of[.]" (Navarro Dep. Ex. 29, Doc. 174-14, #7073). Navarro responded to P&G on July 21st and attached the requested invoices. (*See* Hein Dep. Ex. 412, Doc. 156-3, #5405–07).

While Navarro was working with P&G to resolve that issue, on July 20, 2015, another one came to light. A representative for the model who appeared on the Purple Box emailed Navarro, asserting that P&G was exceeding the scope of the model's usage rights. (Hein Dep. Ex. 413, Doc. 156-4, #5408). Navarro forwarded that email to P&G on July 28, 2015, explaining that the model had "seen [the Purple Box] ... in Chicago and New York" and said that it was "all over Cincinnati." (*Id.*). Navarro attached to that email the confirmations regarding usage that she had provided LPK at the time of the shoot. (*Id.* at #5410–13).

P&G then took over the issue internally. On August 18, Nikki Hein (a P&G employee) wrote to Sara Keating (another P&G employee) that she needed "help managing overdue model usage rights" with respect to the ProX and the Purple Box issues, and notified Keating of Navarro's accusation that P&G "now owes $84,000 in total." (Hein Dep. Ex. 414, Doc. 156-5, #5414). This total included the $28,400 due for the ProX packaging that Navarro previously brought to P&G's attention. (*Id.*). Hein then asked Keating if she could "help direct me to who I should forward this to? Do we pay? I have been playing a bit of back and forth with Annette [Navarro] on this as well as collecting information from marketing." (*Id.*). Keating responded: "Wow. Ok, let me follow up." (*Id.*).

Still working internally, P&G tried to track down copies of the model contracts at issue. (*See* Navarro Dep. Ex. 25, Doc. 174-11, #7068). Eventually Hein followed up with Navarro, asking her to "please forward the contracts that were signed with the models for both ProX and Facial Hair Removal" because P&G "h[ad] the overage fee

documents, but not the original signed contracts." (*Id.* at #7067). Navarro responded on August 28, not by attaching the model agreements, but instead by copying the modeling agency, and providing the dates on which the relevant terms of use were created. (*Id.* at #7066–67). Silence ensued. By September 15, 2015, Navarro had tired of waiting for a response from P&G. Accordingly, Navarro and the modeling agency formulated a plan to be more "aggressive" because they felt that they "ha[d] all the rights." (*Id.* at #7066).

Eventually P&G was able to locate the model usage rights documents from Landor, the design company that replaced LPK as P&G's product-design contractor. (*See* Lewis Dep. Ex. 386, Doc. 193-1, #8712–26). In the process, several individuals with another firm P&G utilizes, Saatachi & Saatachi, noted that "in regard to the ProX brush, this brush is being used on the current N[orth] A[merican] packaging without proper usage as it has expired and it has been used in the past but altered without proper usage on packaging as well as online." (*Id.* at #8714). Saatchi & Saatchi then asked another P&G employee to "please advise" them on what LPK's role in all this was. (*Id.* at #8713). P&G responded that it is still "trying to connect the dots" and did not yet understand the details of the issue. (*Id.* at #8712–13). LPK itself also hopped into the mix, apparently contacting Navarro directly to try to obtain details. Navarro provided LPK the requested documents, as well as several invoices and purchase orders. (*Id.* at #8712, 8718–26). That was September 23, 2015.

Around the same time, other P&G employees started getting involved. In a series of emails between various P&G employees, they note that "we should pay them

(obviously) and we would need to figure out how to negotiate for renewal until Butterfly is live."[6] (Schrimpf Dep. Ex. 169, Doc. 169-4, #6603). In trying to determine who held the relevant information, one P&G employee remembered going "to LPK for any related issues on this," but another noted that "we have had a bit of a knowledge gap" since P&G moved its business from LPK to Landor. (*Id.* at #6602).

Navarro and the modeling agency grew increasingly frustrated with what they perceived as the run-around from P&G. So finally, on October 12, 2015, Navarro notified P&G that she intended to rescind her previously tendered offer to settle if the matter was not resolved "in the next few days.[7]" (Pureval Dep. Ex. 263, Doc. 165-1, #6262). Several months later, P&G paid the models, but not Navarro. (*See* Coffey Dep. Ex. 146, Doc. 170-1, #6676–6684).

But during this time Navarro had developed her own plan to further protect her asserted right to compensation. Namely, in October 2015, she began registering her copyrights in the Images. More specifically, she filed three separate applications with the United States Copyright Office to register copyrights in Images 1, 2, and 7. (Defs.' SOUF at ¶ 102, #10163). The copyright for Image 1 was for "Olay Supersonic" (the ProX), with a November 30, 2010 publication date. (*Id.* at ¶¶ 103–04, #10163; Fifth Am. Compl. Ex. B1, Doc. 133-1, #4127). For Image 2, she identified the title as

---

[6] Butterfly was the name for P&G's global initiative to revamp Olay packaging. It was eventually renamed "Rebirth" which was the parent project of project "Ninja." (*See* Hein Dep., Doc. 156, #5361; Schrimpf Dep., Doc. 169, #6467–68, 6522).

[7] Navarro also sent an email where she stated that she had "no choice but to seek legal counsel and rescind [her] offer to settle the past due usage quotes." (Pureval Dep. Ex. 263, Doc. 165-1, #6262).

"Olay Hair Removal Medium" (the Teal Box) and noted a publication date of August 1, 2011. (Defs.' SOUF at ¶¶104–05, #10163–64;[8] Fifth Am. Compl. Ex. B2 at #4129). For Image 7, she identified the title as "Olay Hair Removal Medium to Coarse" (the Purple Box) and noted a publication date of August 1, 2011. (Defs.' SOUF at ¶¶ 106–07, #10164; Fifth Am. Compl., Ex. B2, #4130). Then, beginning in February 2016 and continuing over the course of the next several months, Navarro filed copyrights in Images 3–6, 8–10, 11, and 12, which account for the remaining photographs at issue here. (*See id.* at ¶¶ 111–19, #10165–67).

Based on her applications, the Copyright Office issued Navarro separate registration certificates for Images 1, 2, 3–6, 7, 8–10, 11, and 12. (*Id.* at ¶ 119, #10167). Then in February 2018, Navarro filed for, and the Copyright Office approved, supplemental registrations for Images 3–6 and 8–10 designed to correct what Navarro claimed were inadvertent errors in her original applications for those composite images. (*Id.* at ¶¶ 120–21, 123, 125 #10167, 10169).

**E.     Navarro Decided To Sue Procter & Gamble, And Later Walmart, For Copyright Infringement, Procter & Gamble Asserted a Counterclaim.**

Roughly sixteen months elapsed from the time when the Copyright Office issued Navarro the last of the copyrights in February 2016 until Navarro filed her initial Complaint on June 14, 2017. (*See* Compl., Doc. 1). After several amended pleadings, Navarro eventually arrived at her Fifth Amended Complaint, which is the

---

[8] In responding to P&G and Walmart's Statement of Undisputed Facts, Plaintiffs may have inadvertently deleted a paragraph. (*Compare* Defs.' SOUF, Doc. 185-2, ¶ 105–06, #8405, *with* Pls.' Resp. to Defs.' SOUF, Doc. 209-1 at ¶¶ 105–06, #10163). As Plaintiffs "Admit" the omitted paragraph it is of little consequence, but worth noting.

operative pleading at this point. (*See* First Am. Compl., Doc. 19; Second Am. Compl., Doc. 48; Third Am. Compl., Doc. 62; Fourth Am. Compl., Doc. 84).

In that sixth version of her Complaint, Navarro lodges four claims: (1) direct copyright infringement in violation of 17 U.S.C. § 501 against P&G and Walmart; (2) vicarious copyright infringement in violation the same against P&G; (3) contributory copyright infringement, again in violation of 17 U.S.C. § 501 against P&G; and (4) a common law fraud claim against P&G. (*See* Fifth Am. Compl, Doc. 133, #4089–4107). While the first three are largely self-explanatory, the fraud claim merits further explication. P&G defends against Navarro's copyright claims by asserting that it has a worldwide license in perpetuity as a result of the 2007 Supplier Agreement (which, it says, transferred Navarro's rights to LPK) combined with the 2007 MSA (which further transferred those same rights from LPK to P&G). Against that backdrop, Navarro asserts that P&G defrauded her during negotiations for the various specific photo shoots by asking for pricing for limited rights (while believing it was actually acquiring worldwide, in-perpetuity rights). Based on those "misrepresentations," Navarro says, P&G secured lower pricing (and Navarro's services) on terms that Navarro would not have offered if P&G had been truthful.

Based on her various claims, Navarro seeks a substantial amount in damages. These damages fall into two basic categories: "actual" damages, i.e., the amount a copyright owner lost due to the infringement; and "profit-based" damages, i.e., the

amount of profits the infringer unjustly earned as a result of the infringement. (*Id.* at #4108).[9]

Not surprisingly, P&G and Walmart dispute Navarro's allegations, both as to liability and as to damages. (*See* Walmart's Answer to Fifth Am. Compl., Doc. 135; P&G's Answer to Fifth Am. Compl., ("Defs.' Answer"), Doc. 136). In their answers, P&G and Walmart also assert a litany of defenses. (*See* P&G's Answer to Fifth Am. Compl., Doc. 136, ("P&G's Answer"), #4423–27; Walmart's Answer to Fifth Am. Compl., Doc. 135, ("Walmart's Answer"), #4324–27). And not only is P&G defending against Navarro's claims, but it also asserts a counterclaim of its own. In particular, P&G argues that, by initiating this lawsuit and by registering the photographs with the Copyright Office as the sole author, Navarro breached her obligations under the 2007 Supplier Agreement. That agreement, P&G claims, required Navarro to assign all her rights to LPK, who under the 2007 MSA, would in turn assign all those rights to P&G. (P&G's Answer at #4428–34).

## E. Plaintiffs and Defendants Cross-Moved For Summary Judgment.

There are two pending motions for summary judgment—one by Defendants (Doc. 185, along with an associated Memorandum ("Defs.' Mem"), Doc. 185-1) and one from Navarro (Doc. 188, and accompanying Memorandum ("Pls.' Mem."), Doc. 204). In total, those two motions include over three-hundred-and-fifty pages of briefing, plus scores of exhibits, in which the parties seek summary judgment, one way or the

---

[9] At one point, Navarro also sought statutory damages and attorneys' fees. In her response to Defendants' Motion for Summary Judgment, though, she expressly drops those requests. (*See* Pls.' Resp. at #10118).

other, on well over fifteen separate issues, many of which involve multiple distinct sub-issues, all of which are (briefly) summarized below.

### 1. Defendants' Motion For Summary Judgment.

P&G and Walmart seek summary judgment on each and every one of Navarro's claims. Principally, P&G and Walmart argue that neither is liable for copyright infringement because Navarro has no standing to sue either of them for two reasons. First, she "unambiguously assigned" all of her rights to LPK through the 2007 Supplier Agreement, which, Defendants claim, "easily satisfies the Copyright Act's" requirements for an assignment. (*Id.* at #8337, 8339). Second, P&G and Walmart claim that LPK and Navarro are joint authors in the final package designs, and that LPK thus can license (and has licensed) P&G to use the joint work. (*See id.* at #8342). Walmart also argues that it cannot be liable for direct infringement under the "first sale" doctrine.

Separately, P&G argues that, even if it is not entitled to summary judgment on the direct copyright infringement claim, it is entitled to summary judgment on Navarro's vicarious and contributory liability claims. (*Id.* at #8356). As to the former, vicarious liability, P&G claims this is so because P&G did not have the right to supervise the retailers' sales or advertising. (*See id.* at #8356–57). As to the latter, P&G argues it cannot be liable for contributory infringement because, even if there was direct infringement, given the 2007 Master Services Agreement, P&G could not have "intentionally contributed to any alleged direct infringement by retailers of its products." (*Id.* at #8358–59).

As to Navarro's fraud claim, P&G (as the only defendant against whom the claim is asserted) argues that it is entitled to summary judgment because undisputed facts show that Navarro cannot establish the necessary elements of that claim. (*See id.* at #8353). More specifically, P&G first argues that it could not have "concealed its belief" that Navarro owned no copyrights because she actually did not, per the 2007 Supplier Agreement, and second that even if this were untrue Navarro could not have "justifiably relied" on any statement or action by P&G suggesting otherwise. (*Id.*). P&G also argues Navarro cannot show causation or intent. (*Id.* at #8354). "In the end," P&G argues, it should not be liable for fraud "because it proceeded on the assumption that it could lawfully use the designs LPK had sold to it" under the 2007 Master Services Agreement. (*Id.*).

Last, P&G and Walmart seek summary judgment on various aspects of damages, either in whole or in part. (*See* Defs.' Mem. at #8360). First, they claim that the Court must limit Navarro's damages claim to the Copyright Act's three-year "look-back" period, which would permit Navarro to recover damages only for the three-year period immediately preceding the date she filed her initial Complaint. (*See id.* at #8360–61 (citing 17 U.S.C. § 507(b))). Next, they claim Navarro cannot show the required factual nexus between the profit-based damages she seeks and the infringing activity she alleges, (*id.* at #8363–64), as Navarro has offered nothing but "fanciful speculation about the relationship between the" two. (*Id.* at #8365). Absent a "reasonable relationship" between Navarro's photographs and P&G or Walmart's revenues, Defendants claim, Navarro is not entitled to profit-based damages.

In the alternative, Defendants argue for summary judgment on five particular *categories* of profit-based damages. First, Defendants argue that Navarro is not entitled to profit-based damages for products that did not feature a Navarro photograph, but that only appeared in coupon-advertising *next to and near* advertisements for products containing a Navarro photograph. (*Id.* at #8371–74).

Second, they dispute Navarro's right to claim profits arising from packages that feature a Navarro photograph, but that were sold within the temporal and geographical scope of the alleged licenses. As to these sales, Navarro concedes that the packaging itself was non-infringing, but she explains that P&G promoted sales of those packages through the presence of in-store advertising displays, or "endcaps," that used the Navarro photographs in violation of the alleged licenses, and thus could give rise to damages.

Third, Defendants argue that Navarro cannot claim profits from the sale of the ProX or Regenerist products, because the Navarro photographs appeared only on *the back* of the packaging. (*Id.* at #8374). Fourth, P&G and Walmart argue that Navarro is not entitled to profit damages for what she calls the "Legacy Image Assisted Sales," i.e., sales that occurred when "retailers continued to display on their websites images of packages bearing a Navarro image even after P&G stopped using her photographs" on the packages themselves. (*Id.* at #8376).

Finally, P&G and Walmart argue that they are not jointly liable for profit-based damages of third-party retailers who Navarro did not name as defendants. (*Id.* at #8377–78). According to Defendants, copyright law makes an infringer liable for

24

profits *it* derives from its infringement, not profits that *other* infringers derive from the same infringement. (*Id.* at #8378).

### 2. Navarro's Motion For Summary Judgment.

Navarro, on the other hand, moves for partial summary judgment on a more limited basis. (*See* Pls.' Mem. at #9314–9404). She seeks summary judgment on only some of her claims, including: P&G's alleged infringement of the Regenerist image (Image 1) only against P&G because of its alleged use without authorization; and for the ProX, Teal and Purple Boxes, and Daily Facials because P&G and Walmart allegedly exceeded the temporal, geographic and usage restrictions Navarro placed on those images in a variety of combinations. (*See id.* at #9361). These arguments all hinge on Navarro's claim that she did not assign all of her rights in all of her photographs to LPK in perpetuity for unlimited use, but instead that the usage restrictions set forth in her invoices control, and that P&G exceeded those limits.

Navarro also moves for summary judgment on 28 of P&G's defenses, 19 of which overlap with Walmart's defenses. (*Id.* at #9377–9404).[10] For their part, P&G

---

[10] Those defenses are: failure to state a claim (Defendants' First AD); equitable estoppel and acquiescence (Defendants' Second AD); statute of limitations (Defendants' Third AD); laches (Defendants' Fourth AD); unclean hands (Defendants' Fifth AD); waiver (Defendants' Sixth AD); Navarro's copyrights are invalid and unenforceable (Defendants' Seventh AD); implied license (Defendants' Eighth AD); failure to mitigate damages (Defendants' Ninth AD); forfeiture or abandonment of copyrights (Defendants' Tenth AD); misuse of copyright (Defendants' Eleventh AD); no volitional act (Defendants' Thirteenth AD); Navarro's rights not infringed upon (Defendants' Fourteenth AD); Extraterritoriality (Defendants' Fifteenth AD); Defendants are entitled to attorneys' fees (Defendants' Seventeenth AD); no remaining commercial value (Defendants' Eighteenth AD); failure to name an indispensable party (Defendants' Nineteenth AD); Navarro received all due compensation (Defendants' Twentieth AD); joint authorship (P&G's Twenty First AD); assignment to LPK (P&G's Twenty-Third/Walmart's Twenty-Second AD); fraud on the Copyright Office (P&G's Twenty-Fourth AD); P&G's "affirmative defenses" to Navarro's fraud claim (P&G's Twenty-Fifth

and Walmart only dispute summary judgment as to six defenses, namely (1) Joint Authorship; (2) Statute of Limitations; (3) Extraterritoriality; (4) Implied License (5) Failure to Mitigate Damages; and (6) Assignment. (*See* Defs.' Resp. to Pls.' Mem., Doc. 207, #9478–9501 (joint authorship and assignment), 9506–12 (statute of limitations, failure to mitigate, extraterritoriality and implied license)).

Navarro also seeks summary judgment on P&G's breach of contract counterclaim. While she asserts multiple bases, the Court finds one of her arguments—that P&G cannot show any compensable damages arising from the alleged breach (*id.* at #9375–76)—dispositive here, and thus does not address the others.

Finally, Navarro asks this Court to impose Rule 37 sanctions on the grounds that P&G allegedly gave "evasive and incomplete" responses to Navarro's interrogatories. (*Id.* at #9377–81).

## LAW AND ANALYSIS

### A. Standard Of Review.

Normally, reviewing a motion for summary judgment requires viewing the evidence in the light most favorable to the nonmoving party and only granting summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019); Fed. R. Civ. P. 56(a). "But 'where,

---

through Twenty Eighth, and Thirtieth ADs); fraud damages too remote or speculative (P&G's Twenty-Ninth AD); and fraudulent misstatements protected by Ohio doctrine of litigation privilege (P&G's Thirty-First AD).

as here, the parties filed cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Black v. Pension Benefit Guaranty Corp.*, 973 F.3d 576, 581 (6th Cir. 2020) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting cases).

Thus, reviewing each Motion on its own, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). "The 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600 at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v.*

27

*City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket omitted) (quoting *Anderson*, 477 U.S. at 247–48)). Accordingly, the non-moving party must do more than simply present *any* evidence in its favor. Rather, the non-moving party must produce enough evidence for a reasonable jury to hold that the party has met its burden of proof as to its entire claim. Put another way, "to defeat a motion for summary judgment, the 'evidence' must be 'such that a reasonable jury could return a verdict for the non-moving party.'" *Morehouse*, 938 F.3d at 818 (quoting *Anderson*, 477 U.S. at 248). *See also Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (noting that, on an issue where the non-moving party bears the burden of proof, summary judgment is still warranted "when, … after viewing the evidence in [the non-moving party's] favor, the record is in 'equipoise' or 'evenly balanced' on an essential element's existence").

The summary judgment standard presents a special challenge for movants in copyright infringement actions. Many questions in copyright disputes, like whether there is "substantial similarity" between the copyrighted work and the allegedly infringing work or the "copyrightability" of the original work, are particularly fact intensive inquiries. Therefore, movants often have an uphill battle to establish that there is no dispute of material fact. That is why, when fact issues arise in copyright infringement cases, "granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly." *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984).

28

**B.     Defendants Move For Summary Judgment In Whole Or In Part On Eight Grounds, Some Directed At Liability, And Some At Damages.**

Defendants seek summary judgment on both liability and damages issues. As noted above, as to the former, Defendants argue that: (1) Navarro unambiguously assigned all her rights to LPK in the 2007 Supplier Agreement (Defs.' Mem. at #8337–42); (2) Navarro and LPK were joint authors in the Olay packaging (*id.* at #8342–52); (3) the "first sale" doctrine shields Walmart from liability for direct infringement (*id.* at #8355); (4) the contributory infringement (*id.* at #8358–60) and vicarious liability claims (*id.* at #8356–58) against P&G fail as a matter of law; and (5) so does Navarro's fraud claim (*id.* at #8352–55).

On the damages front, Defendants argue that: (1) Navarro's damages should be limited to the three-year period prior to the date that she filed suit (*id.* at #8360–63); (2) Navarro is not entitled to any profit-based damages because she has not established a sufficient causal connection between Defendants' revenues and the alleged infringement (*id.* at #8363–71); and (3) even if Navarro can recover some profits-based damages, she cannot recover such damages for particular products or usages. (*id.* at #8371–78).

The Court addresses each of these eight arguments in turn.

**1.     *There Is An Issue Of Material Fact As To Whether Navarro Assigned All Her Rights to LPK In The 2007 Supplier Agreement.***

All parties concede that the Copyright Act requires a transfer agreement to be in writing and signed by the owner of the rights conveyed. 17 U.S.C. § 201(d). P&G and Walmart argue that the 2007 Supplier Agreement "easily satisfies the Copyright

Act's" requirements for a transfer: it is clear and plain in its language, written, and signed by the original copyright owner. (*Id.* at #8337, 8339). The question for the Court on summary judgment is whether there is a genuine dispute as to the effect of that agreement.

At bottom, this is a dispute over contract interpretation. While copyrights are a matter of federal law, the interpretation of a given copyright assignment agreement is controlled by state law. *Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 437 (6th Cir. 2009) ("state contract law will govern the interpretation of a [copyright] license because a license is merely a type of contract"); *Johnson v. Jones*, 885 F. Supp. 1008, 1013–14 (E.D. Mich. 1995). That means that, here, Ohio law controls. Under Ohio law, "contracts are to be interpreted so as to carry out the intent of the parties." *Grubb & Assoc., LPA v. Sandor*, 128 N.E.3d 920, 924 (Ohio Ct. App. 2019) (brackets omitted) (internal quotations omitted). Generally, "a court determines the intent of the parties from the writing itself." *Currier v. Penn-Ohio Logistics*, 927 N.E.2d 604, 607 (Ohio Ct. App. 2010) (citing *Alexander v. Buckeye Pipeline Co.*, 374 N.E.2d 146, 150 (Ohio 1978)). Thus, the starting point, and often the ending point, is the plain language of the agreement.

The language at the heart of this dispute is in paragraph five of the Supplier Agreement. In that paragraph, Navarro agreed to "transfer and assign to LPK in perpetuity throughout the world all intellectual property rights and all other rights that Supplier [Navarro and Navarro LLC], its employees and agents may ever have in the Creations." (Supplier Agreement at #6947–48). The word "Creations" is a

defined term in the agreement, and includes "[a]ll creative ideas, designs, illustrations, developments, inventions originated or developed by [Navarro and Navarro LLC], its employees and agents for LPK." (*Id.*).

The key disagreement here is whether the term "Creations" includes the photographs that Navarro took for P&G's various Olay products. The definition of "Creations" is important because it is only "Creations" that are subject to the ownership and assignment provisions of the Supplier Agreement. Defendants argue that the "common sense" "plain and ordinary meaning" of the word "creations" includes *all* of Navarro's artistic works for LPK, including her photographs. (Defs.' Mem. at #8388). This understanding, Defendants assert, is most consistent with the purpose of the agreement. (*Id.*). After all, LPK only hired Navarro to take photographs, so the word "Creations" must include photographs in order for the agreement to have any effect on the parties' relationship. (*Id.*). Navarro, in turn, argues that Defendants are impermissibly expanding the definition of the word. The definition of "Creations," Navarro asserts, is limited to only those five terms used in the definition of creations, namely, "ideas, designs, illustrations, developments, and inventions." (Pls.' Resp. to Defs.' Mem. ("Pls.' Resp."), Doc. 209, #10040). The item "photographs," she says, does not logically fit in that list. (*Id.*).

Based purely on the contract language this is a close case. "Creations" is a defined term, so the plain language meaning of the word "creation" is irrelevant. Rather, the only question is how the parties defined that term in their agreement. *Sutton Bank v. Progressive Polymers, L.L.C.*, ___ N.E.3d ___, 2020 WL 6435801, *4

(Ohio Nov. 3, 2020) ("[W]here parties to a contract have given a word a specific meaning by expressly defining it in the contract, that definition will generally override whatever definition might otherwise be established by an examination of the word's ordinary meaning or common usage."). Here, the definition includes a list, which admittedly does not include "photographs." At the same time, the agreement does not unambiguously state that the list is exhaustive, and a "photograph" seems at least of a kind with some elements of the list (e.g., "illustrations"). Moreover, as P&G also notes, photographs are the only thing that Navarro was to supply to LPK, so reading "Creations" not to include photographs would render at least the intellectual-property provision largely meaningless.

Navarro seeks to round out the meaning by reference to extrinsic evidence. While discussed in greater detail below, this evidence generally takes the form of communications Navarro and LPK exchanged while negotiating the 2007 Supplier Agreement, as well as the parties' conduct under that agreement. But, before considering the impact of such evidence, the Court must first address whether it can consider extrinsic evidence at all.

This is yet another issue on which the parties are in stark disagreement. Defendants say "no," relying on Ohio law to the effect that "where the terms of a contract are clear and unambiguous, extrinsic evidence may not be used as an aid in interpretation." *State ex rel. Rollins v. Bd. of Educ. for Cleveland Heights-Univ. Heights City Sch. Dist.*, 532 N.E.2d 1289, 1294 (Ohio 1988). But Ohio law also includes a slight wrinkle that may be important here. In particular, the rule that

32

extrinsic evidence "may not be received to contradict or vary the terms of a written instrument" applies only "*as between the parties thereto and their privies*." *Bowman v. Tax Comm'n of Ohio*, 20 N.E.2d 916, 919 (Ohio 1939) (emphasis added). This limitation arises because the prohibition on extrinsic evidence generally rests on the assumption that "[w]hen two parties have made a contract and have expressed it in a writing … they have both assented [to that writing] as the complete and accurate integration of that contract." *Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 662 N.E.2d 1074, 1080 (Ohio 1996) (quoting 3 Corbin, *Corbin on Contracts,* § 573 at 357 (1960)). That logic does not carry over in a straightforward manner to disputes involving strangers to the contract. As these strangers "have not consented to [the contract] and have no right or power to reform or set it aside, they are privileged to show by parol evidence that the instrument does not show the real transaction." *Bowman*, 20 N.E.2d at 919. And, of course, as the stranger to the contract is free to use parol evidence, so is the contract party on the other side of the lawsuit.

Here, all concede that Navarro is a party to the 2007 Supplier Agreement. But P&G is not a signatory. Thus, *Bowman* seems to say that the parol evidence rule plays no role in a dispute between Navarro (a party) and P&G (a non-party) regarding the proper interpretation of that agreement.

P&G, though, argues that is wrong, and offers three theories as to why. First, P&G argues that LPK acted as P&G's agent in forming the Supplier Agreement, and thus, P&G may invoke the parol evidence rule on LPK's behalf. (Defs.' Suppl. Br., Doc. 235, #13257–58). To P&G's credit, Ohio law holds that a principal "is entitled to

33

assert any defense that the agent would be entitled to assert." *Citicasters Co. v. Bricker & Eckler, LLP*, 778 N.E.2d 663, 668 (Ohio Ct. App. 2002). By logical extension, that principle seems to suggest that a principal may assert the parol evidence rule, so long as their agent was a party to the contract. *Id.*

The problem for P&G on that theory, though, is that it is not at all clear that LPK was acting as P&G's agent when it negotiated and signed the Supplier Agreement with Navarro. To the contrary, the evidence suggests that LPK entered into that agreement for its own benefit. Recall that the Supplier Agreement was born of a uniquely LPK–Navarro project. Specifically, LPK hired Navarro to photograph LPK's employees for internal purposes and had her sign the Supplier Agreement as a method of "entering her into the [accounting] system" as a new vendor. (Defs.' SOUF at ¶¶ 8–9, #10121; Pls.' SOUF, at ¶¶ 5, 8 #9520, 9522). Timing further undercuts P&G's agency theory. Navarro and LPK executed the Supplier Agreement on September 13, 2007. (Supplier Agreement at #6948). P&G first commissioned LPK and Navarro to redesign the packaging for its Olay products (the ProX Spinning Brush to be specific) nearly three years later, on January 20, 2010. (Defs.' SOUF at ¶ 31, #10131; Pls.' SOUF at ¶ 27, #9537–38). It seems doubtful that LPK could have been acting as P&G's agent in negotiating the Supplier Agreement with Navarro if, at the time LPK and Navarro executed that agreement, P&G had yet to commission LPK to create the packaging designs for the Olay products at issue (or any other packaging designs involving photographs). Thus, P&G can't rely on "agency theory" to support the use of the parol evidence rule in this case.

Next, P&G argues that it may assert the parol evidence rule as a "third-party beneficiary" to the Supplier Agreement. (Defs.' Suppl. Br., Doc. 235, #13258). Like agents, intended third-party beneficiaries have the right to enforce a contract even though they were not party to the contract. *Grant Thornton v. Windsor House, Inc.*, 566 N.E.2d 1220, 1223 (Ohio 1991) ("Only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio.") (citing *Visintine & Co. v. New York, Chi., & St. Louis RR. Co.* 160 N.E.2d 311, 313–14 (1959)). P&G reasons that, by extension, third-party beneficiaries may also assert the parol evidence rule even though they were not party to the contract. (Defs.' Suppl. Br., Doc. 235, #13258). But that doesn't work. While third-party beneficiaries may *enforce* a contract, they nonetheless remain "strangers" to it. As the Sixth Circuit puts it, a third-party beneficiary can enforce the agreement "*even though … a stranger*" to it. *See Prime Finish, LLC v. Cameo, LLC*, 487 Fed. App'x 956, 959 (6th Cir. 2012) (emphasis added) ("[A] third person may enforce a promise made for his benefit even though he is a stranger both to the contract and to the consideration.") (applying KY law). Consistent with that view, under Ohio law, the parol-evidence limitation that applies to parties and privies does not reach third-party beneficiaries. *See Lamme v. Pope*, 04CA42, 2004 WL 2453346, ¶ 16 (Ohio Ct. App. Oct. 29, 2004) ("Pope was a stranger to the contract between Lamme and Bottorff, only acquiring rights thereunder as a third-party beneficiary. Therefore, parol evidence … was admissible.").

P&G's remaining theory is that it is "in privity" with LPK. (Defs.' Suppl. Br., Doc. 235, #13258). If true, that would advance P&G's cause—those in privity with a contracting party may enforce the parol evidence rule just as if they were an original party to that contract. *Bowman*, 20 N.E.2d at 919 ("[P]arol evidence may not be received to contradict or vary the terms of a written instrument as between the parties thereto and their privies."). Here, P&G relies on a two-link vertical chain of contracts to show privity. (Defs.' Suppl. Br., Doc. 235, #13258). That is, in the Supplier Agreement, Navarro gave LPK ownership of "[a]ll creative ideas, designs, illustrations, developments, inventions originated or developed by [Navarro]…for LPK." (Supplier Agreement at #6947). Then, in the Master Services Agreement, LPK transferred to P&G "all IP RIGHTS, including but not limited to ideas, discoveries, inventions, works of authorship, documents, [or] designs… which LPK develops … or causes to be developed, invented or created specifically relating to the services or parts thereof." (2007 MSA at #8285). Based on the combination of these two agreements, P&G claims it is the successor to the intellectual property rights that LPK obtained from Navarro under the Supplier Agreement, and thus in privity with Navarro. (Defs.' Suppl. Br., Doc. 235, #13258).

But that is not how privity works. Privity is "[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter." *Shoemaker v. Gindlesberger*, 887 N.E.2d 1167, 1170 (Ohio 2008) (quoting Black's Law Dictionary at 1237 (8th Ed. 2004)). In order to create privity with an existing party to a contract, a new party must assume another existing party's

36

contractual duties, and thus the liability that comes attendant to breach of those duties. In other words, privity occurs as to a given contract when a new party "steps into the shoes" of an existing party to that agreement. *See Winland v. Christman*, No. 18 MO 0005, 2019 WL 2513801 at ¶ 53 (Ohio Ct. App. June 14, 2019) (quoting *Berardi v. Ohio Turnpike Comm'n.*, 205 N.E.2d 365, 370 (Ohio Ct. App. 1965)). So, for example, an assignee to one party's interest in a contract would be in privity with the other parties to that assigned agreement.

P&G did not have that relationship to the contract between LPK and Navarro. Instead, P&G simply obtained a set of intellectual property rights from LPK by contract, some of which LPK itself may have received pursuant to a prior agreement with another person, such as its Supplier Agreement with Navarro. But LPK's subsequent sale of the rights it (may have) acquired from Navarro through the Supplier Agreement is not enough, in and of itself, to create vertical privity between P&G (who acquired rights from LPK through the separate 2007 MSA) and Navarro (who was a party to the Supplier Agreement).

The situation here is akin to what the Ohio Supreme Court encountered in *Curl v. Volkswagen of America, Inc.*, 871 N.E.2d 1141 (Ohio 2007). There, Volkswagen manufactured and sold a VW Beetle to an automobile dealership to use as a rental vehicle. That dealer in turn sold the car to a customer. *Id.* at 1143. When the car malfunctioned, the customer sued both the dealer and the manufacturer for breach of express warranty. *Id.* Ohio law, though, requires privity for warranty claims. And, according to the Ohio Supreme Court, the successive contractual relationships from

37

the manufacturer to the dealer, and the dealer to the customer, were not enough to create such privity between the manufacturer and the customer. *Id.*

Other Ohio decisions likewise confirm that the mere fact that multiple agreements arguably touch on the same subject (here the intellectual property rights in Navarro's photographs) does not create privity. *See, e.g.*, *Santagate v. Pa. Higher Educ. Assistance Agency*, No. 19AP-705, 2020 WL 2850264, at ¶ 21 (Ohio Ct. App. June 2, 2020) ("Although there are multiple agreements here related to [the plaintiff's] student loan, the presence of these separate agreements does not give the parties of one agreement privity with the parties on the other agreement.") (citing *State v. Harding*, No. 13AP-362, 2014 WL 1350959 at ¶ 29 (Ohio Ct. App. Mar. 25, 2014) (rejecting an argument that contractual privity exists simply because the parties are both subject to separate contracts that are part of the same loan transaction).

Indeed, in the manufacturing context, there is widespread recognition that a vertical chain of contracts successively transferring rights in a given product does *not* create privity. *See Chemtrol Adhesives, Inc. v. Am. Mfr. Mut. Ins. Co.*, 537 N.E.2d 624, 631 (Ohio 1989) (explaining that "an ordinary consumer" cannot sue for a defective product under a contract law theory because that "ordinary consumer… [is] not in privity of contract with the seller or manufacturer against whom recovery is

sought").[11] Yet that flawed theory is essentially what P&G seeks to advance on the privity front here.

In sum, neither P&G's agency, third-party beneficiary, nor privity arguments alter its status as a stranger to the LPK–Navarro Supplier Agreement.

P&G is not done, though. In a final Hail Mary, P&G argues that the stranger exception to the parol evidence rule is not good law anymore. This is so, P&G claims, for two reasons. First, P&G argues that the Ohio Supreme Court has abandoned the "stranger rule," as it has not relied on the rule since its *Bowman* opinion in 1939. (Defs.' Suppl. Br., Doc. 235, #13258–59). Second, even if the Ohio Supreme Court has not yet explicitly overruled *Bowman*, P&G argues that the *Bowman* holding is at least "in serious tension with decades of more recent Ohio Supreme Court precedent steadfastly and firmly placing primacy on contractual text." (*Id.* at #13259).

As to the first, while P&G may be correct that the Ohio Supreme Court has not cited the rule since *Bowman*, other Ohio courts have. *See, e.g.*, *Citicasters Co.*, 778 N.E.2d at 668 (1st Dist.); *Lamme*, 2004 WL 2453346 at ¶ 16 (2d Dist.); *Zunk v. Zunk*, Nos. L-99-1167, DR-97-0259, 2001 WL 127347 at *5 (Ohio Ct. App. Feb. 16, 2001) (6th Dist.); *Smith v. Withrow*, No. CA90-12-234, 1991 WL 278258 at *2 (Ohio Ct. App. Dec. 30, 1991) (12th Dist.). And, while some Ohio appellate courts have questioned the wisdom of the stranger rule (in unpublished opinions), *see Clarke Assoc. Inc. v. River Downs Inc.*, No. C-820768, 1983 WL 5147 at *5 (Ohio Ct. App. July 27, 1983)

---

[11] This limitation on privity was in many ways an impetus for the development of product liability law, so that tort law could provide a remedy where contract did not. *See, e.g.*, *Escola v. Coca Cola Bottling Co. of Fresno*, 150 P.2d 436, 440 (Cal. 1944) (Taynor, J., concurring).

(holding the stranger exception did not apply, but still criticizing the rule in dicta), or considered limiting the doctrine, *see Dalton v. Belden & Blake Corp.*, 97CA0073, 1999 WL 74627 at *2 (Ohio Ct. App. Feb. 9, 1999), none have concluded that the Supreme Court has abandoned the doctrine altogether. Given the lack of any indication from the Ohio Supreme Court that it is abandoning the stranger-to-the-contract rule, this Court is not in a position to speculate about that court's potentially evolving attitudes toward the rule, especially when the rule has such a firm (and apparently ongoing) foundation in Ohio case law. *Faber v. Ciox Health, LLC*, 944 F.3d 593, 601 (6th Cir. 2019) ("And we may only disregard an on-point decision of the state appellate court if 'other persuasive data' convinces us that the highest state court 'would decide otherwise.') (quoting *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001)).

As for P&G's claim of "serious tension" between the stranger rule and the "primacy of contractual text," that seems somewhat overblown. As already noted, the impetus for the parol evidence rule is the understanding that, in a dispute between parties to the contract, the plain meaning of the text is the most reliable indicator of the parties' intent. *See, e.g.*, *Galmish v. Cicchini*, 734 N.E.2d 782, 789 (Ohio 2000) (noting that "a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements" and that parties should have "merged … or superseded" other ideas in the written document) (quoting 11 Williston on Contracts at 541–548, Section 33:1 (4th Ed.1999)). But this presumption simply does not hold when the dispute involves a stranger to the contract, who did not have the opportunity to cement their understanding in the final written document. *Bowman*,

20 N.E.2d at 919. As such, the stranger rule does not conflict with the "plain meaning" rule, but rather complements it in those situations where the assent-based notion that underlies that rule does not apply.

As P&G is a stranger to the LPK–Navarro Supplier Agreement, the effect of the stranger rule here is to allow the Court to consider extrinsic evidence, offered by either party, in interpreting the agreement. *See Bowman*, 20 N.E.2d at 919 (quoting 22 C.J.S. § 1725 ("[W]here the stranger to the instrument is thus free to vary or contradict it by parol evidence his adversary, although a party to the instrument, must be equally free to do so.")); *see also Art v. Eich*, No. 80-02-0009, 1981 WL 5226 at *2 (Ohio Ct. App. Oct. 28, 1981) (holding in a stranger-party dispute that the contracting party's evidence created an issue of material fact).

Here, when the language of the agreement is supplemented by extrinsic evidence, the result is not so one-sided that it supports summary judgment for either party on the issue of whether the Supplier Agreement resulted in a transfer to LPK of Navarro's ownership interests in the photographs at issue. On one hand, Navarro submits evidence suggesting that, at the time that she signed the Supplier Agreement, she did not intend for the agreement to assign her rights to LPK, or for that matter, to cover any photographs besides the ones for LPK's internal photoshoot.

For example, Navarro offers a series of pre-agreement communications that she says reflect preliminary license negotiations with LPK. On May 31, 2007, Navarro sent the first of these emails which contained an "estimate for an internal photoshoot." (Robinson Dep. Ex. 32, Doc. 167-1, #6410). Later, Navarro sent LPK an

41

invoice for "internal brochure for promotion, within trade industry," where the only "client" listed was LPK. *Id.* at Ex. 38, Doc. 167-2, #6411). Navarro also offers the testimony of Paige Robinson, the LPK employee who was in charge of the internal photoshoot. Robinson indicated that she believed the Supplier Agreement served only to set Navarro up in the system for billing purposes as a new vendor and for confidentiality, not to assign intellectual property rights. (*Id.*, Doc. 167, #6368–69).

Navarro also suggests that the parties' post-Supplier Agreement conduct demonstrates that the agreement was not a complete assignment of her rights. Her primary source of evidence on this front are invoices concerning her photographs for P&G's Olay product line. (*See, e.g.*, Ott Dep. Ex. 55, Doc. 201, #9158–73) (invoices and emails concerning the ProX packaging)). These invoices, Navarro contends, are actually limited licenses that would not be necessary if the Supplier Agreement were a complete assignment of her rights as P&G claims. (Pls.' Mem. at #9364–65; Hempelmann Dep. Ex. 147 Doc. 157-1, #5465–66 (entitled "Agreement for License of Photography" from LPK to Navarro concerning the ProX product)). Navarro also presents the testimony of several LPK employees who stated that Navarro and LPK intended to negotiate usage rights in the future on a project-by-project basis as reflected in Navarro's invoices. (Geiger Dep., Doc. 155, #5239–40; McCoy Dep., Doc. 162, #5756, 5777). This extrinsic evidence suggests that the parties did not understand the Supplier Agreement to assign all of Navarro's rights to LPK.

But there is also extrinsic evidence that seems to cut the other way. For example, when Navarro used an interrogatory to confirm with LPK that the invoices

constituted licenses, LPK objected on the grounds that there may be other "means through which usage rights could be or were conveyed." (Wooten Dep. Ex. 468, Doc. 198, #8756). LPK then went on to note that "[t]hrough the 2007 LPK/Navarro Supplier Agreement, Ms. Navarro transferred and assigned to LPK ... all intellectual property rights ... that [Navarro] ... had] in the Creations." (*Id.*). LPK then stated that it believes that Navarro's photographs of models are part of these "Creations" and, as such, the Supplier Agreement is a "valid and enforceable" assignment "under applicable federal copyright law." (*Id.*). Defendants explain that LPK simply paid the invoices because the Supplier Agreement required them to render "periodic payments in accordance with the progression of services." (Defs.' SOUF at ¶ 20, #10127; Supplier Agreement at #6947).

In short, extrinsic evidence in the record could support either Navarro's theory that the Supplier Agreement was not an assignment or Defendants' arguments that the Supplier Agreement was an assignment. This is an issue of material fact for a jury to sort out. Accordingly, the Court **DENIES** Defendants summary judgment as to the argument that Navarro assigned all her rights to LPK in the 2007 Supplier Agreement.

### 2. *There Is An Issue Of Material Fact As To Whether Navarro And LPK Intended To Be Joint Authors In The Product Packaging.*

Defendants separately argue that, even if the 2007 Supplier Agreement is not a license, Defendants are still not liable for copyright infringement, as LPK is a joint author, and thus could (and did) authorize Defendants to use the copyrighted images. This argument rests on a strong legal footing—it is well settled that all joint authors

43

have an undifferentiated interest in the copyrighted product, and thus any of them can authorize third-party usage. The trickier part for Defendants here, though, is showing that the undisputed facts establish that LPK is a joint author. The Court concludes they fall short in that effort.

The Copyright Act defines a joint work as one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. From this language, courts have fashioned a two-part test, which it appears both parties concede should apply here: (1) two or more parties made independently copyrightable contributions to a work; and (2) the parties intended to be joint authors at the time the work was created. (*See* Defs.' Mem. at #8343 (citing *Thomson v. Larson*, 147 F.3d 195, 201 (2d Cir. 1998) (citing additional cases)); Pls.' Resp. at #10052 (citing *Corwin v. Quinonez*, 858 F. Supp. 2d 903 (N.D. Ohio 2012) (collecting cases))).

A key point of disagreement, though, is the requisite showing of intent. Defendants claim that the intent to create a joint work merely means "that each author intend that their respective contributions be merged into a unitary whole." (Defs.' Mem. at #8346 (quoting *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068–69 (7th Cir. 1994))). Navarro says more is necessary. In particular, she notes that in *Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991), the court specifically addressed the very language that Defendants quote here, but concluded that an "an inquiry so limited would extend joint author status to many persons who are not likely to have

been within the contemplation of Congress." (Pls.' Resp. at #10052). Rather, *Childress* says, the question is whether the parties had agreed to be joint authors.

The Court concludes that Navarro has the better of this argument. The "merged into a unitary whole" test, on its own, defines the category "joint author" too broadly. That test would apply the label, for example, to editors who revise an author's manuscript. Something more is necessary to show the requisite intent. Admittedly, though, precisely defining what the "more" is may be difficult. As a general matter, the relevant question appears to be whether the parties intended that their relationship be one that would create *co-ownership* in a finished product. That is, they need not intend be "authors" for technical copyright law purposes, but they must each have an intent to have shared ownership or shared interest in the outcome of their collaborative efforts.

With the question of the appropriate definition out of the way, there is one more preliminary matter that the Court must discuss. In particular, the Court must decide the exact design or image as to which Defendants are arguing that LPK was a joint author with Navarro. That is, this case involves both (1) photographs, and (2) package designs that incorporate those photographs. At least some of Defendants' arguments seem directed to establishing joint authorship as to the former—they note, for example, that LPK personnel assisted in making decisions at the photo shoots about how to capture the images. (Defs.' Mem. at #8348, 50). But elsewhere, they identify LPK's "copyrightable contributions" (i.e., the second element of the joint-

authorship test) as being things such as font design, color, photo placement, etc., which apply only to the packaging materials themselves. (*Id.* at #8344).

Of course, a finding of joint authorship in either the images or the packaging would presumably lead to the relief that Defendants seek. That is, most of the claimed infringement arises from the use of the images on the packaging, so an ability to license either the images *or* the packaging design incorporating those images, would suffice.

Be that as it may, the Court concludes it need not assess the joint authorship argument as to the images themselves for purposes of Defendants' motion for summary judgment. That is because Defendants expressly disclaim that they are making that argument. (Defs.' Reply in Support of Defs.' Mem. ("Defs.' Reply"), Doc. 212, #10440–41 (noting that Defendants are not arguing that LPK was a joint author in the images)). Thus, in reviewing Defendants' motion for summary judgment on the joint-authorship issue, the Court will limit its inquiry to the question of joint authorship in the packaging materials themselves.[12]

With the above definition in mind, the Court thus focuses on what the evidence shows regarding each party's intent (i.e., Navarro's and LPK's) as to whether they would be joint authors in those package designs. As noted, joint authors are in some ways akin to joint owners in property. Thus, the question is whether Navarro and

---

[12] As discussed below, Navarro also seeks summary judgment on Defendants' joint authorship defense. In contrast to Defendants, though, she requests summary judgment on that argument both as to the photographs (Pls.' Mem. at #9397) and the product packaging (*id.* at #9401–02). Thus, there, the Court considers the joint authorship issue as to both types of products.

LPK each made their independent contributions (i.e., Navarro provided the photographs, and LPK provided the other design elements) with an intent to be joint owners in the resulting product. And, as it is Defendants who are seeking summary judgment, the question is not merely whether a reasonable trier of fact *could* reach that conclusion, but rather whether a trier of fact *must* do so. *See Claggett v. Winzler*, 397 F. Supp. 3d 1054, 1071 (S.D. Ohio 2019) (granting summary judgment only because "no reasonable jury" could find for the non-moving party).

The Court concludes that Defendants have not made that showing. To start, it seems at least possible here that Navarro did not contribute her photos with the goal of being a joint author in the final product, but rather pursuant to a specific license under which she was selling particular usage rights. The sale of limited usage rights from one party to another for inclusion as one element of a given final product seems at least potentially inconsistent with the notion that the two parties intend to have an undifferentiated ownership in the final product itself. To be sure, as Defendants note, the existence of a licensing arrangement may not *preclude* a finding of joint authorship (*see* Defs.' Reply at #10463 (citing case law)), but that is not the question at summary judgment. Rather, the question is whether a jury *must* find joint authorship, and the existence of a license cuts against Defendants on that front. Nor do Defendants overcome that problem by arguing that Navarro's invoices are not really limited licenses, as that is a fact issue for the jury to decide.

The remainder of the record evidence also at least raises questions about whether LPK and Navarro shared the necessary intent as to authorship in the

package designs. LPK's testimony, for example, is ambivalent at best on whether the company even considered its contribution to count as "authorship," let alone that it intended to be a "joint author" with Navarro. (Matheson Dep., Doc. 161, #5666–67; Arnold Dep., Doc. 152, #5004). And, more troublingly, it appeared that LPK understood that it had only limited usage rights in Navarro's photographs, even when used in the package designs. (Cevasco Dep., Doc. 154, #5141–42; McCoy Dep., Doc. 162, #5766). That understanding would be at least arguably inconsistent with the notion of "joint authorship" in those designs.

All in all, at this juncture, on the record evidence, the Court cannot conclude that, as a matter of law, LPK and Navarro intended to be joint authors in the package designs. And, as the Court concludes that Defendants have failed to clear the necessary hurdle at the first step of the test for joint authorship, the Court need not, and thus does not, reach the second step (i.e., whether LPK and Navarro each made independently copyrightable contributions to the work). Based on the foregoing, the Court **DENIES** Defendants summary judgment on the joint authorship issue.

**3.** ***Because There Is Still An Issue Of Fact As To Whether LPK Owned A Copyright Interest, Either By Assignment Or As A Joint Author, It Would Be Premature To Grant Summary Judgment On Navarro's Direct Infringement Claim Against Walmart.***

Walmart argues that it is not liable for direct infringement under the "first sale" doctrine. (Defs.' Mem. at #8355). The "first sale" doctrine has its footing in the statutory text of the Copyright Act, which provides that "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise

48

dispose of the possession of that copy." 17 U.S.C. §109. In other words, a party "who *owns* a copy [of a copyrighted work] *will* receive 'first sale' protection [from copyright infringement], *provided,* of course, that the copy was "*lawfully made.*" *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 535 (2013).

That proviso is the key issue here—the person asserting the doctrine must show that the copy it received was "lawfully made." In requesting summary judgment, Walmart seeks to clear this hurdle by asserting that "LPK held the rights in the product packaging designs as either an assignee or a co-author." (Defs.' Mem. at #8355). If that indeed is the case, then the Court agrees that the first sale doctrine would insulate Walmart, as a transferee from those authorized users, from liability for infringement. The problem, though, is that the Court already has found a genuine dispute as to whether LPK and/or P&G is in fact an assignee or co-author. Thus, the same genuine disputes that foreclose summary judgment on those issues also preclude summary judgment on Walmart's first-sale-doctrine argument. The Court thus **DENIES** Walmart summary judgment on this issue.

### 4. *The Court Denies Summary Judgment On Navarro's Contributory Infringement Claim, But Grants Summary Judgment to P&G on Navarro's Vicarious Liability Claim.*

"The Copyright Act does not expressly render anyone liable for infringement committed by another." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984). But courts have filled the Act's silence with common law principles that impose derivative liability on certain parties even when they have not engaged in the infringing activity. *Id*; *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,*

49

*Ltd.*, 545 U.S. 913, 930 (2005) (citing cases). That includes two theories relevant here—contributory infringement and vicarious liability. *Sony*, 464 U.S. at 435. The former arises where a party intentionally induces or encourages the infringement of another. *NCR Corp. v. Korala Assoc., Ltd.*, 512 F.3d 807, 816 (6th Cir. 2008) (citing *Bridgeport Music, Inc. v. WM Music Corp.,* 508 F.3d 394, 398 (6th Cir. 2007)). The latter, by contrast, arises when a party has the power to stop or limit the infringing activities of another but declines to do so while also reaping profits from that direct infringement. *Grokster*, 545 U.S. at 930 (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir. 1963)). Navarro asserts each as a basis for imposing liability on P&G for allegedly infringing activities undertaken by retailers (including Walmart and other unnamed third parties) who sell P&G products that include the allegedly infringing images on the product packaging. P&G has moved for summary judgment as to both. For the reasons explained below, the Court **DENIES** P&G summary judgment on contributory infringement, but **GRANTS** P&G summary judgment on vicarious liability.

> **a.** **There Is An Issue Of Material Fact As To Whether P&G Intentionally Contributed To The Allegedly Infringing Activities Undertaken By Third-Party Retailers.**

The term "contributory infringement" is a literalism. The doctrine imposes liability when one contributes to another's infringement. But "contribute" could be a fairly broad notion. So, courts have taken pains to make clear that the doctrine reaches only to those instances where a defendant "*intentionally* induc[es] or encourag[es] direct infringement." *Grokster*, 545 U.S. at 930 (citing *Gershwin Pub.*

*Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971) (emphasis added)). Consistent with that principle, contributory infringement occurs only when a party takes "active steps…to encourage infringement." *Id.* at 936. A defendant must not only intend its actions, but must also intend to cause the other party to commit copyright infringement. *Id.* at 936–37 ("[O]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.").

Because of the intent requirement, a party who merely sells a product that has a potentially infringing application is not contributorily liable for the resulting infringement. *Id.* at 933–34; *Sony*, 464 U.S. at 442 (holding that VTR manufacturer was not contributorily liable for infringement that occurred when people copied movies on their devices, because the VTR also had numerous legitimate uses). That said, if a party sells a product that is "good for nothing else but infringement, [and] there is no legitimate public interest in its unlicensed availability," then courts may "presum[e] or imput[e] an intent to infringe." *Grokster*, 454 U.S. at 932 (internal citations omitted).

In sum, contributory infringement occurs when a party (1) with knowledge of the infringing activity; (2) induces, causes or materially contributes to the infringing conduct of another. *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004); *Grokster*, 545 US. at 930. Here, Navarro argues that P&G is a

contributory infringer as it caused the third-party retailers to infringe on Navarro's copyrights when those retailers displayed and sold P&G's products on their shelves.

P&G argues that it is entitled to summary judgment on Navarro's contributory infringement claim for two reasons. First, as described more fully above, P&G insists that the retailers did not infringe on Navarro's copyrights in the first place, as P&G owned the rights to her photographs, either through assignment (i.e., the combination of the Supplier Agreement and the MSA) or because LPK is a joint author who assigned P&G the rights to use the product packaging. (Defs.' Mem. at #8358). But, as the Court explained above, neither party is entitled to summary judgment on either of these theories. Accordingly, for the same reason, the Court cannot rely on those arguments to resolve the contributory infringement claim on summary judgment.

But P&G is not done. It next argues that, even though it sold Olay packaging with Navarro's photographs to several retailers, it did not know (or intend) that those products would infringe on Navarro's copyrights, and as such, cannot be held contributorily liable for the retailers' direct infringement. (Defs.' Mem. at #8358–60). This is so, P&G explains, because, in the Master Services Agreement, LPK promised to acquire all necessary intellectual property rights in the package designs and then to sell those rights to P&G. (*Id.* at #8359; 2007 MSA at #8376). LPK also represented to P&G in the Master Services Agreement that the sale of the package designs and "any part thereof, do not infringe any copyrights." (Defs.' Mem. at #8359; 2007 MSA at #8279). Because P&G expected LPK to procure all of Navarro's rights, and believed

52

LPK had done so, P&G concludes that it could not have known that its product packaging, and the retailers' subsequent sales of those packages, would infringe on Navarro's copyrights. (Defs.' Mem. at #8359).

Navarro, on the other hand, argues that P&G received notice of the alleged infringement as early as 2015 and yet continued to sell product to several retailers, including Walmart. (Pls.' Resp. at #10084). For example, Navarro notes that, on June 23, 2015, she emailed P&G and informed it that the ProX product packaging on at least some store shelves continued to display Navarro's photograph well-beyond the temporal limitations of P&G's limited license. (*See* Navarro Dep. Ex. 28, Doc. 174-13, #7072). P&G acknowledged the email immediately and said it would "forward [her] note to the appropriate design manager." (*Id.*). A few days later, on June 28, 2015, Navarro alerted P&G to another instance of alleged infringement, this time with the Purple Box. (Hein Dep. Ex. 413, Doc. 156-4, #5408). Navarro alleges that as a result of these emails, and other communications with Navarro and LPK, P&G had the requisite "knowledge of the infringing activity" to support a claim for contributory infringement. (Pls.' Resp. at #10085).

If a jury finds that Walmart and other retailers are liable for direct infringement (that is, if those retailers engaged in unlicensed usage), then, based on the evidence to which Navarro points, a reasonable jury could conclude that P&G was "intentionally" contributing to that direct infringement. Conversely, though, a jury could conclude that P&G justifiably believed that LPK had acquired all of Navarro's rights according to the Master Services Agreement. As a jury could reach either

outcome, the Court **DENIES** P&G summary judgment on Navarro's contributory infringement claim.

>    **b.**    **The Undisputed Facts Show P&G Did Not Have Sufficient Control Over The Retailers To Give Rise To Vicarious Liability.**

The test for imposing vicarious liability consists of two elements. First, the copyright owner must show that a defendant has the right and ability to supervise the infringing conduct of another, and second, the defendant must also have an obvious and direct financial interest in the infringement. *Gordon v. Nextel Commc'ns and Mullen Advert., Inc.*, 345 F.3d 922, 925 (6th Cir. 2003). The "right to supervise" prong is met when a party has the power to "to stop or limit" the infringement. *Broadcast Music, Inc. v. Meadowlake, Ltd.*, 754 F.3d 353, 354 (6th Cir. 2014) (quoting *Grokster,* 545 U.S. at 930). Unlike with contributory liability, the question is the control over the activities, not the knowledge of the infringement—"[a] defendant's ignorance about the infringement … does not blunt vicarious liability." *Id.* at 355 (citing *Gordon,* 345 F.3d at 925).

The relevant question, then, is the degree of control the defendant must have in order to be vicariously liable for another's direct infringement. Because vicarious liability arises as a matter of common law, reference to vicarious liability in other settings is helpful in informing the answer to that question. In agency or employment law, for example, vicarious liability arises where the defendant exercises control over the manner and means of the offending party's employment. *Wellman v. Montes*, 288 F. Supp. 2d 860, 864 (N.D. Ohio 2003) (citing *Cmty. for Creative Non-Violence v. Reid,*

490 U.S. 730, 751 (1989)). In such cases, courts hold the defendant liable—typically using the label respondeat superior—because the offending party's actions were in some sense an extension of the defendant's own conduct. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756–59 (1998) (explaining how agency law principles extend liability to an employer for an employee's actions).

Although vicarious liability in the copyright setting is not identical to respondeat superior, "[t]he concept of vicarious copyright liability," at least according to some courts, "was developed … as an outgrowth of the agency principles of respondeat superior." *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261–62 (9th Cir. 1996). That being said, the notion of vicarious liability in copyright law is somewhat broader and can include "a defendant whose economic interests were intertwined with the direct infringer's, but who did not actually employ the direct infringer." *Id.* at 262. *Shapiro*, 316 F.2d at 307–08.

Not all "intertwined" economic interests suffice, though. As *Shapiro* noted, in a series of cases commonly referred to as the "dance hall cases," courts held the operators of entertainment venues liable for infringing performances at their businesses because the operator could control the material entertainers played at the venue. *Shapiro*, 316 F.2d at 307; *see also, e.g., Sony,* 464 U.S. at 437 n. 18 (outlining series of "dance hall cases" where owner became vicariously liable when an orchestra hired to play music for the customers performed a copyrighted work). But in another line of cases referred to as the "landlord-tenant cases," *Shapiro* also noted, courts determined that landlords were not vicariously liable simply because their tenants

committed copyright infringement on the leased premises. *Shapiro*, 316 F.2d at 307 (citing *Deutsch v. Arnold*, 98 F.2d 686 (2d Cir. 1938)).

The distinction between these two lines of cases, *Shapiro* concluded, was that, in the former cases, the employer (or the dance hall owner) "retained the ultimate right of supervision over the conduct" of the direct infringers. *Id.* at 308. A landlord, by contrast, does not constantly police its tenants' conduct—nor do most leases even give landlords such rights. This difference in the extent and exercise of supervision and control explains the different outcome on vicarious liability. *See Broadcast Music*, 754 F.3d at 354 ("Roy does not dispute that, as the company's chief (95%) owner and the restaurant's ultimate decisionmaker, he had the right and ability to supervise the infringing performances.... That makes him liable.").

Here, Navarro argues that P&G had the ultimate supervisory power, at least in this sense—it could have stopped selling infringing product to retailers. (Pls.' Resp. at #10081). But that is not the type of "control" that gives rise to vicarious liability. Rather, consistent with the above, such liability arises when the defendant is the "primary decision maker" who is "in charge *of operating*" the infringer's business, and as such, had the ability to directly police the infringing conduct. *King Records, Inc. v. Bennett*, 438 F. Supp. 2d 812, 852 (M.D. Tenn. 2006) (emphasis added) (holding the direct infringer's president and sole shareholder individually liable under theory the of vicarious infringement because he "made all final decisions, and was ultimately responsible for anything that happened at [the company]").

Perhaps recognizing that, Navarro suggests several additional ways in which P&G could have policed the retailers' infringing conduct. Specifically, Jeffrey Sedlik (Navarro's actual damages expert) suggests that P&G should have: (1) had Walmart (and other retailers) submit usage reports of Navarro's photographs; (2) used a technology vender to monitor the retailers' websites for infringement; and (3) required the retailers to submit examples of printed materials so that P&G could review them for copyright compliance. (Expert Report of Jeffrey Sedlik, Doc. 182-2, #7947). But while P&G perhaps *could* have built these controls into their business relationships, P&G *actually* did not retain any of those supervisory functions. That is, unlike the defendants in the dance hall cases, P&G did not act as the "ultimate decisionmaker" in its retailers' business affairs. *Broadcast Music*, 754 F.3d at 354 (finding vicarious liability because the defendant was the "restaurant's ultimate decisionmaker"). In fact, the record evidence does not show that P&G had much ability at all to control and supervise Walmart's (and other retailers') conduct. For example, P&G's supplier contract with Walmart did not give P&G the right to terminate, discipline, or supervise Walmart in connection with the products that P&G sold to them. (*See* Ott Dep. Ex 70, Doc. 234-1, #13254–55).

Navarro also claims this case is akin to *Leonard v. Stemtech International, Inc.*, 834 F.3d 376, 388–89 (3d Cir. 2006), where the court held a supplier vicariously liable for its distributors' infringing use of photographs. (Pls.' Resp. at #10083). But *Stemtech* involved notably different circumstances. There, Stemtech sold its product, nutritional supplements, through "thousands of distributors [] who form[ed] the

backbone of the company." *Id.* at 383. Each of these distributors agreed to be "subject to Stemtech's policies and procedures manual" and to "use only Stemtech marketing materials and its self-replicated websites." *Id.* In sum, Stemtech exercised direct control over the means by which the distributors marketed and sold its product to the general public. Stemtech also had the contractual right to impose sanctions on distributors and could induce compliance by withholding compensation and access to back office support. *Id.* at 389. As such, *Stemtech* involved a much more intertwined relationship than the one that exists between P&G and the retailers who sell P&G products, and the nature of that relationship provided Stemtech a level of control that P&G simply does not have over those retailers.

At bottom, vicarious liability arises only when a defendant "pervasive[ly] participat[es]" in the infringer's relevant activities and therefore can "police the direct infringers." *Fonovisa*, 76 F.3d at 263. P&G simply does not have that level of control over, or involvement with, the retailers here. The Court therefore **GRANTS** P&G's motion for summary judgment on Navarro's vicarious liability claims.

### 5. *P&G Is Not Entitled To Summary Judgment On Navarro's Fraud Claim.*

To establish a claim for common law fraud under Ohio law, Navarro must prove that P&G (a) knowingly or recklessly made (b) a material (c) misrepresentation or concealment of a fact (d) with the intent to mislead Navarro and that (e) Navarro relied on that misrepresentation or concealment (f) to her detriment. *See e.g.*, *Glassner v. R.J. Reynolds Tobacco, Co.*, 223 F.3d 343, 352 (6th Cir. 2000) (quoting *Burr v. Board of County Comm'rs of Stark Co.*, 491 N.E.2d 1101, 1105 (Ohio 1986)).

58

At trial, Navarro would be required to establish each of these elements by clear and convincing evidence. *Rapport v. Kochovski*, 923 N.E.2d 1212, 1215 (Ohio Ct. App. 2009). To obtain summary judgment, then, Defendants must show that, on the undisputed facts, Navarro will be unable to meet that burden as to one or more of the elements. Defendants have not done so.

Navarro's basic claim is that, in P&G's negotiations with her, P&G misled her regarding the scope of the rights for which it was negotiating. For example, Navarro alleges that, on at least three occasions, P&G led her to provide pricing for North-America-only rights, when P&G believed it would actually acquire worldwide rights from her (due either to LPK's status as a joint author or due to the combination of the 2007 Supplier Agreement between Navarro and LPK, and the MSA between LPK and P&G). (Fifth Am. Compl., Doc. 133 at ¶ 247, #4105). In other cases, Navarro claims P&G misled her into believing that the rights she was assigning would have temporal limitations, when P&G actually thought it was purchasing rights in perpetuity. (*Id.*). And P&G then obtained her services—the actual taking of the photographs—in further reliance on those misrepresentations. (*Id.* at #4103–07). In short, Navarro argues that she would have priced her rights in the photographs (and her services in taking the photos) differently had P&G been honest with her about what it was acquiring. (*Id.* at ¶250, #4106).

While perhaps an unconventional type of fraud claim, that is enough to get to a jury on the facts here. As for the first three elements, Navarro's evidence is sufficient to allow a jury to find that P&G acted knowingly in the price negotiations,

and that what P&G told her it was obtaining (North-America-only rights or three-year limited rights) was sufficiently different from what P&G thought it was actually obtaining (worldwide in-perpetuity rights) to constitute a "material misrepresentation."

Further, a reasonable jury could find that P&G made this misrepresentation (if it indeed was one) intentionally. Ohio law permits a jury to "infer" intent when the tortfeasor acted "with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred." *Glassner*, 223 F.3d at 352 (quoting *Burr*, 491 N.E.2d at 1105). The evidence showing that P&G paid Navarro's invoices (which reflected limited usage rights) and expressly negotiated with her for limited usage rights is sufficient that a jury could find P&G acted at least with reckless disregard for the truth, thus allowing a reasonable jury to infer intent here.

That leaves reliance and damages—and a reasonable jury could find that both of these final elements are present. As for reliance, Navarro argues that she agreed to use her artistic expertise to produce the photographs only because she relied on P&G's statement that it was purchasing a *limited right* to use those photographs. If she knew that P&G would contend that it actually purchased *all of* her rights in those photographs, she would not have taken the photographs in the first instance, or at least would not have agreed to do so at the price she quoted based on the "misrepresentation." And that same argument also illuminates the potential for finding damages—a reasonable jury could conclude that Navarro would have quoted

a higher price if P&G had been honest that it was obtaining of full buyout of her rights in the photographs rather than a limited license.

P&G insists that, contrary to the above, a material misstatement, intent, reliance, and damages are all absent here. (Defs.' Mem. at #8252–54) As to the first, P&G's claims that it could not have made a materially false statement or concealed a material fact regarding the scope of the license, because Navarro signed the Supplier Agreement, and as a result, already knew that P&G owned her photographs. (Defs.' Mem. at #8353). Basically, P&G argues that it could not have "concealed" a fact that Navarro already knew. But that argument turns on P&G's argument above—that the Supplier Agreement unambiguously assigned all of Navarro's rights to LPK (and thus, through LPK's agreement with P&G, to P&G). And the Court has already found that the Supplier Agreement does not unambiguously compel that result.

In any event, Navarro's position throughout this litigation, coupled with her conduct with regard to the Olay photoshoots, supports her claim that she never understood or treated the Supplier Agreement as a full buyout. For example, before a photoshoot took place, Navarro would price several different usage rights scenarios for LPK, each of which LPK would then relay to P&G. (*See* Ott Dep. Ex. 57, Doc. 201-1, #9174–92 (pricing out geographic and temporal usage rights for the Teal Box); Ott Dep. Ex. 60, Doc. 201-2, #9193–9229 (purple box usage negotiations)). This conduct is inconsistent with P&G's argument that Navarro knew that she already assigned all her rights to LPK.

61

Next, P&G argues that even if it implied to Navarro during negotiations with her that Navarro owned her images, Navarro could not have justifiably relied on that understanding because "the [Supplier Agreement] she signed said the opposite." (Defs.' Mem. at #8353). This is just a (very slightly) repackaged incarnation of P&G's first argument, and it fails to justify summary judgment for the same reasons.

P&G then turns to the intent element, claiming that, as a matter of law, it did not "intentionally" mislead Navarro because, "for all [P&G] knew, LPK had obtained Navarro's rights in the images just as LPK had promised." (*Id.* at #8354). But Ohio law permits fraud claims not only when a party "intentionally" makes a material misrepresentation or omission, but also when the party makes a statement "with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred." *Glassner*, 223 F.3d at 352 (quoting *Burr,* 491 N.E.2d at 1105). Here, as already noted, a jury could read the evidence to support a finding of such recklessness.

More specifically, Navarro points to several interactions she had with P&G that should have alerted P&G to her belief that she still owned the rights in her photographs. First, Navarro points to communications in which LPK would negotiate with Navarro on behalf of P&G to obtain the price and usage rights that fit P&G's objectives. (Fifth Am. Compl., Doc. 133 at ¶¶ 247–48, #4104–05). Second, Navarro highlights the Design Standard Estimate Template ("Design SET") or Project Estimate that P&G received from LPK, which reflected the usage rights that LPK, at P&G's direction, had negotiated with Navarro. (*Id.*). And third, Navarro contends that P&G would approve the Design SET and send LPK a purchase order. (*Id.*). A

reasonable jury could conclude that these actions and communications, especially taken together, were designed to convince Navarro that P&G believed that she would own the rights to the photographs she would take for the P&G photoshoots. As such, a reasonable jury could infer that P&G had the intent to defraud Navarro.

Finally, P&G argues that Navarro cannot establish damages because at the time that P&G allegedly defrauded Navarro (by negotiating for usage rights), she had already assigned her copyrights to LPK. (Defs.' Mem. at #8354). Therefore, P&G reasons, even if P&G revealed that it purported to own the photographs, Navarro "would have had no legal basis on which to demand more compensation." (*Id.*). Essentially, P&G contends that Navarro would not have had grounds to "charge[] for rights that she did not possess." (*Id.*).

This argument stems from a misunderstanding of Navarro's fraud claim. Navarro is saying that, if P&G and LPK had been honest that the Supplier Agreement was a full buyout, she would have raised her price, or at least, would not have offered to provide the additional photography services that P&G was seeking. As Navarro puts it, had she known that P&G wanted to use her images without limitation, "the license payments that Navarro would have demanded for use of her Images would have been materially different than the license payments that she received for the limited licenses that Navarro granted to LPK/P&G." (Fifth Am. Compl. at ¶ 251, #4106). In other words, Navarro alleges that, through its fraud, P&G tricked her into providing her photography services without fair compensation. She may or may not have had the ability to charge more for her services, but either way,

P&G received her photographs services at a lower rate than she would have charged absent the alleged fraud.

In sum, none of P&G's arguments suffice to prevent a reasonably jury from finding for Navarro on her common law fraud claim. Accordingly, the Court **DENIES** P&G summary judgment as to Navarro's fraud claim.

### 6. *Under* Petrella*, Navarro's Actual Damages Are Limited To The Three Years Prior To The Date That She Filed Suit.*

The Copyright Act includes a statute of limitations on copyright infringement actions. Specifically, the Copyright Act provides that "[n]o civil action shall be maintained … unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). According to Defendants, this means that Navarro cannot recover for any infringement that occurred outside that three-year period—either (1) because the claim accrued when each act of infringement occurred, and thus expired as to any such acts that took place more than three years before suit, or (2) because the Supreme Court has interpreted the Copyright Act to limit the damages for an act of infringement to a three-year look-back period, even if the claim itself as to that act has not expired. The Court rejects Defendants' first argument. As for the second argument, while the Court has some reservations that, as a functional matter, it is little different from the first, the Court ultimately agrees with Defendants that Supreme Court precedent nonetheless dictates that result.

For statutes of limitations issues, often the threshold question is what triggers a given limitations period. Statutes of limitations typically fall into one of two camps on that issue. First, some are governed by an "injury rule" or "occurrence rule," under

which a statute of limitations begins to run on the date of the injury that forms the basis of the claim. *Everly v. Everly*, 958 F.3d 442, 460 (6th Cir. 2020) (Murphy, J., concurring). In a copyright infringement suit, this would mean that the statute of limitations begins to run the moment that a given act of copyright infringement occurs, whether the copyright holder knows of the infringement or not. Second, some limitations periods are governed by a "discovery rule," under which a cause of action accrues when the injured party learns, or should have learned, of their injury. In a copyright infringement action, this would mean that the claim accrues when the copyright holder discovers, or should have discovered, the alleged act of infringement.

Settled Sixth Circuit precedent holds that a discovery rule applies to copyright infringement actions. *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC,* 477 F.3d 383, 390 (6th Cir. 2007) (citing *Rhyme Syndicate Music*, 376 F.3d at 621). What is more, every circuit court to consider the issue has reached that same result.[13] *See, e.g.*, *Warren Freedenfeld Assocs. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008).

---

[13] *See also Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120, 124–25 (2d Cir. 2014) ("[W]e conclude that copyright infringement claims do not accrue until actual or constructive discovery of the relevant infringement"); *William A. Graham Co. v. Haughey,* 568 F.3d 425, 433–37 (3rd Cir. 2005) ("We conclude that use of the discovery rule comports with the text, structure, legislative history and underlying policies of the Copyright Act."); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 796 (4th Cir. 2001); *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004); *Polar Bear Prods. v. Timex Corp.,* 384 F.3d 700, 705–06 (9th Cir. 2004); *Diversey v. Schmidly*, 738 F.3d 1196, 1200 (10th Cir. 2004).

The Fifth, Eighth and Eleventh Circuits have yet to squarely address the use of the discovery rule in copyright infringement cases, but district courts in those circuits have applied the discovery rule while noting that there is nothing in their circuit's law to prohibit the use of the rule in copyright infringement cases. *Barbour v. Head*, 178 F. Supp. 2d 758, 765 (S.D. Tex. 2001); *Design Basics, L.L.C. v. Carhart Lumber Co.,* No. 8:13CV125, 2016 WL 424794, at *3 (D. Neb. Feb. 3, 2016) ("[C]ourts within the Eighth Circuit have uniformly applied the discovery rule in copyright-infringement cases.") (citing cases); *Tomelleri v. Natale*, 2020 U.S. Dist. LEXIS 125264, at *5–*9 (S.D. Fla. July 15, 2020).

Defendants nonetheless argue that the Supreme Court overruled this uniform approach in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), replacing the discovery rule with an occurrence rule for copyright actions. (Defs.' Mem. at #8361). That misinterprets *Petrella*. To start, it is worth noting that *Petrella* is not really a case directed at the statute of limitations. Rather it principally addresses whether the equitable doctrine of laches can bar relief on a copyright infringement claim even when that claim is brought within the limitations period. *Petrella*, 572 U.S. at 667. In *Petrella*, the plaintiff only sought damages for infringement that occurred in the three years prior to suit. *Petrella*, 572 U.S. at 674–75 ("Petrella sought relief only for acts of infringement occurring on or after [the date exactly three years prior to when she filed suit]. No relief, she recognizes, can be awarded for infringing acts prior to that date."). The core question in *Petrella* thus was whether laches could bar recovery *even as to those acts of infringement.*

In addressing that question, though, the Court began by discussing how the statute of limitations works in copyright matters generally. There, the Court observed that "a copyright claim thus arises or 'accrues' when an infringing act occurs." *Id.* at 670. The opinion continued that "each wrong [infringement] gives rise to a discrete 'claim' that 'accrues' at the time the wrong occurs." *Id.* at 671. And finally, the Court concluded by stating that "[u]nder the Act's three-year provision, an infringement is actionable within three years, and only three years, *of its occurrence.*" *Id.* (emphasis added).

In fairness to Defendants, this language sounds like a ringing endorsement of the occurrence rule, where the statute of limitations begins to run on the date the infringement occurs, regardless of when the copyright holder discovers that infringement. Yet, the Court seemingly declined to resolve that issue. *See id.* at 671 n.4 (acknowledging that nine circuits use a discovery rule in copyright cases, but stating that the Court "ha[s] not passed on the question"). And lest there be any question on that front, the Supreme Court's later opinion in *SCA Hygiene* reiterates that "in *Petrella*, we specifically noted that 'we have not passed on the question' whether the Copyright Act's statute of limitations is governed by [the discovery] rule." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC,* 137 S. Ct. 954, 962 (2017). Thus, to read *Petrella* as abrogating the discovery rule would conflict with the Supreme Court's own understanding of its decision.

Lower court decisions post-*Petrella* concur in this assessment. *See Sohm v. Scholastic Inc.*, 959 F.3d 39, 50 (2d. Cir. 2020) (noting that "it would contravene settled principles of *stare decisis*" for the Second Circuit to rely on *Petrella* to depart from use of the discovery rule); *Grant Heilman Photography, Inc. v. McGraw-Hill Cos.*, 28 F. Supp. 3d 399, 411 (E.D. Pa. 2016) ("While the language related to the statute of limitations is suggestive, this Court does not find that *Petrella* overruled the Third Circuit discovery rule."); *Carhart Lumber Co.,* 2016 WL 424794 at *3 ("Both before and after *Petrella*, courts within the Eighth Circuit have uniformly applied the discovery rule in copyright-infringement cases."); *Design Basics, LLC v. Culver Constr., Inc.*, No. 1:16-CV-49-TLS, 2017 WL 1830533, at *3 (N.D. Ind. May 8, 2017)

("As that precedent stands today, the discovery rule controls the determination of when a copyright infringement claim accrues, and *Petrella* does not instruct otherwise.").

Courts in this Circuit likewise agree. *See e.g.*, *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 305 F. Supp. 3d 788, 792–93 (N.D. Ohio 2018) ("reject[ing] the argument that *Petrella* overruled the Sixth Circuit's rule that copyright-infringement claims accrue under the discovery rule"); *Mitchell v. Capitol Records, LLC,* 287 F. Supp. 3d 673, 677 (W.D. Ky. 2017) ("*Petrella* does not require the Court to ignore Sixth Circuit precedent that clearly defines accrual of a copyright claim as occurring when the plaintiff knew of the potential violation or is chargeable with such knowledge.") (internal citations omitted). Based on *Petrella's* language, as well as this mountain of precedent, this Court rejects the argument that *Petrella* overturned use of the discovery rule as to copyright infringement cases.

But Defendants are not done. They also claim that, even if *Petrella* did not do away with the discovery rule, the Supreme Court's more recent opinion in *Rotkiske v. Klemm*, 140 S. Ct. 355 (2019), did. In *Rotkiske*, the Court confronted the question of whether the discovery rule applied to the Federal Debt Collections Practices Act's (FDCPA's) one-year statute of limitations. *Id.* at 360. But there, the FDCPA's text seemed to incorporate an occurrence rule, providing that an FDCPA action "may be brought ... within one year from the date on which *the violation occurs.*" 15 U.S.C. § 1692k(d) (emphasis added).

The debtor sought to escape that language, arguing that federal courts should apply a default rule under which "limitations periods in federal litigation generally begin to run when plaintiffs know or have reason to know of their injury." *Rotkiske*, 140 S. Ct. at 359 (citing *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 940– 41 (9th Cir. 2009), *overruled by Rotkiske*, 140 S. Ct. at 360–61). The Supreme Court, however, refused to rely on a "general" judicial presumption in favor of discovery rules, when the statute so clearly called for an occurrence-based rule. As Justice Thomas explained, "[i]t is not our role to second-guess Congress' decision to include a 'violation occurs' provision, rather than a discovery provision;" rather, a court must enforce the value judgments made by Congress. *Id.* at 361.

Defendants claim to find in *Rotkiske* what amounts to a clear-statement requirement—that a "discovery rule displaces the occurrence rule only when Congress has plainly said so." (Defs.' Mem. at #8362). That overreads *Rotkiske*. There, the Court said only that a discovery rule will not displace an occurrence rule when Congress clearly expresses a preference in the statutory text for the latter. So understood, *Rotkiske* is not applicable here. The language of § 507(b) refers only to the date the "claim accrued," which does not specifically demand either a discovery rule or an occurrence rule. Thus, *Rotkiske* has little to say about which should apply. And, absent Supreme Court precedent to the contrary, this Court must apply the Sixth Circuit's longstanding precedent adopting the discovery rule for copyright infringement actions. *Roger Miller Music,* 477 F.3d at 390 (citing *Rhyme Syndicate Music*, 376 F.3d at 621).

If that were the end of the analysis, Navarro would be entitled to recover damages for any act of infringement, regardless of when it occurred, so long as she brought suit within three years of her first discovery (whether actual or constructive) of that act. But there is one additional wrinkle. When people hear "statute of limitations" they often think of a clock that "runs forward from the date a cause of action accrues." *SCA Hygiene*, 137 S. Ct. at 961. The Supreme Court has explained, though, that the statute of limitations may also run backwards, at least in terms of the "retrospective relief" that a cause of action provides. *Id.* In other words, independent of what triggers a statute of limitations, the statutory period may also provide a limitation on the available damages period.

The language of *Petrella* seems to suggest that is the case in copyright infringement actions. Even though the *Petrella* Court did not expressly adopt an occurrence rule for triggering purposes, the decision clearly seems to adopt a three-year lookback for damages. The Supreme Court explains, for example, that "a successful plaintiff can gain retrospective relief only three years back from the time of suit. No recovery may be had for infringement in earlier years." *Petrella*, 572 U.S. at 677. Indeed, the Court expressly notes that "the infringer is insulated from liability for *earlier infringements* of the same work." *Id.* at 671. (emphasis added). And, in describing the available recovery, the Court again makes specific reference to that look-back period: "if infringement within the three year look back period is shown, the Act allows the defendant to prove and offset against *profits made in that period* 'deductible expenses' incurred in generating those profits." *Id.* (emphasis added).

Moreover, the Court's references to this limited look-back period for damages cannot be dismissed as dicta because the existence of this limited look-back period was integral to *Petrella*'s broader holding about laches. The *Petrella* Court explained that a copyright holder need not bring suit immediately upon learning of infringement. Rather, a potential plaintiff can wait until the infringement grows to the point where "litigation is worth the candle." *Id*. at 683. But waiting, the Court cautioned, comes with a price, as the copyright owner will "miss out on the damages for periods prior to the three-year look-back." *Id*. Indeed, it was precisely that aspect of copyright damages—that a plaintiff loses the right to recover damages that occurred more than three years before suit—that led the Court to conclude there was no need to incorporate laches as an incentive for plaintiff to sue promptly. *Id. See also Papazian v. Sony Music Entm't*, No. 16-cv-7911, 2017 WL 4339662, at *5 (S.D.N.Y. Sept. 28, 2017) ("[B]ecause the clear and specific three-year limitation on damages under section 507(b) was necessary to the result in *Petrella*, it cannot be construed as dicta.").

This Court acknowledges that, thus understood, it would appear that *Petrella* functionally overrules the discovery rule, even if the *Petrella* Court in footnote four declines to do so explicitly. An example illustrates. Imagine that Company A continuously infringes on a copyright from 2002–2008. The copyright owner discovers the infringement in 2008 and sues in 2010. Under a typical discovery rule, because she brought the action within three years of discovering the infringement, she would be entitled to recover damages for all acts of infringement, even those dating back to

71

2002. But *Petrella* says otherwise. It expressly contemplates a world where this hypothetical copyright owner *loses out* on some damages, i.e., those that *occurred* more than three years before suit (in this example, before 2007). As *Petrella* puts it, the copyright holder who discovers infringement in 2008 has a choice. She can bring suit immediately, allowing her to recover for 2005–2008, or she could wait until 2011 to initiate her action, but then the damages period would be limited to 2008–2011.

As noted above, that creates a regime that—at least in terms of the quantum of damages—appears to be the functional equivalent of an occurrence rule. In other words, if the Copyright Act included an occurrence rule, a plaintiff could recover any damages that resulted from acts of infringement that occurred in the three years prior to suit. But that is the result of *Petrella's* limited damages look-back, as well. To say, "the plaintiff is free to sue on events that occurred outside the three-year period (as long as they were first discovered within that three-year period), but only may recover damages that occurred within the three-year period," looks a lot like saying "the plaintiff can only sue for infringement that occurred within the three-year period."[14]

---

[14] Perhaps another way to understand *Petrella* is that it limits damages to *profits* that the infringers *earned* during the three-year look-back period, for any infringement that was discovered in that same three-year period. This would be a discovery rule of sorts, as the act of infringement could occur outside the three-year period. But it would have aspects of an occurrence rule, as well, in that the damages for that outside-the-period infringement would be limited to those that occurred during the three-year period. There is some language in *Petrella* suggesting that the Court was concerned about when the profits occurred, not when the infringement occurred, for its look-back rule. *See, e.g., id.* ("She will miss out on damages for periods prior to the three-year look-back"); *id.* at 677 ("Profits made [outside the three-year look-back] remain the defendants' to keep."). But if that is the result, then the answer here is the same for Defendants, because the infringement (use on product packaging) and the alleged profits (resulting from the sale of products in that packaging) were contemporaneous.

That said, many lower courts seem to be imposing the time-based damages limitation. According to these courts, while *Petrella* did not adopt an occurrence rule, it nonetheless limits damages to those that occurred within the three-year period prior to suit. *See, e.g.*, *Carhart Lumber Co.,* 2016 WL 424794, at *5–*6 (explaining that a copyright holder "may gain retrospective relief running only three years back from the date the complaint was filed"). As the Second Circuit explained in *Sohm*, "[d]espite not passing on the propriety of the discovery rule in *Petrella*, the Supreme Court explicitly delimited damages to the three years prior to the commencement of a copyright infringement action." 959 F.3d at 51. In short, the case "counsel[s] that we must apply … a three-year lookback period from the time a suit is filed to determine the extent of the relief available." *Id*. at 51–52. The Fifth Circuit likewise opined that *Petrella* "foreclosed [plaintiffs] from seeking damages for any *acts completed* before" the three-year look-back period. *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 271 (5th Cir. 2020).

That being said, certain district courts, including at least one in this Circuit, have rejected that approach. In *Mitchell v. Capitol Records, LLC,* 287 F. Supp. 3d 673, 677 (W.D. Ky. 2017), the court declined to read *Petrella* as barring recovery for damages that occurred more than three years before suit. *Id*. at 677–78 The court found instead that *Petrella* limited damages to those arising from claims that "accrued" during the limitations period (i.e., the traditional understanding of a discovery rule). *Id*. at 678. And, according to *Mitchell*, in the Sixth Circuit "[t]he relevant date … has always been the date of 'accrual.'" *Id*. Adopting an "occurrence-

based" approach would, under that logic, "effectively obliterate[] the discovery rule." *Id. See also*, *Energy Intel. Grp., Inc. v. Scotia Capital (USA) Inc.*, 16-cv-617, 2017 WL 432805, at *2 (S.D.N.Y. Jan. 30, 2017) ("[U]nder no reasonable reading of *Petrella* could the opinion be interpreted to establish a time limit on the recovery of damages separate and apart from the statute of limitations.").

Although this Court largely agrees with the *Mitchell* court's observation that, as a practical matter, the effects of a limited three-year lookback result in a form of occurrence rule, the language of *Petrella*, including language that motivated the ultimate holding in that case, nonetheless expressly limits damages to those that arose in the three years before filing suit. *Petrella*, 572 U.S. at 685. Given *Petrella's* express language, this Court, while acknowledging that this result is at odds with the *Mitchell* court and with pre-*Petrella* Sixth Circuit law, **GRANTS** Defendants summary judgment as to any damages that occurred prior to that date. To quote *Petrella*, "[p]rofits made in those [earlier] years remain the defendant's to keep." *Id.* at 677.[15]

---

[15] Perhaps the more straightforward way to arrive at this same result would be to find that the Copyright Act's statute of limitations adopts an occurrence rule, not a discovery rule. As Judge Murphy notes in his concurring opinion in *Everly*, one could read *Rotkiske* as holding that "when there are two plausible constructions of a statute of limitations, we should adopt the construction that starts the time limit running when the cause of action … accrues, not when the plaintiff discovers the cause of action." *See Everly*, 958 F.3d at 461 (Murphy, J., concurring) (arguing that the text of the Copyright Act contemplates an injury rule, not a discovery rule) (internal citations omitted). In the absence of Sixth Circuit precedent directly on point, though, this Court hesitates to read *Petrella*, even as supplemented by *Rotkiske*, as tacitly overruling settled Circuit law on the applicability of the discovery rule. That being said, as noted above, the damages limitation—which flows directly from *Petrella's* text— appears to accomplish largely the same result. And, in any event, whichever that analytical pathway, the final destination is the same.

7. ***Defendants Have Failed To Show That Navarro's Request For Profit-Based Damages Fails For Lack Of A "Reasonable Relationship" Between The Photographs And Defendants' Revenues.***

In an infringement action, the copyright owner is entitled to recover "the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). This provision allows for two different types of damages: actual damages and profit-based damages.[16] The first of those, actual damages, reflects the straightforward concept that an infringer should pay the copyright owner compensation for amounts that the copyright owner lost due to the infringement. *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 358 (6th Cir. 2007) (conceptualizing actual damages as "the amount [the copyright owner] would have received but for [the infringer's] unlawful copying) (quoting *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 439 F. Supp. 2d 758, 772 (E.D. Mich. 2006)). Often this is the value that the infringer would have paid to use the copyrighted material legally—an amount sometimes calculated as a "reasonable license fee" based on a hypothetical "willing-seller/willing-buyer" informed by norms and customs in the relevant industry.[17] *Id.* at 359 ("[A]ctual damages may include in

---

[16] There is also a third type of damages—statutory damages—that can arise in appropriate circumstances in copyright actions. Here, though, Navarro has expressly disclaimed any entitlement to statutory damages. (Pls.' Resp. at #10118).

[17] Other times, actual damages are equal to the amount of profits that the copyright owner lost as a result of the infringement. For example, a copyright owner might recover actual damages in the amount of lost business or lost market value as a result of consumers purchasing the infringer's product. *See, e.g.*, *Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 280–81 (6th Cir. 1988) (explaining that the measure of actual damages is the profits

appropriate cases the reasonable license fee[.]") (quoting *Davis v. Gap, Inc.,* 246 F.3d 152, 167 (2d Cir. 2001)).

But the consequences of infringement may be broader than that. Infringement does not merely harm the copyright owner, but also may benefit the infringer in the infringer's own business to an even greater extent. Profit-based damages, the second form of compensatory damages under the statute, force the infringer to disgorge the profits it realized from the infringement to the extent that such profits exceed the copyright owner's actual damages. *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 865–66 (W.D. Mich. 2008) (explaining that a plaintiff can only recover profit-based damages in excess of actual damages). In that way, the infringer is not allowed to profit from its infringement, thereby reducing the incentives to infringe in cases where the infringer's profits might exceed a reasonable licensing fee. This in turn pushes infringers to actually negotiate licenses up front, rather than infringe first and worry about determining a "reasonable license fee" later and only if sued. *Id.* at 866 ("[P]rofit damages eliminate a major incentive to steal the copyright instead of fairly negotiating for its use with the owner.") (quoting *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 568 (7th Cir. 2003)).

The calculation of profit-based damages is a two-step process. First, the copyright owner must identify the part of an infringer's gross revenues that bears a "reasonable relationship" to the alleged infringement. *Balsley v. LFP, Inc.*, 691 F.3d 747, 767–68 (6th Cir. 2012). Say, for example, the defendant company sells prints of

---

the copyright owner would have made on houses it would have sold but for its competitor's infringement).

photographs A and B, only the latter of which is an infringing image. The revenues at issue, then, would be those associated with sales of photograph B, not photograph A. Then, once the copyright owner has identified the appropriate revenues, the burden shifts to the infringer to demonstrate what part, if any, of those revenues are not profits attributable to the infringement. *Id.* at 769. The infringer can do so in two ways—first by pointing to the expenses it incurred in generating the revenues, and then second, by allocating any remaining amount (i.e., the profit) among infringing and non-infringing activities. *Id.* at 767 (quoting 17 U.S.C. § 504(b)).

Defendants here argue that Navarro has failed to meet her burden under the first step of the profit-based damages inquiry. Specifically, they say that Navarro has "not introduced any non-speculative evidence of a causal relationship between Defendants' alleged infringing uses of Navarro's photographs and the profits earned from sales of the products at issue." (Defs.' Mem. at #8364). This raises the question: what exactly does a plaintiff need to show in order to establish that the infringement is *reasonably related* to the Defendants' profits?

While the Sixth Circuit has not provided a clear test on this front, several opinions offer some guidance. The best place to start is perhaps *Balsley v. LFP, Inc.*, where the Sixth Circuit first articulated the "reasonable relationship" framework. 691 F.3d at 767–68. The underlying infringement in *Balsley* occurred when Hustler magazine published a copyrighted photo in its February 2006 issue. *Id.* at 755–56. The copyright owner sued for direct infringement in the amount of $1,148,000, which represented all the revenue that Hustler realized on the issue that included the

infringing image. *Id.* at 770. The jury instead awarded the copyright owner slightly over one hundred thousand dollars in damages. *Id.* at 757.

Hustler appealed that damages award, alleging that the lower court erred in failing to require the copyright owner to establish that the copyrighted photograph caused customers to buy the magazine. *Id.* at 768. Specifically, Hustler argued that "99% of its magazines are sold in shrink wrap, so no customer would know that the [copyrighted] photograph was featured in the magazine and, hence, no customer would have purchased the magazine 'because of' that photograph." *Id.* at 770 Therefore, Hustler argued, the plaintiff had no grounds to present the jury evidence of that $1.1 million revenue figure.

The Sixth Circuit, though, explained that Hustler had it backwards. As noted above, at the first step, a copyright owner need not establish causation, but instead must only show a "reasonable relationship" between the infringement and defendants' revenues. *Id.* The alleged infringer can then seek to chip away at those revenues by showing either (1) that some portion of them do not constitute "profits" (i.e., because of the costs incurred in generating the revenues), or (2) that the revenues are not causally linked to the infringement. *Id.* at 768–69.

Given that framework, the "reasonable relationship" standard that applies at the first step must be something less than causation. *Id.* at 769 n. 6 ("We emphasize that we do not impose the more stringent burden of proving a 'causal connection' on copyright owners."). The *Balsley* Court explained it in terms of relevance—to establish a "reasonable relationship" between the defendants' revenues and the

infringement, the copyright owner need only show that the "gross revenue number [is] relevan[t] … to the infringing activity." *Id.* at 769. And, relevance, at least in the context of legal actions, is typically a relatively lenient standard. *See, e.g.*, Fed. R. Evid. 401 (evidence is relevant if it "makes a fact more or less probable than it would be without the evidence"). *Balsley* further goes on to explain that, as to the "reasonable relationship" determination, relevance is a "common sense" inquiry. 691 F.3d at 770. The plaintiff in *Balsley* met the "reasonable relationship" standard merely based on "the parties' stipulation that the Bosley photograph was published in the February 2006 issue. This evidence was all that was required of Plaintiffs under the statute." *Id.*

The Sixth Circuit recently confirmed its generous approach to the reasonable-relationship inquiry in *ECIMOS, LLC v. Carrier, Corp.*, 971 F.3d 616 (6th Cir. 2020). There, Carrier allegedly committed copyright infringement when it included a few lines of ECIMOS-copyrighted computer code to run programs that Carrier used to manufacture HVAC units at its Collierville plant. *Id.* at 625. The trial court allowed ECIMOS to present evidence that Carrier's gross revenues from all of the HVAC units it manufactured with the infringing code totaled $1.25 billion. *Id.* at 634. Carrier submitted mitigating evidence, and the jury ended up awarding ECIMOS $5 million. *Id.* at 636. On appeal, Carrier argued that the gross revenue figure was not reasonably related to the infringing activity. *Id.* at 634. Specifically, Carrier pointed out that "the infringed-upon code constituted only a small part of Carrier's operations

79

at Collierville" and therefore, such a "minor piece of code could not possibly have affected its entire profits." *Id.* at 634.

The Sixth Circuit disagreed, holding that ECIMOS "clearly met" its burden of proving that Carrier's gross revenues are related to the infringement. *Id.* at 636. In so holding, the Sixth Circuit reaffirmed that a "reasonable relationship" exists so long as the gross revenues are somehow linked to the infringement. *Id.* at 635. ("Indeed, we held that 'Section 504(b) unambiguously provides that the burden on the copyright owner is "to present proof only of the infringer's gross revenue" of the infringing product.'") (quoting *Balsley*, 691 F.3d at 767) (emphasis omitted). "In other words, any relevant *revenue* that could be traced back to the infringement can be submitted to the jury, and … it is ultimately for the jury to decide how much profit—after hearing the infringer's mitigating evidence—must be disgorged." *Id.*

Under this relatively lax standard, Navarro has produced enough evidence here to show that Defendants' gross revenues, at least as to some of the products at issue (more on that below), are "reasonably related" to the photographs at issue. Neither party disputes that Defendants used the Navarro photographs on certain product packaging. (Defs.' SOUF at ¶¶ 40, 46, 57, 59, 78, 96, #10136–36, 10138, 10143, 10144, 10152, 10160). For any such packaging, the physical presence of these photographs is itself enough to support a "reasonable relationship" between the photographs and the sales of that product. *See Balsley*, 691 F.3d at 770.

Defendants may take issue with the fact that, in *Balsley* the infringing image was, in a sense, the product itself, whereas here, the Navarro photographs were just

on the packaging *outside* of the actual product. But that Sixth Circuit disclaimed that distinction in *ECIMOS*, where the infringing activity occurred in a quality control machine on the assembly line, not in the ultimate product. And, in any event, any such argument misunderstands the "reasonable relationship" test's function. That test ensures only that a plaintiff is not placing before the jury revenue figures bearing absolutely no relationship to the infringing activity.

To be sure, Defendants remain free to argue to the jury on causation grounds that the revenues that Navarro puts forth, or some portion of them, should not serve even as a starting point for calculating a disgorgement award. But, "the burden is on the copyright *infringer* to prove whatever portion of its gross revenue was *not* attributable to the infringement." *ECIMOS*, 971 F.3d at 635. Accordingly, the Court **DENIES** Defendants summary judgment to the extent that they challenge, as a general matter, Navarro's ability to claim profit-based damages on the record here.

### 8. *Defendants Are Entitled To Summary Judgment As To Some, But Not All, Of Navarro's Profit-Based Damages Claims.*

In addition to their challenge to profit-based damages at a general level, Defendants also take issue with several sub-categories of Navarro's profits-based damages claims. More specifically, they argue that even if some of the revenues clear the reasonable-relation hurdle (e.g., revenues from products sold in boxes bearing Navarro photographs), the revenues as to certain sub-categories of products or sales do not. In particular, Defendants ask for summary judgment as to Navarro's request for profits-based damages on the sale of (1) "additional products;" (2) the ProX and Regenerist products; (3) products sold during the alleged license periods; and

(4) products sold as a result of "legacy assisted sales." (Defs.' Mem. at #8371–77). Defendants also contend that, as a matter of law, they are not obligated to compensate Navarro for the profits from sales of third-party retailers who are not defendants in this action. (*Id.* at #8377–78).

As further explained below, the Court agrees with Defendants that Defendants' revenues from the sale of "additional products" (Category 1) have no reasonable relation to the alleged infringement. Accordingly, the Court **GRANTS** summary judgment as to that category of revenues. As for sales of certain products during the alleged license periods (Category 3), the Court agrees that the undisputed evidence establishes that there was an implied license for use of the photographs, subject to certain restrictions, for in-store use. But the Court lacks sufficient evidence to determine whether the endcaps complied with those restrictions, and thus **DENIES** summary judgment. As for the other two categories, Navarro has offered enough evidence to allow her to present her claims to a jury, and thus the Court also **DENIES** summary judgment as to those categories. Finally, as defendants in copyright actions are not jointly and severally liable for profit-based damages of other infringers, the Court **GRANTS** Defendants summary judgment on any of Navarro's claims for damages that attempt to hold Defendants liable for profits from sales of third-party retailers who are not named as defendants in this action.

### a. *Additional Products*

The first of these categories involves Navarro's claim for profit-based damages from "additional products." (Defs.' Mem. at #8371–74). These additional products did

not feature Navarro's photographs on the packaging. Rather, the basis for Navarro's profits claim is that P&G advertised these products in "BrandSaver" circulars alongside images of packages that *did* feature Navarro photographs. (Fifth Am. Compl. at ¶¶ 154–81, #4080–89). Patrick Gannon, one of Navarro's experts, opines that the coupons featuring Navarro's photographs encouraged consumers to purchase the other products advertised nearby. (Decl. of Patrick F. Gannon, Doc. 208–38, #10011). This, Navarro contends, establishes a reasonable relationship between the allegedly infringing photographs and the profits from these other products. (Pls.' Resp. at #10098).[18]

While the Court acknowledges that "reasonable relationship" is a flexible standard, this argument stretches the concept beyond its breaking point. To establish a reasonable relationship, the copyright owner must submit at least some "non-speculative" evidence of a connection. *Satija v. Permanent Gen. Assurance Corp. of Ohio*, 1:13-cv-00082, 2014 WL 1664557, at *6 (N.D. Ohio Apr. 25, 2014). In ECIMOS for example, the Sixth Circuit allowed the plaintiff to present gross revenue estimates

---

[18] Navarro also presented the expert opinion of marketing professor Larry Chiagouris on this front. He opined that coupons with Navarro's images encouraged the sale of other products for several reasons: (1) the Navarro images on the package often appear larger than the images of the other products that do not have a model's photo on the product or coupon (Chiagouris Report at #7840–41); (2) the Navarro created images at times often appear close to the center of the coupon and, as such, draw the consumer's eye (*id.* at #7840); and (3) there were not any other images of models on these coupon pages other than those that portrayed packages with Navarro-created photographic images. (*Id.*). The Court excluded this section of Chiagouris' report because he failed to offer a reliable methodology connecting these opinions to facts in the record. (Op. & Order on Defs.' Mot. in Limine to Exclude Larry Chiagouris, Doc. 245, #13591–97). Accordingly, the Court does not consider Chiagouris' opinion on the relationship between Navarro's images and the sales of additional products here.

for the products manufactured at the facility that used the infringing code, but there is no suggestion that the plaintiff could have likewise included revenue from *other* Carrier facilities that did not engage in that same infringing activity. And, in *Balsley*, the starting point for profit-based damages included only the revenues from the monthly issue that included the infringing image, not from other issues of that same magazine.

In discussing damages, *Balsley* cited *On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001), which offers a helpful illustration of this principle. Imagine, the Second Circuit began, if a publisher impermissibly reproduced a copyrighted poem in an anthology of poetry. *Id.* The copyright owner would certainly be entitled to include the revenues received on that anthology as a starting point for their damages claim. *Id.* But the copyright owner would not have grounds to include revenue from the publisher's *other* titles, including trade books, textbooks, and cookbooks in the analysis. *Id.* The overarching principle at work here is that "the statutory term, 'infringer's gross revenue' should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement." *Id.*

The facts in *On Davis* further explain the issue in a way that is helpful here. The plaintiff in *On Davis* created copyrighted eyewear designs, one of which The Gap featured on a model in a print advertisement. *Id.* at 156–57. The designer sought profit-based damages, but instead of specifically targeting the revenues associated with The Gap's use of his eyewear, the designer presented the company's net sales across all brands and all business segments, from sales of infantwear to sales of

84

cosmetics. *Id.* at 160–61. Essentially, the plaintiff argued that The Gap's use of his eyewear inflated the company's sales on the whole, and it should be up to the defendant to chip away at those revenues during the second step of the damages analysis. The Second Circuit rejected that argument, holding that company-wide gross revenues were not "reasonably related" to The Gap's unauthorized use of his eyewear. *Id.* at 161.

In short, *On Davis* strongly suggests that "increasing brand equity" and "encouraging sales of other products" are not viable theories for establishing a profit-based damages claim. *See also Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983) (rejecting, in case involving a map-maker who impermissibly reproduced three copyrighted maps, an attempt to put before the jury revenues from all of the map-maker's sales, and finding the other revenues failed the reasonable relationship test).

Navarro's claims for profit-based damages from the sale of "additional products" similarly overextend the notion of a "reasonable relationship." These "additional products" have a single indirect relation to Navarro's photographs—P&G advertised these products *near* advertisements for products that featured Navarro's photographs. Essentially, the "additional products" have nothing in common with the products featuring Navarro's images except (1) Defendants sell both sets of products, and (2) Defendants advertise both sets of products in close proximity to one another. That does not establish a reasonable relation.

Indeed, Navarro's damages theory here threatens a slippery slope. What if a greeting card featuring an infringing image is displayed on a rack with a host of other

cards by the same manufacturer? Under Navarro's liberal construction of "reasonable relationship," a copyright owner may well seek to include the gross revenues for sales of those nearby cards. What if the store also sells pens to write in those cards? The Court must draw a line somewhere. And here, Navarro's claims for damages from "additional products" are simply too attenuated from the alleged infringement to support her claim for profit-based damages as to those products. Therefore, the Court **GRANTS** Defendants summary judgment as to Navarro's claims for profit-based damages from the sale of "additional products."

### b. *Sales Of the ProX and Regenerist Products*

Defendants also argue that Navarro is not entitled to any profits from ProX or Regenerist products because the packaging featured Navarro's photos only on the back of the box. (Defs.' Mem. at #8374–75). Therefore, Defendants reason, the photographs could not have played much of a role in a consumer's purchasing decision. (*Id.*). Defendants even offer the expert testimony from Robert Zeithammer, which purports to show that "Navarro's images on the back of the ProX and Regenerist packages had *no* statistically significant effect on purchasing decisions." (*Id.* at #8375, *see also* Expert Report of Robert Zeithammer, Doc. 199-1, #8966).[19]

But simply because they appear on the back of the packaging does not mean that images are not "reasonably related" to the sale of that product. For example, consider *Balsley*. There, the infringing image was inside a shrink-wrapped magazine,

---

[19] The Court recognizes that Navarro has filed a motion in limine to exclude the opinion of Mr. Zeithammer. (Pls.' Mot. to Exclude Robert Zeithammer, Doc. 218, #11837–79). Zeithammer's opinion, however, does not change the Court's analysis on this issue. Therefore, the Court need not rule on Navarro's motion in limine at this time.

yet the Sixth Circuit concluded the revenues were "reasonably related" to the infringement. 691 F.3d at 770. The Sixth Circuit did so even though Hustler proffered an expert "who theorized that none of the profits were attributable to the Bosley photograph." *Id.* That evidence, the Court explained, may be relevant during the attribution phase (i.e., the second step), but does not prevent a reasonable relationship at the first step. *Id.* at 770–71. The images here are certainly more conspicuous than those in *Balsley*. And, just as the expert's opinion regarding causation in *Balsley* did not change the result of the Court's "reasonable relationship" analysis, so too here. *See also Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789, 797 (8th Cir. 2003) (finding a reasonable relationship even though "some buyer somewhere bought a TT coupe without having seen the commercial despite Audi's extensive use of it") (cited approvingly in *Balsley*, 691 F.3d at 768 n.4). Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to Navarro's profit-based damages claims for the ProX and Regenerist products.

### c. *Profits From Sales Within the Alleged Licensing Periods*

Navarro also seeks damages based on Olay products that Defendants sold during the alleged licensing periods. Neither party disputes that these sales occurred within both the temporal and geographic limitations of the alleged licenses. (Defs.' Mem. at #8375; Pls.' Resp. at #10099–10100). Nevertheless, Navarro contends that these sales resulted from copyright infringement. This is because, Navarro explains, Defendants violated the licenses' usage restrictions. *Id.* Specifically, she claims that Defendants marketed these products using "endcaps," which are displays at the end

of the shopping aisle, that used her photographs, and the alleged licenses did not permit Navarro's photographs to be used in such a display. *Id.*

Defendants, in response, assert that their endcaps did not infringe on Navarro's copyrights at all, because the alleged licenses *implicitly* permitted the use of Navarro's photographs on endcaps. (Defs.' Mem. at #8376 n.5). In other words, Defendants argue that Navarro granted them an implied license to use her photographs on endcaps. "An implied license is an unwritten license to use a work that the court infers from the circumstances and from the conduct between the parties." *Melanie Howard Music, Inc. v. Warner Brothers Records, Inc.*, No. 3:08-0979, 2009 WL 3784611, at *5 (M.D. Tenn. Nov. 10, 2009) (citing *WM Music Corp.,* 508 F.3d at 398–99). Not only is the parties' conduct important, but also anything that colors that conduct, including the parties' expressions of intent, *Johnson v. Jones*, 149 F.3d 494, 500–01 (6th Cir. 1998), and the greater context that surrounds their agreement. *Jeffrey A. Grusenmeyer & Assoc., Inc. v. Davison, Smith & Certo Architects, Inc.,* 212 Fed. App'x 510, 514 (6th Cir. 2007) (noting that courts should examine the "totality of the circumstances").

Here, Navarro's statements, and the industry practices that informed the parties' negotiations, indicate that Navarro granted Defendants an implied license to use Navarro's photographs on in-store endcaps, but only subject to certain restrictions. The undisputed starting point is that both parties agree that Defendants had the right to use Navarro's photographs on product *packaging* during this period, so long as they abided by the appropriate geographical and temporal limitations.

(Defs.' Mem. at #8375; Pls.' Resp. at #10099–10100). But Defendants claim that there is an additional unwritten industry practice at play, namely that when a photographer grants a license permitting the use of photographs on consumer packaging, that license also naturally permits the licensee to use images of that packaging in advertisements. (Defs.' Mem. at #8376 n.5).

The record evidence shows that Navarro recognized this industry practice several times, but perhaps not as broadly as Defendants would like. First, in an email to P&G in 2014, Navarro explained that "[e]veryone is usually agreeable to the box appearing as an unfettered shot in advertising, *but the image must be on pack*." (Dep. of Annette Navarro taken on 7/9/19 – 7/10/19, ("Navarro Dep."), Ex. 11, Doc. 174-5, #7055 (emphasis added)). Likewise, in her 2019 deposition, Navarro reconfirmed that this is still her understanding. Specifically, she stated that she "still stand[s] by what [she] wrote. Everyone is usually agreeable to the box appearing on an unfettered shot in advertising, but the image must be on pack." (Navarro Dep. at 378:22–25, 379:1, #6906–07). In short, it appears there is no dispute that, when Navarro gave Defendants permission to use her photographs on product packaging, she also granted an implied license to use an "unfettered shot" of the photograph on advertising, so long as that advertising depicted her image *on a package*.

On the record evidence, the Court finds as a matter of law that this implied license would extend to Defendants' use of the photographs on endcaps, which are a form of in-store advertising. (Lee Dep., Doc. 159, #5483 (explaining that endcaps are "display[s] at the end of the aisle where [companies] may choose to feature a certain

89

product")). The question, though, is whether the endcap depicted Navarro's image *on a box*. In other words, it does not appear that Navarro has conceded that she granted an implied license to use the image as a standalone.

So, if the endcap were a picture of boxes (which in turn contain her images), then the Court would agree that Defendants would be entitled to judgment as a matter of law on this issue. Unfortunately, it does not appear that the Defendants have submitted a picture of the endcaps, so the Court cannot determine whether the condition Navarro mentioned is met. And absent that, it does not appear that there would be agreement between the parties on whether such use is permissible. So, the Court cannot resolve that matter in Defendants' favor at this juncture.

Beyond that, Defendants' only argument is their general "causation" argument noted above. But the Court has already found that argument unpersuasive.

Accordingly, the Court **DENIES** summary judgment on this issue.

### d. *Legacy-Assisted Sales*

Navarro also seeks damages from "legacy image assisted sales," which allegedly occurred when retailers continued to show images of packages bearing a Navarro image on their websites, even after P&G has stopped using her photographs on the actual in-store packaging. An online customer would click these outdated images to purchase the product, but when the product arrived, it would not display Navarro's image. Defendants argue that there is no reasonable relationship between these online "legacy images" and their sales, because there is "no evidence showing

that" these legacy images "made any difference to [a consumer's] eventual purchasing decisions." (Defs.' Mem. at #8376).

As support, Defendants cite *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376 (3d Cir. 2016). There, Stemtech, a company that sells nutritional supplements, used Leonard's copyrighted photographs of stem cells on its websites and in a sales kit intended to attract and train potential distributors of Stemtech product. *Id.* at 384. Leonard claimed profit-based damages from Stemtech's products, alleging that the use of his photographs "promote[d] [Stemtech's] brand" and "promote[d] understanding of its company and products." *Id.* at 395. The Third Circuit denied Leonard's claim for profit-based damages. *Id.* at 396. The Court explained that, although Leonard's images may have "added an air of legitimacy to [Stemtech]'s product" they lacked a reasonable relationship to the sale of those products. *Id.*

Defendants argue that Navarro's photographs have no reasonable relationship to Defendants' sales because, under *Leonard*, photographs "on websites" do not have a sufficient connection to the sales of actual product. (Defs.' Mem. at #8377). But the problem in *Leonard* was not that the pictures appeared on a website, but rather that they were not linked to a specific product. Rather, Stemtech only used the images to create "brand awareness" and an "air of legitimacy." The Third Circuit's holding in *Leonard* seems akin to the Second Circuit's decision in *On Davis* and the Seventh Circuit's analysis in *Taylor*. In each, the court refused to find a reasonable relationship based merely on alleged benefits to the defendant's brand as a whole.

But Navarro's legacy-assisted sales claim does not appear to rest on the untenable idea that increasing brand equity satisfies the reasonable relationship test. Rather, here the Defendants allegedly used her photographs on their website *to depict the actual Olay products at issue*. That distinguishes this case from *Leonard*. Therefore, the Court **DENIES** Defendants' motion for summary judgment for Navarro's claims for profit-based damages from products sold as a result of "legacy assisted sales."

### e. *Liability For Profits Of Retailers Not Named As Defendants*

The default rule in copyright infringement cases is that, although defendants may be jointly and severally liable for each other's actual damages, each defendant is "severally liable for his or its own illegal *profit*; one defendant is not liable for the profit made by another." *See, e.g.*, *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985). Both parties acknowledge this general rule. (Defs.' Mem. at #8377; Pls.' Resp. at #10108). Even so, Navarro claims that P&G is jointly and severally liable for the "profit-based damages associated with sales from third-party retailers Navarro did not name as defendants in this suit." (Pls.' Resp. at #10108). That is so, Navarro explains, because of two exceptions to the general rule. First, joint liability can arise when the defendants act as partners or practical partners, and second, joint liability can arise when the infringement is intentional. (*Id.*). The Court addresses each exception in turn, finding neither present here.

As to the first exception, Navarro is right that a defendant may be jointly liable for the profits of another infringer if, together, they acted as partners or practical

partners. *See, e.g.*, *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 517 (4th Cir. 2002) (quoting *Frank Music Corp.*, 772 F.2d at 519). But then the question becomes what it means to be "partners" or "practical partners" in the infringement. The inclusion of the category "practical partners" in the exception suggests that the category "partners" is to be read literally. As a general matter, the term partner or partnership refers to a situation where two or more parties have agreed to carry on as co-owners a business for-profit. *See, e.g.*, 17 Ohio Rev. Code § 1776.22.[20] Here, no evidence suggests that P&G was carrying on a business as a co-owner with any retailer not named as a defendant.

Therefore, Navarro's only shot at prevailing under this exception is if she can submit evidence that P&G was acting as a "practical partner" to the retailers not named in the lawsuit. The term "practical partner" seems to mean just what it says— referring to situations where two entities were "practically" partners. *Belford, Clarke & Co. v. Scribner,* 144 U.S. 488, 507–08 (1892) (holding a printer jointly liable for publisher's profits on infringing book since they were "practically partners"). As such, the Court concludes that a practical partnership exists for purposes of copyright law when many of the markers of an actual partnership are present, but the relationship has not yet become an actual legal partnership. Consistent with that, "[t]he determination of a 'practical partnership' depends on an analysis of each entity's role,

---

[20] The citation to Ohio law is not to suggest that the Court finds that Ohio law is controlling on this matter. Presumably, the question of whether parties are "partners" for purposes of damages allocation under copyright law would generally be a matter of federal law. But the definition of "partner" is largely consistent across jurisdictions, and the Court is merely referring to the Ohio statute as one example.

degree of direction, and financial interest in the activities of the other(s)." *GC2 Inc. v. Int'l Game Tech.*, No. 16 C 8794, 2018 WL 5921315, at \*3–4 (N.D. Ill. Nov. 12, 2018). As in a partnership, members of a practical partnership should share some exposure to profits, losses, and mutual control over some joint undertaking. And, importantly here, that joint undertaking must be something more than a mere buyer-seller contractual relationship, indemnification agreement, or royalties agreement. *Id.* (citing *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006)). Rather, partnerships, and by extension practical partnerships, require parties to share both the businesses' benefits (like profits and co-control) and burdens (like joint liability). *See id.* (citing *Frank Music*, 772 F.2d at 519) ("If there is no sharing of profits, this cuts strongly against a finding of a practical partnership.").

In her opposition, Navarro does not explain why she contends that P&G and these unnamed retailers operated as practical partners. Instead, she merely asserts that "fact issues exist" as to the practical partnership issue. But the only fact she cites about the relationship between P&G and these third parties does not bear out her assertion. Specifically, Navarro explains that "P&G [sold] infringing products to third-party retailers." (Pls.' Resp. at #10109). But that does not show a practical partnership. In fact, on the record here, it appears that the relationship between P&G and these third-party retailers is devoid of any markers of a practical partnership. They did not co-manage a joint business and they did not share profits or losses. Instead, they were, and continue to be, separate entities that shared only a contractual vendor-vendee relationship. Accordingly, Navarro cannot hold P&G

jointly liable for third-party retailers' profits under the "partnership/practical partnership" exception.

But Navarro is not done. She also contends that P&G should be jointly liable for the infringement of third-party retailers because P&G's infringement was "not innocent." (Pls. Resp. at #10108–09). Specifically, Navarro suggests that P&G knew that she owned the copyright, knew that its license to use that copyright had expired, and yet continued to sell infringing product to the third-party retailers. (*Id.*). Whether P&G intentionally infringed on Navarro's copyrights, or whether it infringed at all, is still an open question in this case. But the answer to that question does not matter for purposes of assigning joint liability, because the exception for "non-innocent infringement" does not exist.

The key case that Navarro cites in support of this purported exception is *Softel, Inc. v. Dragon Medical and Scientific Communications, Ltd.*, an unpublished decision from the Southern District of New York, which says that there "may be" an exception for non-innocent infringement. No. 87 Civ. 0167 (MGC), 1995 WL 606307, at *1 (S.D.N.Y. Oct. 16, 1995). As support, *Softel* cites *Abeshouse v. Ultragraphics, Inc.*, which notes that joint liability "may be appropriate only where the infringement was not innocent or where the defendants 'engaged in a partnership.'" 754 F.2d 467, 472 (2d Cir. 1985). Importantly, though, neither *Softel* nor *Abeshouse* actually allowed recovery under the "not innocent" exception. *Softel*'s award of profit-based damages turned entirely on New York law on misappropriation of trade secrets. *Softel*, 1995 WL 606307, at *1. For its part, *Abeshouse*'s decision rested on the "partnership"

exception—and, in particular, finding that exception was not present, and thus reversing a district court decision that had imposed joint and several liability on two entities. Given the factual context, the Second Circuit's failure to discuss the "not innocent" exception in *Abeshouse* takes on special significance. As noted, the lower court in that case held the infringer jointly and severally liable for the damages of another infringer. *Id.* at 471–72. If both the partnership and not innocent exception exist, then the Second Circuit could have overturned the district court's decision only if it found that *neither* of these exceptions were present. Instead of analyzing both issues, however, the Court overturned the district court's judgment solely because "it is clear that the evidence would not have supported a finding" that the infringers were partners. *Id.* at 472. That is, the Court did not even address whether the infringement was "not innocent," nor did it engage in any further discussion of that "exception," strongly, if tacitly, suggesting that the Second Circuit does not agree that the exception exists.

A passing reference to an unapplied exception in two cases in a different circuit fails to persuade this Court. Indeed, one other court has noted that "this purported [not-innocent] exception was not actually applied in *Abeshouse*, and as best as the Court can determine it has never been applied in any other reported case since then." *GC2 Inc.*, 2018 WL 5921315, at *4. Not only is the caselaw support shaky at best, but an exception to several liability for non-innocent infringement also conflicts with the text of the Copyright Act. That Act provides that a copyright owner can recover "any profits *of the infringer* that are attributable to the infringement." 17 U.S.C. § 504(a)

(emphasis added). The partnership exception arguably fits with this statutory language because partners share profits; thus, taking the "profits of the infringer" naturally results in the copyright owner dipping into the pocket of that infringer's partner. But that logic does not extend to cover infringement that is "not innocent." Accordingly, the Court declines to apply the purported "not innocent" exception.

As neither exception is available to Navarro here, the Court is bound to apply the well-established general rule that an infringer is liable only for its own profits, and not the profits of other infringers. Thus, the Court declines to hold P&G jointly liable for the profits of unnamed third-party retailers and accordingly **GRANTS** Defendants' motion for summary judgment as to those damages.

## C.     Plaintiffs' Motion For Partial Summary Judgment

Separately, Navarro moves for summary judgment on her copyright infringement claims as to several of the product-packaging designs on the grounds that the undisputed facts show that certain of Defendants' uses of that product-packaging exceed the scope of the licenses granted by Navarro's invoices. (Pls.' Mem. at #9361–70). In addition, she moves for summary judgment on 28 of P&G's defenses, 19 of which overlap with Walmart's defenses. (*Id.* at #9377–9404). P&G and Walmart only dispute summary judgment as to six of those defenses, namely (1) Joint Authorship; (2) Statute of Limitations; (3) Extraterritoriality; (4) Implied License; (5) Failure to Mitigate Damages and (6) Assignment. (*See* Defs.' Resp. at #9478–9501 (joint authorship and assignment), 9506–12 (statute of limitations, failure to mitigate, extraterritoriality, and implied license)). Finally, Navarro seeks summary

judgment as to P&G's counterclaim for breach of contract. (Pls.' Mem. at #9371–77). Navarro advances several arguments that, she says, defeat this counterclaim. One of those—her argument that P&G cannot show that it suffered damages from the alleged breach of contract (*id.* at #9375–76)— is dispositive as to the contract claim. So the Court addresses only that argument here.

In addition to requesting summary judgment, Navarro also asks this Court to impose Rule 37 sanctions on the grounds that P&G allegedly gave "evasive and incomplete" responses to Navarro's interrogatories. (*Id.* at #9377–81).

### 1. *There Is An Issue Of Material Fact As To Whether Navarro Assigned Her Rights To LPK in the 2007 Supplier Agreement.*

Navarro asks for summary judgment on several of her infringement claims because P&G and Walmart allegedly exceeded the temporal, geographic, and usage restrictions Navarro placed on those images in a variety of combinations. (*See id.* at #9361). The entirety of these arguments hinge on Navarro's assertions that (1) she did not assign all of her rights in her photographs to LPK in perpetuity for unlimited use, but instead that the usage restrictions on her invoices control, and (2) the undisputed facts show that P&G exceeded those limits. As the Court explained above, there is a genuine dispute as to whether Navarro assigned all of her rights to LPK through the 2007 Supplier Agreement. Given that dispute, the Court **DENIES** Navarro summary judgment on this issue, as well.

### 2. *P&G And Walmart Waived Several Of Their Affirmative Defenses.*

Navarro also seeks summary judgment on 28 of P&G's defenses, 19 of which overlap with Walmart's defenses. (*Id.* at #9377–9404).[21] In their response, however, Defendants meaningfully dispute summary judgment as to only six defenses, namely (1) Joint Authorship; (2) Statute of Limitations; (3) Extraterritoriality; (4) Implied License; (5) Failure to Mitigate Damages; and (6) Assignment. (*See* Defs.' Resp. at #9478–9501 (joint authorship and assignment), 9506–12 (statute of limitations, failure to mitigate, extraterritoriality, and implied license)).

Defendants do not respond to Navarro's motion for summary judgment as to the other defenses. In fact, Defendants' response does not even refer by name to the other defenses on which Navarro seeks summary judgment. The most Defendants say is that Navarro's request for summary judgment on the "numerous affirmative defenses" is "odd" because "[g]enerally, [such] arguments … are entertained through

---

[21] Those defenses are: failure to state a claim (Defendants' First AD); equitable estoppel and acquiescence (Defendants' Second AD); statute of limitations (Defendants' Third AD); laches (Defendants' Fourth AD); unclean hands (Defendants' Fifth AD); waiver (Defendants' Sixth AD); Navarro's copyrights are invalid and unenforceable (Defendants' Seventh AD); implied license (Defendants' Eighth AD); failure to mitigate damages (Defendants' Ninth AD); forfeiture or abandonment of copyrights (Defendants' Tenth AD); misuse of copyright (Defendants' Eleventh AD); no volitional act (Defendants' Thirteenth AD); Navarro's rights not infringed upon (Defendants' Fourteenth AD); Extraterritoriality (Defendants' Fifteenth AD); Defendants are entitled to attorneys' fees (Defendants' Seventeenth AD); no remaining commercial value (Defendants' Eighteenth AD); failure to name an indispensable party (Defendants' Nineteenth AD); Navarro received all due compensation (Defendants' Twentieth AD); joint authorship (P&G's Twenty-First AD); assignment to LPK (P&G's Twenty-Third/Walmart's Twenty-Second AD); fraud on the Copyright Office (P&G's Twenty-Fourth AD); P&G's "affirmative defenses" to Navarro's fraud claim (P&G's Twenty-Fifth through Twenty-Eighth, and Thirtieth ADs); fraud damages too remote or speculative (P&G's Twenty-Ninth AD); and fraudulent misstatements protected by Ohio doctrine of litigation privilege (P&G's Thirty-First AD).

Rule 12(f) motions to strike." (Defs.' Resp. at #9505). Defendants then contend that Navarro's motion fails even under a 12(f) standard and thus, Defendants should "remain free to raise [those defenses] at trial." (*Id.* at #9505–06).

But this is not a substantive response to Navarro's motion for summary judgment. The Sixth Circuit has consistently explained that "[f]ailure by a [party] to respond to a motion for summary judgment constitutes a forfeiture of the claims to which the motion is addressed." *Rogers v. Mich. Dep't of Corr.*, No. 1:17-cv-383, 2019 WL 1388667, at *1 (W.D. Mich. Mar. 6, 2019) (citing *Notredan, L.L.C. v. Old Republic Exch. Facilitator Co.*, 531 Fed. App'x 567, 569 (6th Cir. 2013). That said, it appears that the Court still has an independent obligation to ensure that Navarro has met her burden to establish no dispute of material fact as to these defenses. *Guarino v. Brookfield Tp. Trs.*, 980 F.2d 399, 405–07 (6th Cir. 1992); *Reeves v. Wallington*, No. 06-10326, 2008 WL 5060400, at *4 (E.D. Mich. Nov. 24, 2008).

In that regard, Defendants appear to concede that several of their "affirmative defenses" are not actually affirmative defenses at all. An affirmative defense is an "assertion of facts and arguments that, if true, will defeat the plaintiff's ... claim, even if all the allegations in the complaint are true." *Starnes Family Office, LLC v. McCullar*, 765 F. Supp. 2d 1036, 1048 (W.D. Tenn. 2011) (quoting *Black's Law Dictionary* (9th ed. 2009)). In other words, an affirmative defense is a "perhaps, but" defense, which allows a party to argue that it is not liable even if the plaintiff has proved a prima facie case. *United States ex rel Scott v. Humana, Inc.*, NO. 3:18-CV-61-GNS, 2018 WL 4868991, at *2 (W.D. Ky. Aug. 16, 2018) (*R&R Adopted by United*

*States ex rel Scott v. Humana, Inc.*, NO. 3:18-CV-00061-GNS-CHL, 2018 WL 4868987 (W.D. Ky. Sept. 7, 2018)). Accordingly, then, an argument that the plaintiff has not proven its prima facie case is not an "affirmative defense," but rather is simply an argument that the plaintiff has failed to meet its burden as to some element of its claim. *Ford Motor Co. v. Transport Indemnity Co.,* 795 F.2d 538, 546 (6th Cir. 1986) ("On the other hand, some defenses negate an element of the plaintiff's *prima facie* case; these defenses are excluded from the definition of affirmative defense."). Several of Defendants "affirmative defenses" fit into this category.[22]

Navarro has moved for summary judgment on these "defenses," arguing that they are "improper when they are asserted as affirmative defenses." (Pls.' Mem. at #9382). As noted, Defendants have elected not to respond to that argument, and thus have technically waived these "defenses." Accordingly, the Court **GRANTS** Navarro summary judgment as to these ten, what she refers to as, "negative defenses." (Pls.' Mem. at #9382). Importantly, though, in granting summary judgment as to those "defenses," the Court is not precluding Defendants from arguing at trial that Navarro has failed to establish an element of her claim. In other words, Defendants remain free to argue that, for example, Navarro's fraud damages are too speculative or that Navarro's rights are not infringed upon (because she allegedly sold those rights).

---

[22] These "defenses" are that: (1) Navarro has failed to state a claim (Defs.' First AD); (2) Navarro's rights are not infringed upon (Defs.' Fourteenth AD); (3) Navarro's copyrights have no remaining value (Defs.' Eighteenth AD); (4) Navarro received all due compensation (Defs.' Twentieth AD); (5–9) Navarro has failed to sufficiently allege a claim for fraud (P&G's Twenty-Fifth, Twenty-Sixth, Twenty-Seventh, Twenty-Eighth, and Thirtieth AD); and (10) Navarro's fraud damages are too remote or speculative (P&G's Twenty-Ninth AD). (P&G's Answer, Doc. 136 at #4423–27); Walmart's Answer, Doc. 135 at #4324–27).

Rather, the Court's point is merely that these are not "affirmative defenses," per se, as Defendants appear to recognize.

Navarro also argues that Defendants have inappropriately characterized their request for attorney's fees as an affirmative defense. (*Id.* at #9383). The Court agrees that Defendants' request for attorney's fees is not an affirmative defense, but rather is a counterclaim, as it asserts an affirmative claim for relief against Navarro. *See VP Props. & Dev., LLLP v. Seneca Specialty Ins. Co.*, 645 F. App'x 912, 916 (11th Cir. 2016); Fed. R. Civ. P. 13(a). But the labels 'counterclaim' or 'defense' have "no magic." *Tenneco Inc. v. Saxony Bar & Tube, Inc.,* 776 F.2d 1375, 1379 (7th Cir. 1985) (Easterbrook, J.). Rather, the Federal Rules of Civil Procedure provide that, in cases like this, where a "a party mistakenly designates … a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated." Fed. R. Civ. P. 8(c)(2).

Here, there is no harm in applying this pragmatic rule to Defendants' mislabeled claim for attorney's fees. Navarro had notice that Defendants are seeking attorney's fees under the Copyright Act, and she had a fair and full opportunity to respond to that claim on summary judgment. Moreover, Navarro knew that Defendants' claim for attorney's fees is a counterclaim, not an affirmative defense. In fact, Navarro devotes her entire argument for summary judgment on the issue to her revelation that "a claim for attorneys' fees is not an affirmative defense." (Pls.' Mem. at #9383). Accordingly, the Court finds that justice is best served by addressing Defendants' claim for attorney's fees as a counterclaim.

Beyond noting that it is not an affirmative defense, Navarro offers no support for her argument that she is entitled to summary judgment on Defendants' claim for attorney's fees. (Pls.' Mem. at #9383). Navarro has neither pointed to a lack of evidence for Defendants' claim nor suggested that there is no issue of material fact. (*Id.*). Accordingly, the Court finds that Navarro has failed to meet her burden on summary judgment. Therefore, the Court **DENIES** Navarro's motion for summary judgment as to Defendants' claim for attorneys' fees (Defendants' Seventeenth AD). In doing so, though, the Court by no means suggests that Defendants' claim for attorneys' fees is meritorious, but only that Navarro has failed (at least so far) to show that it is not.

Beyond those defenses or claims addressed above, several of Defendants' defenses do at least qualify as true "affirmative defenses." Navarro argues that she is entitled to summary judgment on seventeen of these defenses, too, but for two different reasons. First, Navarro argues that Defendants have not offered enough evidence to support ten of these seventeen affirmative defenses.[23] (Pls.' Mem. at #9384–93). Defendants responded to Navarro's summary judgment motion as to three of those defenses, namely, their statute of limitations, implied license, and failure to mitigate defenses. The Court addresses those arguments below. As to the remaining seven defenses, Navarro asserts that Defendants have failed to establish a dispute of

---

[23] Those defenses are (1&2) equitable estoppel and acquiescence (Second AD) and waiver (Sixth AD); (3) latches (Fourth AD); (4) unclean hands (Fifth AD); (5) copyrights are invalid and unenforceable (Seventh AD); (6) forfeiture or abandonment of copyrights (Tenth AD); (7) Misuse of copyrights (Eleventh AD); (8) Statute of limitations (Third AD); (9) implied license (Eighth AD); (10) failure to mitigate (Ninth AD).

material fact as to those issues.[24] (*Id.* at #9393–9404). Again, Defendants responded to Navarro's arguments on this front only as to three of those defenses—the joint authorship, extraterritoriality, and assignment defenses. Defendants, however, neglected to respond to Navarro's motion as to those other four defenses.

In total, Defendants elected not to argue in support of eleven of the affirmative defenses on which Navarro moved for summary judgment. Therefore, so long as Navarro at least minimally met her burden on summary judgment as to those defenses, judgment in her favor is warranted. *Reeves*, 2008 WL 5060400, at *4 (citing cases). The Court finds that Navarro has done so both with respect to the seven defenses as to which she claims lack sufficient evidentiary support, and the four defenses that she claims involve no dispute of material fact. Therefore, the Court **GRANTS** Navarro summary judgment on those eleven affirmative defenses.[25]

---

[24] Those defenses are: (1) no volitional act (P&G's Thirteenth AD); (2) failure to name an indispensable party (P&G's Nineteenth AD); (3) Fraud on the Copyright Office (P&G's Twenty-fourth AD); (4) fraudulent misstatements protected by Ohio litigation privilege (P&G's Thirty-first AD); (5) extraterritoriality (Fifteenth AD); (6) joint authorship (Twenty-first AD); and (7) assignment to LPK (Twenty-third AD).

[25] The Court grants Navarro summary judgment on Defendants' (1) equitable estoppel and acquiescence (Second AD); (2) waiver (Sixth AD); (3) latches (Fourth AD); (4) unclean hands (Fifth AD); (5) copyrights invalid and unenforceable (Seventh AD); (6) forfeiture or abandonment of copyrights (Tenth AD); and (7) misuse of copyrights (Eleventh AD) defenses for waiver and because Defendants have failed to offer enough evidence to support those defenses. The Court also grants Navarro summary judgment on Defendants' (1) no volitional act (P&G's Thirteenth AD); (2) failure to name an indispensable party (P&G's Nineteenth AD); (3) fraud on the Copyright Office (P&G's Twenty-fourth AD); and (4) fraudulent misstatements protected by Ohio doctrine of litigation privilege (P&G's Thirty-first AD) for waiver and because Defendants have failed create a dispute of material fact.

### 3. *Navarro Failed To Develop Her Argument On Mitigation, And Thus The Argument Is Deemed Waived.*

That leaves the six contested affirmative defenses, to which the Court now turns, beginning with failure to mitigate. In her 82-page opening brief, Navarro includes a four-sentence request for summary judgment on the Defendants' affirmative defense of failure to mitigate damages. (*Id.* at #9392). She baldly asserts that, because she is seeking damages, she could not have failed to mitigate, and further, that the Defendants' allegations as to failure to mitigate are so barebones that the Court should strike the defense altogether. (*Id.*).

As the Sixth Circuit has explained in the related context of an appeal brief, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). That is equally true in addressing motions for summary judgment. *See, e.g., Ricks v. Pauch*, No. 17-12784, 2020 WL 1640166, at *26 (E.D. Mich. Apr. 2, 2020), reconsideration denied, No. 17-12784, 2020 WL 4040703 (E.D. Mich. July 17, 2020) (relying on McPherson's perfunctory-argument-as-waiver rule to deny summary judgment); *Becknell v. Univ. of Ky.*, 383 F. Supp. 3d 743, 758 (E.D. Ky. 2019) (relying on McPherson's perfunctory-argument-as-waiver rule at summary judgment stage). Skeletal is a charitable description of Navarro's argument on failure to mitigate here. Accordingly, the Court **DENIES** Navarro summary judgment on Defendants' failure to mitigate defense.

4.    ***Defendants' Extraterritoriality Defense Does Not Fail As A Matter Of Law.***

Defendants assert as an affirmative defense that Navarro is not entitled to damages for overseas sales of packages containing her images. Navarro, while admitting that as a general matter the Copyright Act does not apply to overseas conduct, nonetheless seeks summary judgment on this defense. She claims that the undisputed facts show that the conduct here falls within an exception to that rule. The Court disagrees. While Navarro *may* be entitled to damages on such sales, the record does not show that she necessarily *is* entitled to such damages. Accordingly, the Court **DENIES** Navarro summary judgment on this issue.

"[I]t is a long-standing principle that United States copyright laws do not have extraterritorial operation." *Liberty Toy Co., Inc. v. Fred Silber Co.*, No. 97-3177, 1998 WL 385469, at *3 (6th Cir. June 29, 1998). Both parties agree with that proposition as a general matter. (Pls.' Mem. at #9394; Defs.' Resp. at #9507). Navarro argues, though, that Defendants nonetheless are liable for extraterritorial infringement here because the undisputed facts show that the international infringement is directly linked to "predicate acts" of infringement in the United States, thus making Defendants answerable for that infringement here. (Pls.' Mem. at #9394).

Several circuits have embraced this "predicate act" exception and held that a plaintiff can collect damages from foreign violations that are directly linked to domestic infringements. *See, e.g.*, *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 307–08 (4th Cir. 2012); *L.A. News Serv. v. Reuters TV*

106

*Intern., Ltd*, 149 F.3d 987, 990–92 (9th Cir. 1998); *Update Art, Inc. v. Modiin Publ'n, Inc.*, 843 F.2d 67, 73 (2d Cir. 1988).

At the same time, as Defendants point out, the Sixth Circuit has yet to explicitly adopt this exception. (Defs.' Resp. at #9507 n.5). However, the Sixth Circuit has recognized, albeit in an unpublished decision, that domestic ties to international infringement can bring the act within the jurisdiction of U.S. courts. *See Liberty Toy*, 1998 WL 385469, at *3. In *Liberty Toy*, a Canadian company sold (supposedly infringing) stuffed toys to an American company, but retained title to the toys until the point of delivery in the United States, at which time it received payment and transferred title. *Id.* at *1–2. The district court dismissed the claim, reasoning that that "merely holding a claim of title to infringing products while they are within the United States" is insufficient to give rise to subject-matter jurisdiction. *Id.* at *4. The Sixth Circuit disagreed, explaining that "as long as some act of infringement occurred in the United States, the Copyright Act applies." *Id.* at *3. The qualifying "act of infringement" in *Liberty Toy* was the fact that the parties completed the sale of the infringing toys in the United States. *Id.* at *5. This domestic act of infringement was sufficient to bring the case within the subject matter jurisdiction of the district court. *Id.*

The Court understands *Liberty Toy* to quietly endorse the "predicate act" doctrine. The Fourth Circuit reads *Liberty Toy* the same way. *Tire Eng'g & Distrib.*, 682 F.3d at 307–08. In fact, the Fourth Circuit used the Sixth Circuit's opinion in *Liberty Toy* as support for its own adoption of the "predicate act" rule. *Id.* at 308.

But to come within that doctrine, Navarro must demonstrate a qualifying "predicate act." To do so, Navarro must show (1) a domestic violation of the Copyright Act, and (2) damages flowing from foreign exploitation of that infringing act. *Id.* at 308. Start with the first prong. While case law on the topic is slim, it appears that there must be conduct in the United States that actually constitutes infringement to establish a domestic violation. Merely authorizing infringement is not enough. So, for example, in *L.A. News Serv.* 149 F.3d at 992, the Ninth Circuit explained that Reuters could be liable for international infringement because Reuters had copied a copyrighted video in the United States (the predicate act) and then distributed it abroad. *Id.* In reaching that result, the court explained that such facts differentiated Reuters from the defendants in *Allarcom* and *Subafilms*, where the defendants *authorized* infringement in the United States, but the actual infringing conduct took place wholly abroad. *Id.* at 991–92 (citing *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995), and *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1090 n.3 (2d Cir. 1994)); *see also Update Art, Inc.*, 843 F.2d at 73 ("If the illegal reproduction of the poster occurred in the United States and then was exported to Israel, the magistrate properly could include damages accruing from the Israeli newspapers.").

Here, Defendants contend that there is no domestic violation of the Copyright Act that is "directly linked" to infringements abroad. Defendants explain that, at the time they negotiated international sales, P&G had a license to use Navarro's images, and when that license ran out, no more reproduction occurred in the United States,

108

even though sales of the previously printed packages were completed overseas. (Defs.' Resp. at #9508). Therefore, Defendants conclude, there is no direct infringement connected with those international sales. (*Id.*). Navarro contests P&G's assertion that it designed the packaging in a non-infringing manner pursuant to the license. (Pls.' Reply in Support of Pls.' Mem., ("Pls.' Reply"), Doc. 213, #10514). And even if the design was non-infringing, Navarro argues that P&G continued to domestically manufacture and print packaging for several products for use in the international market. (*Id.*).

That sounds like a genuine dispute. The Court agrees that printing, designing, and manufacturing infringing material in the United States may constitute a "predicate act" that could impose liability on Defendants for subsequent international infringement. But the undisputed facts do not show that infringing conduct occurred. Accordingly, the Court **DENIES** Navarro summary judgment on the extraterritoriality issue.

### 5. *Defendants Have Failed To Demonstrate An Issue Of Material Fact As To Whether Navarro Granted An Implied License To LPK.*

Defendants argue that they did not commit copyright infringement because Navarro, through her conduct, granted LPK an "implied license" to use her photographs in P&G packaging designs, which LPK in turn licensed to P&G. (P&G's Answer to Fifth Am. Compl., Doc. 136, #4424; Walmart's Answer to Fifth Am. Compl., Doc. 135, #4324; Defs.' Resp. at #9510). In her Motion, Navarro contends that Defendants' argument fails as a matter of law. (Pls.' Mem. at #9390). The Court finds that Defendants have failed to create a genuine dispute of material fact regarding

109

this issue, and thus **GRANTS** Navarro summary judgment as to this affirmative defense.

An implied license exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requester copy and distribute it." *Mahavisno v. Compendia Bioscience, Inc.*, 164 F. Supp. 3d 964, 968 (E.D. Mich. Feb. 23, 2016). "There is no precise formula for determining whether an implied license exists, but, rather, the court is to examine the 'intent' of the parties from the 'totality of the circumstances.'" *Melanie Howard Music, Inc.*, 2009 WL 3784611, at *6 (citing *Jeffrey A. Grusenmeyer & Assoc., Inc. v. Davison, Smith & Certo Architects, Inc.,* 212 Fed. App'x 510, 514 (6th Cir. 2007)). An implied license is not a transfer of ownership, so it does not have to be in writing; rather, a party can grant an implied license either orally or through their conduct. *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). The form of the license is not important. The key is that the facts and circumstances demonstrate that the parties made an agreement permitting the defendants to use the copyrighted work. *Id.* at 502.

The existence of an implied license is an affirmative defense, and, as is the case with other affirmative defenses, the party claiming the defense bears the burden to establish that defense. *Melea Ltd. v. Quality Models Ltd.*, 345 F. Supp. 2d 743, 752 (E.D. Mich. 2004). That means Defendants bear the burden to show that Navarro granted LPK an implied license to use her work. For purposes of summary judgment, then, Navarro must explain why Defendants are unable to meet this burden.

110

Here, there is little dispute as to either of the first two steps needed to show an implied license. Rather, the matter comes down to whether Defendants can show that the licensor (Navarro) intended at the time that she provided the images to the licensee-requester (LPK) that the latter would copy the copyrighted work and distribute it. *Id.* As to this third element—intent—Navarro argues that she is entitled to summary judgment because there is a "complete lack of evidence" that she intended to grant an implied license permitting LPK to use her images in perpetuity. (Pls.' Mem. at #9390).

In response, Defendants provide little more than the barebones assertion that "the conduct between the parties … is clearly relevant to show that Navarro at the very least granted an implied license to LPK to use the photographs at issue." (Defs.' Resp. at #9510). While Defendants are undoubtedly correct in their assertion such conduct is relevant, it was also incumbent upon them in opposing summary judgment to point to evidence regarding the particulars of that relevant conduct here, and to explain why such conduct created an implied license. That is, Defendants, and Defendants alone, have the obligation to develop the affirmative defense of implied license—the Court does not have an obligation to scour the record in search of any conduct that may support that argument. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). And Defendants have pointed to no such evidence. Absent such evidence, a reasonable jury could not find an implied license exists.

In short, the Court does not dispute that the existence of an implied license is a fact-specific inquiry. The problem is that Defendants have not identified any specific

facts. Because Defendants have not met their burden to establish an issue of material fact as to their affirmative defense of implied license, the Court **GRANTS** Navarro summary judgment on the issue.

6.      *There Is An Issue Of Material Fact As To Whether Navarro And LPK Intended To Be Joint Authors With Respect To The Product Packaging, But, As A Matter Of Law, LPK and Navarro Are Not Joint Authors Of The Photographs Themselves.*

As noted above, one ground on which Defendants sought summary judgment was their claim that LPK and Navarro are joint authors in the package designs. The Court concluded that genuine disputes of material fact precluded a finding in Defendants' favor on that ground at this time. But Navarro has also moved for summary judgment on that same issue, insisting that the undisputed facts show that Defendants cannot prevail on this defense. (Pls.' Mem. at #9395–9402). Here, though, the analysis is slightly different—Navarro is seeking summary judgment on Defendants' joint authorship defense both as to the photographs and as to the packaging. (*Id.* at #9397 (photographs), 9402 (package designs)). For the reasons discussed below, the Court concludes that Navarro is correct as to the former, but not the latter. Accordingly, the Court **GRANTS** Navarro summary judgment on joint authorship as applied to the images, but **DENIES** Navarro summary judgment on joint authorship grounds as to the packaging.

The Court has already laid out the test that it will employ on the joint-authorship issue, as well as many of the facts. The difference here, of course, is that it is now Navarro moving for summary judgment on the issue. Thus, to prevail, she

will need to show that a reasonable jury could not conclude that she intended to be a joint author on any product on which she seeks summary judgment.

Here again, there are two potential products at issue for the joint-authorship analysis—the photographs and the package designs that incorporate the photographs. Unlike above, though, here the Court must analyze each, as Defendants claim there is a jury question as to whether LPK was a joint author of the photographs themselves—an issue they did not raise in their own motion for summary judgment. (*Compare* Defs.' Resp. at #9507, *with* Defs.' Mem. at #8342–52). Thus, the Court analyzes each in turn.

Start with the photos. As described above, Defendants must establish two elements in order to support their joint authorship defense—that LPK and Navarro shared an intent to be joint authors and that both made independently copyrightable contributions. *See Tang v. Putruss*, 521 F. Supp. 2d 600, 605 (E.D. Mich. Oct. 5, 2007). Navarro claims that Defendants' joint-authorship-in-the-photographs argument fails on both fronts because they allegedly have neither established that LPK made the necessary contribution to the photographs, nor proven that the parties intended that they would be joint authors in the photographs. The Court similarly struggles to find evidence of either element.

To be sure, based on the facts, it appears that LPK played at least some role in determining how the photo shoot should go forward to achieve the desired effect for the purposes for which the photographs would be used, including assisting with selecting models and creating "shot lists." (Navarro Dep., Doc. 174, #6819–21; Wooten

113

Dep. Ex. 468, Doc. 198, #8769). LPK personnel also worked with Navarro on editing and retouching. (Navarro Dep., Doc. 174, #6832–33; Wooten Dep. Ex . 468, Doc. 198, #8769). Without more, though, that is too slim a reed to support a finding of joint authorship. As for the intent element, Navarro testified that she never intended to be a joint author with regard to the images. (Navarro Dep., Doc. 174, #6842). And, she also listed herself as the sole author on the copyright applications. (*Id. See also* Fifth Am. Compl. Ex. B1-B4, Doc. 133-1, #4127–40). Although that could perhaps be dismissed as self-serving testimony, LPK said essentially the same thing. (Matheson Dep., Doc. 161, #5666–67; Arnold Dep., Doc. 152, #5004). What is more, its witnesses say that LPK claims no ownership in the images themselves. (*Id.*). Nor did LPK ever maintain that it had a right to license those photos without Navarro's consent. (Cevasco Dep., Doc. 154, #5141–42; McCoy Dep., Doc. 162, #5766). In short, there is no meaningful evidence that LPK thought itself, or intended to be, a joint author in the photographs themselves.

Even apart from the joint intent issues, LPK's identified contributions to the images do not appear to be independently copyrightable. At best, the facts show that LPK personnel consulted with Navarro about aspects of the photos, but the evidence appears clear that she maintained ultimate control over the photoshoots. In fact, Navarro testified that she occasionally disregarded LPK's opinion on the set. For example, Navarro took most of her photographs while the model was moving despite Kathy Sorrano's (LPK's creative director) suggestions that Navarro pose the model for still shots. (Navarro Dep., Doc. 174, #6821). Navarro also refused Sorrano's

suggestions that she photograph the model at certain angles or that she put white lipstick on the model during the shoot. (Navarro's Non-Dep. Ex. in Support of Pls.' Mot. Ex. 21, Doc. 181-21, #7649–50). And the references to "editing" and "retouching," without more by way of description, fail to give rise to a genuine dispute.

As the record does not support either element that P&G must show to establish its claim that LPK is a joint author in the images, the Court **GRANTS** Navarro summary judgment on that issue.

That leaves the question of the packaging. But, while Navarro says she is seeking summary judgment on this issue, she provides virtually no substantive argument as to it. Her entire argument consists of three sentences, in which she baldly asserts (1) that LPK admits that it is not a joint author, (2) that LPK's package designs are not independently copyrightable, (3) that LPK claims no intellectual property rights in the packaging, and (4) that LPK never sought copyright protection. (Pls.' Mem. at #9402). Those bald assertions do not suffice for Navarro to meet her initial burden at the summary judgment stage. And, in any event, those assertions are by no means undisputed. As P&G points out, as to the first, Navarro is over-reading LPK's admission, (Defs.' Reply at #10437–40), and, in any event, "admissions" regarding legal issues are not typically binding on the Court. *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997).

In terms of the second, the Court starts from the proposition that a work is copyrightable "as long as it possesses some creative spark, no matter how crude, humble or obvious it might be." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S.

340, 345 (1991); *see also Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 275 (6th Cir. 2009) (explaining that the "vast majority of works make the grade quite easily"). LPK's contribution to the packaging required a number of artistic judgments, including text in various fonts and sizes, located in different parts all around the packaging, plus a mix of colors in various curved shapes and background highlighting for certain areas of text. (Fifth Am. Compl. Ex. D3-D6, Doc. 133-1, #4166–74). A reasonable jury, given the low bar for copyrightability, could find that LPK's contributions to these package designs are independently copyrightable.

Finally, LPK's failure to claim intellectual property rights or seek copyright protection could be explained either (1) by LPK being mistaken about what is copyrightable, or (2) by the fact that it had already assigned any rights it had to P&G, so it was merely noting that it had no ongoing rights in the packaging. Thus, none of Navarro's arguments warrant summary judgment in her favor on the joint-authorship issues, especially in light of Navarro's failure to develop the joint-authorship argument further on the packaging materials. Accordingly, the Court **DENIES** summary judgment on this issue.

### 7. *The Sixth Circuit's Discovery Rule Survived* Petrella *And, As Such, Navarro's Claims Against P&G And Walmart Do Not Offend The Statute Of Limitations.*

Navarro argues that she is entitled to summary judgment on Defendants' statute of limitations defense because no fact in the record supports that she delayed suing for more than three years after becoming aware of the alleged infringement of her images. (*See* Pls.' Mem. at #9386–87). This argument fails, Defendants allege,

because, under *Petrella*, Navarro cannot recover any damages for acts of infringement occurring more than three years before she filed suit. (Defs.' Resp. at #9507).

The relevant statute of limitations provides that "[n]o civil action shall be maintained … unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). As this Court explained above, *Petrella* says that this statute of limitations restricts damages to the three years prior to the date that Navarro filed suit. *See Petrella*, 572 U.S. at 671, 677. But, *Petrella* did not abrogate settled Sixth Circuit precedent that holds that a discovery rule applies to copyright infringement actions. *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC,* 477 F.3d 383, 390 (6th Cir. 2007) (citing *Rhyme Syndicate Music*, 376 F.3d at 621). In fact, the *Petrella* Court overtly declined to rule on the viability of the discovery rule in copyright infringement cases. *See id.* at 671 n.4 (acknowledging that nine circuits use a discovery rule in copyright cases, but stating that the Court "ha[s] not passed on the question"); *see also SCA Hygiene,* 137 S. Ct. at 962 ("[I]n *Petrella*, we specifically noted that 'we have not passed on the question' whether the Copyright Act's statute of limitations is governed by [the discovery] rule.").

Accordingly, Navarro's claims are viable so long as she discovered the acts of infringement on which she is suing within three years of the date that she filed suit. Navarro first learned of P&G's alleged infringement on June 22, 2015 and emailed Bridget Quinn at P&G the very next day. (Pls.' SOUF at ¶82, #9580). Navarro then sued P&G on June 14, 2017, (Compl., Doc. 1), which is well within the three-year

statute of limitations. Therefore, the Court **GRANTS** Navarro's motion for summary judgment on P&G's statute of limitations defense.[26]

In contrast, Navarro does not clearly allege the date when she first discovered Walmart's alleged infringement.[27] That is not fatal, however, to her infringement claims because "[i]t is widely recognized that the separate-accrual rule attends the copyright statute of limitations." *Petrella*, 572 U.S. at 671 (citing cases). "Under that rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation. Each time an infringing work is reproduced or distributed, the infringer commits a new wrong." *Id.*

Moreover, as described above, the copyright statute of limitations, even post-*Petrella*, incorporates a discovery rule. Thus, Navarro has complied with the statute of limitations as to any act of Walmart's infringement that she first discovered within

---

[26] As described in the portion of the Opinion discussing damages, though, Navarro's recovery will be limited to damages sustained in the three years prior to her filing suit.

[27] In their briefing on Navarro's motion for summary judgment, both Navarro and Walmart allege only that Navarro discovered "P&G's infringement in June 2015 and did not sue Walmart until late 2018." (Pls.' Reply at #10518; Defs.' Resp. at #9511). This does not explain when Navarro discovered *Walmart's* infringement. A cursory review of the record reveals only the same type of vague allegations. For example, In Navarro's responses to Defendants' interrogatories, (Doc. 181-29, #707–09), she says that the modeling agency told her that the images were being used "on store shelves in Chicago and New York." Again, this is not helpful because it fails to specify *the name of the stores* which committed the alleged infringement. Similarly, in her deposition, Navarro notes that she would "personally observe" the infringing images on packaging at "various retailers," but neglects to identify those retailers. (Navarro Dep., Doc. 174, #6900–01). Finally, in Navarro's briefing on Walmart's earlier motion to dismiss, she shares that "there is not a single allegation in the Third Amended Complaint of when Navarro first discovered Walmart's infringement of any of the Images." (Pls.' Resp. to Walmart's Mot. to Dismiss Pls.' Third Am. Compl., Doc. 74, #1792–94, 1799–1800). The Fifth Amended Complaint provides no further clarification. (*See generally* Fifth Am. Compl., Doc. 133).

three years prior to the date on which she filed suit.[28] Navarro clearly has met her burden of pointing to such acts of alleged infringement. In fact, Navarro has highlighted conduct that occurred as recently as December 18, 2019, when Walmart.com displayed images of Olay products with the Navarro photographs on the packaging. (*See* Expert Rep. of Patrick Gannon, Doc. 200-6, #9074). Accordingly, the Court **GRANTS** her motion for summary judgment on Walmart's statute of limitations defense.

### 8.    *There Are No Damages To Support P&G's Breach Of Contract Counterclaim.*

Navarro requests summary judgment on P&G's breach of contract counterclaim arguing both that there was no breach and that P&G cannot show damages that flow from the alleged breach. (Pls.' Mem. at #9371–77). The Court starts (and ends) with the latter. As more fully discussed below, the Court agrees that, as a matter of law, P&G cannot demonstrate damages on the facts here. And, because damages are a necessary element for a breach of contract claim, *see Byers DiPaola Castle, LLC v. Portage Cnty. Comm'rs*, 41 N.E.3d 89, 94–95 (Ohio Ct. App. 2015), the Court thus **GRANTS** Navarro summary judgment on P&G's breach claim.

P&G claims that it has suffered damages from Navarro's breach in terms of the attorneys' fees it has incurred in this action. P&G explains that, in the 2007 Supplier Agreement, Navarro agreed "*not to sue LPK's clients for copyright infringement*," "to forgo further compensation other than the fees paid to her," and

---

[28] That said, *Petrella* will limit her damages to the acts of infringement that *occurred* within the three years prior to the date when she filed suit.

"to cooperate in securing any proprietary rights on behalf of LPK or Client." (Defs.' Resp. at #9504). P&G argues that Navarro breached those contractual obligations when she brought this lawsuit, which means that P&G's attorneys' fees are thus consequential damages arising from that breach.

P&G's argument immediately runs into a major roadblock. Ohio applies the "American Rule," which requires each party to pay its own litigation expenses, at least absent some type of statutory fee-shifting provision or a finding that a party has acted in bad faith. *Wilborn v. Bank One Corp.*, 906 N.E.2d 396, 400 (Ohio 2009). But, there are exceptions to that principle. And both parties agree that one such exception exists when attorney's fees are functionally compensatory damages. (Defs.' Resp. at #9503–04; Pls.' Reply at #10509). The dispute here is over the scope of that exception.

Under Ohio law, the "compensatory damages" exception to the American Rule arises only when the breached contract was a covenant not to sue or a settlement agreement. As to such contracts, one of the express "benefits of the bargain" is the lack of litigation expenses. Thus, awarding attorney's fees is the only way to make a non-breaching party whole. But the court in *Rayco Mfg., Inc. v. Murphy, Rogers, Sloss & Gambel* explained this exception's narrow reach. 142 N.E.3d 1267, 1275 (Ohio Ct. App. 2019). It applies only where "the end of litigation is an essential component of the consideration exchanged as part of the [agreement]." *Id.* Thus understood, *Rayco* is just one of many Ohio cases that articulate the well-settled principle that "attorney fees may be awarded where it can be established they were the result of the offending party's breach of [a] settlement agreement and sought as compensatory damages and

120

not merely as costs of the action." *Wehr v. Petraglia*, 65 N.E.3d 242, 254 (Ohio Ct. App. 2016).

P&G argues that the 2007 Supplier Agreement falls within this exception because it contained boilerplate language requiring Navarro to, among other things, "cooperate fully in the prosecution and defense of" LPK's client's rights. (Defs.' Resp. at #9504). But the Supplier Agreement is neither a "settlement agreement," nor an agreement meant to bring about the "end of litigation," nor, for that matter, an agreement to settle (and thus prevent) impending litigation. *See Rayco*, 142 N.E.2d at 775. In fact, when the Supplier Agreement was executed, litigation was not even a twinkle in anyone's eye. To be sure, the parties undoubtedly drafted the contract, at least in part, in hopes of avoiding litigation. But the same could be said of virtually any contract.

Perhaps recognizing that problem, P&G argues that Ohio courts award attorney's fees as compensatory damages even outside of the "settlement agreement" context. (Defs.' Resp. at #9504). But that is not altogether accurate, or at least not as broadly as P&G needs it to be here. Rather, at most, the exception may extend beyond actual settlement agreements to include agreements drafted in the shadow of an impending dispute. And even applying the exception that broadly would not capture the contract here. For this Court to go farther and read the exception as broadly as P&G requests would result in the exception swallowing the "American Rule" whole, at least as to contract actions. The Court sees no indication in Ohio precedent that the exception should be read that way. *See, e.g., Dehoff v. Veterinary Hosp. Operations*

*of Cent. Ohio, Inc.*, No. 02AP-454, 2003 WL 21470388, at \*22 (Ohio Ct. App. June 26, 2003) (refusing to apply exception to sale-of-assets agreement between two parties).

**9.** ***Navarro Did Not Sufficiently Develop The Rule 37 Issue For The Court To Address It At This Juncture.***

The final issue the Court must address is Navarro's request for sanctions under Fed. R. Civ. P. 37. In particular, Navarro asserts that Defendants failed to provide during discovery sufficient information regarding the factual bases for various affirmative defenses, and thus should be precluded from providing evidence regarding those defenses now as a discovery sanction under Rule 37. (Pls.' Mem. at #9378).

Navarro correctly states the five-factor test that the Sixth Circuit uses for determining whether a party's failure to supplement discovery responses is substantially justified or harmless. (*Id*. at #9378 (citing *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015)). What Navarro does not do, however, is apply those five factors to any specific discovery responses. Nor does she identify the particular affirmative defenses as to which the allegedly "missing" discovery information would apply. The closest Navarro comes to the latter is in her reply brief, where Navarro claims that discovery information would have better illuminated Defendants' failure to mitigate defense. (Pls.' Reply at #10516). But, as noted above, the Court is denying Navarro summary judgment on that issue because she failed to develop the argument. Navarro's invocation of Rule 37 does not cure that deficiency.

Of course, at any subsequent trial in this matter, Navarro is free to raise any objections she may have—including under Rule 37—to particular evidence that

Defendants seek to introduce. At this stage, though, absent more specifics than Navarro has provided, the Court sees no basis for taking any action under that Rule.

## CONCLUSION

For the reasons above, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. 185) on the argument that Navarro unambiguously assigned all her rights to LPK, (*id.* at #8337–42), and on the argument that Navarro and LPK were joint authors (*id.* at #8342–52). The Court similarly **DENIES** Walmart's motion for summary judgment on the direct infringement claims that Navarro has asserted against it. (*Id.* at #8355). As to P&G, the Court **DENIES** summary judgment on Navarro's contributory infringement claim (*id.* at #8358–60), **GRANTS** summary judgment on Navarro's vicarious liability claim (*id.* at #8356–58), and **DENIES** summary judgment on Navarro's fraud claim, (*id.* at #8352–55).

As to the damages issues in Defendants' motion, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 185) on the argument that Plaintiffs' actual damages are limited to a three-year look-back period (*id.* at #8360–63), **DENIES** Defendants' Motion for Summary Judgment directed at the entirety of Plaintiffs' profit-based damages (*id.* at #8363–71), and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment as to particular categories of Plaintiffs' profit-based damages (*id.* at #8371–78).

As for Plaintiffs' Motion for Partial Summary Judgment (Doc. 188), the Court **DENIES** Navarro summary judgment on the limited infringement claims, **DENIES** Plaintiffs' Motion as to Defendants' extraterritoriality defense, finding that there are

disputed issues of fact as to whether Plaintiff can collect damages based on Defendants' international sales (*id.* at #8520), **DENIES** Plaintiffs' Motion as to Defendants' failure to mitigate defense (*id.* at #8517–18), **GRANTS-IN-PART** (as to the images) and **DENIES-IN-PART** (as to the packaging design) Plaintiffs' Motion as to Defendants' joint-authorship defense (*id.* at #9395–9402), **GRANTS** Plaintiffs' Motion as to Defendants' implied license defense (*id.* at #9390–92), and **GRANTS** Plaintiffs' Motion as to Defendants' statute of limitations defense (*id.* at #9386–87).

Defendants, however, fail to oppose Navarro's motion for summary judgment as to several of their affirmative defenses. Thus, the Court deems that Defendants have waived those defenses. Accordingly, the Court **GRANTS** Navarro summary judgment on 21 of P&G's Defenses and 13 of Walmart's defenses.[29] The Court, however, finds that Navarro has failed to meet her burden as to her motion for summary judgment on Defendants' claim for attorney's fees, and accordingly

---

[29] Specifically, the Court grants Navarro summary judgment on failure to state a claim (Defendants' First AD); equitable estoppel and acquiescence (Defendants' Second AD); laches (Defendants' Fourth AD); unclean hands (Defendants' Fifth AD); waiver (Defendants' Sixth AD); Navarro's copyrights are invalid and unenforceable (Defendants' Seventh AD); forfeiture or abandonment of copyrights (Defendants' Tenth AD); misuse of copyright (Defendants' Eleventh AD); no volitional act (Defendants' Thirteenth AD); Navarro's rights not infringed upon (Defendants' Fourteenth AD); no remaining commercial value (Defendants' Eighteenth AD); failure to name an indispensable party (Defendants' Nineteenth AD); Navarro received all due compensation (Defendants' Twentieth AD); fraud on the Copyright Office (P&G's Twenty-Fourth AD); P&G's "affirmative defenses" to Navarro's fraud claim (P&G's Twenty-Fifth through Twenty-Eighth, and Thirtieth ADs); fraud damages too remote or speculative (P&G's Twenty-Ninth AD); fraudulent misstatements protected by Ohio doctrine of litigation privilege (P&G's Thirty-First AD).

**DENIES** summary judgment on that issue.[30] The Court also **DENIES** Navarro's request for Rule 37 Sanctions.

Finally, the Court **GRANTS** Plaintiffs' Partial Motion for Summary Judgment on Defendants' breach of contract counterclaim, finding that, as a matter of law, Defendants cannot prove damages, which are an essential element of their claim (Doc. 188, #8496–8502).

   **SO ORDERED.**

 January 19, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[30] Defendants listed their request for attorney's fees as their seventeenth affirmative defense, even though it is really a counterclaim. (Walmart's Answer, Doc. 135, #4326; P&G's Answer, Doc. 136, #4425).